# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| L.S., on behalf of himself and all others similarly situated, by his next friend JASON MAURER, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| FRANKLIN COUNTY, CHIEF JUDGE MELISSA MORGAN of the Second Judicial Circuit Court, DARLA FITZJERRELLS, Director of Court Services of the Second Judicial Circuit Court, and LAVONDA PORTER, Acting Superintendent of the Franklin County Juvenile Detention Center, | ) ) ) ) ) ) ) ) ) ) ) | Case No. _____  Hon. _____ |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

Plaintiff L.S., on behalf of himself and all others similarly situated, by and through his undersigned counsel and next friend, hereby files this Class Action Complaint against Defendants Franklin County ("County"), Chief Judge Melissa Morgan, Darla Fitzjerrells, and LaVonda Porter, (the "Second Circuit Defendants") (collectively, the "Defendants"), and alleges as follows:

## INTRODUCTION

1.     Franklin County Juvenile Detention Center ("FCJDC" or "the Center") detains children as young as 11 years old. The children who make their way to the Center are a uniquely vulnerable population, many having already suffered harrowing abuse and trauma during their young lives. They are under Defendants' exclusive, full-time care at a crucial point in their physical, psychological, educational, and social development. FCJDC has the responsibility of raising these children for the time they are within the walls of the facility. But instead of caring for

them, Defendants subject them to inhumane conditions of confinement that are well known to cause lasting harm, especially to the young.

2.      Solitary confinement is the rule, not the exception, for children at FCJDC. Day in and day out, these children spend between 20 and 23 hours per day confined in their cells. Defendants often eliminate even the brief window of time these children are allowed to leave their cells, imposing 24-hour "lockdown" solitary confinement as an enhanced form of punishment. These enhanced solitary confinement periods are sometimes imposed back-to-back at the whim of jail staff, who lock children in their cells for days on end. Defendants maintain this culture of solitary confinement in the face of the extensive and settled body of research showing that the practice inflicts immeasurable harm on children and is wholly inappropriate in a juvenile detention setting.

3.      The harm of solitary confinement is amplified by the conditions in which the children are detained. The fluorescent lights in their cells are *never turned off*, making day virtually indistinguishable from night. Children have long been forced to eat nutritionally inadequate meals alone in their cells, just a few steps away from the toilet where they have to defecate. Most of the time, they cannot even flush the toilets on their own; only staff can do that.. The cells are often dirty and have black mold growing on the walls. While confined, children are cruelly denied basic human interaction, let alone the kind of activities and programming they should be receiving. They are left to pace their tiny, brightly-lit cells alone to pass the days, weeks, and months they spend at FCJDC.

4.      Defendants further compound the trauma they inflict on the children in their custody by denying mental health services they desperately need. Despite housing a high-risk population of children with acute mental health needs and challenges, and a well-documented

history of child suicide and suicide attempts at FCJDC, Defendants have not hired a single mental health professional to work at the facility. They do not perform mental health screenings. Defendants have even apparently defied court orders requiring them to provide mental health counseling for youth in desperate need of it.

5.      The children at FCJDC are denied anything resembling an education during their time at the Center. For "schoolwork," the children instruct themselves: their "school" consists of self-guided worksheets that they complete on their own, often in their living areas. When they occasionally visit the facility's classroom it is only to complete the worksheets in a different place. There are no special education services for youth who need them. Many youth go days or weeks without any schoolwork at all.

6.      For years, Defendants have maintained these conditions in the face of multiple public warnings that the facility is an unfit environment for children. The facility faced a lawsuit after a child tragically committed suicide while in solitary confinement. Some judges and state's attorneys from neighboring counties reportedly have refused to commit children for detention at FCJDC due to the conditions there.[1] Just last August the Illinois Department of Juvenile Justice, which is responsible for auditing juvenile detention centers in the state, labeled FCJDC a "facility in crisis." A follow-up visit from IDJJ in January showed no meaningful change in the facility's use of solitary confinement, denial of mental health services, or other key deficiencies.

7.      FCJDC's poor conditions are directly attributable to the County's conscious choice: the County deliberately runs the facility with an inadequate skeleton staff that predictably results in youth being locked up day and night. The County has chosen this route in the face of public

---

[1] *See, e.g.*, Colin Baillie, *Heartland juvenile detention center called 'a facility in crisis' in 15-page inspection report*, KFVS (October 3, 2022), https://www.kfvs12.com/2022/10/03/heartland-juvenile-detention-center-called-facility-crisis-15-page-inspection-report/.

scrutiny and despite open discussion of the facility's deficiencies at meetings of the County Board. The remaining Defendants supervise and oversee the abusive day-to-day environment that festers in a facility without the staffing or resources to allow the children in its custody more than fleeting respite from grinding, maddening solitary confinement. In the words of one youth detained there, life in FCJDC is not "living" at all.

8.      The history of FCJDC teaches that the current unconstitutional conditions will persist unless this Court stops them. The named Plaintiff, and the Putative Class of detained children described below, seek immediate declaratory and injunctive relief requiring Defendants to provide constitutionally adequate conditions of confinement at FCJDC, including mental health and educational services.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) because this action presents federal questions and seeks to redress the deprivation of rights under the Fourteenth Amendment to the U.S. Constitution.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims asserted herein occurred within this judicial district.

11.     This Court is authorized to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

## PARTIES

12.     Plaintiff L.S. is a 16-year-old boy who is currently detained at FCJDC. Plaintiff L.S. is identified by his initials in accordance with Federal Rules of Civil Procedure 5.2 because he is a minor at the time of this action. L.S. has been detained at FCJDC since May 27, 2023, when he was last admitted. He appears in this action through his guardian, Jason Maurer. L.S. sues on

his own behalf and on behalf of the Putative Class.

13.     Defendant Franklin County (the "County") is the unit of local government that chose, through its governing body the Franklin County Board (the "Board"), to build FCJDC. The County, acting through the Board, is responsible for the facility's budget and finances, including establishing an annual budget for the Center's operation and paying its debt service. The County pays staff salaries and benefits, hires individuals or independent contractors to provide support services, including the Center's health care delivery system, and helps determine the facility's staffing needs. The County is responsible for providing all essential equipment and supplies for the Center's operation, as well as the expense of training staff. The County is also responsible for ensuring that the facility complies with the Illinois Department of Juvenile Justice's juvenile detention center standards.

14.     Defendant Chief Judge Melissa Morgan of the Second Judicial Circuit Court is the official statutorily authorized to have administrative and supervisory authority over FCJDC. In this role, Defendant Chief Judge Morgan is responsible for overseeing, directing, and ensuring the safe, secure, and efficient operation of the facility, which she visits and observes regularly as part of her role. Defendant Chief Judge Morgan, along with Defendant Darla Fitzjerrells and Defendant Franklin County, is responsible for hiring an adequate number of jail staff at the facility, including the Superintendent, to operate the Center. Defendant Chief Judge Morgan is also responsible for ensuring that the facility complies with the Illinois Department of Juvenile Justice's juvenile detention center standards. Defendant Chief Judge Melissa Morgan performs this role and discharges these duties and responsibilities in an administrative, not judicial, capacity. Defendant Chief Judge Melissa Morgan is sued in her official capacity.

15.     Defendant Darla Fitzjerrells is the Director of Court Services for the Second

Judicial Circuit Court, and oversees the administration and supervision of FCJDC along with Defendant Chief Judge Melissa Morgan. Defendant Darla Fitzjerrells is responsible for assisting with hiring jail staff, including the Superintendent, as well as evaluating the Superintendent's performance. Defendant Darla Fitzjerrells is also responsible for ensuring that the facility complies with the Illinois Department of Juvenile Justice's juvenile detention center standards. Defendant Darla Fitzjerrells is sued in her official capacity.

16.    Defendant LaVonda Porter is the Acting Superintendent of FCJDC. Defendant Porter is the official responsible for the management of the Center's daily operations. Defendant Porter is responsible for supervising and training FCJDC staff and ensuring the safety and well-being of all children in custody on a day-to-day basis. Defendant Porter is also responsible for ensuring that the facility complies with the Illinois Department of Juvenile Justice's juvenile detention center standards. Defendant Porter is sued in her official capacity.

17.    Defendants each establish and have responsibility for establishing policy, custom, and practice that shape the lives of the children detained at FCJDC.

## BACKGROUND

18.    FCJDC is a 38-bed facility in Benton, Illinois. It houses hundreds of children between the ages of 11 and 17 each year from multiple counties across southern Illinois. Most children housed in the facility come from Franklin, Jefferson, Jackson, Williamson, and Saline counties.

