# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| L.S., on behalf of himself and all others similarly situated, by his next friend JASON MAURER, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Case No. _____ |
| FRANKLIN COUNTY, CHIEF JUDGE MELISSA MORGAN of the Second Judicial Circuit Court, DARLA FITZJERRELLS, Director of Court Services of the Second Judicial Circuit Court, and LAVONDA PORTER, Acting Superintendent of the Franklin County Juvenile Detention Center, | ) ) ) ) ) ) ) ) ) | Hon. _____ |
| Defendants. | ) ) | |

## DECLARATION OF L███ S███

I, L██ S███, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I have been detained at Franklin County Juvenile Detention Center ("FCJDC" or "the Center") since approximately May 27, 2023.

2. I am sixteen years old. The first time I was detained I was 13 and I stayed about a month. I was in for a couple months last year, too.

3. FCJDC has six separate housing pods, which are labeled A, B, C, D, E, and F. I currently live in D pod, which has 8 cells that hold one kid each. I have been in this pod since I arrived this year and there is only one other kid in the pod with me right now. During past stays I lived in A, B, and E pods.

4.      My cell is very small, with barely enough room to walk around. It is a very uncomfortable place to be. There is a hard cement slab with a thin mattress against the back wall, but I put my mattress on the floor to sleep.  I do this for a couple reasons.  I first started doing this in my cells in A, B, and E pods because the windows above the slab leaked water and made the mattress wet. Now I do it because it's easier to hear staff coming in the door and I want to make sure I can react if they show up. That's because they tell us we're not allowed to talk between cells, and we're not allowed to wrap our shirt around our face to block out the light because it makes it so we can't hear staff if they tell us to do something. I like to try to talk to my podmate and I always wrap my shirt around my head because it's the only way I can sleep. I also want to make sure that I can hear if the staff does anything bad to my podmate because I think staff picks on him sometimes and I worry about him.

5.      On the other side of my cell there is a combined toilet and sink. For almost the entire time I've been here the toilet and sink have been controlled from the outside, so I can't flush my own toilet. Only staff can do it and you have to ask them to. It usually takes them hours to do it which makes your room stink. For the last couple weeks the staff has let us control our own toilets and sinks although I have seen them take that away from my podmate. I don't know how long that will last and it made me realize they can give kids control if they want to and they definitely use water and toilet control as a way of controlling and punishing kids. My podmate can't control his own toilet.

6.      My cell door has a heavy lock that can only be opened from the outside. Every cell I've lived in at FCJDC has had black mold on the walls or the ceiling (or both), including the cell I'm in right now. My current cell has a broken sprinkler and water damage. I heard another kid

broke the sprinkler and it soaked the room. It looks like that made the black mold grow around the sprinkler head. I think the black mold is making me cough. I am very healthy and never have coughs when I'm outside the facility, but every time I've been put into one of these cells I start coughing a day or so after I get here and don't stop until I leave.

7.      In one of my prior cells the sprinkler once went off, too.  It soaked me, my blankets, my clothes, and my stuff. I told staff about it but they didn't clean the room for hours. They also didn't replace my wet blankets, sheets, and clothes for about three days, and I had to live in that wet room and just be cold and uncomfortable. That seemed to make the black mold grow worse.

8.      There is a small window in my cell, it doesn't let in much light. All I can ever see from my cell is the razor wire outside the window and part of another building, and then the cell across from me in my pod. There are fluorescent lights on the ceiling of my cell that stay on all the time, night and day. The lights never go out here and it makes it almost impossible to sleep. I don't sleep well at all. I try to sleep by tying a shirt around my eyes but staff tells us we can't do that. I've been punished for doing that with my shirt and I've seen that happen to other kids too. I've even seen kids put on Restriction for tying their shirts. I don't know how they expect us to sleep if the lights are on and we can't even block them out.

9.      I have never had a pillow and only have two thin blankets and I know we cannot get more. This also makes it hard to sleep at night.

10.     All the rooms in FCJDC that I have seen and stayed in are set up in basically the same way. They are all dirty, disgusting, and bright and most of them have black mold in them. The toilets smell since they don't get flushed when they're supposed to. In one of my prior cells the toilet once overflowed and it took staff a long time to come clean it, making my cell stink even worse.

11.     In D pod, like the other pods, there is a small dayroom between the cells that has two metal tables, some chairs, a broken water fountain, and a TV mounted on the wall. On days we get "free time" it is just an hour or two in the day room. The whole time I've been here each kid has had "free time" in the dayroom by themselves. One kid gets brought out for their free time, they sit there, and then go back to their cell. Then the next kid comes out and does the same thing. During free time we aren't allowed to walk around. We have to stay seated and can't move around freely, or else the jail staff will put us back in my cell. This is really frustrating for me because it's the only place we go often that's big enough to at least walk around and get some exercise and they won't even let us do that. I don't want to cause any trouble, I just want to be able to walk a longer distance than the one or two steps I can move in my cell and it drives me crazy I can't even do that during my free time.

12.     I spend most of my time in my cell at FCJDC. This is how it has been for me during all my stays at this facility. On average I would say I spend a minimum of about 21 hours a day in my cell right now, and that's really a good day. In prior stays I was in the cell 22 hours a day at least, and for long stretches it was more like 23 hours.  We have had free time taken away regularly since I recently came to the facility for things like the facility needing maintenance or there not being enough staff. They put the whole facility on "lockdown" for their convenience at least once or twice a week. Last week they put the whole facility on lockdown for most of the day so they could have a plumber do work on the plumbing or something. They just canceled our little bit of free time like it was no big deal.

13.     In my entire time at FCJDC I don't remember ever setting foot outside. Rec time is just going to the basketball court for what is supposed to be an hour, though it gets taken away all the time and shortened more often than not.

14.     Over the time at this facility, I have eaten almost all my meals in my cell by myself. We sometimes get to eat for 10-15 minutes in the dayroom and the last couple of weeks we have gone to dietary sometimes, but you never know where you're supposed to eat.

15.     They do not give you enough food here. I never get full from a meal.  Kids also can't share with one another or they can get put on Restriction.

16.     I get to shower once a day for about 15 minutes.  Then it's right back to my cell.

17.     I do not get to talk to anybody when I am in my cell, except sometimes talking to other kids in their cells through the doors when there is a kid put in a cell close to me. It's important for me to be able to talk to my podmates, though, because that's basically the only human contact I get. This isn't allowed, though—just last week staff reminded us that we are not supposed to "communicate through our cell doors." Some of them say they won't enforce it, and sometimes they don't, but I've also seen multiple kids put on Restriction and get punished in other ways for talking. That's how it is here with everything: the staff can just do what they want and you don't know what you're really allowed to do and not allowed to do. They have never given me a rule book even though I've asked for one over and over so I can get some idea of what's expected here.

18.     Jail staff do "watch tours," where they walk around the cells to monitor the area, but these only lasts a few seconds and the staff does not talk to us much.  Lately only the third shift staff has really even done watch tours, so there's nobody around for the vast majority of the day. It's very lonely to have so little human contact.

19.     It is very boring to never really be able to talk to anybody for a real conversation and to have nothing to do but stare at a wall in a cell. Even with other kids in cells nearby you feel very much alone. And now I only have one podmate and he's leaving soon and I'll probably be all by myself in my pod. I spend as much time as I can reading, and otherwise I just pace around and

do push-ups and sit-ups in my cell. It is really horrible and sad to spend that much time by yourself, though. It makes you go too much into your own head and think about all the bad things in your life. I feel like they've stripped me away from everything except my own mind and it's hurting my mental health.

20.     I have been put in Restriction at least ten times as punishment during my time at FCJDC. Restriction means spending 24 hours in my cell, with no possibility of coming out to the day room or for Recreation. Restriction is terrible and hurts your mental health. It's important to come out of your cell at least a little bit.

21.     I have been put on Restriction for multiple days on end. Once I was placed on Restriction for an entire week and not even allowed to shower every day. That was a very bad time.

22.     Kids get put on Restriction for all kinds of things and it's usually not for big things either. I've seen kids put on Restriction for putting their shirts over their head to sleep, for talking too much or too loudly between cells, and for walking around the dayroom instead of staying seated. I have seen it used to punish kids for eating off another kid's meal tray, even if the kid gave the food to you. I see it a lot for "talking back" to staff but that's just up to staff what that means. Staff are so hit-or-miss. They just slap this Restriction on us whenever they want. It feels like they treat us like animals putting us in cages when they're mad then they punish us when we act out because of that, and just punish us even more.

23.     I do not go to school full-time while at FCJDC and I never have. School has been "over" since I arrived this time, so I've done no schoolwork at all. I honestly have no idea if there's a teacher here now because I've never seen one during my most recent stay. During my other stays I can count the times I visited the facility classroom on one hand. I have never had regular classes

like with a teacher teaching a lesson at the front of the class, and I do not have face-to-face instruction with any teachers at FCJDC.

24.     The schoolwork I have done in past visits was just worksheets that I did by myself. The worksheets are easy and pointless. I even see them use the same worksheets more than once. They are never graded, and I do not get any feedback on my work except the staff thanks me for doing them. I don't get worksheets graded or marked up, although I'm sure I did everything right because the worksheets are not at my grade-level. When I've done schoolwork it was basically always in my pod.

25.     There is not enough staff here. There's about three staff on duty, and one is in the control room not doing much, and sometimes sleeping. That leaves two "on the floor" to deal with all six pods. All the staff complain about not having enough people to watch us and they tell us that is why we never get out of our cells. Sometimes they have to bring in police to help control kids when they refuse to do something because there's just not enough staff to deal with it when a kid doesn't comply with their orders.

26.     My time at FCJDC has affected my mind and my personality in a bad way. I feel frustrated, restless, lonely due to the amount of time I am confined to my cell alone, and the lack of human interaction. I can't believe I have to deal with this for a while longer, it honestly makes me really sad.

27.     I do not have access to mental health care while at the facility. I have asked for counselors and they're not available. One time I buzzed the staff and was really honest with them that I was really down and had to talk to somebody and they just said "we don't have mental health workers here, we can't help you." There are no counselors that come around to visit us and there is no mental health worker on the staff to go see if you need someone to talk to.

28.     The one time I talked to a counselor was a pretty extreme situation—I was on suicide watch. Even then, they just put me on the phone with a hotline and it was only for like five minutes.

29.     Suicide watch is just a worse version of Restriction. I was locked in the "suicide watch" cell for two weeks straight when I was on suicide watch. The cell is the same as any other except it has a camera and a big window that's supposed to be for observation, but it just means everybody can look in on you all day which is embarrassing. When I was on suicide watch they took my clothes, my books, and my stuff and put me in the turtle suit, which is just like a big barrel they strap on your body that doesn't really keep you warm. I had to stay like that for the whole time and only allowed to shower twice a week. That is no way to treat somebody who's already feeling so bad. It made my mental health even worse. How can you punish somebody for wanting to commit suicide by just putting them in Restriction?

30.     I've seen four or five other kids get put on suicide watch and they all get treated basically the same way. It's terrible.

31.     Another really bad thing I experienced here was what they do to you when you get taken for intake. They process you, give you a physical exam, take your clothes, put lice killing stuff in your hair, and ask you a bunch of basic questions like do you do drugs and have you ever tried suicide. Beyond that, though, they don't do any kind of detailed mental health screening and the person asking the questions is just a security staff person or the nurse, not a mental health professional. They don't do any educational screening. Then when all this is done you get to quarantine, which for me meant staying alone in a cell for 5 days only coming out for showers (and I only came out for showers twice). So right off the bat you are put in solitary here and it starts you on a bad foot.

32.     During my arrest I got attacked by a police dog who chewed up my arm really bad and injured me. When I got processed this past May they let me talk to a nurse who gave me bandages, and I told her I think I have nerve damage because I can't close my right hand all the way. I'm right-handed and now that hand is way weaker than my left. She said she'd order an X-ray right away. That was about three weeks ago and I haven't seen her since. I have never seen a doctor for it even though I've asked for one. They changed my bandages every couple days, but that's it. I'm worried my arm is going to have nerve damage and I'm not going to get treated for it.

33.     Outside of legal calls we only get two personal calls a week here for ten minutes each—on Monday and Friday. They time your calls. If you call people and nobody answers you're out of luck.

34.     I've complained about the problems here many times and never got any response.

35.     From everything I have seen, and from talking to the few other kids I get to contact here, everybody here has it about as bad as me. I've seen lots of kids get put on Restriction. As far as I know nobody gets to go to school full-time. I have never seen any kid that gets to go outside on Rec more than I do. The pods that I have visited are all set up the same with the same small cells and dayrooms.

36.     My lawyers have explained the class action process to me and I understand we are trying to bring a case as a class action. I understand that I am going to be the class representative and I understand the responsibilities of serving as a class representative in this action against Defendants. I understand I represent not just me but the other kids in Franklin County and kids who will be here in the future. I want to make life better here for kids that come after me because it's really bad here. No kid should have to live like this. I am willing to serve as a class representative.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 6th day of June 2023.                    Respectfully submitted,

**L.S.**

# Exhibit 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

L.S., on behalf of himself and all others )
similarly situated, by his next friend )
JASON MAURER, )
)
      Plaintiffs, )
)
      v. )
)
FRANKLIN COUNTY, CHIEF JUDGE )
MELISSA MORGAN of the Second )
Judicial Circuit Court, DARLA )
FITZJERRELLS, Director of Court )
Services of the Second Judicial Circuit )
Court, and LAVONDA PORTER, )
Acting Superintendent of the Franklin )
County Juvenile Detention Center, )
)
      Defendants. )

Case No. _____

Hon. _____

## DECLARATION OF T██████ T██

I, T████ T██, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I have been detained at Franklin County Juvenile Detention Center ("FCJDC" or "the Center") since January 23, 2023.

2.      This is my fourth time being detained at FCJDC. The first time I was detained I was fourteen years old. I'm now sixteen. The first time I came to FCJDC was in May, 2021 and I stayed for about a month. I came back in July 2021 and stayed about three weeks. Then I came back again in September 2021 and stayed another six weeks or so. I was in IYC Harrisburg during 2022 and came back to FCJDC in January after I was arrested in Mt. Vernon.

3.      FCJDC has six separate housing pods, which are labeled A, B, C, D, E, and F. I currently live in D pod, which has 8 cells that hold one kid each. I have been in this pod since January of this year. There have been between 1 and 6 other kids in D pod, and there is only one

other kid in there with me right now.  I have been moved to other pods from time to time.  I started in E pod and was in a cell that had a sink that didn't work so I had no water at all.  Eventually I complained enough that they transferred me to B pod.  I moved from B pod to D pod in March.

4.      My cell is very small, about the size of a parking space. There is a hard cement slab with a thin mattress against the back wall. I usually put my mattress on the floor because it's a little better to sleep that way. I also did that back when I lived in B pod because the window above the slab would leak water down onto the slab making the mattress wet.  On the other side, close to the cell door, there is a combined toilet and sink. It's controlled from the outside, so I can't flush my own toilet, I have to ask jail staff to do it and it takes them way too long to do it, usually like an hour or more which makes the cells stink.  They can also turn the water on and off in my sink. Sometimes they turn the water off in my sink for no reason.  They have done this a lot to kids in my pod.  Like I mentioned my first cell didn't even have a working sink at all.

5.      My cell door has a heavy lock that can only be opened from the outside. My former cell wall had black mold on it and the other rooms I have stayed in have black mold too.  I asked to be moved out of this room because the black mold made me cough and made me very congested. They agreed to move me to a new room that has less mold but they just put another kid right into the moldy cell I left.

6.      There is a small window in my cell, it doesn't let in much light. There are fluorescent lights on the ceiling that stays on all the time, night and day, including when I am trying to sleep.  The lights never go out here.  The constant light makes it hard for me to sleep and gives me a headache.

7.      I have never had a pillow even though I've asked for one.  I only have two thin blankets and cannot get more, even though I have asked many times because it gets too cold to sleep at night, especially during the winter.

8.      All the rooms in Franklin County that I have seen and stayed in are set up in basically the same way.  They are all dirty and bright and most of them have black mold in them. The toilets are not flushed enough so they smell, and the sinks only work part of the time.  One of my friends in D pod had his toilet overflow recently and the water and urine flowed under his door into the hallway and made the staff mad.  They pushed the urine back into his room with a broom and didn't clean it for him.  It smelled very bad and they made him live like that for a couple of days.

9.      In D pod, like the other pods, there is a small dayroom between that has two metal tables, some chairs, a broken sink, and a TV mounted on the wall. On some days we get "free time" which is just an hour or two in the day room.  During free time we aren't allowed to walk around and there's no socializing. We have to stay seated and can't move around freely, or else the jail staff will put us back in my cell.

10.     I spend most of my time in my cell at FCJDC. From when I wake up until I fall asleep, I am usually in my cell. This is how it has been for me during all my stays at this facility. On average I would say I spend about 20-22 hours a day in my cell.  Some weeks are worse than others. The last time I met with my lawyers for this case at the end of May I spent about four total hours outside my cell the whole week, most of which was to meet with my criminal lawyer and my lawyer for this case.  Without legal calls it would have been worse. The last week it has been a little better than that, but I still only had about three hours a day outside my cell, and all of that time has been spent in the dayroom right next to my cell sitting on the metal chair.

11.     My pod only gets to go outside for recreation once every few weeks, and when we do it is only for an hour or less to just walk around the grounds. There are no activities or sports when we are outside. I have only been outside about 5-10 times since January. We occasionally go to the basketball court inside for 30 minutes to an hour but that's also only every couple of weeks. We just go when they say they have enough staff to let us do it, which is rare. I haven't been outside, or to indoor Rec, since April or early May.

12.     I have eaten most of my meals at FCJDC alone in my cell, just a few steps away from my toilet. For a little while we were allowed to eat dinner in the D pod day room, but jail staff told us that is not happening anymore for security reasons and that we went back to eating all our meals in our cells again. Last week I had more meals out of my cell but I was only able to eat in the dayroom just a few feet away. It changed back to eating in our cells before so I guess it will change back again.

13.     I get to shower once a day for about 10 minutes.  Then it's right back to my cell.

14.     I do not get to talk to anybody when I am in my cell, except sometimes talking to other kids in their cells through the doors when there is a kid put in a cell close to me. Just last week, though, the staff reminded us that their rule is that kids can't communicate between cells at all. They can enforce that rule or not depending on their mood, you never know. Jail staff conduct "watch tours," where they walk around the cells to monitor the area, but these only last a few minutes and the staff does not talk to us much.

15.     It is very boring to never really be able to talk to anybody for a real conversation and to have nothing to do but stare at a wall in a cell. To pass the time, I usually sleep as much as I can during the day. Sometimes I read a book that I request from the library or do push-ups, which is the only exercise I can do in my cell.

16.    I have been put in Restriction many times as punishment while at FCJDC. Restriction means spending 24 hours in my cell, with no possibility of coming out to the day room or for Recreation. Restriction is terrible and even though it's only an extra hour or two locked in your cell, never coming out of your cell at all for a whole day really messes with your mind.

17.    Since I came to FCJDC in January, I have been put on Restriction about ten times. Sometimes they also put everybody on Restriction at once, they call it "lockdown" but it means everyone in their cell until staff lets them come out. Just about a week ago the whole facility got put on lockdown for a day because of building maintenance. We had to stay in our cells the whole time.

18.    It is never clear to me what kinds of things will get me put on Restriction. I have not been given any kind of rules or handbook that explains this and staff do not explain it either. Staff puts kids on Restriction for things like fighting, but sometimes kids get put on Restriction for really little things. I was once put on Restriction for arguing with another kid in the pod through our doors. It wasn't even a real big argument and we weren't even in the same room. Another time the whole pod got put on Restriction because one kid was banging on the door, but we all got punished. I got put on Restriction a few weeks ago for something another kid in the pod did, I guess they thought it was me but even when I explained it they locked me up. It's crazy to me that I could get locked down for things like that but it's just up to the staff member who's there.  They can basically do whatever they want.