19.    The children at FCJDC are mostly awaiting adjudication in Illinois's juvenile justice system, which is governed by the Juvenile Court Act. Youth involved in the juvenile justice system are different from adults in the criminal justice system; youth who are adjudicated delinquent are not convicted of crimes. Youth are adjudicated delinquent in non-criminal

proceedings and are not provided with the same procedural protections as adults. The primary goal of delinquency proceedings is to rehabilitate and further the best interests of the child, not to punish.

20.     The Juvenile Court Act allows detention of children 10 years of age or older before they are adjudicated under certain circumstances. Children detained at FCJDC have, for the most part, not been adjudicated delinquent or convicted of the crime for which they were arrested, but rather are locked in the facility while they wait for trial or sentencing.

21.     The children at FCJDC are housed in six separate housing pods labeled A, B, C, D, E, and F. Most of these pods contain eight single-occupancy cells. The cells in each pod are arranged around a common "dayroom" area with a handful of metal tables and chairs, a sink, and in some cases a television attached to one wall. Between the pods is a central control booth with an intercom that allows two-way communication between the children in the cells and the jail staff stationed in the control booth.

22.     The population of children detained at FCJDC varies in size over time, though there are typically 15 to 25 children at FCJDC on any given day.

23.     Children are often held at FCJDC for weeks at a time. It is not uncommon for youth to be locked in FCJDC for multiple months.

**I.      FCJDC Detains Children in Unconstitutional Conditions**

24.     FCJDC's conditions are shockingly inadequate and affirmatively abusive. It is no place for children.

25.     Four youth currently or recently detained at the facility for extended periods of time—L.S., T.T., A.B., and T.W.—experienced these conditions first-hand.

### A.     L.S.'s Experience at FCJDC

26.     Plaintiff L.S. is a 16-year-old boy from Mt. Vernon, Illinois who has been detained multiple times at FCJDC over the past three years. He has spent approximately three months at the facility during that time. L.S. currently lives at the facility, where he has been detained since approximately May 27, 2023. *See* Declaration of L.S. ("L.S. Decl."), attached hereto as Exhibit 1.

27.     Although he has lived in at least four different pods throughout the facility, L.S. is currently housed in D pod, where he was detained with only one other child. *Id.* at ¶ 3. That child was transferred on June 27, 2023, leaving L.S. alone in his pod.

28.     L.S. is detained in a very small concrete cell that barely allows him enough room to walk around. *Id.* at ¶ 4.

29.     L.S. spends most of his time in his cell at FCJDC, as he has during all his stays at this facility. L.S. spends a minimum of about 21 hours per day in his cell right now, though the number of hours above 21 fluctuates. In the last few weeks, for example, that time has been increased for various reasons, including the entire facility being placed on "lockdown" for most of a day to allow for "maintenance work." L.S. has spent long stretches during his time at FCJDC when the total time he spent in his cell was about 23 hours per day. *Id.* at ¶ 12.

30.     On top of the extended solitary confinement that forms the baseline of L.S.'s day-to-day existence at the facility, he is sometimes subjected to extended solitary confinement at the staff's discretion. This is called "Restriction," which involves staff placing youth in their cell for a 24-hour period with no escape except for (sometimes) a brief shower. L.S. has been placed on Restriction multiple times at FCJDC. Sometimes staff has stacked Restriction periods on top of one another, leaving him confined to his cell for multiple days in succession. L.S. once spent an entire week locked alone in his cell on "Restriction," and was not even given a daily shower during

that time. *Id.* at ¶¶ 20-21.

31.     In L.S.'s experience, kids get placed on Restriction for all kinds of reasons, often over trivial matters. He has seen kids placed on Restriction for talking too loudly between cells, or for eating food off another child's meal tray even with the other child's permission (there is no food sharing in the facility). L.S. says kids are commonly placed on Restriction for "talking back" to staff, although it is up to the staff member to decide what that means. L.S. says the staff can place kids on Restriction for whatever they want. L.S. has never received a rule book or a set of policies, even though he has asked for one over and over. *Id.* at ¶¶ 17, 22.

32.     L.S.'s cell has fluorescent lights on the ceiling that never turn off—it is brightly lit all day and all night, which makes it very difficult to sleep. L.S. sometimes ties a shirt around his face to block out the light, though he has been disciplined for doing this because some staff members claim that shirt-wrapping prevents the kids from hearing their commands quickly enough. *Id.* at ¶ 8.

33.     There is a hard cement slab with space for a thin mattress against the back wall of L.S.'s cell, though L.S. puts his mattress on the floor when he goes to sleep. He first started sleeping on the floor when he was in A, B, and E pods because the windows above the slab in his various cells always leaked water and made the mattress wet. He continues to sleep on the floor now because it is easier to hear staff walking toward his cell door and he wants to make sure he can react if they show up. That is because staff tells youth they are not allowed to talk between cells or wrap their shirts and can discipline you if they catch you doing these things. But these things are important to L.S.—talking through cell doors is almost all the human contact he is allowed, and wrapping his shirt around his eyes is the only way he can sleep. L.S. also slept on the floor in recent weeks to make sure that he could hear if the staff did anything bad to his podmate

because he thinks staff picked on him, and L.S. worried about him. *Id.* at ¶ 4.

34.     L.S. is incredibly bored sitting in his cell for hours on end with nothing to do but walk back and forth and stare at the wall. He passes his time by reading, sleeping as much as he can, pacing, and doing push-ups and sit-ups. Even with other kids in cells near him L.S. feels very much alone. Spending so much time by himself makes L.S. feel horrible because it makes him go "in his own head" too much. He feels cut off from the world and like the facility has stripped everything away from him but his own mind, and that is hurting his mental health. *Id.* at ¶ 19.

35.     L.S. does not have access to mental healthcare at FCJDC. He needs mental health treatment but cannot get it. For example, once when L.S. was feeling particularly down he buzzed from his cell to staff members to inform them he really needed a counselor to talk to. They told him they could not help him because the facility has no mental health professionals on staff. *Id.* at ¶ 27.

36.     On at least one occasion L.S. has had a mental health crisis so acute that FCJDC staff placed him on "suicide watch." He describes suicide watch as "just a worse version of Restriction" that is served in a designated "suicide watch cell" with a camera and a large window. L.S. says the large window is embarrassing because everyone can look in on you from the outside. When staff members informed L.S. he was going on suicide watch they stripped him of his clothes and placed him in what kids at the facility call a "turtle suit," which is like a padded barrel with Velcro shoulder straps that is supposed to prevent self-harm. L.S. spent two weeks in this condition during one suicide watch, and was only allowed to leave his cell to shower twice. This extended solitary confinement made L.S.'s mental health crisis much worse, and he does not understand how a facility could think it is a good idea to punish kids on suicide watch with more solitary confinement. L.S. was not given any mental health treatment on suicide watch except a few

minutes on the phone with what he understood to be a hotline. No doctors or mental health professionals ever visited him while he was on suicide watch. He was just forced to sit alone for days on end. *Id.* at ¶¶ 28-29.

37.     L.S. also spent his first five days at the facility in "quarantine" as part of the intake process, which was essentially another form of Restriction. There was no educational screening during his intake, nor any meaningful mental health screening beyond a security staff member asking basic questions about substance abuse and suicide attempts. For the most part, intake was just an invasive physical exam followed by more time in solitary confinement. *Id.* at ¶ 31.

38.     The condition of the cells where L.S. has spent almost all his time at FCJDC is inadequate and makes his confinement worse. He has never had a pillow, and has only two thin blankets that do not keep him warm, which are additional reasons it is so hard for L.S. to sleep. There is black mold growing on the ceiling of his cell, as in all his prior cells. L.S. believes this black mold is causing him respiratory problems. He almost never gets sick outside the facility, but inside the facility he has had a constant cough that starts within a day or two of when he was first detained in his cell. It goes away when he leaves. *Id.* at ¶¶ 6-7, 9-10.

39.     L.S.'s cell has a combined toilet and sink. FCJDC staff usually controls the toilet and sink from outside the cell, meaning L.S. cannot flush his own toilet and has to ask staff to do it for him. It usually takes staff a long time to flush for him, which gives his room a foul odor. Sometimes, like in the last couple of weeks, staff has turned control of the toilet over to him, though the realization that it is physically possible for youth to control their own toilets has led L.S. to believe staff are using the toilet and sink as a way of controlling and punishing kids. His podmate was never permitted to control his own toilet. *Id.* at ¶ 5.

40.     The very limited time L.S. spends out of his cell is called "free time." But almost

all that time is spent just a few steps away from his cell in his pod dayroom, which has a few metal tables and chairs, a broken water fountain, and a television mounted to the wall. Incredibly, even this "free time" is spent alone. The staff do not allow children in the pod to be together in the dayroom; they must each come out of their cells and sit in the dayroom one at a time. *Id.* at ¶ 11.