19.    I do not go to school full-time while at FCJDC and I never have.

20.    I do not have regular classes, and I do not attend school with a teacher at FCJDC. There are two rooms called classrooms here, but I have only been there a few times and have not

seen been there at all in more than two months.  School is over now for the year so I guess that's it.

21.     My schoolwork is just worksheets that I have to complete by myself. The worksheets are never graded, and I do not get any feedback on my work. I do not think that the worksheets are at my grade-level (I'm supposed to be a sophomore).  Even the few times I visited the classroom I just sat and did the same worksheets I do in my pod.

22.     I am often denied the opportunity to go to school even in my pod. Sometimes the staff forgets to wake me up to do my worksheets, or they do not bring me the worksheets for the day at all.  In the past month or more I have done zero schoolwork at all.

23.     Recently, my entire cell pod was denied access to any schoolwork all at once.  The staff said it was because we were not behaving well.  They just put us all on "Admin" status (meaning none of us could leave the pod) and didn't explain the reason at all.  It seems pointless to even try to behave when you don't understand the rules and the punishments are so random.

24.     I never know when I will go to school, or what I will learn on any given day.

25.     There is not enough staff here.  All the staff complain about not having enough people to watch us and they tell us that is why we never get out of our cells.  Sometimes they have to bring in police and it's not just to break up fights, either. It's just because they don't have enough staff to run the facility. A few months back police came in and broke my friend's arm and he had to go to the hospital. This was all just because he didn't want to go back to his cell during Rec when they tried to shorten his Rec for no reason. His arm was in a splint for a while because of this.  I have seen police in the facility multiple times.

26.     I feel upset, restless, and lonely because I spend so much time alone in my cell and don't get to talk to many people. This facility has had a very negative impact on my life.

27.     I do not have access to mental health care while at the facility.  There are no counselors that come around to visit us and there is no mental health worker on the staff to go see if you need someone to talk to.

28.     I have submitted multiple written grievances about the conditions at FCJDC, but no one from the detention center has ever answered my grievances.

29.     From everything I have seen, and from talking to the few other kids I get to contact here, everybody here has it as bad as me.  I've seen lots of kids get put on Restriction.  As far as I know nobody gets to go to school full-time.  I have never seen any kid that gets to go outside on Rec more than I do.  The pods that I have visited are all set up the same with the same small cells and day rooms.

30.     My lawyers have explained to me about this lawsuit and explained the class action process to me and I understand we are trying to bring a case as a class action.  I want to make life better here for kids that come after me because it's really bad here. No kid should have to live like this.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 16th day of June 2023.          Respectfully submitted,

**T.T.**

# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| L.S., on behalf of himself and all others similarly situated, by his next friend JASON MAURER, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Case No. _____ |
| FRANKLIN COUNTY, CHIEF JUDGE MELISSA MORGAN of the Second Judicial Circuit Court, DARLA FITZJERRELLS, Director of Court Services of the Second Judicial Circuit Court, and LAVONDA PORTER, Acting Superintendent of the Franklin County Juvenile Detention Center, | ) ) ) ) ) ) ) ) ) | Hon. _____ |
| Defendants. | ) ) | |

### **DECLARATION OF T██████ W██████**

I, T███ W██████, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am 15 years old.  I was born ████████ 2008. I am from Mt. Vernon, Illinois.

2.     I have been detained at FCJDC four times.

3.     I was most recently detained at Franklin County Juvenile Detention Center ("FCJDC" or "the Center") between April 10, 2023 and May 17, 2023.

4.     The first time I was detained I was 14 years old.  The first time I came to FCJDC was in October 2022 and I stayed for about a month. I came back in January and stayed about 3 days.  Then I came back again in February 2023 and stayed another six weeks or so.

5.     A few days after I met with my lawyers in FCJDC the facility transferred me to IYC Harrisburg.  That is where I live now.

6.     When I was at FCJDC I lived in D pod.  I also lived in A pod and F pod.

1

7.      All the cells I stayed in when I was at FCJDC were basically the same.  They were all very small concrete boxes. They were all moldy and disgusting.  There is a cement slab on the back wall with a thin mattress, and a combined toilet-sink on the opposite wall near the cell door. I put my mattress on the wall because the slab hurt my back, but anyway the water would leak in from the window up on the ledge and once I woke up with my chest soaking wet with water so I never slept up there again. I never had a pillow while I was there even though I asked for one. They just don't give kids pillows for whatever reason.  I never had enough blankets to keep warm and it was really cold in the cells in the winter.

8.      One of the worst things about the cells was the little toilet sink that was across the cell from the bed. Kids don't have control over it so you have to ask staff to flush your toilet.  It usually takes them a long time to do it.

9.      I was almost always in my cell when I was at FCJDC. I would say I spent about 20-22 hours a day in my cell on average.  It got worse and worse the longer I was there and the last few weeks I almost never left my cell except to shower each day for about 25-30 minutes.  I ate all my meals in my cell by myself. I know there is a cafeteria in the facility but I have never eaten there and I never saw any other kids eat there either. When I did leave my cell it was just to go to the dayroom right outside my door where all we could do was sit at a table. Staff will put you back in your cell if you walk around the dayroom.

10.      All but one of my cells at the Center were filthy and moldy. I was in a D pod cell with a lot of black mold on the walls. It made it hard to breathe and I felt congested all the time and my ears were plugged up and hurt. I begged the jail staff to relocate me to a different cell. I wanted to move cells so badly that I tossed my shoe at the sprinkler system in my cell one day. All this black water poured out of the sprinklers and flooded my cell. At that point, jail staff finally

2

relocated me to a new cell, but the next day, after trying to clear up the black water from the sprinkler system, they returned me to the moldy cell.

11.     The staff put me on Restriction all the time.  When you're on Restriction you are locked up in your cell for 24 hours.  Sometimes they make you do two or three Restrictions in a row so you're in your cell for a few days. Usually it's for something like arguing with staff but sometimes I didn't even know why I was on Restriction exactly.  It makes you go crazy when you spend all that time alone.  The staff put me on Restriction about 30 times.  Most of the time I was not on Restriction I was on Admin status which means just staying in your cell or the dayroom for a few hours, you never leave your pod. Being alone that long really messed with me emotionally and made me sad. I cried sometimes. I was really mad that when I was in Restriction I couldn't talk to my mom and it's important to me that I get to talk to her.

12.     Sometimes the staff would extend Restriction for multiple days. I had multiple day Restriction several times, sometimes for three or even four days.

13.     My last time in Restriction was really bad. I got into it verbally with the staff and called them names and then they really were mad at me and had it out for me. So they started messing with me bad and messing with my mind. First they refused to flush my toilet so it overflowed. The water and urine from the toilet overflowed out on the floor and it went under my door into the hallway.  This made the staff even more mad and they took a broom and pushed the urine back into my room and put a little foam mat under the door to keep it in there. I asked them to clean it for me but they wouldn't do it and I had to sit in there with all that on the floor for about four days (I was on a really long Restriction at the time so I was locked up in there with it 24 hours a day).  It smelled very bad and made me feel sick.

14.     During my last four-day Restriction I was also stripped down to my boxers. The staff took my clothes and made me stay in my underwear. It was super cold and I just stayed on my mattress pretty much all day. I was also put on shower restriction for two days during this Restriction which is when you can't take your daily shower. When the other kids got to eat cheeseburgers on cheeseburger night the staff gave me cold cuts instead saying I didn't deserve cheeseburgers.  They called me stupid and called me names with swear words that I don't want to write in this paper for the Court.

15.     I do not get to talk to anybody when I am in my cell, except sometimes talking to other kids in their cells through the doors when there is a kid put in a cell close to me. Jail staff conduct "watch tours," where they walk around the cells to monitor the area, but these only last a few minutes and the staff does not talk to us.

16.     I have mental health issues that I used to get treatment and medication for on the outside, and that I get treatment and medication for now that I'm at IYC Harrisburg.  I got nothing at FCJDC for my mental health issues. There wasn't even anyone to talk to. There are no mental health counselors at the facility or other people to talk to about these issues. They were always running out of my medication so I sometimes went a day or more without the medication that I really need.

17.     I was in pretty bad mental health crisis during my most recent time at FCJDC. On April 11, 2023 I was cutting my arm with a broken colored pencil while confined in my cell. The staff saw that I was bleeding all over. Instead of getting me any mental health treatment, they just gave me a paper towel to clean up the blood. I asked to see a nurse they said she wasn't there that day.  No doctor or nurse ever looked at my arm.

4

18.     After the cutting incident, the staff kept me confined to my cell and placed me on suicide watch in my cell for two days. They stripped me to my boxers and tried to put me in what we call the turtle suit, which is supposed to fit over your head and restrain you so you can't hurt yourself.  But they couldn't get it on me because the straps didn't work so I just sat in my underwear instead. My mom later found out and called in a person from a suicide hotline to come visit me and talk to me, but the facility never had anyone talk to me or help me when I was on my suicide watch.

19.     While I was at FCJDC I got placed on suicide watch 2 times. There's a special suicide watch cell with a big window so the staff can watch the kid on suicide watch, but they don't always use it and both of my suicide watches were in my cell. Suicide watch is just Restriction, though. They don't give you any help or let you talk to anybody to calm you down.

20.     My mom was able to set up some counselors to come visit me while I was at FCJDC since the jail didn't have anybody to help me. She had to do it all on her own, though.

21.     I got lice while at the Center and got locked up in intake for multiple days and put on shower restriction.

22.     When I was at FCJDC we only went for Recreation time when there were enough staff members to take us.  That was probably about once a week.  Usually Recreation just meant spending about an hour at the indoor basketball court. We only went outside for Recreation about 3-4 times when I was at FCJDC.  There are no activities out there.  We just walk around the buildings. During my final month at FCJDC, I didn't go out for Rec at all.

23.     When I'm in my room by myself it drives me crazy. It makes my mind go to bad places. I don't have anything to pass the time. I can't really sleep well because the lights are so bright and they never turn off.

24.     I never went to school full-time while I was at FCJDC. For my last few weeks I never went to the classroom at all. I sometimes did work on worksheets in my dayroom, but toward the end of my time the staff told my whole pod that we were not going to school anymore at all because there was too much stuff going on at the facility so they didn't have time to take us. I only visited the one classroom 5-6 times and when I did it was just to do the same worksheets I did in the dayroom. I never had regular classes, and I didn't ever have real face-to-face instruction with a teacher at FCJDC.

25.     I also have an Individualized Education Plan, but I didn't get any special education services at FCJDC.

26.     There is not enough staff at FCJDC. There is hardly anyone ever around. All the staff complained about not having enough people to watch us and they tell us that is why we never get out of our cells.  Sometimes they had to bring in police to help them do things because there weren't enough staff to actually deal with things that went wrong.

27.     Earlier this year police came in and broke my friend's arm and he had to go to the hospital after he refused to leave Rec to go back to his cell.  I saw police in the facility multiple times.  Two times they came for me just for small stuff like kicking my door open or not wanting to go back in my room. When the police come in there's like 8-10 of them at a time.

28.     There are always long delays in seeing the nurse. The nurse wouldn't help me with my cut arm. I've heard there is a doctor that is supposed to be available to come to the facility but I've never seen this doctor.

29.     My time at FCJDC has affected my mind and my personality. It affects the way I think, the way I act, and how I think about myself. It made me really angry but also made me feel like I was worthless. Everybody in there is a human being, the guards are just people like us kids,

they're no different. But the staff treat us like we're something different from them. They treat us like a creature or like an animal. So I always felt like an animal when I was at FCJDC. People are all the same, so they should be treated like people.

30.     They should shut down FCJDC. I heard some kids who went to other JDCs didn't have it so bad. It's too bad here to be fixed. They should shut it down and rebuild.

31.     From everything I have seen, and from talking to the few other kids I get to contact here, everybody here has it bad. I've seen lots of kids get put on Restriction. As far as I know nobody gets to go to school full-time. I have never seen any kid that gets to go outside on Recreation every few weeks. The cells that I have visited are all set up the same way with the same day rooms.

32.     I've complained numerous times about the conditions at FCJDC, but no one on staff has ever responded.

33.     My lawyers have explained to me about this lawsuit and explained the class action process to me and I understand we are trying to bring a case as a class action.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ⸺ day of June 2023.          Respectfully submitted,



T.W.

# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| L.S., on behalf of himself and all others similarly situated, by his next friend JASON MAURER, | ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| FRANKLIN COUNTY, CHIEF JUDGE MELISSA MORGAN of the Second Judicial Circuit Court, DARLA FITZJERRELLS, Director of Court Services of the Second Judicial Circuit Court, and LAVONDA PORTER, Acting Superintendent of the Franklin County Juvenile Detention Center, | ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) ) ) |

Case No. _____

Hon. _____

## <u>DECLARATION OF A.B.</u>

I, A███ B███, also known as K███ K███, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I was detained at Franklin County Juvenile Detention Center ("FCJDC" or "the Center") from October 12, 2023 to June 1, 2023. I live at IYC Harrisburg now.

2.    This is my first time being detained at FCJDC, though I have stayed at two other facilities (Madison County JDC and intake at a JDC facility in Arkansas) that were both much better than FCJDC.

3.    I have been in D pod since March of this year, but I have spent time in most of the other pods.

4.      My cell is very small—I have been very bored and so I measured it with my feet (I have big feet and I believe it is about 11.5 by 7.5 feet. There is a hard cement slab with a thin mattress against the back wall but I can't sleep there because the small window above the bed leaks constantly. If I leave the mattress there I get wet, so I moved the mattress to the floor.

5.      Next to the cell door, there is a combined toilet and sink. It's controlled from the outside, so I can't flush my own toilet. When I ask jail staff to flush the toilet it typically takes hours for them to do it. Lately they have tried to use a schedule where they flush the toilet every few hours, but it has not been working. They can also turn the water in my sink on and off. I need the water to be on because I get very thirsty, especially when I do push-ups (I try to do a few hundred a day). My water has been turned off many times for multiple days at a time. Right now my water has been off for four or five days because another kid in a different cell let his sink overflow. So, I'm being punished for something another kid did (I think his water has been turned off too). I ask for the staff to bring me water and they say no.

6.      The lights on the ceiling of my room never go out, even at nighttime. It makes it almost impossible to sleep for a long time, you always get woken up by the light.

7.      My current cell wall has black mold on it and the other rooms I have stayed in have black mold too. There is a small window that leaks water, especially when it rains. That makes the mold worse. I think the mold is affecting my breathing—I get stuffed up and congested when I stay in the rooms with black mold. Most of the rooms I have stayed in at FCJDC have at least some of the black mold that you can see on walls or the ceiling.

8.      I have never had a pillow at FCJDC—nobody does. Everybody gets one sheet and a thin blanket. I always ask for extra blankets and some staff members will give you an extra

blanket or two, some will not. Either way you never have enough blankets to stay warm at night, in the winter especially when the cells get so cold you can see your breath.

9.      All the cells I have been in have been set up in basically the same way except that there are a few two-person cells in one of the pods.

10.     There are not enough staff here. There are only a few of them in the facility each day so you do not see many staff. There are not enough staff to control things when kids get in fights or disobey the staff so they bring in the police regularly. The police station in Benton is directly across the street from FCJDC, it's just a few feet away, so they can get the police here quickly and they're here all the time.

11.     One day in December 2022 I had my arm broken by police. We were given a short time to go to the indoor recreation facility for the first time in a long time. I had just gotten off three days of lockdown with almost no time outside my cell, so I was very happy to be out. I got into a verbal argument with another kid but we were not fighting. A staff member told me I had to go back to my cell, but not the other kid. I was so frustrated that I was going to miss this recreation period and get locked back up, and because it was unfair that only I was being punished. So, I said I would not go back to the room, I wanted to stay at recreation until the end. A few minutes later a group of officers rushed in. They were much larger than me and they threw me around in a way that was way too rough. When they were throwing me to the ground they twisted my arm and there was a snap that everybody could hear. They still twisted my broken arm behind my back and it was extremely painful. The officer asked me about my arm and I said "you know it's broken, you heard it snap." They still kept me handcuffed an put me in my room that way. My arm was really painful because it was broken and handcuffed behind my back. I asked to go to the hospital. The staff cooked dinner and took another group of kids for recreation first and then took me to the

emergency room after making me sit in my room for two hours. The ER told me I broke my humerus and put a splint on my arm, and sent me to an orthopedic hospital for more observation. My arm took a few months to heal.

12.     I have seen police at the facility many times since I arrived. I have seen them get too rough with other kids. They tazed another kid. The crazy thing is the police don't even just come in for fights or big things, they come in just when a kid doesn't want to move and they do things that the staff should be doing. There's just almost nobody here, so the police are like the staff.

13.     I spend most of my time in my cell at FCJDC. From when I wake up until I fall asleep, I am usually in my cell. On average I would say I spend about 23 hours a day in my cell.

14.     I have been put on Restriction many times as punishment while at FCJDC. Restriction means spending 24 hours in my cell, with no possibility of coming out to the day room or for Recreation. I am constantly on Restriction, I can't count the number of times I have been on Restriction since I got to FCJDC. There have been times Restriction lasts longer than 24 hours. A couple of times it has lasted as long as three days in a row. Restriction is really bad and makes my loneliness and restlessness a lot worse. Even the day before I was transferred out of FCJDC, I was on Restriction.

15.     One of the worst things about Restriction is there is no way to tell when it is coming. Just this week I woke up in the morning to a staff member telling me I was put on Restriction without giving me a reason. I still have no idea why it happened. Kids get put on Restriction for things like swearing or just "disrespecting" a staff member but it's just up to the staff member to do it and they are not always fair. Sometimes they put kids on Restriction in groups for things only one kid did. It is not clear to me what kinds of things will get me put on Restriction.

16.     In my last JDC the first thing that happened was we got a piece of paper that explained all the things we were allowed to have, what we couldn't do, and what the rules were. There is nothing like that here. I have not been given any kind of rules or handbook that explains this and staff do not explain it either. It's like there are no rules here, it's just whatever the staff makes up every day.

17.     The other kind of punishment you can get is "Admin" status.  That's when you can't leave your pod at all, you're just stuck in your cell and then whatever free time they give you in your dayroom. I have been on Admin status pretty much permanently, especially lately, and so have several other kids in my pod. This is only slightly better than Restriction—it just means you're in your cell for like 22 or 23 hours a day instead of 24. Just like Restriction I don't have any real idea why we get put on Admin status. Admin status is probably even less clear and gets handed out as punishment for the whole pod a lot of the time.

18.     In D pod, like the other pods, there is a small dayroom between the cells that has two metal tables with chairs connected to it. The D pod dayroom also has a TV on the wall. Some days the kids who are not on Restriction are given "free time" which just means spending an hour or even less in the dayroom in the evening. The staff only allow one kid to have "free time" at a time, so there's no one to talk to or hang out with when it's your turn to have "free time" in the dayroom. During that time we are usually not allowed to walk around, we just have to sit in the metal seats. I am a very active person and being forced to sit like this is not good for me, but the staff will not let me stretch my legs and pace around like I want to. For the last couple of weeks there has not been any free time anyway, though.

19.     I mostly eat all my meals alone in my cell, just a few steps away from my toilet. The only times I eat a meal outside my cell were the times they let us eat dinner in the D pod

dayroom, but jail staff told us that is not happening anymore so we are back to eating all meals in our cells.

20.      I get to shower once a day for about 10-15 minutes. We usually try to stretch out our showers as long as we can to avoid going back to the room but if you do that too long you can get in trouble and be prevented from taking a shower in the future.

21.      I do not get to talk to anybody when I am in my cell, except talking through the doors to kids in cells next to me. Jail staff conduct "watch tours," where they walk around the cells to monitor the area, but these only last a few minutes and the staff does not talk to us much.

22.      Being alone all the time and not talking to people messes with my head.  I am really bored and restless. I used to read books I would ask the staff to bring me from the library but now I can't really concentrate on them. I just pace around my cell to try to stay active and do a few hundred push-ups a day because I am very restless and have so much energy that I can't get out.