41.     Youth are also not allowed to walk around the dayroom. Staff confine them to their chairs, and if youth do walk around they are sent right back into their cell, or sometimes punished with Restriction. This is frustrating for L.S., who just wants to walk around to stretch his legs. L.S. sometimes eats his meals in this dayroom, though he has eaten the vast majority of his meals at FCJDC in his cell by himself. *Id.* at ¶ 11, 14.

42.     L.S. does not remember setting foot outside a single time while at FCJDC (except to leave). Staff occasionally take kids for "Recreation" or "Rec," but that consists of less than an hour inside a basketball gym. *Id.* at ¶ 13.

43.     L.S. typically gets two personal telephone calls per week for ten minutes each (staff members time them). If the person or people you are calling do not answer, L.S. explains, you are out of luck. *Id.* at ¶ 33.

44.     L.S. does not have access to adequate medical care at FCJDC, which does not have any medical professionals on staff. There is an outside nurse who sometimes visits the facility, but she has not been helpful. L.S. was attacked by a police dog during his most recent arrest and sustained an arm injury that has made it difficult to open and close his dominant hand. He explained this to the nurse when he arrived at the facility and she promised to order him an X-ray the following week. That was over four weeks ago and there has been no X-ray. L.S. has never seen a doctor and worries that he has permanent nerve damage in his arm that will go untreated. *Id.* at ¶ 32.

45.     L.S. has not attended school at FCJDC. In his most recent stay he has not done any schoolwork at all because he understands school is "over" for the year. In past stays his "schoolwork" has just been a series of worksheets that he completed by himself, almost always in his pod. L.S. describes the worksheets as easy and pointless. He has even seen staff use the same worksheets more than once. They are never graded or marked up. L.S. knows the facility has a classroom but he has only visited it a handful of times, and when he was there he just completed the same types of worksheets he does in his pod. *Id.* at ¶ 23.

46.     L.S. does not believe there are enough staff at FCJDC to operate the facility. There are typically three staff on duty at a given time, with one remaining in the central "control booth." That leaves only two staff members for all six pods. Staff regularly complain about not having enough staff to watch the youth and say that lack of staffing is the reason kids spend so much time in their cells. If there are behavioral incidents there are not enough staff to deal with them—L.S. has seen staff call in local police on those occasions. *Id.* at ¶ 25.

47.     L.S.'s time at FCJDC has negatively affected him. He feels frustrated and lonely being locked in a cell all day and cannot believe he has to deal with this for the rest of his time at the facility. He is not sure how he will do it, and "it honestly makes [him] really sad." *Id.* at ¶ 26.

48.     L.S. has complained to staff about the conditions in the facility and never received any response or remediation. *Id.* at ¶ 34.

**B.     T.T.'s Experience at FCJDC**

49.     Plaintiff T.T. is a 16-year-old boy from Mt. Vernon, Illinois who has been detained multiple times at FCJDC over the past three years for a total of about ten months. T.T. was detained around January 23, 2023, and was most recently housed in D pod with one other child (L.S.). *See* Declaration of T.T. ("T.T. Decl."), attached hereto as Exhibit 2. T.T. was transferred out of FCJDC

on or about June 27, 2023.

50.     T.T.'s D pod cell—like every other cell at the facility he has ever seen—is about the size of a parking space. Staff controlled the toilet in his cell from the outside, so T.T. had to ask staff members to flush it. Staff responded to his request to flush his toilet inconsistently, and it sometimes took them an hour or longer to do it. There were bright fluorescent lights on the ceiling of T.T.'s cell that were always turned on, even at night when he was trying to sleep. The constant bright light made it hard for T.T. to fall asleep and gave him headaches. *Id.* at ¶¶ 4-6.

51.     T.T. never had a pillow at FCJDC, despite requesting one. All he had was a thin blanket, which barely provided enough warmth to sleep comfortably, especially during the winter. *Id.* at ¶ 7.

52.     In T.T.'s previous cells in E and B pods there was black mold growing on the walls. His last cell had less black mold, but there was still mold in surrounding D-pod cells. T.T. coughed and felt congested all the time and believed it was because of the mold. *Id.* at ¶ 5.

53.     T.T. spent virtually all his time at FCJDC confined by himself within the four walls of his cell. He spent about 20 to 22 hours per day in his cell. *Id.* at ¶ 10.

54.     During the week of one of his visits with counsel in late May 2023, T.T. had a mere four hours outside of his cell, with most of that time spent with his lawyers. If it were not for those necessary legal calls and meetings T.T. believes he likely would have remained confined to his cell throughout that time. *Id.*

55.     T.T. had no significant human interaction or environmental stimulation while he was locked in his cell. His only direct contact with other people while he was in solitary confinement came when staff delivered meals and performed quick checks of the cells, known as "watch tours." T.T. had to "buzz" to staff in the control booth if he needed things like water, toilet

paper, or to have his toilet flushed. Apart from these limited interactions, T.T. occasionally had the opportunity to communicate with other children in neighboring cells through the cell doors, though this was only possible if they were located nearby and staff allowed it. *Id.* at ¶¶ 14-15.

56.     T.T. was incredibly bored when confined to his cell. He found himself frequently staring at the walls due to the lack of activities or stimulation. To pass the time, he often resorted to sleeping for as long as he could during the day. He occasionally read a book or did push-ups, the only exercise he could manage within his small cell. *Id.* at ¶ 15.

57.     Even though the facility includes a separate dining area with tables for communal meals, T.T. ate almost all his meals at FCJDC alone in his cell, mere steps away from the toilet. He was occasionally allowed to eat meals by himself a few feet away in the dayroom. *Id.* at ¶ 12.

58.     On days when T.T. was allowed to come out of his cell for "free time" he typically only traveled a few steps into the dayroom of his cell pod, where he sat alone in a different place for an hour or two. The day room contained a few metal tables with attached chairs, a broken sink, and a television mounted to the wall. When he was allowed in the dayroom, T.T. was required to remain seated and was not allowed to freely move around. *Id.* at ¶ 9.

59.     T.T. and the other youth with whom he has interacted at FCJDC only had recreational time (which they refer to as "Rec") in the indoor basketball gym once every week or two, and it usually lasted for an hour or less. T.T. had no idea when his pod would have Rec time, as it was entirely up to the staff to decide if and when they could have it. *Id.* at ¶ 11.

60.     T.T. was also placed on Restriction multiple times while at FCJDC. Since his admission to FCJDC in January, T.T. estimated that he was placed on Restriction (spending 24 or more consecutive hours in his cell alone) more than 10 times. *Id.* at ¶¶ 16-17.

61.     T.T. does not know exactly what actions can lead staff to place youth on Restriction,

but in his experience it was sometimes for small infractions like talking too loudly to another kid in his pod. Staff sometimes decided to punish T.T.'s whole pod even if only one child was misbehaving, such as when his entire pod was put on Restriction because one child was banging on his cell door. *Id.* at ¶ 18.

62.    In the final weeks before his transfer staff members placed T.T.'s entire pod on "Admin" status (meaning none of them could leave the pod for anything except their daily shower), and then informed them that they also would not get access to schoolwork for an unspecified period of time because they had not been well-behaved. *Id.* at ¶ 23.

63.    T.T., a high school student before his detention at FCJDC, never went to school full-time while at FCJDC. He did not set foot inside the Center's classroom in many weeks prior to his transfer. His "schoolwork," when he had it, was a series of ungraded worksheets he was left to complete himself if he chose. *Id.* at ¶¶ 19-24.

64.    T.T.'s detention at FCJDC has had a significant impact on his mental health. T.T. felt frustrated, restless, and lonely at FCJDC due to the prolonged isolation and absence of human interaction. *Id.* at ¶¶ 26-27.

65.    T.T. complained about all these issues to staff many times at the facility. He has received no meaningful response or remediation. *Id.* at ¶ 28.

**C.    T.W.'s Experience at FCJDC**

66.    T.W. is a 15-year-old boy who has been detained at FCJDC four times over the last year, most recently between April 10, 2023 and May 17, 2023. He was 14 when he was first detained. The facility transferred T.W. to IYC Harrisburg shortly after he met with his lawyers in this matter in June 2023. *See* Declaration of T.W. ("T.W. Decl."), attached hereto as Exhibit 3.

67.    The multiple cells T.W. lived in while at FCJDC were all set up the same way. In

his most recent cell in D pod, T.W. slept with his mattress on the floor after he awoke one night with his chest soaking wet from water leaking out of the window above the cement slab. He has never had a pillow at the facility despite repeatedly asking for one. He had difficulty sleeping because of the fluorescent lights blazing 24 hours per day. All T.W.'s cells were filthy and moldy, and he believes the mold caused his respiratory problems and congestion. *Id.* at ¶ 7.

68.     After staff refused to transfer him out of a particularly moldy room, T.W. threw a shoe at his sprinkler head in frustration and was showered with black water from the sprinkler system. The staff transferred him to another room while they mopped up the mess from the sprinkler, but returned him to the moldy cell shortly thereafter. *Id.* at ¶ 10.