23.      Kids who are not on Restriction get to recreation but it only happens once every few weeks.  There is indoor recreation which is when we go to an indoor gym with one basketball hoop. We go outside for recreation even less often, really only when the staff say there are enough of them and they decide they want to do it. When we do go outside it is just to just walk around the grounds. They won't let us move freely. I like to go to the fence to look out and see the town but the staff won't let me stand there, I have to stay near the building which doesn't make any sense to me because there's huge fences with razor wire that I could not possibly climb. There are no activities or sports when we are outside.

24.      I do not go to school full-time while at FCJDC. I hardly go to school at all.

25.      I do not have regular classes, and I do not have face-to-face instruction with a teacher at FCJDC. There is one classroom here, but I have only been there a few times and have

not been there in weeks. Even the few times I visited the classroom I just sat and did the same worksheets I do in my pod.

26.     My schoolwork is just worksheets that I have to complete by myself. The worksheets are never graded, and I do not get any feedback on my work. I do not think that the worksheets are at my grade-level since I should be a senior in high school. The reading assignments are like something a third grader could do.  I have asked for more challenging work but I haven't gotten it. You just do a couple worksheets then take a test but nothing is graded and given back to me. I'm sure I did well on it because it is so easy but there is no real point to any of it.

27.     Right now I can only do my worksheets in my cell, or occasionally, in my pod's dayroom.

28.     I am often denied the opportunity to go to school even in my pod. Sometimes the staff forgets to wake me up to do my worksheets, or they do not bring me the worksheets for the day. This would happen pretty often.

29.     In the past two weeks, I have not done any schoolwork at all. This is true for at least two other kids in my pod, too. Now school is over for the summer so I guess I will never do schoolwork again.

30.     Recently, my entire cell pod was denied access to any schoolwork all at once. The staff said it was because we were not behaving well but you can never tell why anything is happening.

31.     I would like to graduate from high school, but I don't have any clear idea of what I need to do to get the credits I need to graduate.

32.     I know that school can be OK in these facilities because in Madison County I had real school. We had teachers who taught age-appropriate lessons and did things in the classroom.

I was actually learning something and I got grades on the work I completed.  We had games and movies and a thing called "Fun Fridays" where we would do activities together in the classroom.

33.     I have PTSD and other mental health problems because I have been exposed to a lot of bad things and trauma over the last few years. I have been shot and have been the victim of a lot of abuse and violence. I really need someone to talk to and I need medication to handle my mood. I do not have access to mental health care while at the facility. There are no counselors on staff and nobody that comes around to visit us and I really need one. I even have a court order requiring that the facility give me a counselor and I still don't have one. I have night terrors when I get to sleep and am having a hard time.

34.     I did get medication ordered for me at my prior JDC and that transferred over here, so the nurse who comes through gives me my medication but other kids who didn't get another facility to order them medication can never get anything because there is nobody here to diagnose them or prescribe the medication.

35.     There is a "suicide watch" cell that I see all the time, because it's in my pod—it's D-9. It's like any other cell except it has a big window and a camera so the kid who gets put in there can be seen all the time. Kids who get put on suicide watch get stripped to their boxers or shorts, and sometimes put in the "turtle suit" which is like a padded suit that looks like a turtle body that I guess is supposed to keep you from hurting yourself. Sometimes they have to sit in there in just their boxers or shorts. Other than that it's just like Restriction because they're on lockdown.  I don't see any counselors or anything go in there to help the kid, they are just locked down for like 24 hours without clothes and that's it.

36.     The nurse who comes through the facility cannot do much because there is nobody to really diagnose anyone with anything. I have been asking for Tylenol and Ibuprofen and been

denied by staff, who seem to be the ones who decide if you need medical care or not and they are not doctors. I get a lot of headaches from previous concussions, and one day I had a really horrible headache, and the staff told me they couldn't give me Tylenol or anything like that anymore. They did not explain why. A friend of mine had a serious cut on his finger that almost cut his finger in half. He couldn't get the pain medication he needed or the treatment he needed for days. He begged and begged and finally after many days got some ointment and a bandage, but he never even saw a doctor.

37.     From everything I have seen, and from talking to other kids through the cell walls and in the dayroom, everybody here has it bad. I've heard lots of kids get put on Restriction. As far as I know nobody gets to go to school full-time. Nobody gets to go outside but once every week or two. The cells are all bad and the conditions in them are horrible.

38.     I have complained dozens of times about the conditions at FCJDC, but no one from the detention center has ever fixed the problems. In my last facility they had a weekly meeting on Mondays where they addressed all the complaints and grievances for the week. Here if you complain about something it just disappears and you never hear about it again.

39.     My time at FCJDC has been horrible. I have been on my own since I was 15 and lived in some bad places and feel like I can put up with a lot but this place is treacherous. Being locked up by yourself all the time messes with your head and makes you go crazy for real. This place brings out the worst in everyone. They make you go crazy and then it's like they punish you for acting like that.

40.     I am really sad for the younger kids because it seems like it messes with them the most. Some kids here are like 11 and they are still learning how to live because they're just kids. They get really sad with having to put up with the conditions here.

41.     I always say you can live here but it's not really living.  Being here is not living.

42.     The lawyers in this case have explained to me about this lawsuit and explained the class action process to me and I understand we/they are trying to bring a case as a class action. I want to help other kids who go to Franklin County, especially the younger kids.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 25th day of May 2023.                    Respectfully submitted,



# Exhibit 5

COPY

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
MOULTRIE COUNTY, ILLINOIS

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) | **FILED** |
| | ) | SIXTH JUDICIAL CIRCUIT |
| v. | ) NO. ███████ | NOV 1 8 2022 |
| | ) | |
| K████ K████ a/k/a, | ) | *Christe S McDaniel* |
| A████ B████ | ) | CIRCUIT COURT |
| Defendant. | ) | MOULTRIE COUNTY, ILLINOIS |

## ORDER FOR MENTAL HEALTH ASSESSMENT AND COUNSELLING

This cause came on for status hearing on November 17, 2022. Assistant State's Attorney, Elizabeth Dobson, appeared on behalf of the People. The Defendant (minor), K████ K████ a/k/a A████ B████ appeared personally and with his counsel, T. Jeannine Garrett.

THE COURT, having considered the arguments and recommendations of counsel and being fully advised in the premises, herein enters the following order:

IT IS ORDERED that as a condition of his placement in the Franklin County Juvenile Detention Center, that the Defendant is to cooperate with any, and all mental health assessment, treatment, or counseling referrals made on his behalf. The Detention Center is directed to locate and implement a counseling agent/agency that will stablish an ongoing counseling relationship with the Defendant (minor) while the Defendant (minor) remains in detention.

DATE: ___11/13/22___   ENTERED: _____

Jeremy J. Richey
Circuit Judge

# Exhibit 6

2022

# 2022 Franklin County Juvenile Detention Center Inspection Report

JOHN ALBRIGHT, CHIEF OF PERFORMANCE AND INNOVATION
ILLINOIS DEPARTMENT OF JUVENILE JUSTICE

**Executive Summary**

The Illinois Department of Juvenile Justice (the "Department") conducted an annual inspection of the Franklin County Juvenile Detention Center on August 2, 2022, pursuant to 730 ILCS 5/3-15-2(b). The Department observed several areas on non-compliance during this review, many of which warrant immediate attention.

The Franklin County Juvenile Detention Center is a facility in crisis. The staffing levels at the facility are extremely low and directly impact conditions of confinement for youth that are well-below minimum standards. On the date of the inspection, the facility only employed eight full-time staff and four part-time staff. It is not possible to adequately manage a 24-hour facility with staffing numbers that low.

The sections and specific requirements of the 20 Ill. Adm. Code 2602 County Juvenile Detention Standards ("County Detention Standards") noted as non-compliant are listed in the table below and specific observations are noted in the following sections of this report.

Each section of the report also includes policy and practice recommendations to either gain compliance or move towards best practice. Those recommendations are combined in a second table at the end of the report.

**Areas of Non-Compliance**

| Section | Requirement |
|---------|-------------|
| 2602.100 Clothing, Personal Hygiene, Grooming | Opportunities to shower shall be provided daily except as amended by medical advice in individual cases. |
| 2602.110 Food Services | At least one full-time cook or the food service provider shall have food services sanitation manager certification from the Illinois Department of Public Health. Meals shall be served and conducted in a group setting except when prohibited by security or medical needs. |
| 2602.170 Discipline | All facilities shall have a developmentally appropriate, research informed behavioral management program that supports the development of pro-social skills and provides positive reinforcement for good behavior. The program shall provide opportunities for immediate recognition of pro-social behavior as well as meaningful incentives and rewards for improvement and maintenance of desired behavior. The program shall also include potential sanctions for negative behavior that are developmentally appropriate, research informed, proportionate and fair. Room confinement may be used only as a temporary response to behavior that threatens the safety of the youth and others. Room confinement shall not be used for a fixed period of time, but only until the youth is calm enough to rejoin programming without being a risk to the safety of others. Supervisory staff shall be notified immediately when room confinement is used. At no time should room confinement exceed 4 hours without administrators and/or mental health staff developing an |

| | individualized plan to address the behavior. Youth shall not be deprived of the following basic rights as part of a disciplinary response: Approved phone calls; Education. |
|---|---|
| 2602.20 Administration | All staff will have a minimum of 40 hours of training annually. . . Employees shall have access to a manual of policies and procedures either in a written or electronic format. Employees shall review policies on a yearly basis and document acknowledgement of their review. Prior to assuming responsibility for supervision of youth, all staff must complete a 40-hour orientation including but not limited to: A) Facility mission and code of ethics; B) Basic rights of incarcerated youth, including legal rights, grievance procedures and right to be free of retaliation for making a complaint; C) Facility policies and procedures, particularly safety, security and fire and other emergency procedures; and D) Confidentiality. In the first year of employment, all staff shall minimally receive an additional 80 hours of training. Employees shall have access to a manual of policies and procedures either in a written or electronic format. Emergency procedures in event of a fire, riot, escape, bomb threat and natural disaster shall be part of the manual. Employees shall review policies on a yearly basis and document acknowledgement of their review. The superintendent shall designate a person to maintain documentation of employee review from year to year. |
| 2602.210 Visiting | A liberal visiting schedule shall be established identifying no fewer than two visiting days each week, one of which must be during the weekday evening hours and one during the weekend. Additionally, visiting shall be allowed on all legal holidays |
| 2602.220 Detention Programs | Programs designed to address the risk and needs of delinquent youth shall be provided to youth in custody either by staff or community providers. Programs may include drug and alcohol treatment, group or individual counseling, social and life skills training and family interventions. Facilities shall have in place an evidence-based positive behavior program that target criminogenic risk and needs of youth in custody |
| 2602.230 Education | A detention facility shall operate a 12-month long schedule of school instruction and programming with appropriately certified teachers that are licensed by the State Board of Education. There shall be a minimum of five hours of instruction per day. |
| 2602.260 Recreation and Leisure Time | Vigorous physical activities, indoor and out, shall be a part of the daily schedule. Passive indoor activities, in addition to television viewing and radio listening, shall be included. At least one hour of physical recreation and one hour of additional leisure activity shall be scheduled each day. |
| 2602.30 Personnel | Each detention facility must have sufficient personnel to provide adequate 24-hour supervision of youth seven days a week. . . An assistant superintendent, qualified by training and experience to supervise staff and youth, shall be designated for a detention facility of 25 or more rated |

| | capacity. . . Staffing levels must anticipate the need for coverage for staff absence for leave and training. . . An agency shall employ or designate an upper-level, agency-wide Prison Rape Elimination Act ("PREA") coordinator with sufficient time and authority to develop, implement, and oversee agency efforts to comply with the PREA standards in all of its facilities. . .All personnel working in the detention center, including contractual staff and volunteers, must complete a background check prior to employment and at least once every five years throughout employment. |
|---|---|
| 2602.50 Admissions Procedures | Following admission, a strip search may be administered only when there is an individualized, reasonable suspicion. . .Within 72 hours after the youth's arrival at the facility and periodically throughout a youth's confinement, the agency shall obtain and use information about each youth's personal history and behavior to reduce the risk of sexual abuse by or upon a resident. Assessments shall be conducted using an objective screening instrument. . . An initial orientation shall be conducted by a detention staff member at time of admission. The orientation shall include: Information regarding programs (i.e., education, arts and crafts, counseling and all social services. Procedures for making requests or entering complaints to staff members, judiciary or to Department personnel. . . The agency shall also provide at least one way for youth to report abuse or harassment to a public or private entity or office that is not part of the agency and that is able to receive and immediately forward resident reports of sexual abuse and sexual harassment to agency officials, allowing the resident to remain anonymous upon request. |
| 2602.80 Medical and Health Care | Access to psychiatric and/or psychological services shall be provided in individual cases as needed. |
| 2602.90 Mental Health Services | All facilities shall employ or contract with qualified mental health professionals to address the needs of youth identified in the mental health screening, as well as needs that arise during the period of confinement. Services shall meet or exceed the community level of care. . . Youth with significant mental health needs shall be assessed by a qualified mental health professional. A service plan shall be developed for each youth that includes: 1) Counseling or psychotherapy to be provided; 2) Behavioral management strategies and goals; 3) Medication; 4) Protocol for monitoring youth's progress; and 5) Needed adjustments to normal detention programs and procedures. The facility shall provide appropriate services to youth with serious mental illnesses (e.g., bi-polar disorder, psychosis, severe depression) including psychiatric evaluation and care, as well as prescribing and monitoring psychotropic medication. |

**Methodology**

- Interviews Conducted
  - Acting Superintendent
  - 1 Supervisor

3

- o   2 Correctional Officers
- o   6 youth
- o   1 Educator
- o   Program Manager – Redeploy Illinois
- o   1 Nurse

- Documents Reviewed
  - o   Youth point cards
  - o   Sample youth files
  - o   Staff Training Documentation
  - o   Sample Incident Reports
  - o   Menus

## Overview

The Franklin County Juvenile Detention Center is a 32-bed facility in Benton, Illinois. The facility houses youth from several counties in southern Illinois.

The on-site portion of the review took place on Tuesday, August 2, 2022. At the time of the audit, the facility had 15 residents, three of which were out at court. The facility has one acting superintendent, and eight full-time staff (inclusive of both Detention Officers and Supervisors). The Acting Superintendent reported the facility has had trouble hiring over the past several years, which she attributed to a combination of a low starting salary and a requirement that applicants have a bachelor's degree. The facility has four additional people that work in a part-time capacity, usually to provide transportation for youth when needed. The facility does not employee a dietary staff. Detention Officers and Supervisors cook food at the facility.

## Admission Policy and Procedures

The Franklin County Juvenile Detention Center offers 24-hour coverage for admissions. Youth property is collected, inventoried, and laundered according to standards.

The facility conducts strip searches of all youth upon intake. County Detention Standards permit strip searches of youth upon admission only when there is an individualized, reasonable suspicion of weapons, contraband, or body pests.

The facility does not have an adequate orientation process for youth. The facility does not have a formal Youth Orientation Manual; instead, they supply youth with a short, 3-page form that largely consists of facility rules and a small summary of telephone privileges. Some youth indicated a lack of clear expectations after the initial orientation.

The County Detention Standards were updated in 2021 to include some elements from PREA standard. PREA requirements include an assessment to determine risk for victimization within 72 hours of each

4

youth's admission and periodically throughout a youth's confinement. The facility has not undergone a formal PREA audit and does not use any type of assessment for risk of victimization, nor does the facility have anyone acting in a PREA Coordinator role. Of the youth who were interviewed, none of them were familiar with PREA.

Areas of Non-Compliance and Recommendations

- 2602.50 Admissions Procedures states: "Following admission, a strip search may be administered only when there is an individualized, reasonable suspicion. . .Within 72 hours after the youth's arrival at the facility and periodically throughout a youth's confinement, the agency shall obtain and use information about each youth's personal history and behavior to reduce the risk of sexual abuse by or upon a resident. Assessments shall be conducted using an objective screening instrument. . . An initial orientation shall be conducted by a detention staff member at time of admission. The orientation shall include information regarding programs (i.e., education, arts and crafts, counseling, and all social services) and procedures for making requests or entering complaints to staff members, judiciary or to Department personnel. . . The agency shall also provide at least one way for youth to report abuse or harassment to a public or private entity or office that is not part of the agency and that is able to receive and immediately forward resident reports of sexual abuse and sexual harassment to agency officials, allowing the resident to remain anonymous upon request."
    - o Recommendation:
        - ▪ Eliminate the use of strip searches as a standard process during intake.
        - ▪ Implement the PREA Risk for Victimization Assessment for youth within 72 hours of admission and periodically throughout a youth's confinement.
        - ▪ Hire a PREA Officer to supervise facility compliance with PREA standards.
        - ▪ Develop a formal Youth Orientation Handbook that contains information on things like programming, a youth grievance procedure, and information regarding PREA.
        - ▪ Develop a form to capture youth acknowledgment of receipt of the Youth Orientation Manual and PREA orientation.
        - ▪ Contract with a third-party entity for youth to access in order to report abuse or harassment in a confidential manner.

**Personnel, Staffing, Supervision, and Administration**

As aforementioned, the facility only has eight fulltime staff (inclusive of supervisors and correctional staff) and four part time workers. On the date of the inspection there were only three employees working the shift (one supervisor and two detention officers). The Acting Superintendent indicated they only have three people working during the day on most shifts. These staffing levels are directly contributing to poor conditions of confinement for youth and a poor work environment for employees. The staffing levels at the facility are critical and unsustainable as it is not possible to safely run a juvenile justice facility 24 hours a day/seven days per week with just eight fulltime employees, especially considering those employees are charged with providing youth transportation and cooking meals in addition to providing supervision to youth. The facility does not employ an Assistant Superintendent, despite a County Detention Standards requirement that facilities with rated capacity of 25 or more

employ an Assistant Superintendent. The Franklin County Juvenile Detention Center has a rated capacity of 32. Attention needs to be given to this staffing shortage urgently.

There is an obvious lack of training at the facility. New employee training was described as job-shadowing without any formal online or classroom-based education. The facility utilizes Crisis Prevention Institute (CPI) as the primary de-escalation and physical restraint technique. The supervisor on duty reported CPI training has not been conducted in several years and acknowledge some newer employees have never received training at all. This poses a high risk for potential liability for the county. Furthermore, the facility was unable to provide an active policy manual when requested. Staff on-site were not able to find the existing policy manual when it was requested and could only find a version that was approximately 15-years old.

Areas of Non-Compliance and Recommendations
- 2602.20 Administration states "All staff will have a minimum of 40 hours of training annually. . . Employees shall have access to a manual of policies and procedures either in a written or electronic format. Employees shall review policies on a yearly basis and document acknowledgement of their review. Prior to assuming responsibility for supervision of youth, all staff must complete a 40-hour orientation including but not limited to: A) Facility mission and code of ethics; B) Basic rights of incarcerated youth, including legal rights, grievance procedures and right to be free of retaliation for making a complaint; C) Facility policies and procedures, particularly safety, security and fire and other emergency procedures; and D) Confidentiality. In the first year of employment, all staff shall minimally receive an additional 80 hours of training. Employees shall have access to a manual of policies and procedures either in a written or electronic format. Emergency procedures in event of a fire, riot, escape, bomb threat and natural disaster shall be part of the manual. Employees shall review policies on a yearly basis and document acknowledgement of their review. The superintendent shall designate a person to maintain documentation of employee review from year to year."
  - Recommendations:
    - Ensure all new hires receive pre-service training in the areas required by these standards.
    - Develop a schedule to ensure all staff receive 40 hours of training annually.
    - Review and revise all existing policies to reflect recent changes in standards.
    - Have all employees sign-off on receipt of the policy manual annually.
- 2602.30 Personnel states: "Each detention facility must have sufficient personnel to provide adequate 24-hour supervision of youth seven days a week. . . An assistant superintendent, qualified by training and experience to supervise staff and youth, shall be designated for a detention facility of 25 or more rated capacity. . . Staffing levels must anticipate the need for coverage for staff absence for leave and training. . . An agency shall employ or designate an upper-level, agency-wide PREA coordinator with sufficient time and authority to develop, implement, and oversee agency efforts to comply with the PREA standards in all of its facilities. . .All personnel working in the detention center, including contractual staff and volunteers, must complete a background check prior to employment and at least once every five years throughout employment."
  - Recommendations:

- Hire an Assistant Superintendent.
- Hire or designate an upper-level employee to act as PREA Coordinator.
- Compete background checks on all employees who have been employed for five years or longer.
- Develop and implement a plan to substantially increase staffing numbers at the facility.