69.     T.W. was on Restriction constantly while he was detained at FCJDC, and on Admin status much of the rest of his stay. Staff's imposition of Restriction and Admin status was unpredictable and arbitrary. *Id.* at ¶¶ 11-12.

70.     During his final weeks at the facility T.W. had a particularly traumatic period of Restriction that lasted for four consecutive days. During this time staff forced T.W. to strip to his underwear for two of the four days, which made him extremely cold and uncomfortable and forced him to stay in bed to keep warm. After T.W. got into a verbal altercation with staff during his extended Restriction the staff refused to flush his toilet, causing it to overflow onto the floor and into the hallway. The staff swept the urine and water from the toilet back into T.W.'s cell and placed a foam mat under his door to trap the waste in the cell. They then refused to clean it, forcing T.W. to live in his own filth for several days. *Id.* at ¶ 13.

71.     T.W. has been diagnosed with multiple mental illnesses and has significant challenges managing his mental health. But he has been denied mental health care at FCJDC because of the facility's lack of mental health staff. *Id.* at ¶¶ 16-17.

72.     T.W. experienced multiple mental health crises while detained at FCJDC. During one of these crisis periods, T.W. purposely cut his arm multiple times with a broken pencil. When staff found him bleeding in his cell they simply gave him paper towels and told him to clean himself up. The facility did not send anyone to help T.W. through his crisis. There were no mental health professionals on staff to help anyway. *Id.* at ¶ 17.

73.     After the cutting incident staff placed T.W. on "suicide watch," which T.W. describes as nearly indistinguishable from Restriction status. T.W. was locked in his room for multiple days and not even allowed to leave his room to shower. (He was not placed in the designated "suicide watch room" although he knows what it is.) Staff attempted to fit him with the so-called "turtle suit," but because the straps did not fit him T.W. was forced to strip to his underwear again for multiple days, which made it difficult to sleep because he was so cold. This was not T.W.'s only "suicide watch" while at FCJDC. His other watch was handled similarly. *Id.* at ¶¶ 18-19.

74.     T.W. never went to school full-time at FCJDC. He was not given any special education services despite having an Individualized Education Plan. *Id.* at ¶¶ 24-25.

75.     T.W. rarely went to Rec while at FCJDC, and even more rarely went outside the building—only 3-4 times while at the facility. *Id.* at ¶ 22.

76.     T.W.'s prolonged isolation in substandard conditions without mental health care has had devastating effects on T.W., who experienced extreme sadness, loneliness, and feelings of worthlessness during his time at FCJDC. He felt that staff treated him, and other youth, like animals instead of people. *Id.* at ¶ 29.

77.     T.W. complained about the conditions at FCJDC multiple times but received no response or remediation. *Id.* at ¶ 32.

D.     **A.B.'s Experience at FCJDC**

78.     A.B. is a 17-year-old boy from Decatur, Illinois who was detained at the FCJDC from October 12, 2022 to June 1, 2023. Prior to FCJDC, A.B. was detained at Madison County Juvenile Detention Center. *See* Declaration of A.B. ("A.B. Decl."), attached hereto as Exhibit 4.

79.     A.B. has significant mental health needs. Some of A.B.'s mental health issues stem from severe trauma he has endured in recent years, including surviving incidents of severe domestic violence and abuse. There were no mental health professionals, or even a counselor, at FCJDC that he could talk to about his mental health struggles. *Id.* at ¶ 33.

80.     A court order from Circuit Judge Jeremy Richey dated November 18, 2022 required Defendants to "locate and implement a counseling agent [or] agency that will establish an ongoing counseling relationship with" A.B. while he is detained at FCJDC. *See* A.B.'s Order for Mental Health Assessment and Counseling, attached hereto as Exhibit 5. Defendants did not implement any counseling plan with A.B. despite this order. A.B. Decl. at ¶ 33.

81.     At the time of his declaration A.B. was detained in D pod, where he had been detained since March 2023. *Id.* at ¶ 14. Shortly after counsel visited A.B. FCJDC denied counsel a follow-up legal call with him, stating that A.B. had been placed on indefinite Restriction and was not allowed legal calls. A.B. was transferred out of the facility the following day.

82.     In A.B.'s latest cell at FCJDC, there was a leaky window that dripped water onto his mattress. In order to stay dry at night A.B. was forced to place his mattress on the floor and sleep there. *Id.* at ¶ 4.

83.     FCJDC staff frequently turned off the water in A.B.'s sink. Within the final weeks prior to his transfer, A.B.'s water was shut off for multiple consecutive days because another child in his pod allowed his sink to overflow after staff turned the water on. While his sink was turned

off the staff frequently denied A.B.'s requests for water, which he needed because he was often thirsty, especially when he tried to exercise inside his cell. *Id.* at ¶ 5.

84.     A.B. had personal experience with staff calling local law enforcement to supplement FCJDC's tiny staff. On or around late December 2022 A.B.'s arm was broken by a police officer. The incident occurred after A.B., who had just come off a multiple-day Restriction, engaged in a verbal argument with another child. Staff instructed A.B. to return to his cell but he refused, intent on receiving the few minutes of Rec time he would be allowed that week. A few minutes later a group of police officers rushed in, threw A.B. to the ground, and forcefully twisted his arm while handcuffing him. When one officer twisted A.B.'s arms there was a loud "snap," causing A.B. excruciating pain. The officer had broken A.B.'s arm. Despite this, police and staff kept A.B. in handcuffs with his broken arm twisted behind his back, and staff delayed taking him to the hospital until after staff cooked dinner and took another group of children to recreation— approximately two hours after the incident. Upon examination at the emergency room A.B. was diagnosed with a broken humerus and referred to an orthopedic facility for treatment and observation. A.B.'s arm took months to heal. *Id.* at ¶¶ 10-11.

85.     A.B. witnessed instances where officers used force against other children. In his experience, staff frequently called officers to the facility, often to handle a child's refusal to move or go back to their cell. *Id.* at ¶ 12.

86.     While he was at FCJDC, the facility placed A.B. on Restriction so many times that he lost count. He was subjected to multiple successive 24-hour Restriction periods, at times subjected to solitary confinement for three consecutive days. A.B. had constant anxiety about being put on Restriction because imposition of that punishment was so unpredictable. He was placed on Restriction shortly before his transfer without any given reason. In other instances, A.B.

was collectively punished with his pod and put on Restriction for the misconduct of another child, or at least that is what he believes—the lack of any policy or explanation makes it difficult to know. *Id.* at ¶¶ 14-15.

87.     A.B. was also frequently placed on "Admin" status. "Free time" on Admin status was limited to sitting alone in the pod's dayroom a few feet away from his cell, with no possibility for Rec time. As with Restriction, the criteria for placing children on "Admin" status is unclear. *Id.* at ¶ 17.

88.     A.B. could not tell what the rules at FCJDC were since jail staff seemed to create new rules every day. *Id.*

89.     A.B. spent most of his days at FCJDC pacing in his cell or doing push-ups. *Id.* at ¶ 22.

90.     A.B. got to shower once a day for 10-15 minutes. He would try to prolong his showers as long as he could to delay having to go back into his cell, but that created its own problems, since some staff punished children for exceeding the time limit, resulting in future shower restrictions. *Id.* at ¶ 20.

91.     A.B. never attended school while at FCJDC, and he rarely had any educational programming at all. A.B. did his schoolwork (self-guided worksheets) in his cell or pod's dayroom. A.B. was only inside the facility's classroom a few times during his detention at FCJDC and it just served as an alternate location to complete worksheets. The worksheets were not suitable for his grade level. A.B. was a senior in high school while he was at FCJDC, but his assignments sometimes seemed like work fit for a third-grader. A.B. asked for more challenging worksheets but never received them. *Id.* at ¶¶ 24-31.

92.     A.B. was particularly frustrated with FCJDC's neglect of education because he

knew from experience that meaningful schooling is possible in a custodial setting. A.B. went to school full-time at Madison County Juvenile Detention Center. He had teachers who taught him live lessons in the classroom, he received evaluations for the assignments he completed, he did age-appropriate work, and he felt generally engaged and that he was learning something. *Id.* at ¶ 32.

93. Due to his prolonged isolation, seclusion, and the absence of any mental health treatment, A.B.'s mental health and overall well-being significantly deteriorated while at FCJDC. A.B. reported that while he has lived in many difficult situations during his life, FCJDC was uniquely terrible. He described it as "treacherous" and said that living in the facility was not really "living" at all. *Id.* at ¶¶ 37, 39, 40-41.

94. A.B. complained about all these problems to multiple staff many times to no avail. *Id.* at ¶ 38.

\*          \*          \*

95. L.S., T.T., T.W., and A.B.'s, experiences at FCJDC are not unique. Sadly, they are typical of the conditions faced by all children currently detained at FCJDC.