**Detention Programs, Youth Discipline, and Confinement**

On paper, the facility uses a traditional token economy system in which youth earn points throughout the day based on their behavior which are converted into a behavior level (A-D). In practice, however, the facility does not have a meaningful behavior management system at all. Youth and staff both acknowledged that there is virtually no incentive distinction between levels. The facility does not have any kind of meaningful incentive system. Youth do not earn things like later bedtimes, more phone calls, access to activities, or commissary depending on their level. Youth interviewed were uncertain of what level they were on and indicated that it did not matter since their day looked exactly the same regardless of their level. Behavioral incentives are nonexistent at the facility.

The primary behavioral consequence at the facility is confinement. Youth are confined up to 24 hours for infractions. If a youth's scheduled phone call happens to be scheduled when they are confined, the youth misses the phone call. If a youth is on behavioral confinement during school, they are not permitted to attend. The facility also has a list of youth who were on a confinement status on previous stays and has a practice of making youth serve those consequences if they are re-admitted. These are listed on a board in the supervisor office, with a list of youth names and the length of confinement they have left to serve if they happened to be re-detained again at some point in the future.

On the date of the inspection, most of the youth were confined in their rooms, with a couple of youth watching television alone in their respective dayrooms. There is no formal schedule at the facility, but both staff and youth shared that youth eat all meals in their rooms. Youth rotate for "recreation" in two-hour blocks throughout the day. During this time youth are usually alone in the dayroom and watch television. The facility has a gym and an outdoor recreation area, but youth have not had access to either area since early 2020. Youth are only permitted to shower every other day. The facility was on a summer break from school at the time of inspection, but both youth and staff stated youth have not attended school in any of the classrooms since 2020; rather the educator floats from youth to youth during school time to assist the youth with work. One youth who was interviewed was directly asked by inspectors how many times he had exited his dayroom since he arrived the facility. The youth, who had been detained for two months, shared the only times he has left his small dayroom were for phone calls twice per week, to get a new book, and for court and one professional visit. He stated he had never been to the gym or outside.

The practices surrounding youth confinement at the Franklin County Juvenile Detentions are in significant violation of County Detention Standards. Clearly, some of these are either caused or exacerbated by the staffing levels at the facility. Regardless, however, the day-to-day lives of youth at the facility are best described as isolated, whether isolated in their room or in a slightly larger dayroom.

Youth have no access to the gym or outdoor recreations areas and are only offered showers every other day.

The facility does not offer in-person visitation for youth, which the Acting Superintendent attributed to low staffing number rather than Covid-19 mitigation.

<u>Areas of Non-Compliance and Recommendations</u>

- 2602.100 Clothing, Personal Hygiene, Grooming states: "Opportunities to shower shall be provided daily except as amended by medical advice in individual cases."
    - Recommendation:
        - Provide youth the opportunity to shower daily.
- 2602.170 Discipline states: "All facilities shall have a developmentally appropriate, research informed behavioral management program that supports the development of pro-social skills and provides positive reinforcement for good behavior. The program shall provide opportunities for immediate recognition of pro-social behavior as well as meaningful incentives and rewards for improvement and maintenance of desired behavior. The program shall also include potential sanctions for negative behavior that are developmentally appropriate, research informed, proportionate and fair. Room confinement may be used only as a temporary response to behavior that threatens the safety of the youth and others. Room confinement shall not be used for a fixed period of time, but only until the youth is calm enough to rejoin programming without being a risk to the safety of others. Supervisory staff shall be notified immediately when room confinement is used. At no time should room confinement exceed 4 hours without administrators and/or mental health staff developing an individualized plan to address the behavior. Youth shall not be deprived of the following basic rights as part of a disciplinary response: Approved phone calls; Education."
    - Recommendations:
        - Identify and implement a clear list of incentives associated with each behavior level.
        - Implement a policy that prohibits the use of confinement longer than 4 hours without administrator approval and development of an individualized plan.
        - Enhance the documentation of youth confinement time to include:
            - Written reports that indicate the reason for confinement.
            - The start and end times of the confinement.
            - Attempts to de-escalate the youth and return them to regular programming.
        - End the practice of withholding phone calls and access to education during confinements.
        - End the practice of continuing consequences across different detention stays.
- 2602.210 Visiting states: "A liberal visiting schedule shall be established identifying no fewer than two visiting days each week, one of which must be during the weekday evening hours and one during the weekend. Additionally, visiting shall be allowed on all legal holidays."
    - Recommendations:
        - Establish a visitation schedule that allows for at least two visitation days each week.

8

- 2602.220 Detention Programs states: "Programs designed to address the risk and needs of delinquent youth shall be provided to youth in custody either by staff or community providers. Programs may include drug and alcohol treatment, group or individual counseling, social and life skills training, and family interventions. Facilities shall have in place an evidence-based positive behavior program that targets criminogenic risk and needs of youth in custody."
  - Recommendations:
    - Seek programming to be delivered either by employees or via contract with community organizations and integrate them into a daily youth schedule.
- 2602.260 Recreation and Leisure Time states: "Vigorous physical activities, indoor and out, shall be a part of the daily schedule. Passive indoor activities, in addition to television viewing and radio listening, shall be included. At least one hour of physical recreation and one hour of additional leisure activity shall be scheduled each day."
  - Recommendations
    - Implement a daily schedule that includes, at minimum, one hour of large muscle exercise for each resident in the gym or outdoor recreation space.

**Medical and Health Care**

Medical services are provided via a contract with Wellpath that includes 15 hours of nursing coverage per week. The primary nurse at the facility works in the evenings and is responsible for seeing all youth within seven days of admission for a physical assessment. The facility has a sick call process by which a youth can request to be added to the sick call list, which is maintained in the control room to be given to the nurse upon her arrival. Medication is packaged and organized by day and time for distribution by facility staff. There was not, however, documentation available that indicated physical approval for medication distribution by facility staff. The Wellpath contract includes a physician who is on call and is present at the facility once every two weeks, however there are no psychiatric services included.

Areas of Non-Compliance and Recommendations

- 2602.80 Medical and Health Care states: "Access to psychiatric and/or psychological services shall be provided in individual cases as needed."
  - Recommendations:
    - Hire or contract with an entity to provide psychiatric and/or psychological services.
    - Document physician approval for medication distribution by non-medical personnel.

**Mental Health Services**

Youth at the facility have minimal access to mental health services. The Franklin County Juvenile Detention Center does not have any mental health practitioners employed, nor does the county have a contract with any community mental health service providers. The facility utilizes Screening, Assessments and Support Services (SASS) when youth are in crisis.

Staff at the facility cited a community agency called the Stress and Trauma Center as an agency that has provided services to youth. The primary contact for that agency was interviewed. Essentially, the Stress

9

and Trauma Center is a subcontractor of Redeploy Illinois through the Second Judicial Circuit. Per the program supervisor, youth at the facility only receive services through the Stress and Trauma Center if they are already enrolled in Redeploy. Absent a court-ordered psychological assessment, youth who are not already enrolled do not receive any type of mental health assessment during intake and do not have access to mental health services through Franklin County. Franklin County does not contribute any financial resources towards providing the mental health services to youth at the facility required by the County Detention Standards. As such, the facility is in violation of a large portion of the mental health section of the standards.

Areas of Non-Compliance and Recommendations
- Section 2602.90 Mental Health Services states: "All facilities shall employ or contract with qualified mental health professionals to address the needs of youth identified in the mental health screening, as well as needs that arise during the period of confinement. Services shall meet or exceed the community level of care. . . Youth with significant mental health needs shall be assessed by a qualified mental health professional. A service plan shall be developed for each youth that includes: 1) Counseling or psychotherapy to be provided; 2) Behavioral management strategies and goals; 3) Medication; 4) Protocol for monitoring youth's progress; and 5) Needed adjustments to normal detention programs and procedures. The facility shall provide appropriate services to youth with serious mental illnesses (e.g., bi-polar disorder, psychosis, severe depression) including psychiatric evaluation and care, as well as prescribing and monitoring psychotropic medication."
    - Recommendations:
        - Employ or contract with qualified mental health professionals to provide mental health services to youth at the facility.
            - Provide a mental health assessment for all youth.
            - Develop and implement service plans for all youth with mental health needs.
        - Employ or contract with a psychiatrist to provide psychiatric assessments, services, and medication prescribing and monitoring for youth in need.


**Youth Grievances**

The facility does not have a formal procedure for youth grievances. Youth at the facility were not familiar with a youth grievance process and no policy governing the process was provided. Staff at the facility reported they have not received a youth grievance over the past year.

Areas of Non-Compliance and Recommendations
Recommendations:
- Develop a policy to govern the youth grievance process.
- Incorporate information about the youth grievance process into the Youth Orientation Manual that is to be developed.
- Make grievance forms available to youth without having to obtain one from a staff member.
- Place youth grievance boxes in youth living units and common areas.

- Develop and implement a method for tracking all youth grievances, including the date written and date and summary of the response.

**Food Services**

The facility has a kitchen on-site but does not employ or contract with any formal dietary staff. Food preparation and service is managed by facility staff. This is particularly problematic given the staffing crisis that exists at the facility. Since the facility is typically only staffed by three employees during youth waking hours, having to manage food service preparation is directly exacerbating conditions of confinement that are well below minimum standards.

While the facility does a space for youth to eat meals together, youth have been eating all of their meals in their rooms for the past year.

Areas of Non-Compliance and Recommendations
- Section 2602.110 Food Services states, "At least one full-time cook or the food service provider shall have food services sanitation manager certification from the Illinois Department of Public Health. Meals shall be served and conducted in a group setting except when prohibited by security or medical needs."
  - Recommendations:
    - Hire or contract with a sufficient number of staff to provide dietary coverage for all three meals seven days per week.
    - Serve meals in a group setting.

**Education**

There are two primary teachers employed by the Regional Office of Education that provide services at the facility. One of the teachers is a special education teacher. Youth at the facility are formally enrolled with the Benton High School. One of the teachers does reach out to youth home schools to obtain information and communicate any credits earned while at the facility. School was not in session at the time of the inspection, as the youth were on a summer break. The facility does not offer educational services according to a 12-month schedule; rather the facility operates on a schedule that largely follows that of the Benton High School.

The facility has three classrooms, however, they have not been in use for at least two years. Instead, teachers provide packets of work to youth and rotate amongst the youth to provide individual assistance. As previously noted, the facility had youth largely confined in their rooms and are provided time out of their rooms in the dayroom in a rotation. During the last school year, work was only provided to youth when they were out for their dayroom time. It was not provided to youth when they were in their rooms. The educator reported youth typically spent either the morning or afternoon in their rooms, essentially meaning youth were only provided work for half of a typical school day.

Areas of Non-Compliance and Recommendations

11

- 2602.230 Education states: "A detention facility shall operate a 12-month long schedule of school instruction and programming with appropriately certified teachers that are licensed by the State Board of Education. There shall be a minimum of five hours of instruction per day."
  - Recommendations:
    - Adjust the annual school schedule to include educational service through the summer to operate a 12-month schedule of instruction.
    - Provide 5 hours of education to all youth each day.
    - Utilize the classrooms to provide direct instruction to youth in a traditional classroom setting.

**Recommendations**

| Section | Recommendations |
|---|---|
| Clothing, Personal Hygiene, Grooming | • Provide youth the opportunity to shower daily. |
| Food Services | • Hire or contract with a sufficient number of staff to provide dietary coverage for all three meals seven days per week.<br>• Serve meals in a group setting. |
| Discipline | • Identify and implement a clear list of incentives associated with each behavior level.<br>• Implement policy that prohibits the use of confinement longer than 4 hours without administrator approval and development of an individualized plan.<br>• Enhance the documentation of youth confinement time to include:<br>  ○ Written reports that indicate the reason for confinement.<br>  ○ The start and end times of the confinement.<br>  ○ Attempts to de-escalate the youth and return them to regular programming.<br>• End the practice of withholding phone calls and access to education during confinements.<br>• End the practice of continuing consequences across different detention stays. |
| Administration | • Ensure all new hires receive pre-service training in the areas required by these standards.<br>• Develop a schedule to ensure all staff receive 40 hours of training annually.<br>• Review and revise all existing policies to reflect recent changes in standards.<br>• Have all employees sign-off on receipt of the policy manual annually. |

| | |
|---|---|
| Visiting | • Establish a visitation schedule that allows for at least two visitation days each week. |
| Detention Programs | • Seek programming to be delivered either by employees or via contract with community organizations and integrate them into a daily youth schedule. |
| Education | • Adjust the annual school schedule to include educational service through the summer to operate a 12-month schedule of instruction.<br>• Provide 5 hours of education to all youth each day.<br>• Utilize the classrooms to provide direct instruction to youth in a traditional classroom setting. |
| Recreation and Leisure Time | • Implement a daily schedule that includes, at minimum, one hour of large muscle exercise for each resident in the gym or outdoor recreation space. |
| Personnel | • Hire an Assistant Superintendent.<br>• Hire or designate an upper-level employee to act as PREA Coordinator.<br>• Compete background checks on all employees who have been employed for five years or longer.<br>• Develop and implement a plan to substantially increase staffing numbers at the facility. |
| Admissions Procedures | • Eliminate the use of strip searches as a standard process during intake.<br>• Implement the PREA Risk for Victimization Assessment for youth within 72 hours of admission and periodically throughout a youth's confinement.<br>• Hire a PREA Officer to supervise facility compliance with PREA standards.<br>• Develop a formal Youth Orientation Handbook that contains information on things like programming, a youth grievance procedure, and information regarding PREA.<br>• Develop a form to capture youth acknowledgment of receipt of the Youth Orientation Manual and PREA orientation.<br>• Contract with a third-party entity for youth to access in order to report abuse or harassment in a confidential manner. |
| Medical and Health Care | • Hire or contract with an entity to provide psychiatric and/or psychological services.<br>• Document physician approval for medication distribution by non-medical personnel. |

| | |
|---|---|
| Mental Health Services | • Employ or contract with qualified mental health professionals to provide mental health services to youth at the facility.<br>  ○ Provide a mental health assessment for all youth.<br>  ○ Develop and implement service plans for all youth with mental health needs.<br>• Employ or contract with a psychiatrist to provide psychiatric assessments, services, and medication prescribing and monitoring for youth in need. |
| Youth Grievances | • Develop a policy to govern the youth grievance process.<br>• Incorporate information about the youth grievance process into the Youth Orientation Manual that is to be developed.<br>• Make grievance forms available to youth without having to obtain one from a staff member.<br>• Place youth grievance boxes in youth living units and common areas.<br>• Develop and implement a method for tracking all youth grievances, including the date written and date and summary of the response. |

# Exhibit 7

Franklin County Juvenile Detention Center – Interim Inspection Report

**Summary**

The Department of Juvenile Justice conducted an annual inspection of the Franklin County Juvenile Detention Center on August 2, 2022, pursuant to 730 ILCS 5/3-15-2(b). The Department observed several areas of non-compliance during this review, many of which warranted immediate attention.

The Department of Juvenile Justice conducted a follow-up inspection to assess facility progress towards the noncompliant areas on January 23, 2023. There were some improvements noted, but several areas of significant noncompliance remain. Furthermore, there was an incident at the facility on 12/28/22 in which a youth suffered a broken arm during a use of physical intervention. The Franklin County JDC sometimes utilizes county sheriff personnel as emergency responders when an incident occurs at the facility. In this case, the facility had called the Franklin County Sheriff's Department to assist with a non-compliant youth. Sheriff department deputies responded and engaged the youth in a physical intervention, during which the youth suffered a broken arm.

There are several areas of concern in the follow-up to that incident as it is not clear that there was any kind of significant, internal review of the incident to assess if anything improper occurred to contribute to the youth's injury. The Acting Superintendent initially reported that an internal review was conducted by the Franklin County Sheriff's Department since the staff involved in the incident were Franklin County Sheriff's Department Staff, not juvenile detention staff. The Probation Director reported the internal review was conducted by juvenile detention center administrators. No document or summary of findings was produced. Furthermore, the camera system at the facility was found to be deficient as the system did not record the incident and only shows live footage. Administrators reported they are taking steps to improve the camera system.

The commitment and ability for facility administrators to conduct internal reviews of the use of physical intervention is essential to ensuring youth and staff safety. While this report is intended to assess progress on the 2022 report, some additional recommendations are listed below in light of this event and some other observations.

The table below summarizes the areas of non-compliance and recommendations from the August 2, 2022, inspection, along with the observations from the January 23, 2023 follow-up visit.

**Audit Team:**
John Albright, Chief of Performance and Innovation
Jeremy Burtis, Deputy Director of Operations
Omar Jamil, Senior Policy Advisor

Franklin County Juvenile Detention Center – Interim Inspection Report

| Section | Recommendations from August 2, 2022, Inspection | Status Assessment – January 23, 2023 |
| --- | --- | --- |
| Clothing, Personal Hygiene, Grooming | • Provide youth the opportunity to shower daily. | Met |

The facility has implemented a policy requiring youth be offered a shower daily. Interviews with youth confirmed showers are being offered daily.

| Section | Recommendations from August 2, 2022, Inspection | Status Assessment – January 23, 2023 |
| --- | --- | --- |
| Food Services | • Hire or contract with a sufficient number of staff to provide dietary coverage for all three meals seven days per week.<br>• Serve meals in a group setting. | Not Met |

There has been no progress in this area. While some additional staff have received food handler certificates, Corrections Officers are still making and serving meals and there is no current plan to make changes. All youth meals are still served in the rooms. Though it was noted that the absence of dietary staff was mitigated by security staff helping in preparing meals, it should be noted that these security staff are not trained dietitians. This was observed in the inadequate food that was prepared on the day of the visit. Youth received a double-patty chicken sandwich on a hamburger bun, an iceberg lettuce salad with ranch dressing, peaches in syrup, and a small carton of milk. Using general estimates of calorie and nutritional information for these items, it appears that this meal could not have been more than 780 calories [Chicken patty = 120 calories x 2, 1 hamburger bun = 128 calories, 1 cup of peaches in light syrup = 135 calories, Salad dressing = 145 calories (2 tbsp), and carton of milk = 140 calories]. Assuming the calories in dinner are approximate to that of lunch; youth would receive around 1,600 calories a day, far lower than a 2,000 minimum for sedentary teen youth as recommended by the USDA (https://www.fns.usda.gov/estimated-calorie-needs-day-age-gender-and-physical-activity-level). The facility did provide a menu with caloric values that calculated the total to be slightly over 2,000 calories, however the analysis was done by a previous administrator, not a trained dietitian.

Further, it should be noted that aside from the chicken patties and milk, most of the calories contained in this meal were from simple carbohydrates, which because of a high glycemic index can lead to increased hunger sooner than if more complex carbohydrates (fiber) or proteins were included. Youth reported not having enough food to eat during the day, and that sometimes they would hoard snacks for future use when there was not enough food. Youth reported that in IDJJ facilities, they had the option of receiving double portions if requested. Double-portions or extra helpings were not an option at this facility.