96. Children at FCJDC are routinely subjected to solitary confinement for more than 20 hours a day. They are also regularly placed on "Restriction" enhanced solitary confinement for 24 hours or more at the whim of staff. They endure solitary confinement in cells with the same appalling and harmful conditions described above. Most of the precious few minutes of so-called "free time" outside their cells is not meaningfully different from their solitary confinement: they spend it seated in an attached dayroom only a few feet away. They are cruelly denied human interaction even during this brief scenery change, as they are forced to sit by themselves even when other youth are detained in cells surrounding the dayroom. They are fed nutritionally-inadequate

food, and not enough of it, as they are regularly left hungry. The facility does not provide any of the children in their custody with adequate mental health care or medical care. It does not provide any of them an education beyond self-guided worksheets.

97.     The facility's lack of established routines or clearly-communicated rules and guidelines further ensures that these harms are inflicted on children in a maddeningly arbitrary and unpredictable fashion. The chaotic and capricious quality of life at FCJDC is obvious even to outsiders who visit youth in the facility. Counsel's access to their clients in the weeks leading up to the filing of this Complaint, for example, shifted with the whims of each staff member. In recent weeks counsel were at various times denied legal calls with their clients; told the facility could not accommodate private legal calls (only in-person visits); informed that they were subject to a "new policy" that required them (and only them) to set up calls through the Chief Judge (a policy that was later apparently rescinded); denied access to youth because the youth were on "Restriction," and denied access because all youth in the facility were apparently on "lockdown" while the facility did maintenance work.

## II.     The Inhumane Conditions at FCJDC are Well-Known to Defendants

98.     FCJDC's inhumane conditions are well known in Franklin County and the surrounding area. Based on public reporting and on information and belief, judges and state's attorneys from neighboring counties have refused to commit children for detention at FCJDC due to the conditions there.[2] The facility's problems are not new, they have been the subject of public scrutiny for some time, and they are well-known to Defendants.

---

[2] *See, e.g.*, Colin Baillie, *Heartland juvenile detention center called 'a facility in crisis' in 15-page inspection report*, KFVS (October 3, 2022), https://www.kfvs12.com/2022/10/03/heartland-juvenile-detention-center-called-facility-crisis-15-page-inspection-report/.

A.     **IDJJ Recently Declared FCJDC a "Facility in Crisis"**

99.     In August 2022, the Illinois Department of Juvenile Justice ("IDJJ") conducted an audit of FCJDC and described it as a "facility in crisis" and identified insufficient staffing, and a related lack of established facility rules and guidelines, as contributing to the crisis-level conditions at FCJDC. *See* IDJJ Franklin County Audit Report ("Report"), attached hereto as Exhibit 6.

100.     In accordance with 730 ILCS 5/3-15-2(a) and (b) of the Illinois Compiled Statutes, IDJJ is statutorily responsible for establishing minimum standards for juvenile detention centers throughout the state. IDJJ also inspects all county detention centers on a yearly basis to ensure compliance with these standards.

101.     Among other serious operational failures it identified, IDJJ's Report sounded the alarm regarding the facility's use of extended child confinement. According to IDJJ, the "day-to-day lives of youth at the facility are best described as isolated." During the inspection, most children were found confined to their cells. The Report highlighted the experience of one child who disclosed that, throughout his two-month detention, he rarely ventured beyond his small dayroom. The child had never gone to the gym or played outside. The Report noted that FCJDC did not even use its small dining area for meals—instead, children ate all their meals in their cells, and had done so for the year prior to the audit.

102.     IDJJ's Report found that solitary confinement is the primary form of behavioral discipline used at the facility, with children being subjected to up to 24 hours of confinement for breaking rules, causing them to miss out on any educational activities and phone calls to their families, among other things.

103.     The Report confirmed that the facility typically operates with just three total staff members during most day shifts, which the Report described as "directly contributing" to poor

conditions children experience at the facility. The Report noted the absence of an Assistant Superintendent despite IDJJ's minimum standards requiring one. IDJJ's Report disclosed that the skeleton FCJDC staff is overburdened, even charged with preparing all food while they manage all other aspects of the facility, despite lacking training as dietary staff and the knowledge required to ensure that the food provided to the youth meets their basic nutritional needs.

104.    The Report described the facility as experiencing a "staffing crisis." IDJJ described FCJDC's staffing situation as "critical" and "unsustainable," emphasizing that it is impossible to maintain a safe environment in a juvenile detention facility with such limited staff. IDJJ's report urged Defendants to immediately address this staffing shortage.

105.    The Report revealed that the lives of children confined to FCJDC are not governed by clear rules or protocols. There was no Youth Orientation Manual to hand out to children, and no orientation process for children in custody. As a result, the Report noted that children at the facility were confused about the rules and procedures that they are expected to follow.

106.    IDJJ's Report also highlighted the facility's deficiencies in medical and mental health care, which were "in violation of a large portion of the mental health section of [IDJJ's] standards." The Report revealed that the facility does not perform mental health assessments when children arrive at the Center, so staff are unaware if a child has a specific mental health need, a history of trauma or abuse, a history of suicide attempts, or other issues in need of treatment. In any event, the Report noted that there were no mental health professionals working at the facility to provide treatment to children who needed it.

107.    The Report disclosed the lack of any meaningful education for children at FCJDC. IDJJ reported that the facility's classrooms had not even been used for at least two years. Instead, teachers distributed packets of work to children and rotated among the youth in their respective

cell pods to help. Additionally, children were only provided with work for half of a typical school day.

108.    IDJJ performed a follow-up audit of the facility in January 2023 that showed no meaningful improvement in any of these areas. *See* Franklin County Juvenile Detention Center – Interim Inspection Report, attached hereto as Exhibit 7. Despite their public warning, facility leadership allowed the facility to confine youth to their rooms almost the entire day, with the rest of their time spent a few feet away in the dayroom. Staff continued to prepare food, and the food they made failed to meet USDA nutrition standards, lacking sufficient calories and nutrient-dense food options. As a result, youth were still hungry after meals and frequently resorted to "hoard[ing] snacks" when food was limited. And, according to the most recent IDJJ report, Defendants acknowledged "there is no current plan to make changes" to ensure that trained dietary staff prepare and serve meals to youth that meet their basic nutritional needs. The facility also had inadequate medical and healthcare and did not provide psychiatric or psychological services. There were still no mental health professionals on staff and no meaningful mental healthcare from outside the facility. While some youth were occasionally allowed to visit the classroom, no youth attended school full time or received direct instruction.

## B.    FCJDC Has a Public, Documented History of Youth Suicide and Suicide Attempts

109.    IDJJ's Reports were not the first time FCJDC's conditions have come under public scrutiny. A child's suicide at FCJDC resulted in a federal lawsuit and revealed a disturbing history of suicide attempts at the facility.

110.    In 2014, a 12-year-old child with diagnosed mental health conditions committed suicide while he was confined to his FCJDC cell for disciplinary reasons. *McKinney v. Franklin Cnty.*, 417 F.Supp.3d 1125, 1129 (S.D. Ill. 2019). The child's estate sued multiple FCJDC officials.

*Id.*

111.    Filings in the *McKinney* case showed that the facility had a documented history of suicide attempts. There were 37 suicide attempts in 2011, 43 suicide attempts in 2012, and 28 suicide attempts in 2013. There were 21 suicide attempts at the facility in the eight months before the 12-year-old's tragic death on September 23, 2014. *Id.* at 1135. Case filings detailed a gruesome history of attempted child suicides by hanging, cutting, and blunt force trauma.

112.    The case also disclosed that FCJDC's own suicide prevention guidelines in place at the time identified punitive youth confinement as a "high risk period" for suicide.

113.    The County, as well as the then-acting Superintendent, Assistant Superintendent, Director of Court Services, and other detention staff settled this case, and the terms of the settlement are unknown.

## III.    The Conditions at FCJDC Are a Direct Result of Policies, Customs, and Practices Defendants Developed

114.    FCJDC's culture of solitary confinement and psychological abuse, unmitigated by mental health resources or meaningful educational opportunity, has developed as a consistent and deliberate policy, custom, and practice over an extended period of time under the leadership of Defendants Morgan, Porter, and Fitzjerrells, who are responsible for overseeing the day-to-day operation of the facility, and under the oversight of Franklin County, which has policymaking authority for the Center and exercises hiring authority and oversight over the other Defendants with respect to its functioning. Defendants have subjected children to these conditions with no legitimate penalogical government purpose, and in the face of public condemnation of the facility's practices.