Franklin County Juvenile Detention Center – Interim Inspection Report

| Section | Recommendations from August 2, 2022, Inspection | Status Assessment – January 23, 2023 |
|---|---|---|
| | • Identify and implement a clear list of incentives associated with each behavior level.<br>• Implement policy that prohibits the use of confinement longer than 4 hours without administrator approval and development of an individualized plan.<br>• Enhance the documentation of youth confinement time to include:<br>    ○ Written reports that indicate the reason for confinement.<br>    ○ The start and end times of the confinement.<br>    ○ Attempts to de-escalate the youth and return them to regular programming.<br>• End the practice of withholding phone calls and access to education during confinements.<br>• End the practice of continuing consequences across different detention stays. | Not Met |
| Discipline | There has been very little improvement in this area. The facility maintains the same point and level system as the August 2 visit. Despite having a point and level system, there are few incentives available to youth who achieve higher levels due to the prevalence of confinement at the facility. Youth continue to largely be separated from other youth during the day. Some youth have started attending school in small groups during the day and participate in one hour of recreation time in the gym together, however some youth are not included in these groups. Youth largely spend most of the day in their rooms, rotating to be alone in the dayroom for "free time" in 1–2-hour increments. Youth also reported that if they were confined as a result of a behavioral consequence on the day of their scheduled phone call, they were not permitted to make it.<br><br>As noted in the introduction of this report, there was an incident at the facility on 12/28/22 in which a youth suffered a broken arm during a use of physical intervention. There are several areas of concern in the follow-up to that incident as it is not clear that there was any significant, internal review of the incident to assess if anything improper occurred to contribute to the youth's injury. The Acting Superintendent initially reported that an internal review was conducted by the Franklin County Sheriff's Department since the staff involved in the incident were Franklin County Sheriff's Department staff, not juvenile detention staff. The Probation Director reported the internal review was conducted by juvenile detention center administrators. No document or summary of findings was produced. Furthermore, the camera system at the facility was found to be deficient during the review, as the system did not record the incident and only shows live footage. Administrators reported they are taking steps to improve the camera system.<br><br>The facility has ended the practice of continuing consequences across different detention stays.<br><br>The original recommendations from the August 2, 2022 inspection for the discipline section of the County Detention Standards remain. In addition, the following recommendations are made. | |

Franklin County Juvenile Detention Center – Interim Inspection Report

New Recommendations:
- Develop a policy to manage the review process of incidents involving the use of physical intervention and youth injuries to include video review, identification for the need of staff training or corrective actions, and a process for review documentation.
- Procure fixes or enhancements to the facility video monitoring system to allow for video playback of past events.

| Section | Recommendations from August 2, 2022 Inspection | Status Assessment – January 23, 2023 |
| --- | --- | --- |
| | Ensure all new hires receive pre-service training in the areas required by these standards. | Partially Met |
| | Develop a schedule to ensure all staff receive 40 hours of training annually. | |
| | Review and revise all existing policies to reflect recent changes in standards. | |
| | Have all employees sign-off on receipt of the policy manual annually. | |
| Administration | | |

The Administrative Office of Illinois Courts (AOIC) conducted a 40-hour training for all employees in December 2022 to address the training deficiencies cited in the 2022 report. The facility has updated the policy manual.

| Section | Recommendations from August 2, 2022 Inspection | Status Assessment – January 23, 2023 |
| --- | --- | --- |
| Visiting | Establish a visitation schedule that allows for at least two visitation days each week. | Partially Met |

Franklin County Juvenile Detention Center – Interim Inspection Report

The facility has implemented a visitation schedule that includes two visitation days per week on Sundays and Wednesdays. This is reflected in an updated policy that was made effective in September 2022. Youth confirmed they have access to family visitation twice per week. These visits are only non-contact, however, so while it is good that the facility has implemented visitation twice per week it is a County Detention Standard requirement that all visits shall be contact visits unless there are specific concerns that preclude contact visits for identified individuals.

New Recommendation:

- Permit all youth visits to be contact visits unless there are specific concerns that preclude contacts visits for identified individuals.

| Section | Recommendations from August 2, 2022 Inspection | Status Assessment – January 23, 2023 |
|---|---|---|
| Detention Programs | • Seek programming to be delivered either by employees or via contract with community organizations and integrate them into a daily youth schedule. | Not Met |

There has been very little progress towards this recommendation. There is no substantive programming provided by facility staff. Administrators and youth shared one instance of a community organization providing programming in the facility since the last audit, but there is no evidence of any attempts to increase this otherwise.

Franklin County Juvenile Detention Center – Interim Inspection Report

| Section | Recommendations from August 2, 2022 Inspection | Status Assessment – January 23, 2023 |
|---|---|---|
| Education | • Adjust the annual school schedule to include educational service through the summer to operate a 12-month schedule of instruction.<br>• Provide 5 hours of education to all youth each day.<br>• Utilize the classrooms to provide direct instruction to youth in a traditional classroom setting. | Not Met |

Some youth have started attending school in the classroom; however, youth only attend a half day of school and rotate with youth on the living units.

| Section | Recommendations from August 2, 2022 Inspection | Status Assessment – January 23, 2023 |
|---|---|---|
| Recreation and Leisure Time | • Implement a daily schedule that includes, at minimum, one hour of large muscle exercise for each resident in the gym or outdoor recreation space. | Partially Met |

The facility has begun to allow youth to participate in recreational activity in the gym in groups, however youth reported some disruption to their attendance at times due to consequences or staffing levels.

Franklin County Juvenile Detention Center – Interim Inspection Report

| Section | Recommendations from August 2, 2022 Inspection | Status Assessment – January 23, 2023 |
|---|---|---|
| | • Hire an Assistant Superintendent.<br>• Hire or designate an upper-level employee to act as PREA Coordinator.<br>• Compete background checks on all employees who have been employed for five years or longer.<br>• Develop and implement a plan to substantially increase staffing numbers at the facility. | Partially Met |
| Personnel | | |
| The Franklin County Juvenile Detention Center has taken some steps to address the needs in this area. At the time of the August 2, 2022 review, the facility only employed eight full-time employees. The County has made some changes to increase recruitment by increasing the starting salary from $28,000/year to $43,000/year. At the time of the January 23, 2023 review, the facility had a total of 12 full-time employees, three of which are supervisory staff. The facility has also promoted one person to the role of Assistant Superintendent, who is functioning as the Acting Superintendent. While the staffing numbers have improved, significantly more staff are needed to sufficiently correct the areas of non-compliance from the 2022 inspection report. There has not been anyone identified as a PREA Coordinator at the facility. | | |

| Section | Recommendations from August 2, 2022 Inspection | Status Assessment – January 23, 2023 |
|---|---|---|
| | • Eliminate the use of strip searches as a standard process during intake.<br>• Implement the PREA Risk for Victimization Assessment for youth within 72 hours of admission and periodically throughout a youth's confinement.<br>• Hire a PREA Officer to supervise facility compliance with PREA standards.<br>• Develop a formal Youth Orientation Handbook that contains information on things like programming, a youth grievance procedure, and information regarding PREA.<br>• Develop a form to capture youth acknowledgment of receipt of the Youth Orientation Manual and PREA orientation.<br>• Contract with a third-party entity for youth to access in order to report abuse or harassment in a confidential manner. | Not Met |
| Admissions Procedures | | |
| There are no improvements in this area. The facility does not have any updated admissions policies, orientation materials, or PREA-related improvements. The facility still conducts strip searches of all youth upon intake. | | |

Franklin County Juvenile Detention Center – Interim Inspection Report

| Section | Recommendations from August 2, 2022 Inspection | Status Assessment – January 23, 2023 |
|---|---|---|
| Medical and Health Care | • Hire or contract with an entity to provide psychiatric and/or psychological services.<br>• Document physician approval for medication distribution by non-medical personnel. | Not Met |

There has been no improvement in this area. No contract was provided that indicated youth access to psychiatric services.

| Section | Recommendations from August 2, 2022 Inspection | Status Assessment – January 23, 2023 |
|---|---|---|
| Mental Health Services | • Employ or contract with qualified mental health professionals to provide mental health services to youth at the facility.<br>  ○ Provide a mental health assessment for all youth.<br>  ○ Develop and implement service plans for all youth with mental health needs.<br>• Employ or contract with a psychiatrist to provide psychiatric assessments, services, and medication prescribing and monitoring for youth in need. | Not Met |

There has not been any improvement in this area. Administrators reported they have a contract in place with Advanced Correctional Healthcare (ACH) to provide mental health services "as needed" based upon the request of the Administration Team. Auditors requested a copy of the contract, but it was not provided. Youth reported having minimal contact with anyone providing mental health services.

Franklin County Juvenile Detention Center – Interim Inspection Report

| Section | Recommendations from August 2, 2022, Inspection | Status Assessment – January 23, 2023 |
|---|---|---|
| | • Develop a policy to govern the youth grievance process.<br>• Incorporate information about the youth grievance process into the Youth Orientation Manual that is to be developed.<br>• Make grievance forms available to youth without having to obtain one from a staff member.<br>• Place youth grievance boxes in youth living units and common areas.<br>• Develop and implement a method for tracking all youth grievances, including the date written and date and summary of the response. | Not Met |
| Youth Grievances | | |
| The facility has not updated policies governing the youth grievance process in a manner consistent with County Detention Standards. The facility has a form for youth to use, but they have to request them from a staff member to access them. There are no youth grievance boxes available on the living units to assist with confidentiality. Rather, youth have to turn grievances in to staff in order to be addressed. One youth reported he had written two grievances on blank pieces of paper, placed them in envelopes, and given them to staff but did not receive any response. The acting superintendent is tasked with responding to grievances but reported she had not received the grievances the youth claimed to have submitted. All of the findings of non-compliance and recommendations in this area remain. | | |

# Exhibit 8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| L.S., on behalf of himself and all others similarly situated, by his next friend JASON MAURER, ) ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | |
| FRANKLIN COUNTY, CHIEF JUDGE MELISSA MORGAN of the Second Judicial Circuit Court, DARLA FITZJERRELLS, Director of Court Services of the Second Judicial Circuit Court, and LAVONDA PORTER, Acting Superintendent of the Franklin County Juvenile Detention Center, ) ) ) ) ) ) ) ) ) ) | Case No. _____ Hon. _____ |
| Defendants. ) ) ) | |

## DECLARATION OF LOUIS KRAUS, M.D.

I, Louis Kraus, pursuant to 28 U.S.C. § 1746, declare as follows:

### Expert Qualifications

1.      I am currently Professor and Division Director of Child and Adolescent Psychiatry at Rush University Medical Center in Chicago, Illinois. In that capacity, I supervise and train child and adolescent psychiatry fellows in various placements, including in-patient, residential treatment, and outpatient programs for children, adolescents, and young adults. I am also currently the Psychiatric Director at the Sonia Shankman Orthogenic School, a day treatment program for children and adolescents in need of support for profound emotional issues; the Founding Director of the Autism Assessment, Research, Treatment and Services Center ("AARTS") at Rush University Medical Center; and the Medical Director of the Chicago Metropolitan Easter Seals

1

Therapeutic School, a school providing a continuum of services for children with autism. I also have a private practice where I assess and treat children and adolescents and provide therapy and psychopharmacological services.

2.      I have worked with juveniles in correctional settings for the past 33 years, including for nine years from 1990 to 1999 as the treating psychiatrist at the Illinois Maximum Security Youth Center in Joliet, Illinois. From 2003 to 2004, I was a consultant to the Civil Rights Division of the United States Department of Justice on a Civil Rights of Institutionalized Person Act (CRIPA) investigation in Maryland. I also consulted with the American Civil Liberties Union of Illinois in a case challenging conditions in the Cook County Juvenile Temporary Detention Center which resulted in system-wide restructuring of mental health services for juveniles held in pretrial detention. I have served as a consultant on various other correctional and juvenile justice matters. I more recently worked as an expert in Palm Beach County, New York, and in several cases in Seattle, Washington.

3.      I have been appointed to serve as monitor in consent decrees involving reform in juvenile justice systems in Arizona and Illinois, both of which included reform to the use of solitary confinement against juveniles in those systems. In my monitor role in Illinois, which is currently ongoing, I am assessing and restructuring the mental health programming of the Illinois Department of Juvenile Justice. *See R.J. v. Mueller*, No. 1:12-cv-07289 (N.D. Ill. Sept. 2012). In the Arizona case, I assisted the Department of Justice from 2005 to 2008 in restructuring the mental health, medical services, and dental services in two state facilities. *See United States v. Arizona*, No. 2:04-cv-01926-EHC (D. Ariz. Sept. 2004).

4.      I have also been involved in special education consulting and development of Individualized Education Programs and Plans ("IEPs") for the past twenty-six years. I am currently

a consultant on special education issues to over fifteen school districts in Illinois. I typically complete one educational evaluation every week, assist with developing IEPs, and attend IEP meetings. I have testified regarding special education issues in due process hearings under the Individuals with Disabilities Education Act as well as in other civil cases.

5.      I have authored a number of publications on treatment of juveniles in correctional settings. I am the primary author of the American Academy of Child and Adolescent Psychiatry's ("AACAP") Policy Statement on Solitary Confinement. I assisted in the completion of the American Psychological Association policy statement on Solitary Confinement of Juveniles. I co-edited two monographs on juvenile justice reform for the AACAP, I co-edited a book through Cambridge University Press entitled *The Mental Health Needs of Young Offenders*, and also edited a book through the Child and Adolescent Psychiatric Clinics of North America entitled *Adjudicated Youth*, published in January of 2016. I wrote the Practice Parameter for Child and Adolescent Forensic Evaluations for child and adolescent psychiatry, which was published in the Journal of Child and Adolescent Psychiatry.

6.      I have served in a number of professional appointments in my field. From June 2014 to 2015, I served as the chair-elect of the American Medical Association's Council on Science and Public Health, and from 2015 to 2016, I served as chair. From May 2012 to May 2015, I was the chair of the American Psychiatric Association's Council on Children, Adolescents and Their Families, which I had served in as a member for 18 years. From October 2000 to October 2015, I was the chair of the AACAP's Juvenile Justice Reform Committee, and from 2011 to 2013, I was chair of the AACAP Assembly.

7.      I was on the Board of Directors of the National Commission of Correctional Health Care ("NCCHC") from 1997 to 2003. I was appointed chairman of the NCCHC Committee on

Juvenile Health Care from 1999 to 2003 and served as vice-chairman of the same committee in 1998.

8.      I obtained my Doctor of Medicine degree, M.D., from the Chicago Medical School in 1987 and my Bachelor of Science degree, B.S., from Syracuse University in 1983.

9.      I include a copy of my Curriculum Vitae to this report which includes all publications that I have authored in the previous ten years. *See* Exhibit A. I also include a list of the cases that I have testified in as an expert at trial or deposition during the past four years. *See* Exhibit B.

**Professional Opinions Regarding Practice of Solitary Confinement**

10.     In this present case, I was asked by the ACLU of Illinois to evaluate the effects of solitary confinement on children in connection with this action challenging the conditions of confinement at the Franklin County Juvenile Detention Center ("FCJDC") in Benton, Illinois.

11.     For the purpose of preparing this declaration, I reviewed the Illinois Department of Juvenile Justice's August 2022 audit of FCJDC, which described the facility's use of solitary confinement, among other things. I also reviewed the complaint in this case and the declarations of the young people that were submitted with the complaint in this case. I understand that FCJDC's policy and practice is to isolate children in solitary confinement for more than 20 hours a day and sometimes for days at a time, in locked cells alone, depriving them of meaningful social interaction, environmental stimulation, outdoor recreation, educational instruction, access to personal property, and adequate sanitation.

12.     I also understand that there are no mental health professionals or counselors employed at FCJDC.

13.     It is my professional view, based on over three decades of academic and

professional experience, that children detained in extended solitary confinement as described above and by IDJJ's report—whether for administrative or disciplinary reasons—are at risk of serious harm.

14.     The AACAP defines solitary confinement as the placement of an incarcerated individual "in a locked room or cell with minimal or no contact with people other than staff of the correctional facility." The NCCHC defines solitary confinement or "isolation" as "the housing of an adult or juvenile with minimal to rare meaningful contact with other individuals" who "often experience sensory deprivation and are offered few or no educational, vocational, or rehabilitative programs."

15.     Solitary confinement can be dangerous for anyone, but juveniles are especially susceptible to the severe and devastating psychological impacts of solitary confinement because of their ongoing physical, social, psychological, and neurological development.

16.     The risk of harm from solitary confinement exists for all children, even for short periods of time, and increases with the length of confinement.

17.     Medical research on adolescent brains explains why juveniles are more vulnerable to the negative effects of solitary confinement. In the adolescent and young adult brain, the connections between the frontal lobe and the mid-brain have not fully developed. The mid-brain, which is the part of the brain responsible for the flight-or-fight response, is firing away. If an adolescent is traumatized in certain ways, it can cause permanent changes in brain development and create a higher risk of developing permanent psychiatric symptoms like paranoia and anxiety. This trauma in the developing brain can likely lead to changes in brain structure for these juveniles. Trauma, such as what is induced by solitary confinement, has a high likelihood of causing these permanent changes.

5

18.     Based on knowledge of the brain development and the impact of adverse childhood experiences on the physical, mental, and behavioral health of children and adolescents, experts agree that children subject to solitary confinement in the criminal justice system are at increased risk for adverse reactions.

19.     These risks are even more pronounced for children who have mental illnesses or developmental disabilities. Children with mental illness constitute a high proportion, at least 60%, of the population in the juvenile justice system.

20.     Solitary confinement negatively impacts juveniles by perpetuating, worsening, or precipitating mental health concerns, including but not limited to post-traumatic stress disorders, psychosis, anxiety disorders, major depression, suicidal ideation, suicidal intent, self-mutilation, and suicidal behavior. Solitary confinement has a high likelihood of bringing on acute symptomatology, even if the symptomatology is not already present in the individual. For the estimated 60% of youth in correctional settings who already have this symptomatology, the incidence of presenting it again after solitary confinement is much higher.

21.     There is a clear medical consensus that for those juveniles with mental illnesses, the risk of serious harm from solitary confinement is especially great. People with mental illnesses already have deficits in their brain structure or biochemistry. They have weakened defensive mechanisms, making them less resilient than the general population. They are at a higher risk for mental health symptoms and are more susceptible to the significant trauma of social isolation. The trauma of social isolation that can occur for those with mental illnesses will be even more significant and long-lasting than for those without a mental illness.

22.     There is a high correlation between juvenile suicide and the use of solitary confinement in detention, including when solitary confinement is used for short periods of time.

6

A national study by the U.S. Department of Justice's Office of Juvenile Justice and Delinquency Prevention found that half of youth who committed suicide in juvenile facilities were in isolation at the time of their death and more than 60% percent of young people who committed suicide in detention had a history of being held in isolation. Of the children held in detention centers, suicides occurred within the first 4 months of confinement, with 40% of those suicides occurring within the first 72 hours. This evidence demonstrates a substantial risk of serious harm that can be fatal for children exposed to solitary confinement for even short periods of time.

23.     The absence of mental health treatment and intervention for children placed in solitary confinement exacerbates these harms and dangers.

24.     Solitary confinement can cause long-term harm, including chronic conditions like depression which, in teenagers, can manifest as anger or as self-harm. Children who experience depression and anxiety are at a higher risk of presenting with these diagnoses again after their release from solitary confinement. In addition, the damage from solitary confinement associated with low self-esteem, vegetative features, and hopelessness associated with depression can be similarly long-standing. Depression in the general population is generally associated with a standard 10-15% mortality rate for suicide, and solitary confinement increases the risk of depression and suicide substantially compared to the general population.

25.     Solitary confinement of juveniles can also lead to long-term trust issues with adults, including paranoia, anger, and hatred directed at others. This makes it difficult to create a trusting, therapeutic relationship. It can also lead to noncompliance with treatment in the future, making it hard for people to get the help that they need to address the mental health concerns resulting from solitary confinement.