115.    The unspeakable conditions experienced by children in FCJDC are also direct result of a policy of understaffing and underfunding that has been established by the Franklin County

Board and overseen and implemented by Defendants Morgan, Porter, and Fitzjerrells. The County has a statutory duty to provide adequate funding for the safe and proper operation of FCJDC. *See* 55 ILCS 75/1(a); 55 ILCS 75/3(a). It has failed to do so.

116.    FCJDC did not have to be built. The County Board unanimously voted to establish and construct the youth detention facility over 20 years ago. Around the time it was opened, the Board hailed FCJDC "an asset to all of Southern Illinois" that was expected to sustain itself financially while bringing in revenue for the county.

117.    The Board authorized the borrowing of over $5 million for the facility's construction, including securing a $3.5 million loan and spending nearly $2 million in federal and state grants. The County currently owns FCJDC and the Board is responsible for directing its financial affairs and covering all its operational expenses.

118.    Most of the facility's funding comes from other counties that pay Franklin County to incarcerate their children. Each child detained at FCJDC from another county comes with a payment, and the Board depends on the Center's revenue to help pay off the debt it took on to build the Center and keep the 22,000-square-foot facility running.

119.    In the years since its opening FCJDC has encountered a substantial and extensively documented array of financial and staffing challenges. Rather than being a profitable or at least self-sustaining venture, as the County had hoped, it is a burdensome financial liability for the County, which still owes roughly $1.5 million on the loan it secured to build the facility, which loses money month after month.

120.    The facility's budgetary problems have led to multiple near-shutdowns and regular discussion at Board meetings about proposals to close, repurpose, or downsize the facility. Rather than closing the facility or reducing its youth population, however, the County has elected to keep

the facility open and run it on the cheap with a skeleton staff. Defendants Morgan, Porter, and Fitzjerrells oversee, supervise, and implement the restrictive and inhumane day-to-day conditions that predictably result when a detention facility lacks the staff and resources necessary to allow detained children a meaningful life outside their cells.

121.   Defendants are aware that the staffing levels they have chosen are inadequate and that the facility suffers as a result. Franklin County's own independent financial audit report in 2021 stated that "the low staffing levels [] are not sustainable to properly run the facility."[3] As noted above, IDJJ has published two reports in the past year declaring the facility's staffing levels—and the solitary confinement and other inadequate conditions that follow—to be unacceptable.

122.   The staffing shortages at FCJDC—and the serious problems that flow from them—are also a regular topic of discussion at Board meetings, yet the inadequate staffing levels have not been addressed.

123.   Chronic understaffing and underfunding have proximately caused the unconstitutional conditions the facility's children now face, which are predictable outcomes of stripping a facility of staff and resources the County knew were necessary to "properly run the facility." Indeed, the culture of solitary confinement and deprivation that children endure is itself an entrenched policy, custom, and practice Defendants have knowingly overseen and implemented.

## IV.   The Conditions and Culture of Solitary Confinement Maintained at FCJDC are Profoundly Harmful

### A.   Extended Solitary Confinement is Harmful for Children

---

[3] Rice Sullivan, LLC, *Franklin County Independent Auditor's Report*, 13 (2021), https://franklincountyil.gov/wp-content/uploads/2022/12/Franklin-County-2021.pdf.

124.     An extensive body of research on solitary confinement establishes that the practice results in serious and wide-ranging negative effects on incarcerated individuals. Children are particularly vulnerable to the harmful effects of confinement due to their ongoing physical, psychological, social, and neurological development. As a result, there is a widespread clinical consensus that solitary confinement is inappropriate for children. *See* Declaration of Louis Kraus, M.D. ("Kraus Decl."), attached hereto as Exhibit 8.

125.     Children who have a history of trauma, mental illness, or developmental disabilities are particularly vulnerable to the harms caused by solitary confinement. *Id.* at ¶¶ 19, 24. Most children who are detained or incarcerated for any length of time fall into one or more of these categories. *Id.*

126.     Children in solitary confinement face a significant risk of serious psychological and emotional harm. *Id.* at ¶¶ 15-16, 18. Solitary confinement negatively impacts children by perpetuating or worsening existing mental health problems, or precipitating new ones. *Id.* at ¶ 20. This can lead to a range of psychological symptoms, including but not limited to, anxiety, depression, difficulty maintaining attention, impaired concentration, memory problems, disorientation, heightened sensitivity, feelings of paranoia and psychosis, engaging in self-harm, and an increased risk of suicide. *See id.* at ¶¶ 26-27.

127.     The effects of solitary confinement manifest in physical symptoms, including gastrointestinal problems, insomnia, deterioration of eyesight, chronic fatigue, weakness, sensitivity to cold temperatures, heart palpitations, recurring migraine headaches, joint pains, loss of appetite, weight loss, and exacerbation of pre-existing medical conditions. *See id.* at ¶ 28.

128.     Solitary confinement deprives children of social interaction, educational opportunities, and environmental stimulation during critical developmental stages. Children

subjected to this practice see their cognitive growth and overall brain development severely impaired. *See id.* at ¶ 20.

129.    Because it necessarily deprives them of educational opportunities, extended solitary confinement also deprives children of the intellectual stimulation needed for their cognitive development. *See id.* at ¶ 30; *see also* Sandra Simkins, Marty Beyer, and Lisa Geis, *The Harmful Use of Isolation in Juvenile Facilities: The Need for Post-Disposition Representation*, 38 Wash. U.J.L. & Pol'y 241, 257-61 (2012); *see also Report of the Attorney General's National Task Force on Children Exposed to Violence*, U.S. Department of Justice Office of Juvenile Justice and Delinquency Prevention (December 2012), https://www.justice.gov/defendingchildhood/cev-rpt-full.pdf.

130.    Suicide rates and incidents of self-harm are much higher for detainees in solitary confinement. Kraus Decl. at ¶¶ 22-23*; see also* ACLU Briefing Paper, *The Dangerous Overuse of Solitary Confinement in the United States* (2014), https://www.aclu.org/sites/default/files/assets/stop_solitary_briefing_paper_updated_august_2014.pdf. A national study by the U.S. Department of Justice Office of Juvenile Justice and Prevention found that half of youth who committed suicide in juvenile facilities were in isolation at the time of their death and more than 60% of young people who committed suicide in detention had a history of being held in isolation. Kraus Decl. at ¶ 22; Lindsay Hayes, *Juvenile Suicide in Confinement: A National Survey*, U.S. Department of Justice Office of Justice Programs, 27 (February 2009), https://www.ojp.gov/pdffiles1/ojjdp/213691.pdf. Among children held in detention centers, 40% of suicides occurred within the initial 72 hours of confinement. Kraus Decl. at ¶ 22. Thus, even short periods of solitary confinement pose a serious risk of harm that can be fatal for children. *Id.*

131.    Indeed, FCJDC's own internal policies at the time of the *McKinney* suit—which

resulted from a child suicide at the facility—recognized that suicide risk was heightened during periods of solitary confinement.

132.    Children subjected to solitary confinement have an increased chance of recidivism, or reoffending. Kraus Decl. at ¶ 28; Council of Juvenile Correctional Administrators, *CJCA Toolkit: Reducing the Use of Isolation*, 7 (March 2015), https://stopsolitaryforkids.org/wp-content/uploads/2016/04/CJCA-Toolkit-Reducing-the-use-of-Isolation.pdf. Isolation and a lack of rehabilitative programming can make successful reintegration into society more difficult. Kraus Decl. at ¶¶ 25, 30. Additionally, the psychological trauma caused by solitary confinement can lead to feelings of alienation from society and resentment, reducing defined children's ability to reintegrate into their communities and making it more difficult for them to find stability. *See id.* at ¶¶ 17-18, 20, 25.

133.    The negative effects of solitary confinement can extend beyond the immediate period of isolation. Children may continue to experience the negative effects of solitary confinement even after their release from custody. *Id.* at ¶ 24.

134.    The overwhelming body of research demonstrating youth solitary confinement's profound harms has led to a widespread legal and institutional consensus that the practice has no proper place in juvenile detention. In December 2012, a task force appointed by the U.S. Department of Justice's Attorney General issued a report that read in part, "[n]owhere is the damaging impact of incarceration on vulnerable children more obvious than when it involves solitary confinement." *Report of the Attorney General's National Task Force on Children Exposed to Violence*, U.S. Department of Justice Office of Juvenile Justice and Delinquency Prevention, 178 (December 2012), https://www.justice.gov/defendingchildhood/cev-rpt-full.pdf. And in 2016, based on the Department's recommendation, the use of solitary confinement against children was

banned in all federal prisons. *Department of Justice Review of Solitary Confinement*, The White House Office of the Press Secretary (January 2016), https://obamawhitehouse.archives.gov/the-press-office/2016/01/25/fact-sheet-department-justice-review-solitary-confinement.

135.    Other authorities such as the American Medical Association, the American Academy of Child and Adolescent Psychiatry, and the National Commission on Correctional Health Care have recognized that solitary confinement is harmful for children and have opposed the use of solitary confinement on children. Kraus Decl. at ¶ 28.