26.     In my experience, juveniles placed in solitary confinement also exhibit fear,

7

dissociative episodes, and anxiety, which may lead to increased levels of hopelessness, paranoia, and lack of trust in others resulting from the arbitrary nature of the use of solitary confinement as a punishment in detention. This creates an anxious and fearful environment for the children even when they are not in solitary confinement, as they cannot predict which behaviors will result in their placement in solitary confinement again. Furthermore, when children are subjected to open-ended, and repeated, solitary confinement it exacerbates mental health conditions as they perceive that they are subjected to seemingly interminable periods of time in isolation. Children experience time differently—a day to a child feels longer than a day to an adult—and have a greater need for social stimulation. Juveniles should be managed in a correctional setting using defined structures for behavioral management and imposition of discipline, as well as mental health interventions.

27.     Children that I have interviewed in various detention facilities, including those that documented as having a pre-existing mental illness or suicide risk, have reported they had the following symptoms (or that symptoms became worse) while they were in solitary confinement: depression, distrust, fear, anxiety, thoughts of self-harm, sadness, and engaging in self-harm. These harms are consistent with the literature about the damaging impacts of solitary confinement.

28.     For these reasons, several health, medical, corrections, and professional organizations have condemned solitary confinement of children recognizing that they are particularly vulnerable to the adverse psychiatric consequences of such confinement. The American Academy of Child and Adolescent Psychiatry opposes the use of solitary confinement for juveniles in correctional facilities, recognizing the damaging impacts from solitary confinement relevant to adolescents' developmental vulnerabilities and that the majority of suicides in juvenile correctional facilities occur when the individual is isolated or in solitary confinement. The National Commission on Correctional Health Care, a major accrediting agency, takes the position that

juveniles should be excluded from solitary confinement completely. The American Medical Association has called for correctional facilities to halt the isolation of juveniles in solitary confinement for disciplinary purposes. The American Psychiatric Association has supported this position statement. The United Nations Rules for the Protection of Juveniles Deprived of their Liberty specifically prohibit the solitary confinement of juvenile offenders. The World Health Organization has recognized that solitary confinement is particularly harmful to children, noting the particular vulnerabilities of children, who are developing physically, mentally and socially, and the high rates of mental illness and suicide among young people. The United Nations Standard Minimum Rules for the Treatment of Prisoners, revised in 2015 as the Nelson Mandela Rules, completely prohibit solitary confinement for children. The Council of Juvenile Correctional Administrators opposes the use of solitary confinement for juveniles based on research that shows that placing detained youth in isolation has "negative public safety consequences" and "does not reduce violence and likely increases recidivism" and can cause "permanent psychological damage" and is highly correlated with suicide. In 2016, the United States Department of Justice ended the practice of using solitary confinement for juveniles in all federal prisons because of the growing consensus of the risk of harm for children.

29.     Research studies and professional guidelines on the potentially damaging effects of solitary confinement are evolving, namely, that mental health professionals, institutions, and government agencies have formed a consensus that solitary confinement is deeply problematic, and correctional systems must find better ways to manage incarcerated individuals—particularly when they are juveniles.

30.     The harm that children suffer as a result of solitary confinement becomes more severe when there is no programming or environmental stimulation, as well as when the cells and

facility are in poor physical condition. Denying children educational opportunities further exacerbates an already harmful environment.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 20th day of June 2023.                Respectfully submitted,


/s/ Louis Kraus, MD  _____

**<u>REFERENCES</u>**

American Academy of Child & Adolescent Psychiatry, *Solitary Confinement of Juvenile Offenders* (April 2012), https://www.aacap.org/aacap/Policy_Statements/2012/Solitary_Confinement_of_Juvenile_Offenders.aspx.

American Medical Association, *Solitary Confinement of Juveniles in Legal Custody H-60.922*, https://policysearch.ama-assn.org/policyfinder/detail/youth%20solitary%20confinement?uri=%2FAMADoc%2FHOD.xml-0-5016.xml.

American Psychiatric Association, *Position Statement on Solitary Confinement of Juveniles* (May 2018), https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Solitary-Confinement-Restricted-Housing-of-Juveniles.pdf.

American Psychological Association, *Brain research advances help elucidate teen behavior* (2004), https://www.apa.org/monitor/julaug04/brain.

Karen M. Abram, Linda A. Teplin, et al., *Posttraumatic Stress Disorder and Trauma in Youth in Juvenile Detention*, 61 Archives Gen. Psychiatry 403, 403-10 (2004).

Elizabeth Bennion, *Banning the Bing: Why Extreme Solitary Confinement Is Cruel and Far Too Usual Punishment*, 90 Ind. L.J. 741, 753 (2015).

Samantha Buckingham, *Trauma Informed Juvenile Justice*, 53 Am. Crim. L. Rev. 641, 654 (2016).

Andrew B. Clark, *Juvenile Solitary Confinement as a Form of Child Abuse*, 45 J. Am. Acad. Psychiatry and the Law, 350 (2017).

Child Welfare Information Gateway, *Child Maltreatment and Brain Development: A Primer for Child Welfare Professionals* (March 2023), https://www.childwelfare.gov/pubPDFs/brain_development.pdf.

Council of Juvenile Correctional Administrators, *CJCA Toolkit: Reducing the Use of Isolation* (March 2015), https://stopsolitaryforkids.org/wp-content/uploads/2016/04/CJCA-Toolkit-Reducing-the-use-of-Isolation.pdf.

*Department of Justice Review of Solitary Confinement*, The White House Office of the Press Secretary (January 2016), https://obamawhitehouse.archives.gov/the-press-office/2016/01/25/fact-sheet-department-justice-review-solitary-confinement.

Stefan Enggist, Lars Møller, Gauden Galea, and Caroline Udesen, *Prisons and Health*, World Health Organization (2014), file:///C:/Users/apicard/Downloads/9789289050593-eng.pdf.

Jay N. Giedd, et al., *Quantitative magnetic resonance imaging of human brain development: ages 4-18*, 6 Cerebral Cortex 551, 551-59, (1996).

Jay N. Giedd, et al., *Brain development during childhood and adolescence: a longitudinal MRI study*, 2 Nature Neuroscience 861, 861-63 (1999).

Stuart Grassian, *Psychopathological Effects of Solitary Confinement*, 140 Am. J. of Psychiatry 1450, 1452 (1983).

Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U.J.L. & Pol'y 325 (2006).

Stuart Grassian & Nancy Friedman, *Effects of Sensory Deprivation in Psychiatric Seclusion and Solitary Confinement*, 8 Int'l J.L. & Psychiatry 49 (1986).

Lindsay Hayes, *Juvenile Suicide in Confinement: A National Survey*, U.S. Department of Justice Office of Justice Programs (February 2009), https://www.ojp.gov/pdffiles1/ojjdp/213691.pdf.

*Intersection Between Mental Health and the Juvenile Justice System*, U.S. Department of Justice Office of Juvenile Justice and Delinquency Prevention (July 2017), https://ojjdp.ojp.gov/model-programs-guide/literature-reviews/intsection_between_mental_health_and_the_juvenile_justice_system.pdf.

Sara B. Johnson, et al., *Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy*, Journal of Adolescent Health (2009), https://www.jahonline.org/article/S1054-139X(09)00251-1/fulltext;

National Commission on Correctional Health Care, *Solitary Confinement (Isolation)* (April 2016), https://www.ncchc.org/position-statements/solitary-confinement-isolation-2016/.

Sandra Simkins, Marty Beyer, and Lisa Geis, *The Harmful Use of Isolation in Juvenile Facilities: The Need for Post-Disposition Representation*, 38 Wash. U.J.L. & Pol'y 241, 253-61 (2012).

Kathleen Skowyra and Joseph Cocozza, *A Blueprint for Change: Improving the System Response to Youth with Mental Health Needs Involved with the Juvenile Justice System*, The National Center for Mental Health and Juvenile Justice Policy Research Associates, Inc. (January 2007).

Linda A. Teplin, et al., *Psychiatric Disorders in Youth in Juvenile Detention*, 59 Archives Gen. Psychiatry 1133, 1133-43 (2002).

United Nations General Assembly, *U.N. Rules for the Protection of Juveniles Deprived of their Liberty* (1990), https://www.ohchr.org/en/instruments-mechanisms/instruments/united-nations-rules-protection-juveniles-deprived-their-liberty#:~:text=Juveniles%20deprived%20of%20their%20liberty%20shall%20not%20for%20any%20reason,with%20the%20deprivation%20of%20liberty.

United Nations General Assembly, *Resolution adopted by the General Assembly on 17 December 2015* (January 2016), https://documents-dds-ny.un.org/doc/UNDOC/GEN/N15/443/41/PDF/N1544341.pdf?OpenElement.

# Appendix A

## LOUIS JAMES KRAUS, M.D., DFAPA, FAACAP
Woman's Board Professor of Child and Adolescent Psychiatry
Chief, Section of Child and Adolescent Psychiatry
Rush University Medical Center

910 Skokie Boulevard, Suite 230
Northbrook, IL 60062
Office Telephone: (847) 559-0560
Cell: (847) 217-7755
Email: rkraus9@mac.com

**PERSONAL DATA:**          Louis James Kraus, MD
                           DOB:  12-3-1960 USA

**EDUCATION:**

| | |
|---|---|
| 1987 | M.D., University of Health Sciences, The Chicago Medical School |
| 1983 | B.S., Syracuse University |

**POSTGRADUATE TRAINING:**

| | |
|---|---|
| 7/1/92-6/30/94 | Child and Adolescent Psychiatry Fellow, The University of Chicago, Chicago, Illinois |
| 10/1/88-6/30/92 | Psychiatry Resident, Northwestern University, Chicago, Illinois |
| 7/1/91-12/31/91 | Chief Resident, Psychiatry, Northwestern University, Chicago, Illinois |
| 7/1/87-6/30/88 | Surgical Intern, Boston University, Boston, Massachusetts |

**ACADEMIC APPOINTMENTS:**

| | |
|---|---|
| July 2016 – Present | Professor of Clinical Psychiatry, Rush University Medical Center |
| July 2003 – June 2016 | Associate Professor of Clinical Psychiatry, Rush University Medical Center |
| March 2001 – 2002 | Visiting Associate Professor of Psychiatry, University of Illinois at Chicago |
| July 2001 – 2002 | Assistant Professor of Psychiatry, Northwestern University |
| November 1997 – July 2001 | Clinical Instructor, Dept. of Psychiatry, Northwestern University |

1

July 1994 – August 1997          Assistant Professor, Department of Psychiatry, University of Chicago

July 1994 – August 1997          Director of Child and Adolescent Forensic Psychiatry, University of Chicago

**BOARD CERTIFICATION**:

May, 2015 (Current)              Maintenance of Certification in **Child and Adolescent Psychiatry**, by The American Board of Psychiatry and Neurology, Certification No. 3956

June, 2019 (Current)             Board Certified in **Forensic Psychiatry**, by the American Board of **Psychiatry and Neurology**, Certification No. 1079

October, 1995 (Current)          Board certified in **Child and Adolescent Psychiatry**, by The American Board of Psychiatry and Neurology, Certification No. 3956

December, 1993 (Lifetime)        Board certified in **General Psychiatry**, by The American Board of Psychiatry and Neurology, Certification No. 38252

**LICENSE**:

| | | |
|---|---|---|
| State of Illinois | No. 036-079584 | Expires: 07/31/2023 |
| State of Florida | No. ME 83084 | Expires: 01/31/2023 |
| State of Arizona | No. 33456 | Expires: 04/03/2023 |

**HONORS AND AWARDS**:

- 2020 Agnes Purcell McGavin Award for Distinguished Career Achievement in Child and Adolescent Psychiatry from the American Psychiatric Association (APA) and APA Foundation.
- Child and Adolescent Psychiatry, Award: "Scholarship and Perseverance in the Creation of our Practice Parameter for Child and Adolescent Forensic Evaluations", 58th Annual Meeting, Toronto, Canada, October 2011.
- Fellow, American Academy of Child and Adolescent Psychiatry (2006)
- Distinguished Fellow, American Psychiatric Association (2004)
- Woman's Board Professor of Child and Adolescent Psychiatry, Rush University Medical Center (2004)
- AMA Glaxo Welcome Emerging Leaders Development Program (1998)
- Top Doctor – 1997 - 2001
- Resident Fellowship of The American Psychoanalytic Association (1992)
- Laughlin Fellow, Northwestern University (1991)
- Magna Cum Laude, Syracuse University
- Phi Beta Kappa Honor Society
- Honors Program in Biology, Syracuse University

**PROFESSIONAL SOCIETY MEMBERSHIPS**

American Medical Association
American Academy of Child and Adolescent Psychiatry
American Academy of Psychiatry and the Law
American Psychiatric Association
Illinois State Medical Society
Illinois Council of Child and Adolescent Psychiatry
Illinois Psychiatric Association
Chicago Medical Society
American College of Psychiatrists

**TEACHING EXPERIENCE:**

| | |
|---|---|
| Sept 2021-Present | Supervise Rush child and adolescent psychiatry fellows of the Orthogenic Day School. |
| May 2008 – Present | American Psychiatric Association Mentor for psychiatric residents through the Council on Children, Adolescents and Their Families |
| July 2006 – June 2021 | Supervise Rush child and adolescent psychiatry fellows at the Sonia Shankman Orthogenic School (a residential school) |
| July 2002 – Present | Supervise general residents and child and adolescent fellows at Rush University Medical Center |
| July 2002 – Present | Developed forensic rotation at Rush University Medical Center for child and adolescent fellows allowing them to observe forensic evaluations in court, and the Cook County Juvenile Pre-Detention Facility |
| July 2002 – Present | Develop school consult didactics as well as didactics dealing with Autism at Rush University Medical Center; Supervise Rush University Medical Center's child and adolescent fellows in their school Autism rotation at the Chicago Metropolitan Easter Seals Therapeutic Day Schools |
| July 2002 - Present | Develop and teach the child and adolescent forensic psychiatry course for child and adolescent psychiatry fellows at University of Illinois at Chicago and Rush University Medical Center |
| July 2002 - Present | Teach and supervise medical students in clinical rotations through child and adolescent psychiatry at Rush University Medical Center |
| March 2001 – July 2002 | Supervise and lecture residents at University of Illinois |

3

| August 1997 – March 2001 | Teaching and lecturing to general psychiatry residents at Northwestern University |
| August 1997 – March 2001 | Supervise child and adolescent psychiatry residents and general psychiatry residents at Northwestern University |
| August 1994 – 1997 | Provide child and adolescent forensic psychiatry course offered to residents and fellows at the University of Chicago |
| August 1993 – 1997 | Supervise child and adolescent psychiatry fellows, psychiatry residents and psychology trainees at the University of Chicago |
| July 1991- July 1992 | Supervise psychiatry residents at Northwestern University |

**ELECTED POSITIONS:**

| June 2008 – Oct 2021 | Chair, AACAP Delegation to AMA House of Delegates |
| July 2015 – June 2016 | Chair, AMA Council on Science and Public Health |
| July 2014 – June 2015 | Chair Elect, AMA Council on Science and Public Health |
| 2011 – 2013 | Chair, AACAP Assembly |
| 2011 – 2013 | AACAP Executive Committee |
| July 2008 – June 2016 | AMA Council on Science and Public Health |
| 2009 – 2011 | Vice-Chair, AACAP Assembly |
| 2007 – 2009 | AACAP Assembly Treasurer |
| 2007 – 2013 | AACAP Council |
| 2002 – 2004 | AACAP Assembly Representative to the Executive Committee |

**REVIEWER:**

Guest Reviewer – Journal of The American Academy of Child and Adolescent Psychiatry
Panelists –AMA Organized Medical Staff on Science and Public Health June 6, 2018
Guest

**TRAINEES AND MENTOREES:**

| 2005 – Present | Ongoing Mentoring for AACAP and APA Mentor Programs |
| 2005 – 2007 (Jada Johnson, MD) | Chair, Psychiatry, Illinois Masonic Hospital |
| 2002 – 2004 (Shiraz Butt, MD) | Prior Medical Director, Maryville Academy |
| 1998 – 2000 (Lucyna Puszkarska, MD) | Medical Director, River Edge Hospital |
| 2021-Present (Adrienne Adams) | Medical Director, for Rosecrance Residential Treatment Program |

**PROFESSIONAL SOCIETY APPOINTMENTS**

| 2017 – 2021 | APA Budget & Finance Committee |
| May 2015 – 2021 | American Psychiatric Foundation (APF BOD), Board of Directors |
| 2014 – 2021 | CMS District 1, Delegate to 2014 Illinois House of Delegates |

| | |
|---|---|
| May 2012 – 2016 | Chair – Council on Children, Adolescents and Their Families, American Psychiatric Association |
| May 2012 – May 2014 | Chicago Medical Society, District 1 Councilor |
| May 2012 – May 2013 | Chicago Medical Society District 1, Alternate Delegate to Illinois 2013 House of Delegates |
| November 2010 – June 2011 | APA Task Force on Prevention of Bullying. |
| 2009 – Present | APA Political Action Committee (PAC) Board |
| October 2009 – Present | AACAP Committee on Juvenile Justice Reform |
| April 2008 – 2009 | Member APA Council on Children, Adolescents and Their Families. |
| 2008 – Present | AACAP Delegate to AMA House of Delegates |
| May 2007 – Present | Member – Council on Children, Adolescents and Their Families, American Psychiatric Association |
| September 2001 – Present | Co-chairman of the AACAP committee on Juvenile Justice Reform. |
| May 2001 – 2010 | Chairman of the American Psychiatric Association Committee on Juvenile Justice Issues |
| December 2000 – 2007 | AACAP Alternate Delegate to the AMA House of Delegates 2007 |
| June 2000 – June 2002 | President, Illinois Council of Child & Adolescent Psychiatry |
| December 1999 – December 2000 | AACAP Delegate for Young Physicians to the AMA |
| November 1999 – 2001 | Evanston Northwestern Healthcare Child Protection Committee |
| September 1999 – March 2001 | Member, Evanston Mental Health Board, Substance Abuse Task Force |
| June 1999 – 2001 | Member, AMA Advisory Board on Alcohol Intervention Project for Youth |
| January 1999 – January 2003 | Chairman, National Commission on Correctional Health Care, Committee on Juvenile Health Care |
| 1998- 2010 | Member of the American Psychiatric Association Committee on Juvenile Justice Issues |
| October 1998 – Present | Delegate, for The Illinois Council of Child and Adolescent Psychiatry to American Academy of Child and Adolescent Psychiatry (AACAP) |

| September 1998 – 2000 | Clinical Advisor, Chicago Metropolitan Child and Adolescent Comprehensive Community Services Systems Network Advisory Council |
|---|---|
| April 1998 – December 1998 | Vice Chairman, National Commission on Correctional Health Care, Committee on Juvenile Health Care |
| April 1998 – December 1998 | Vice Chairman, National Commission on Correctional Health Care, Task Force for Revision of the NCCHC Standards for Health Services in Juvenile Detention and Confinement Facilities |
| June 1997 – January 1999 | Chairperson of AACAP Committee for New Physicians |
| June 1997 – January 2003 | Board of Directors, National Commission on Correctional Health Care |
| January 1997 – July 2000 | Program Chairman, Illinois Council for Child and Adolescent Psychiatry |
| July 1995 – July 1996 | Program Chairman for Chicago Society for Adolescent Psychiatry |
| September 1994 – October 1999 | AACAP Committee on Foster and Adoptive Families |
| March 1994 – December 1996 | AACAP Alternate Delegate for Young Physicians to the AMA |

**CONSULTING POSITIONS**

| January 2013-Present | Federal Consent Decree appointment, Assessment and restructuring of the mental health programming for the Illinois Department of Juvenile Justice (IDJJ) under a Consent Decree filed with the Attorney General's Office by the American Civil Liberties Union (ACLU) of Illinois in December 2012 (RJ v. Bishop) |
|---|---|
| February 2006 – Present | Consultant to the ACLU |
| May 2003 – 2008 | Consultant, United States Department of Juvenile Justice, Civil Rights Division |
| March 2001 – June 2002 | Director, Child and Adolescent Forensic Psychiatry, University of Illinois at Chicago |
| 1993 – Present | Forensic testimony in Juvenile Court (abuse/neglect & delinquency), Family Court focusing on custody and expert testimony in other state and federal cases. Previously worked as an Expert for the Cook County Public Guardian's Office and DCFS. |
| September 1992-1993 | Psychiatrist Chairperson of the Physician Review Board for the City of Chicago, Department of Mental Health – 1992 |

| 1992 – Present | Expert testimony in juvenile and domestic relations courts in a variety of cases ranging from transfer hearings, abuse including Munchausen by Proxy, Child Advocacy Focusing on Custody and "Best Interest" of the Child |
|---|---|
| April 1990 – June 1999 | Psychiatric Consultant to Illinois Youth Center, Joliet, Illinois; General Population and the Intensive Reintegration Unit |
| January 1990 – 1992 | City of Chicago, South East Community Mental Health Center |