136.    International and human rights organizations have also criticized the use of solitary confinement. The World Health Organization ("WHO"), the United Nations, and other international bodies have recognized that solitary confinement is particularly harmful to a child's psychological well-being and cognitive development. The United Nations Standard Minimum Rules for the Treatment of Prisoners, revised in 2015 as the Nelson Mandela Rules, completely prohibit solitary confinement for children. *Resolution adopted by the General Assembly on 17 December 2015*, United Nations General Assembly (January 2016), http://undocs.org/en/A/RES/70/175. The United Nation's Special Rapporteur on Torture has repeatedly condemned the use of solitary confinement on children *for any duration*, calling it "cruel, inhuman or degrading treatment or punishment or even torture." *Report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment*, United Nations General Assembly (2015), http://undocs.org/en/A/HRC/28/68.

137.    In Illinois's youth prison system solitary confinement has been effectively banned for some time. On May 4, 2014, as part of a lawsuit filed in 2012 by the ACLU of Illinois, IDJJ instituted a policy banning use of the practice in its now five state-run juvenile facilities. *R.J. v. Mueller*, No. 12 C 7289 (N.D. Ill. Sept. 2012); *see also* Julie Bosman, *Lawsuit Leads to New Limits*

*on Solitary Confinement at Juvenile Prisons in Illinois*, The New York Times (2015), https://www.nytimes.com/2015/05/05/us/politics/lawsuit-leads-to-new-limits-on-solitary-confinement-at-juvenile-prisons-in-illinois.html. In addition, Illinois House Bill 3140 ("End Youth Solitary Confinement Act"), which prohibits all youth solitary confinement—including in juvenile detention facilities—was recently passed by both the Illinois House and Senate in early May.

138.    Many other states in recent years have banned or placed restrictions on the use of solitary confinement for children as well. *See, e.g.*, Amy Fettig, *2019 was a Watershed Year in the Movement to Stop Solitary Confinement*, ACLU National Prison Project (December 2019), https://www.aclu.org/news/prisoners-rights/2019-was-a-watershed-year-in-the-movement-to-stop-solitary-confinement; *see also State Laws or Rules that Limit or Prohibit Solitary Confinement of Juveniles*, National Conference of State Legislatures (January 2021), https://www.documentcloud.org/documents/21203238-state-laws-that-limit-or-prohibit-solitary-confinement-2020.

## B.    Defendants Confine Children in Physical Conditions That Create a Psychologically Abusive Environment

139.    FCJDC compounds the harm caused by its use of solitary confinement by maintaining appalling conditions within the cells themselves.

140.    Fluorescent overhead lights in children's cells stay on 24 hours a day. Sleeping in a constantly illuminated environment has been shown to be extremely harmful. Indeed, it is a recognized method of torture. *Solitary Confinement Facts*, American Friends Service Committee, https://afsc.org/solitary-confinement-facts; *see also Torture in United States Prisons: Evidence of Human Rights Violations*, American Friends Service Committee, https://afsc.org/sites/default/files/documents/torture_in_us_prisons.pdf.

141.    FCJDC further disrupts children's sleep by denying them pillows and adequate blankets and forcing them to sleep in damp, moldy environments that cause children respiratory problems.

142.    Defendants have also failed to maintain the facility's plumbing system which has frequently resulted in toilet backups, as well as sinks that are often broken or cannot be used. Jail staff also have control over the water and the flushing of toilets in children's cells, which is demeaning and abusive. It often takes staff hours to flush toilets, and staff refuse to turn on the water or flush the toilets as a form of punishment.

143.    When they are occasionally allowed to leave their cells children are still prevented from contacting other children, even those locked up in cells only a few feet away. They are also subjected to traumatic and physically abusive encounters with law enforcement officers, who are frequently called in to supplement the skeleton staff on site at FCJDC.

144.    In addition, children are frequently left hungry, with inadequate food that lacks the necessary calories and nutrients to meet basic nutritional standards.

145.    All of these conditions reinforce one another to form a toxic, abusive, and unconstitutional environment no child should be made to endure.

C.    **Withholding Mental Healthcare from Youth Subjected to Extended Solitary Confinement is Harmful**

146.    The culture and policy of solitary confinement maintained at FCJDC imposes harms that are amplified by Defendants' cruel failure to provide the affected children with mental health services necessary to cope with the trauma of their surroundings.

147.    A large percentage of children in detention have diagnosed and undiagnosed mental health needs, or histories of trauma and abuse, or both. *See* Kraus Decl. at ¶¶ 19-20. A national study found that 75% to 93% of children entering the juvenile justice system are estimated to have

experienced some degree of trauma. Samantha Buckingham, *Trauma Informed Juvenile Justice*, 53 Am. Crim. L. Rev. 641, 654 (2016).

148.    Additionally, studies show that 65-75% of children in juvenile custody have a diagnosable mental health disorder, with 20% of these children exhibiting a severe mental health disorder. *See* Skowyra, Kathleen, and Cocozza, Joseph., *A Blueprint for Change: Improving the System Response to Youth with Mental Health Needs Involved with the Juvenile Justice System*, The National Center for Mental Health and Juvenile Justice Policy Research Associates, Inc. (January 2007), https://www.prainc.com/wp-content/uploads/2022/03/2006-R2P-Blueprint-for-Change-559538.pdf. FCJDC's practice of solitary confinement exacerbates these mental health problems while causing new ones. *See* Kraus Decl. at ¶ 20.

149.    Withholding mental healthcare from youth subjected to solitary confinement—even those on suicide watch or otherwise acute mental health crisis—exacerbates the practice's physical and psychological harms, and inflicts new ones. *See* Kraus Decl. at ¶ 23.

**D.    Withholding Education from Youth Subjected to Extended Solitary Confinement is Harmful**

150.    Defendants' failure to provide the children in their care a meaningful education further compounds the harm of their solitary confinement.

151.    It is well-established that education in correctional facilities reduces recidivism rates. Davis, Lois M., Robert Bozick, Jennifer L. Steele, Jessica Saunders, and Jeremy N. V. Miles, *Evaluating the Effectiveness of Correctional Education: A Meta-Analysis of Programs That Provide Education to Incarcerated Adults*, RAND Corporation (2013), https://www.rand.org/pubs/research_reports/RR266.html. Defendants have failed to ensure that all children detained at FCJDC have access to meaningful and comprehensive educational services.

152.    Children at the facility are formally enrolled at the local Benton, Illinois school

district. The Regional Office of Education employs one primary teacher, but none of the children at FCJDC are receiving full-time educational services.

153.    As IDJJ's Report noted, the children at FCJDC had not attended school in a classroom for *two years* at the time of the Department's 2022 audit, and IDJJ's follow-up report confirms that some youth are *still* not being taught in a classroom. Their experience with "schooling" was the completion of self-guided worksheets. The only apparent difference between August 2022 and the current facility is that select youth may sometimes complete these "worksheets" in a classroom rather than their pod. There is no qualified and licensed special education teacher on staff and no special education services provided to children with Individualized Education Plans. There is no full-day school for any of the youth at FCJDC. School is constantly canceled or denied as punishment, or in response to even slight disruptions or time conflicts.

154.    Children incarcerated at FCJDC are at crucial points in their educational development. Outside incarceration, cancellation of a single day of school causes school districts to mobilize and plan to make up every lost hour at the end of the year. Yet when youth enter FCJDC their educational needs are simply ignored for the weeks or months they are detained there. They are thus deprived of education as punishment, and denied the education provided to other children their age in Illinois.

155.    As a proximate result of the Defendants' repeated failures to provide an adequate education to children in their custody, the children in FCJDC suffer compounding physical and psychological harm from their confinement, and are falling behind in their academic development.

## CLASS ALLEGATIONS

156.    Plaintiff L.S. brings this action on his own behalf and on behalf of others similarly

situated pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

157.    The putative Plaintiff Class includes all children who are currently, or in the future will be, detained in FCJDC (the "Putative Class").

158.    If discovery or further investigation reveals that the Putative Class should be expanded or otherwise modified, the named Plaintiff reserves his right to amend the Class definition or propose subclasses as necessary.

159.    The Plaintiff Putative Class satisfies the requirements of Rule 23(a) in that:

160.    *Numerosity*: The Putative Class is so numerous that joinder of all members is impracticable. FCJDC detains hundreds of children annually. According to the most recent available data, FCJDC had 235 admissions in 2021.[4] There has been similarly significant facility turnover in 2023. Due to financial and legal capacity constraints, most of these children cannot file individual lawsuits.

161.    *Commonality*: There are questions of law and fact common to the Putative Class. These include, but are not limited to:

(a)    Whether the conditions at FCJDC pose substantial risks of serious harm to Plaintiff and the Class?