**ADMINISTRATIVE SERVICES:**

| 2021-Present | Division Director of Child and Adolescent Psychiatry Rush University Medical Center. |
|---|---|
| 2011 - Present | Development of the Autism Assessment, Research, Treatment and Services (AARTS) Center at Rush University Medical Center |
| 2006 – Present | Director of the Sonia Shankman Orthogenic School and Rush University Medical Center's clinical rotation for child and adolescent psychiatry fellows at Rush |
| 2006 – Present | Director of Psychiatric Services, Sonia Shankman Orthogenic School |
| 2002 – Present | Chief of Child and Adolescent Psychiatry, Rush University Medical Center |
| 1999 – Present | Medical Director of the Chicago Metropolitan Easter Seals Therapeutic Schools |

**CLINICAL SERVICE:**

| June 2019-Present | Medical Director, Josselyn Community Mental Health Center |
|---|---|
| 2012 - Present | Director, Autism Assessment, Research, Treatment and Services Center at Rush University Medical Center |
| July 2005 – Present | Psychiatric Director Sonia Shankman Orthogenic School at Chicago |
| June 2005 – Present | Psychiatric Consultant to New Trier, Niles North and Niles West High Schools |
| February 2000 – June 2001 | Director, Child and Adolescent and Forensic Psychiatry, University of Illinois at Chicago |

7

| January 1999 – present | Medical Director, Chicago Metropolitan Easter Seals Therapeutic School |
| September 1998 – Present | Psychiatric Consultant to Evanston Township High School |
| August 1997 – February 2000 | Division Head of Child/Adolescent Psychiatry, Evanston Northwestern Healthcare |
| May 1997 – June 1999 | Psychiatric Consultant to Youth Campus (A DCFS contracting agency) |
| September 1992 – May 1993 | Psychiatrist Chairperson of the Physician Review Board for the City of Chicago, Department of Mental Health – 1992 |
| July 1994 – August 1997 | Assistant Director of Child and Adolescent Inpatient Services, University of Chicago |

**MEDIA**
1. October 26, 1994, Chicago Sun Times, TV-Violence Line Elusive.
2. November 6, 1994, Chicago Tribune, "Mental health tests for kids spark debate;" Screening: Testing would help parents, supporters say.
3. November 19, 1994, Chicago Tribune, Try Sandifer suspect as kid, experts say.  Louis Kraus testified, "Derrick Hardaway suffers from a *conduct disorder* that developed in his early adolescence because of family tensions, physical abuse and other problems."
4. February 25, 1997, Chicago Tribune, Leniency sought for teen convicted of killing Sandifer.
5. March 13, 1997, Chicago Tribune, Return girl slowly to mom, psychiatrist say.
6. March 30, 1997, Chicago Tribune, Student-Teacher contact is becoming a danger zone. Kraus was quoted to say, "The students are drawn into the relationship because they idolize their teacher and often don't see anything wrong until much later. At that point they might feel depressed and used and have trouble forming relationships."
7. March 25, 1998, Chicago Tribune, 4 pupils, teacher die in schoolyard ambush.
8. March 25, 1998, Chicago Sun Times, Kids ambush kids; Shooting stuns school.
9. March 29, 1998, Violence is linked to genetics, early abuses that set patterns
10. April 6, 1998, Chicago Tribune, Teen smokers a pack short of a carton in wisdom department.
11. June 3, 1998, Toronto, Canada, American Psychiatric Association, The Daily Bulletin, Presidential Sessions on "A Time of Violence."
12. June 1998, Chicago Parenting, "Keeping rage from turning into tragedy."
13. August 14, 1998, Chicago Sun Times, Making Sense of kids' case.
14. August 14, 1998, Chicago Tribune, Young suspects sent home. Dr. Kraus testament was paramount in the 7-year-old being allowed to go home with his family.
15. Possley, M. and Puente, T., "Young Suspects Sent Home", Chicago Tribune, August 14, 1998
16. Kotlowitz, A., "The Unprotected", The New Yorker. February 8, 1999
17. March 7, 1999, Chicago Tribune, Aftermath an ordeal for parents, kids.
18. November 11, 1999, Northwest Herald, Boy who shot clerk sentenced.
19. February 23, 2000, Tribune Allied Health, Safety nets for teens.
20. April 9, 2000, Chicago Tribute, School provides unique antidote for depression.
21. January 30, 2001, Chicago Tribune, Files in Ryan Harris case shed new light. Disclosure of the results of the psychiatric interview changed interview process of minors.
22. December 7, 2001, Psychiatric News, AACAP Kraus was quoted "We certainly disagree with the

Supreme Court ruling and believe the death penalty constitutes cruel and unusual punishment."

23. July 9, 2002, Psychiatric News, AMA Vows to Prevent Future Psychologist Prescribing Laws.
24. April 4, 2003, Study Questions Youths' Ability to Understand Trial Process, *Study Implications.*
25. July 18, 2003, Psychiatric News, Psychiatrist Wins AMA Leadership Post: *Psychiatry Scores in HOD.* Kraus argued successfully in favor of an amendment to a resolution asking that the AMA support comprehensive health education for female delinquent, including information on responsible sexual behavior and the prevention of sexually transmitted diseases and HIV/AIDS." Kraus also testified, "Medicaid reaches 44 million Americans, more than Medicare or any other form of health insurance and covers Americans who are among the poorest and most disadvantaged populations in the country."
26. February 13, 2004, Chicago, Metro North Shore, Abuse of cold medicine rising.
27. Tresniowski, A.  Hewitt, B., "Escape from Hell", People Magazine. September 25, 2006
28. Reuters, "Experts say video games not an addiction in AMA Meeting", June 25, 2007
29. Neergaard, L. "Easy nondrug helps ADHD Kids", USA Today. September 3, 2007
30. Tanner, L. "Shock Treatment Sought for Autistic Man", USA Today. September 3, 2007
31. Reuters, "Antidepressant warnings scared parents, doctors", September 9, 2007
32. Fox News, "Study: Brains of ADHD Children Develop More Slowly than Brains of other Youngsters", November 13, 2007
33. Bynum, R., Stobbe, M., "Experts Dubious of Ga. 3rd- Grader Plot", Associated Press. April 2, 2008
34. October 31, 2008, The Wall Street Journal, Therapy, Antidepressants Ease Anxiety in Children.
35. Tanner, L., "Kids with ADHD on meds test better than peers", Associated Press. April 27, 2009
36. Tanner, L., "Jackson kids face hurdles coping with his death, universal trauma of losing a parent may be eased if stability can be offered", Associated Press. July 5, 2009
37. Chicago Tribune by Bonnie Miller Rubin, "Caught in the Web of Addiction", September 9, 2009
38. Fox News, "Psychiatrists say Blagojevich's choice to have daughters join him at court may be stressful", July 7, 2010
39. FOX – Judge Jeanine, "8-year Old Boy's Commitment to a Psychiatric Ward", February 19, 2011
40. CNN, Anderson Cooper 360, "KTH: Mass. School called 'house of horrors', May 24, 2012,
41. Fox News Chicago, "Beauty may no longer be in the eye of the beholder", May 10, 2012
42. CNN, Anderson Cooper 360, "Anderson Cooper Investigates Shocking RTC Treatment", June 4, 2012
43. Moran, M. "More research needed on SSRI's for treating Autism Disorders", Psychiatric News. Volume 47, Number 11. June 11, 2012
44. CNN, Anderson Cooper 360, "Crime and Punishment, The Sandusky Trial", June 12, 2012
45. NBC News Chicago, "How to Talk to Your Kids about Conn. Shooting", December 14, 2012
46. Niedowski, E., Tanner, L. "How to Talk to Your Kids about Conn. Shooting", Associated Press. December 15, 2012
47. CNN, Anderson Cooper 360, "Former Child Hostage Describes Captivity Underground", February 4, 2013
48. Fox News Chicago, "Violence has long term effects on children", August 12, 2013
49. England, C. "Helping young adults make the transition", Chicago Medicine Magazine, September 2013
50. Schmadeke, S., "State's youth prison system violates inmates' rights, experts say", Chicago Tribune. September 25, 2013
51. WGN Radio.com, "Solutions for Gun Violence in Chicago", June 17, 2014
52. NBC News, "Black Box warning on antidepressants raised suicide attempt", July 18, 2014
53. FOX News, "How far should we go to discipline our kids", September 2014
54. Fox News, "Study: Brains of ADHD Children Develop More Slowly than Brains of Other Youngsters", January 13, 2015

55. FOX News, "Could a self-esteem booster turn your child into a narcissist?", March 2015
56. Al Jazeera America, "US Only Nation to Imprison Kids for Life," March 2015
57. NBC Channel 5 News, "Some Suburban Schools Ban Fidget Spinners as Popularity Grows", May 2, 2017
58. Associated Press, "Video Games Focus on a Red Herring", March 8, 2018
59. US Today, "Doctor:  Impact-separating-families tragic June 19, 2018
60. Fox News,  "Medical experts warn that separating children from parents causes psychological damage June 20, 2018
61. March 20, 2019, Chicago Tribune, "Local autism community cheers Amy Schumer's loving disclosure that her husband has a form of autism". Kraus was quoted stating "To have someone like Amy Schumer come out and talk about this is really amazing. I think it will be wonderful for people (with autism) and perhaps generate interest in the dating population about autism"
62. AP News, "Linked by pain: 2 school massacre survivors, dad kill selves", March 25, 2019
63. Channel 9 Chicago Local News "Helping Explain the Tragedy in Highland Park to Kids", July 5, 2022
64. Fox 32 News, "How to Talk to Your Children About the Highland Park Shooting", July 8, 2022
65. Fox 32 News, "Tips for Talking to Your Children About Gun Violence", July 8, 2022
66. Fox 32 News, "Mass Shootings: Breaking the Cycle, a Fox 32 Special Report" July 15, 2022

## SCIENTIFIC ACTIVITIES
### a)  *Grants*:

| | |
|---|---|
| 2011-Present | Effects of memantine vs. placebo on motor planning and memory in children with autism spectrum disorders. $74,176 |
| 2010 | Rush Women's Board, Assessment of prevalence of Bipolar Disorder in adolescent population in a residential placement, $30,000 |
| April, 1999 | Department of Human Service, State of Illinois Grant – Bridges Program for Development of School and Home-based Therapeutic Services for Adolescents, $100,000 per year |
| March 1998 | Evanston Northwestern Healthcare Auxiliary Grant for Development of a Community-based Adolescent Mental Health and Substance Abuse Program, $1,000,000 |

### b)  *Research*

| | |
|---|---|
| 2011 – Present | Development of Research Program at the Rush AARTS Center |
| 1984 - 1986 | Research under direction of Max Harry Weil, Ph.D., Chairman, Department of Medicine, University of Health Sciences, The Chicago Medical School, on the reversal of academia during cardiopulmonary resuscitation |
| 1999 – 2001 | Outcomes research focusing on adolescent dual diagnosis; early diagnosis and intervention in a community based treatment program. |

### c)  *Poster Presentations*

Grunewald, S., Kraus, L., Youngkin, S., Wade, K. H., Forburger, N., Owley, T., Loftin, R., Fogg, L. & Soorya, L. (May 2014). *Access to care:*

*Familial and racial variables associated with limited service access for individuals with ASD.* Poster presented at 2014 Annual International Meeting for Autism Research (IMFAR). Atlanta, GA.

Poster Presentation:  APA Meeting, Washington, DC "Monitoring Resident Supervision in Times of Change," May 1992.

## SCHOLARSHIP

### a) Books and Chapters

1. Thomas, C.R., Kraus, L.J. "Public Policy Implications of Research on Aggression and Antisocial Behavior", The Origins of Antisocial Behavior.  Oxford University Press, 2012.
2. Galatzer-Levy, R., Kraus, L, Galatzer-Levy, J., The Scientific Basis of Child Custody Decisions. **Cambridge Press**, 2009.
3. Kessler, C., Kraus, L, The Mental Health Needs of Young Offenders. **Cambridge Press**, 2007.
4. Geraghty, R., Kraus, L, Fink, P, "Assessing children's competence to stand trial and to waive Miranda rights: new directions for legal and medical decision-making in juvenile courts" in The Mental Health Needs of Young Offenders. **Cambridge Press**, 2007,
5. Kraus L, Sobel, H "Post-adjudicatory assessment of youth" in The Mental Health Needs of Young Offenders. **Cambridge Press**, 2007.
6. Galatzer-Levy, R., Kraus, L.J., eds, The Scientific Study of Child Custody Decisions, **Wiley Press,** 1999.
7. Kraus, L, "Understanding the Relationship between Children and Caregivers" in The Scientific Basis of Child Custody Decisions, **Wiley Press**, Ed. Galatzer-Levy R. and Kraus, L 1999.
8. Leventhal, B. Kelman, J., Galatzer-Levy, R., Kraus, L., "Divorce, Custody, and Visitation in Mid-Childhood" in The Scientific Basis of Child Custody Decisions, **Wiley Press,** Ed. Galatzer-Levy R. and Kraus, L 1999.
9. Kraus, L.J., Trivedi, H.K. "Adjudicated Youth: Child and Adolescent Psychiatric Clinics of North America" in Clinics Review Articles Volume 25. **Elsevier,** 2016.

### b) Peer Reviewed Publications

1. 1988 Practice Parameter for "Child and Adolescent Forensic Evaluations", Kraus, L, JAACAP, Vol 50, No.12, Dec. 2011 pp1299-1312.
2. Geraghty, T.F., Kraus, L, "Treating the Mentally-Ill Offender: The Challenge of Creating an Effective, Safe and Just System," **The Journal of Criminal Law and Criminology**, Northwestern University School of Law 89 (1) Fall, 1998.
3. von Planta, M., Gluldipati, R., Weil, M.H., Kraus, L.J., Rackow, E., "Bicarbonate and Tromethamine (Tham) Buffers Fail to Improve Resuscitability During Porcine C.P.R.," **Federation Proceedings 46** (4), 1145, 1987
4. von Planta, M, Gudipati, R., Weil, M.H., Kraus, L.J., Rackow, E., "Effects of Tromethamine and Sodium Bicarbonate Buffers During Cardiac Resuscitation," **Journal of Clinical Pharmacology 28,** 594-599, 1987

### c) Other Publications

1. Kraus, L, Arroyo, W. "Recommendations for Juvenile Justice Reform, Second Edition", American

Academy of Child and Adolescent Psychiatry Committee on Juvenile Justice Reform. October 2005.

2. Kraus, L, Arroyo, W. Editors, "Recommendations for Juvenile Justice Reform", **Monograph**, October 2001, American Academy Child and Adolescent Psychiatry.

3. Kraus, L. "Standards for Juvenile Detention and Confinement Facilities", Recommendations for Juvenile Justice Reform, **Monograph**, October 2001.

4. Kraus, L. "Females in the Juvenile Justice System", Recommendations for Juvenile Justice Reform, **Monograph**, October 2001.

5. Kraus, L, Morris R. "Seclusion and Restraint Standards in Juvenile Corrections", Recommendations for Juvenile Justice Reform, **Monograph**, October 2001.

6. Kraus, L, "Tackling Juvenile Justice," **AACAP News**, Volume 31, Issue 2, March/April 2000, pp. 75-76.

## PRESENTATIONS:

Association of Women Attorneys of Lake County September Meeting, "Coping with Trauma in our Community" with Ruth Kraus, Ph.D. and Louis J. Kraus, MD, September 7, 2022

American Psychiatric Association, "Mentally-Healthy Schools in Times of a Pandemic" Speaker-Wednesday, August 19, 2020

Community SAFETY & The Future o Illinois' Youth Prisons.  Children and Family Justice Center, "Harm Instead of Healing: Imprisoning Youth with Mental Illness", March 2020

American Psychiatric Association, "Children & Adolescents in Juvenile Detention", October 7, 2018

Harvard University Conference, "Behind Bars: Health and Human Rights in U.S. Prisons" November 28, 2017

AACAP 64th Annual Meeting, Washington, DC, October 23-28, 2017

Keynote Speaker, Eugene J-M.A. Thonar, PhD, Award Presentation, Rush University Medical Center, October 14, 2014

Grand Rounds, Rush University Medical Center, "Psychiatric Malpractice: Dos and Don'ts." May 21, 2014

**Chair**, AACAP Douglas B. Hansen, MD 39th Annual Review Course in Child and Adolescent Psychiatry, *Child and Adolescent Forensic Psychiatry*, Westin Chicago River North, Chicago, IL, March 22-23, 2014.

Autism, Behavioral Challenges and Complex Medical Needs (ABC) Conference, "Making Systems Work Across the Lifespan for Children with Special Needs," *Treatment and Advocacy for the Autistic Teen as they Transition into Adulthood*, Kraus, LJ, Palos Hills, IL November 22, 2013.

Illinois State Board of Education, Kraus, LJ, **Keynote Speaker**, "The Complexity of Diagnosis and Behavior of Students Placed Residentially."  November 7, 2013.

Illinois State Board of Education, Kraus, LJ, "Juvenile Justice, Social Maladjustment and Associated Mental Health Disorder: How do we educate this difficult population and what do we do when they get out?" November 7, 2013.

7th Congress of Asian Society for Child and Adolescent Psychiatry & Allied Professions and 12th Biennial Conference of Indian Association for Child and Adolescent Mental Health; Kraus, LJ., **Chair,** "Cyberage and Child Mental Health." September 26, 2013, New Delhi, India.

12th Biennial Conference of Indian Association for Child and Adolescent Mental Health; Kraus, LJ., **Chair**, "Role in the Changing Landscape of Child and Adolescent Psychiatry and Mental Health," September 25, 2013, New Delhi, India.

12th Biennial Conference of Indian Association for Child and Adolescent Mental Health, Kraus, LJ., "DSM-V: Implications for Child and Adolescent Psychiatry," September 25, 2013, New Delhi, India.

Illinois Institute for Continuing Legal Education, IIT Chicago-Kent College of Law, "Cutting Edge Child Custody Symposium", *Professional Training and Requirements*, June 21, 2013.

Illinois Institute for Continuing Legal Education, IIT Chicago-Kent College of Law, "Cutting Edge Child Custody Symposium," *Point and Counterpoint: Adoption of Custody Evaluation Standards*, June 21, 2013.

American Psychiatric Association (APA) Annual Meeting Workshop; "A Career in Child and Adolescent Psychiatry: From a Developmental Perspective." San Francisco, CA May 22, 2013.

Office of Juvenile Justice and Delinquency Prevention in Collaboration with the National Center for Youth in Custody "The Impact of Isolation Practices in Confinement Facilities," National Webinar, April 3, 2013.

19th Judicial Circuit Child Representative/Guardian ad Litem Training, "Psychology of Child Development and Age Appropriate Visitation." College of Lake County, Grayslake, Illinois, September 12, 2012.

Abraxas Education Forums; "The Role of Child and Adolescent Psychiatry in Public and Private Special Education." Woodridge, IL March 30, 2012.

Learning Disabilities Association of America, 49th International Conference, "Dissecting a Bully: Interventions for the Bullied." February 22-25, 2012, Chicago, IL.

APA Annual Meeting, "Wayward Youth Revisited", May 17, 2011, Honolulu, Hawaii.

APA Annual Meeting, "Teen Bullying", May 17, 2011, Honolulu, Hawaii.