(b)    Whether the conditions at FCJDC are the result of the Second Circuit Defendants' practices, programs, and administration of the Center?

(c)    Whether the Second Circuit Defendants have acted with knowledge or reckless disregard as to these conditions?

(d)    Whether the County's long-standing "policy or custom" of underfunding the Center caused harmful and injurious conditions at FCJDC?

162.    *Typicality*: The named Plaintiff's claims are typical of those of the Putative Class. The named Plaintiff is detained at FCJDC and has been subjected to the Defendants' challenged

---

[4] *JMIS Monthly Data Report*, Illinois Juvenile Justice Commission (2021), https://ijjc.illinois.gov/wp-content/uploads/2022/05/JMIS-Monthly-Data-Report-December-2021.pdf.

policies, practices, and procedures (or lack thereof); therefore, his claims arise from the same conduct and are based on the same legal theory as the class claims.

163.    *Adequacy*: The named Plaintiff is capable of fairly and adequately protecting the interests of the Putative Class and will diligently serve as a class representative. The named Plaintiff does not have any antagonistic interests to the Putative Class and seeks injunctive relief on a class-wide basis to remedy class injuries and enjoin the Defendants' unlawful conduct. Furthermore, the named Plaintiff and the Putative Class are represented by competent counsel with significant experience in civil rights litigation, detainee and prisoners' rights litigation (including over a decade of experience in the youth detention context in Illinois), and complex class action litigation.

164.    This action is maintainable as a class action pursuant to Rule 23(b)(1) because the prosecution of separate actions by individual children would create a risk of inconsistent and varying adjudications, which in turn, would establish incompatible standards of conduct for FCJDC.

165.    This action is also maintainable as a class action pursuant to Rule 23(b)(2) because Defendants have acted, or failed to act, on grounds generally applicable to the Class as a whole, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the Class.

## CAUSES OF ACTION

**COUNT I – 42 U.S.C. § 1983**
**Violation of the Due Process Clause of the Fourteenth Amendment**
**(Asserted by Named Plaintiff and Putative Class Against Defendants LaVonda Porter, Darla Fitzjerrells, and Chief Judge Melissa Morgan)**

166.    The preceding paragraphs are incorporated as if fully set forth herein.

167.    When Defendants take a child into custody, they assume a duty under the

Fourteenth Amendment to protect the child from harm and substantial risks of serious harm.

168.    Plaintiff and members of the Putative Class have substantive Due Process rights that include, but are not limited to: the right to be free from and protected from physical, psychological, and emotional harm; the right to necessary treatment, care, and services; the right not to deteriorate physically, psychologically, or emotionally while in custody; and the right to be free from substantial risks of the above-mentioned harms.

169.    Defendants maintain a policy, custom, and practice of using solitary confinement as FCJDC's default confinement method, and for further extending solitary confinement as enhanced punishment through Restriction lockdowns, in a manner that lacks any penological or justifiable government purpose and is grossly inconsistent with established clinical and legal consensus that youth solitary confinement is profoundly harmful.

170.    Defendants compound the harm of solitary confinement by forcing children to spend their days in physical conditions that combine with the trauma of solitary confinement to create a toxic and psychologically abusive environment.

171.    Defendants' failure to provide mental healthcare to children in its custody likewise exacerbates and causes harm. By failing to provide any mental health staff on site, failing to screen children for mental health conditions upon their arrival at FCJDC, failing to adequately train and supervise staff to respond in appropriate ways to children with mental health issues, and in responding to a well-known pattern of suicide attempts not with mental health care, but with enhanced solitary confinement, Defendants profoundly harm the youth detained at FCJDC.

172.    Defendants further compound the harm to children detained at FCJDC by denying them any meaningful education at critical points in their academic development.

173.    Children at FCJDC thus endure a constellation of abuses and deprivations while detained there, locked in extended solitary confinement in cells with substandard conditions and without enough food, all while denied basic mental healthcare and the intellectual stimulation that comes from age-appropriate schooling. These practices—each harmful in isolation—mutually reinforce and amplify one another to create an environment of acute psychological abuse at FCJDC.

174.    These conditions are imposed on children as punishment, and with no legitimate government or penalogical purpose.

175.    Defendants are aware of the harm and risks of harm these practices cause to children at FCJDC, yet have consistently applied the same harmful policies and practices and failed to make any changes to improve the conditions at FCJDC. The Defendants' response to this harm and risk of harm is objectively unreasonable and shows a deliberate, knowing, or reckless disregard for the consequences.

176.    Defendants' actions were taken under color of state law and within the scope of their employment.

177.    Defendant Morgan's actions challenged in this Complaint were administrative rather than judicial in nature.

178.    The conditions described in this Complaint violate the Due Process rights of the children detained at FCJDC.

179.    Defendants have continuously violated the law, as detailed in this Complaint. As a proximate result of Defendants' actions, the named Plaintiff, as well as the Putative Class he represents, have endured and continue to suffer serious and irreparable physical, psychological, and emotional injuries.

180.    These injuries will continue unless enjoined by this Court.

## COUNT II – 42 U.S.C. § 1983
## Municipal Liability
### (Asserted by Named Plaintiff and Putative Class Against Defendant Franklin County)

181.    The preceding paragraphs are incorporated as if fully set forth herein.

182.    Defendant Franklin County, acting through the Franklin County Board, is responsible for overseeing FCJDC's operation and supervising and conferring with its leadership, funding FCJDC's operations, as well as hiring staff and contracting for support services that shape the day-to-day lives of the children at FCJDC.

183.    Franklin County implemented and oversaw the policy, custom, and practice of children being subjected to solitary confinement in substandard conditions without access to mental healthcare or a meaningful education.

184.    Defendant Franklin County has also demonstrated an ongoing pattern of reacting to financial difficulties by purposely understaffing and underfunding FCJDC. This has itself become a deeply embedded County policy, practice, and custom that proximately caused, and led to the predictable consequence of, the conditions described in this Complaint. The County's policy of underfunding and understaffing has been a "moving force" behind the unconstitutional conditions for children in detention.

185.    The County has also overseen and participated in a pattern and practice of constitutional violations so widespread as to constitute a custom, policy, or practice with the force of law.

186.    Defendant Franklin County reasonably knew that its failure adequately to fund and staff the facility would result in children being confined to their cells and losing access to critical services like education and medical and mental health care.

187.    Defendant Franklin County was also made aware that its policies, practices, and customs caused the unconstitutional conditions described in this Complaint, and of the attendant harm they caused the children of FCJDC.

188.    Defendant Franklin County's policies, practices, and procedures proximately caused the harm described in this Complaint.

189.    Defendant Franklin County acted with deliberate indifference in developing, overseeing, and implementing those policies, customs, and practices.

190.    Defendant Franklin County's actions are objectively unreasonable and show a deliberate, knowing, or reckless disregard for the consequences.

191.    Defendant Franklin County has continued to violate the Constitution, and the named Plaintiff, as well as the Putative Class he represents, have endured and continue to suffer serious and irreparable physical, psychological, and emotional injuries as a result.

192.    These injuries will continue unless enjoined by this Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff L.S., on behalf of himself and all others similarly situated, respectfully request that the Court enter the following relief:

a.    Declare this suit is maintainable as a class action pursuant to Rules 23(a), 23(b)(1) and 23(b)(2) of the Federal Rules of Civil Procedure;

b.    Adjudge and declare pursuant to Rule 57 of the Federal Rules of Civil Procedure that the conditions of confinement at FCJDC, as well as the Defendants' policies, practices, acts, and omissions complained of herein, violate the rights of the named Plaintiff and the Putative Class he represents under the Fourteenth Amendment's Due Process Clause;

c.    Permanently enjoin Defendants, their agents, officials, employees, and all persons

acting in concert with them under color of state law or otherwise, from continuing the unlawful acts, conditions, and practices described in this Complaint;

       d.      Order Defendants, their agents, officials, employees, and all persons acting in concert with them under color of state law or otherwise, to develop and implement, as soon as practical, a plan to eliminate the substantial risks of serious harm described herein;

       e.      Award named Plaintiff and the Class attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988; and

       f.      Grant such other and further relief and this Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff L.S., as well as the Putative Class, hereby demand a trial by jury on all issues so triable.


DATED: June 30, 2023               Respectfully submitted,


                            /s/ Kevin M. Fee

                            Kevin M. Fee
                            Camille E. Bennett
                            Allyson M. Bain
                            Alexis Picard
                            ROGER BALDWIN FOUNDATION OF ACLU, INC.
                            150 N. Michigan, Suite 600
                            Chicago, IL 60601
                            Phone: (312) 201-9740
                            Fax: (312) 201-9760
                            kfee@aclu-il.org
                            cbennett@aclu-il.org
                            abain@aclu-il.org
                            apicard@aclu-il.org