ISBA Chicago Regional Meeting (Effective Advocacy for Juveniles with Mental Health Needs) "Diagnosis and Treatment of Mental Health in the Juvenile Justice System", May 11, 2011.

American Academy of Child and Adolescent Psychiatry (AACAP) 57th Annual Meeting, "Variations in State Decisions on Custody" October 29, 2010, NY, NY.

AACAP 57th Annual Meeting, "Role of the Expert in Child & Adolescent Psychiatry Malpractice" October 29, 2010, NY, NY.

AACAP 57th Annual Meeting, "Advocacy for Children with Autism: How to Find the Right Services" October 29, 2010, NY, NY.

ISBA Family Law Section, Springfield, IL. "Custody Evaluations When Children Have Major Psychiatric Disorders", October15, 2010.

ISBA Family Law Section, Chicago, IL. "Custody Evaluations When Children Have Major Psychiatric Disorders", September 23, 2010.

DePaul University College of Law, "Juvenile Competency to Stand Trial and Understand Miranda", April 11, 2009.

Illinois State Bar Association (ISBA) and the Committee on Continuing Legal Education, Attorney Education in Child Custody and Visitation Matters, "Factoring a Child's Development into Custody and Visitation" November 21, 2008.

AACAP Members Forum, Practice Parameter for Child and Adolescent Forensic Evaluations, October 31, 2008.

55th Annual AACAP Meeting Chicago, "The Role of the Child Psychiatrist in Juvenile Competency" October 30, 2008.

Rush University Medical Center, Department of Pediatrics Grand Rounds, "Perspectives on Delinquency, Past and Present", August 12, 2008.

American Medical Association (AMA), "How has science impacted juvenile justice regarding competency, waiver hearings, adjudications, dispositions, and treatment (psychopharmacology)". Annual Meeting, Washington DC, July 2008.

Spring Midwest American Academy of Psychiatry and the Law (AAPL) Meeting, Chicago, IL, "Juvenile Competency to Stand Trial and Understand Miranda," Louis J. Kraus, MD, April 21, 2007.

National APA Meeting in San Diego, "Workshop on Juvenile Justice Presentation on Child Competency to Stand Trial and Understand Miranda. May 2007.

53rd Annual American Academy of Child & Adolescent Psychiatry, San Diego, CA, "The Psychiatrist's Role in Child Custody: A Mock Hearing," Louis J. Kraus, MD, October 28, 2006.

Rush University Medical Center, Department of Psychiatry Grand Rounds, "Capital Punishment for Teenagers – The Recent Supreme Court Decision Roper v Simmons: Discussion and Forensic Application of Current Neuroimaging Research on Teenagers ", April 20, 2005.

Cambridge Hospital, Department of Psychiatry Grand Rounds, "Juvenile Delinquency", September 2004

AACAP National Meeting, San Francisco – Symposium – "Addressing the Needs of Behavior Disordered Children Within the School System", San Francisco, CA, October 25, 2002.

University of Chicago – Workshop "Early Onset Bipolar Disorder", December 14, 2001.

Juvenile Justice Reform – Media Workshop, National AACAP meeting, Honolulu, Hawaii, October 2001.

Hephzibah Children's Association – Workshop "Child and Adolescent Psychiatric Diagnoses and Medications" September 28, 2001

A&E Television Broadcast on "Shattered Innocence - Fells Acres Abuse Case", August 8, 2001

15th Annual Statewide Forensic Conference, October 16-17, 2000 Loyola University Chicago, Illinois Department of Human Services

Speaking engagements at parent groups, managed care meetings, University of Chicago, the Department of Corrections and Probation

Media interviews on television, radio and in newspapers and various publications.

American Psychiatric Association – "Littleton – One Year Later, The Assessment of the Potentially Violent Child Within The School System," May 15, 2000.

Institute of Psychoanalysis, Conference on Youth and Violence, "Diagnosis and Treatment of Delinquents in a Maximum Security Youth Center," May 12, 2000

Evanston Northwestern Healthcare – Pediatric Grand Rounds, "Connections Program – Development of a Community-Based Adolescent Alcohol and Drug Treatment Program," May 2, 2000.

Evanston Northwestern Healthcare – Pediatric Grand Rounds, "ADHD, Differential Diagnosis and Treatment" April 4, 2000.

New Trier High School – Peer Helping, "Adolescent Youth Violence," March 2, 2000.

Response Center, Skokie, IL, "Adolescent School Violence," February 16, 2000.

Chicago Bar Association Matrimonial Law Committee, "Physical, Mental and Emotional Abuse in Custody Cases," February 14, 2000.

Cook County Public Guardian's Office, "Domestic Violence and How It Affects Children," January 31, 2000.

Illinois Psychological Association, "Assessment of Violence in Children and Adolescents, November 11, 1999.

New Trier Township, "School Violence - Treatment and Community Intervention," May 12, 1999.
Shand Morahan Worksite Lunch Program, "Signs of ADD/ADHD and Possible Treatment," April 21, 1999.

Evanston Northwestern Healthcare Health Watch Program, "Childhood Attention Deficit Disorder: Treatment Options," April 7, 1999.

Evanston Northwestern Healthcare, Department of Psychiatry, Professional Conferences, "School Violence," April 6, 1999.

The Warren Wright Adolescent Center, Stone Institute of Psychiatry, Northwestern Memorial Hospital, "Violence in Schools," November 6, 1998.

Institute for Women's Health, Evanston Northwestern Healthcare "Helping Kids Cope with Divorce," October 1998.

Illinois Society of Child and Adolescent Psychiatry, "Juvenile Transfer Hearings – The Psychiatric Evaluation," October 1998.

APA Meeting, Toronto, Ontario, Canada, "Treatment of Severe Delinquents in a Maximum Security Youth Center," June 1998.

Evanston Northwestern Healthcare Pediatric Lecture Series, "The Continuum of Behavior Disorders," April 1998.

Evanston Northwestern Healthcare Department of Psychiatry, Professional Conferences, "Transfer Hearings in Juvenile Court: Evaluation of Behavior Disordered Youth," January 1998.

Evanston Northwestern Healthcare Department of Psychiatry, Professional Conferences, "The Use of Attachment Theory in Custody Evaluations," January 1998.

Juvenile Justice Division of the Circuit Court of Cook County, "Psychiatric Assessments in Juvenile Justice Cases," June 1997.

Chicago Bar Association-Juvenile Law Committee, "Utilizing Psychiatric Evaluations In Juvenile Justice Cases: Transfer And Dispositional Hearings," February 1997.

Genesis Schools/Illinois Association of Counsel for Children, "Helping Incarcerated Youth Overcome Delinquency and Mental Illness," December 1996.

University of Chicago, Laboratory School Lower School Parents Association Lecture Series, "Is My Child's Behavior Normal?" November 1995.

CAUSES - Illinois Masonic Hospital, "Attachment Theory In The Use Of Bonding Evaluations," September 1995.

Illinois Probation and Court Services 1995 Annual Spring Conference, "Kids Killing Kids," March 1995.

Grand Rounds: Columbus Hospital Department of Pediatrics.  "Delinquency, Etiology and Intervention," July 1994.

Cook County Juvenile Court, Office of the Public Guardian.  "Munchausen By Proxy," July 1994.

Columbus Hospital, Department of Pediatrics Grand Rounds, "Delinquency, Risk Factors, and Interventions," July 1994.

International Correctional Education Association Conference, Chicago " Attention Deficit Hyperactivity Disorder," May 1993.

16

The American Psychoanalytic Association National Conference, New York, "Attachment Theory - Forensic Implications for Best Interest of the Child," December 1993.

Poster Presentation:  APA Meeting, Washington, DC "Monitoring Resident Supervision in Times of Change," May 1992.

The University of Health Sciences, The Chicago Medical School, "Effects of Tham and NaHCO3 on Acid Base Balance During CPR," 1984.

Presentation: Lake County Bar Association Seminar, "Preparing a Client for a 604.10 Evaluation and/or Mediation," April 23, 2021.

# Appendix B

**Louis J. Kraus, MD**
**910 Skokie Boulevard**
**Suite 230**
**Northbrook, IL  60062**

**Deposition and Testimony Cases**

*Telephone: 847-559-560*
*Facsimile: 847-559-0612*

| | | | | |
|---|---|---|---|---|
| **06/30/2022**<br>**18 D 005945** | Schiller, DuCanto & Fleck | Kenney V Strang | Trial Testimony | Circuit Court of Cook County |

| | | | | |
|---|---|---|---|---|
| **03/18/2022**<br>**4:19-cv-00431-RLF-MJF** | Florida Legal Services, Inc. | GH., et al v. Dept of Juvenile Justice and Secretary of the Dept of Juvenile Justice | Deposition | United States District Court of Northern District of Florida Tallahassee Division |

| | | | | |
|---|---|---|---|---|
| **03/09/2022**<br>**14D8661** | Katz & Stefani | Skidelsky v Skidelsky | Deposition | Circuit Court of Cook County |

| | | | | |
|---|---|---|---|---|
| **02/15/2022**<br>**14D8661** | Davis Friedman | Skidelsky v Skidelsky | Deposition | Circuit Court of Cook County |

| | | | | |
|---|---|---|---|---|
| **01/20/2022**<br>**18D005945** | Schiller, DuCanto & Fleck, LLP | Kenney v Strang | Deposition | Circuit Court of Cook County |

| 09/29/2021<br>4:19-cv-002-<br>AW-MAF | Florida Legal Services, Inc. | Harvard v Inch | Deposition | United States District Court Northern District of Florida Tallahassee Division |
| --- | --- | --- | --- | --- |
| 9/22/2021<br>12 L 58 | Patrick Flaherty of Kinnally, Flaherty, Krentz, Loran, Hodge & Masur | Carolyn Overstreet, Special Administrator of the estate of Cynthia Overstreet, Deceased v Rhomas Rossi, MD et al | Trial | Circuit Court of the 17th Judicial Circuit Winnebago County, Illinois |
| 9/21/2021<br>2014 D 11482 | Brigham Law | Buterman v Buterman | Trial | Circuit Court of Cook County |
| 07/06/2021<br>2015 D 3224 | Beermann Law And Veon Law | Ball v Olson | Deposition | Circuit Court of Cook County, Illinois |
| 05/21/2021<br>1:18-CV-05560 | City of Chicago | City of Chicago v. Mendez | Deposition | United States District Court for the Northern District of Illinois |

| 03/29/2021<br>16 L 008702 | Karlin Fleisher & Falkenber LLC And Clausen Miller, PC | TR v Rockford | Deposition | Circuit Court of Cook County, Illinois |
|---|---|---|---|---|
| 02/03/21<br>2019 D 6124 | Berger Schatz | Zach Trial | Deposition | Circuit Court of Cook County, Illinois |
| 2021<br>2016 L 008702 | Clausen Miller, PC | T.R. vs. Rockford Acquisition Sub, Inc | Deposition | Circuit Court of Cook County, Illinois |
| 2020<br>18 D 1380 | Bradford & Gordon, LLC/Burcu Ozadali | Sean Noonan v Brook Noonan | Deposition | Circuit Court of Cook County, Illinois |
| 2019<br>2016 L 011004<br>Consolidated with 2016 L 011007 | Kathleen Kunkle of Ancel, Glink, Diamond, Bush, DeCianni Krafthefer, P.C. | Jane Doe 1 v Cicero School District 99 | Trial | Circuit Court of Cook County, Illinois, County Department, Law Division |
| 2019<br>12 L 58 | Patrick Flaherty of Kinnally, Flaherty, Krentz, Loran, Hodge & Masur | Carolyn Overstreet, Special Administrator of the estate of Cynthia Overstreet, Deceased v Rhomas Rossi, MD et al | Deposition | Circuit Court of the Seventeenth Judical Circuit Winnebago County, Illinois |
| 2019<br>18 D 1071 | Jordan Rosenberg of Beermann, LLP | Dr. Jennifer Casey v Jason Sachman | Deposition | Circuit Court for the Nineteenth Judicial Circuit Lake County, Illinois |

| **2019**<br>**16 D 6144** | Joan Comiskey of Law Office of Joan Comiskey and Leon Finkel of Berger & Schatz | Anthony Geroulis v Mirofora Geroulis | Deposition | Circuit Court of Cook County Illinois |
|---|---|---|---|---|
| **2019**<br>**11 D 002 451** | Enrico Mirabelli of Beermann, Pritikin, Mirabelli, Swerdlove, LLP | Roiban Ryan v Suzanne Ryan | Trial | Circuit Court of Cook County, Illinois |
| **2019**<br>9:19-CV-0061 | Mario Williams, Dalls LePierre of Nexus Derechos Humanos Attorneys, Inc. | Natalya Paykina, on behalf of minor child, E.L. v Donna Lewin, Anthony Annucci, John Doe 1, John Doe 2, et al | Evidentiary Hearing | United States District Court for the Northern District of New York |
| **2019**<br>1:16-CV-08303 | Steven Weil Weil and Chardon LLC | T.S., et at v Twentieth Centry Fox Television, et al. | Deposition | United States District Court for the Northern District of Illinois Eastern Division |
| **2019**<br>2017 D 0301 | Ruggio & Associates | Yasser Refaat Farid/ Hassan V Rehab Esmat Baldrerin | Deposition | Circuit Court of Cook County Illinois |
| **2019**<br>2017 D 1173 | Richard Boonstra Boonstra, Hoogendoorn & Talbot LLP | Charles Pratt v Lisa Anne Settli | Trial | Circuit Court of Cook County Illinois |
| **2019**<br>12 – L 132 | Ann DeVries, Hinshaw & Culbertson Law, LLP | Chynna Brown v Rockford Memorial Hospital | Deposition | Circuit Court of the 17th Judicial Circuit Winnebago County, IL |

| | | | | |
|---|---|---|---|---|
| **2018**<br>17 D 662 | Miller, Shakman & Beem, LLP and Berger Schatz | Kemper Ryan v Kristen Ryan | Deposition | Circuit Court of the Nineteenth Judicial Circuit, Lake County, Il |
| **2018**<br>3:18-CV-05056 | Law, Lyman, Daniel, Kamerrer & Bogdanovich, P.S. | Samuel Tarabochia v Thurson County; Peter Feliciano, Christopher Marx, Anjelita Fornara, Vic Herbert, John Cody White, Mike Fenton, Ted Bryan, Dana Hanson, in their individual capacities | Deposition | U.S. District Court Seattle, Washington |
| **2018**<br>12CV02595 | Alan Mandel, Alan J Mandel Law Office | Nagrin Kormi v Antoinette Choate, and David L. Lee | Deposition | US District Court Northern District of Illinois Eastern Division |
| **2018**<br>17 – D 662 | Miller,Shakman and Beem LLC | Kemper Ryan v Kristen Ryan | Deposition | Circuit Court of the Nineteenth Judicial Circuit, Lake County, Il |
| **2018**<br>16-CV-01356-NJR-RLD | Roderick and Solange MacArthur Justice Center, Northwestern Pritzker School of Law | Delarren Mason v Superintendent Donald Schaefer, Cheryl Prost, et al. | Deposition | US District Court Southern District of Illinois |
| **2017**<br>16-CV-00039 | Buckley Sandler | Latson V Clarke | Deposition | Western District of VA |

| **2017** 16-cv-02848-LHK | Daniel Berger of Grant & Eisenhofer | Charles Des Roche et el v California Physicians Service | Deposition | US District Court for the Northern District of California (San Jose Division) |
|---|---|---|---|---|
| **2017** 2012 F 000032 | Michael Ochoa Law Office of Jeffery Leving, Ltd. | Whitlock/Kochevor | Deposition | 1st Municipal District – Cook County, Chicago |
| **2016** 2014 D 001488 | Schiller DuCanto & Fleck | DePalo v. DePalo | Deposition Testimony | 1st Municipal District – Cook County, Chicago |
| **2016** 2014 D 009277 | James Hagler, Esq. Law Office of Jeffery Leving, Ltd | Rea v. Rea | Deposition Testimony | 1st Municipal District – Cook County, Chicago |
| **2016** 2014 D 009277 | James Hagler, Esq. Law Office of Jeffery Leving, Ltd | Rea v. Rea | Deposition Testimony | 1st Municipal District – Cook County, Chicago |
| **2015** 2010 L005691 | B. Whalen | McKinley v Doe | Deposition | 1st Municipal District-Cook County, Chicago |
| **2015** 2013 D 000182 | A Berman Grund & Leavitt | Radassnau 215(a) | Deposition | 1st Municipal District-Cook County, Chicago |
| **2014** 2008 D 10469 | Michael Bender | Dowd v Strauss | Deposition Trial | 1st Municipal District-Cook County, Chicago |

| | | | | |
|---|---|---|---|---|
| **2014**<br>008800 | O'Connor v Hurst | Weinhouse | Trial | 1st Municipal District-Cook County, Chicago |
| **2014**<br>ON L143 | Livingston/Berger | Miller v Morgan | Deposition | 1st Municipal District-Cook County, Chicago |
| **2014**<br>2013 D 005580 | Schiller, DuCanto Fleck | Ring 215a | Deposition | 1st Municipal District-Cook County, Chicago |
| **2014**<br>2009 L 003496 | Stephen Veltman Pretzel, Strougger | Angel v Segal | Deposition Trial | 1st Municipal District-Cook County, Chicago |
| **2014**<br>2012-CV-000648 | Minh C. Wai | LaCrosse v Veolia, et al | Deposition | 1st Municipal District-Cook County, Chicago |
| **2013**<br>2010 D 007929 | Brian Hurst | Burrows v Burrows 604.5 | Trial | 1st Municipal District-Cook County, Chicago |
| **2013**<br>2010 D 009879 | Levin & Conde | Blakeslee/Slade 604.5 | Deposition Trial | 1st Municipal District-Cook County, Chicago |
| **2013**<br>2010 EV 11187C | Insley/Race | Dukes v Acadia et al | Deposition | 1st Municipal District-Cook County, Chicago |

| | | | | |
|---|---|---|---|---|
| **2013**<br><br>2009 L 003496 | Pretzel & Stouffer | Angel v Segal et al | Deposition | 1st Municipal District-Cook County, Chicago |
| **2013**<br><br>2012 D 011835 | Clancy Law | Sproston v Gallee DO | Deposition | 1st Municipal District-Cook County, Chicago |
| **2013**<br><br>2009 L 000083 | Holfert Hickey, Melia & Assoc | Bjork v Beltran | Deposition | 1st Municipal District-Cook County, Chicago |
| **2013**<br><br>2007 L 009154 | Richard Griffin | Molina v Morgan | Deposition | 1st Municipal District-Cook County, Chicago |
| **2013**<br><br>2012 D 011835 | J. Dahlan | G. Rotter (215a) | Testimony | 1st Municipal District-Cook County, Chicago |
| **2012**<br><br>09 CV 7290 | Wms. Montgomery & John | Green v Kabota | Opinion Deposition | 1st Municipal District-Cook County, Chicago |
| **2012** | Samuel Lockner Carlson, Caspers, Vandenburg | Elan v Teva | 2nd Opinion | |
| **2012** | Capital WRITS | How Brain Development Effect Both Intent & Culpability | Opinion | |

| 2011 | Baizer Kolar & Lewis | Estate of K. Brock | Deposition | |
|------|---------------------|-------------------|------------|--|

| 2011 | Cunningham Meyer & Vedrine | First Choice v Professional, Ltd. Et al | Deposition | |
|------|---------------------------|----------------------------------------|------------|--|

| 2011 | Kevin Costello Zukowski, Flood, Rogers, McArdie | Jeremy March | Deposition Trial | 1st Municipal District |
|------|-------------------------------------------------|--------------|------------------|------------------------|

| 2010<br><br>00 D 06326 | Grund & Leavitt | Gleicher v Garland | Testimony | 1st Municipal District |
|-------------------------|-----------------|--------------------|-----------|------------------------|

| 2010<br><br>4:09-CV-00033 | York Legal Group | USA v Arkansas | Deposition | |
|----------------------------|------------------|----------------|------------|--|

| | | | | |
|--|--|--|--|--|