# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| L.S., on behalf of himself and all others similarly situated, by his next friend JASON MAURER, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| FRANKLIN COUNTY, CHIEF JUDGE MELISSA MORGAN of the Second Judicial Circuit Court, DARLA FITZJERRELLS, Director of Court Services of the Second Judicial Circuit Court, and LAVONDA PORTER, Acting Superintendent of the Franklin County Juvenile Detention Center, | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Case No. _____

Hon. _____

## DECLARATION OF L▇▇ S▇▇▇

I, L▇▇ S▇▇▇, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I have been detained at Franklin County Juvenile Detention Center ("FCJDC" or "the Center") since approximately May 27, 2023.

2.      I am sixteen years old.  The first time I was detained I was 13 and I stayed about a month.  I was in for a couple months last year, too.

3.      FCJDC has six separate housing pods, which are labeled A, B, C, D, E, and F. I currently live in D pod, which has 8 cells that hold one kid each. I have been in this pod since I arrived this year and there is only one other kid in the pod with me right now. During past stays I lived in A, B, and E pods.

4.      My cell is very small, with barely enough room to walk around. It is a very uncomfortable place to be. There is a hard cement slab with a thin mattress against the back wall, but I put my mattress on the floor to sleep.  I do this for a couple reasons.  I first started doing this in my cells in A, B, and E pods because the windows above the slab leaked water and made the mattress wet. Now I do it because it's easier to hear staff coming in the door and I want to make sure I can react if they show up. That's because they tell us we're not allowed to talk between cells, and we're not allowed to wrap our shirt around our face to block out the light because it makes it so we can't hear staff if they tell us to do something. I like to try to talk to my podmate and I always wrap my shirt around my head because it's the only way I can sleep. I also want to make sure that I can hear if the staff does anything bad to my podmate because I think staff picks on him sometimes and I worry about him.

5.      On the other side of my cell there is a combined toilet and sink. For almost the entire time I've been here the toilet and sink have been controlled from the outside, so I can't flush my own toilet. Only staff can do it and you have to ask them to. It usually takes them hours to do it which makes your room stink. For the last couple weeks the staff has let us control our own toilets and sinks although I have seen them take that away from my podmate. I don't know how long that will last and it made me realize they can give kids control if they want to and they definitely use water and toilet control as a way of controlling and punishing kids. My podmate can't control his own toilet.

6.      My cell door has a heavy lock that can only be opened from the outside. Every cell I've lived in at FCJDC has had black mold on the walls or the ceiling (or both), including the cell I'm in right now. My current cell has a broken sprinkler and water damage. I heard another kid

broke the sprinkler and it soaked the room. It looks like that made the black mold grow around the sprinkler head. I think the black mold is making me cough. I am very healthy and never have coughs when I'm outside the facility, but every time I've been put into one of these cells I start coughing a day or so after I get here and don't stop until I leave.

7.    In one of my prior cells the sprinkler once went off, too.  It soaked me, my blankets, my clothes, and my stuff. I told staff about it but they didn't clean the room for hours. They also didn't replace my wet blankets, sheets, and clothes for about three days, and I had to live in that wet room and just be cold and uncomfortable. That seemed to make the black mold grow worse.

8.    There is a small window in my cell, it doesn't let in much light. All I can ever see from my cell is the razor wire outside the window and part of another building, and then the cell across from me in my pod. There are fluorescent lights on the ceiling of my cell that stay on all the time, night and day. The lights never go out here and it makes it almost impossible to sleep. I don't sleep well at all. I try to sleep by tying a shirt around my eyes but staff tells us we can't do that. I've been punished for doing that with my shirt and I've seen that happen to other kids too. I've even seen kids put on Restriction for tying their shirts. I don't know how they expect us to sleep if the lights are on and we can't even block them out.

9.    I have never had a pillow and only have two thin blankets and I know we cannot get more. This also makes it hard to sleep at night.

10.    All the rooms in FCJDC that I have seen and stayed in are set up in basically the same way. They are all dirty, disgusting, and bright and most of them have black mold in them. The toilets smell since they don't get flushed when they're supposed to. In one of my prior cells the toilet once overflowed and it took staff a long time to come clean it, making my cell stink even worse.

11.     In D pod, like the other pods, there is a small dayroom between the cells that has two metal tables, some chairs, a broken water fountain, and a TV mounted on the wall. On days we get "free time" it is just an hour or two in the day room. The whole time I've been here each kid has had "free time" in the dayroom by themselves. One kid gets brought out for their free time, they sit there, and then go back to their cell. Then the next kid comes out and does the same thing. During free time we aren't allowed to walk around. We have to stay seated and can't move around freely, or else the jail staff will put us back in my cell. This is really frustrating for me because it's the only place we go often that's big enough to at least walk around and get some exercise and they won't even let us do that. I don't want to cause any trouble, I just want to be able to walk a longer distance than the one or two steps I can move in my cell and it drives me crazy I can't even do that during my free time.

12.     I spend most of my time in my cell at FCJDC. This is how it has been for me during all my stays at this facility. On average I would say I spend a minimum of about 21 hours a day in my cell right now, and that's really a good day. In prior stays I was in the cell 22 hours a day at least, and for long stretches it was more like 23 hours.  We have had free time taken away regularly since I recently came to the facility for things like the facility needing maintenance or there not being enough staff. They put the whole facility on "lockdown" for their convenience at least once or twice a week. Last week they put the whole facility on lockdown for most of the day so they could have a plumber do work on the plumbing or something. They just canceled our little bit of free time like it was no big deal.

13.     In my entire time at FCJDC I don't remember ever setting foot outside. Rec time is just going to the basketball court for what is supposed to be an hour, though it gets taken away all the time and shortened more often than not.

14.     Over the time at this facility, I have eaten almost all my meals in my cell by myself. We sometimes get to eat for 10-15 minutes in the dayroom and the last couple of weeks we have gone to dietary sometimes, but you never know where you're supposed to eat.

15.     They do not give you enough food here. I never get full from a meal. Kids also can't share with one another or they can get put on Restriction.

16.     I get to shower once a day for about 15 minutes. Then it's right back to my cell.

17.     I do not get to talk to anybody when I am in my cell, except sometimes talking to other kids in their cells through the doors when there is a kid put in a cell close to me. It's important for me to be able to talk to my podmates, though, because that's basically the only human contact I get. This isn't allowed, though—just last week staff reminded us that we are not supposed to "communicate through our cell doors." Some of them say they won't enforce it, and sometimes they don't, but I've also seen multiple kids put on Restriction and get punished in other ways for talking. That's how it is here with everything: the staff can just do what they want and you don't know what you're really allowed to do and not allowed to do. They have never given me a rule book even though I've asked for one over and over so I can get some idea of what's expected here.

18.     Jail staff do "watch tours," where they walk around the cells to monitor the area, but these only lasts a few seconds and the staff does not talk to us much. Lately only the third shift staff has really even done watch tours, so there's nobody around for the vast majority of the day. It's very lonely to have so little human contact.

19.     It is very boring to never really be able to talk to anybody for a real conversation and to have nothing to do but stare at a wall in a cell. Even with other kids in cells nearby you feel very much alone. And now I only have one podmate and he's leaving soon and I'll probably be all by myself in my pod. I spend as much time as I can reading, and otherwise I just pace around and

do push-ups and sit-ups in my cell. It is really horrible and sad to spend that much time by yourself, though. It makes you go too much into your own head and think about all the bad things in your life. I feel like they've stripped me away from everything except my own mind and it's hurting my mental health.

20.     I have been put in Restriction at least ten times as punishment during my time at FCJDC. Restriction means spending 24 hours in my cell, with no possibility of coming out to the day room or for Recreation. Restriction is terrible and hurts your mental health. It's important to come out of your cell at least a little bit.

21.     I have been put on Restriction for multiple days on end. Once I was placed on Restriction for an entire week and not even allowed to shower every day. That was a very bad time.

22.     Kids get put on Restriction for all kinds of things and it's usually not for big things either. I've seen kids put on Restriction for putting their shirts over their head to sleep, for talking too much or too loudly between cells, and for walking around the dayroom instead of staying seated. I have seen it used to punish kids for eating off another kid's meal tray, even if the kid gave the food to you. I see it a lot for "talking back" to staff but that's just up to staff what that means. Staff are so hit-or-miss. They just slap this Restriction on us whenever they want. It feels like they treat us like animals putting us in cages when they're mad then they punish us when we act out because of that, and just punish us even more.

23.     I do not go to school full-time while at FCJDC and I never have. School has been "over" since I arrived this time, so I've done no schoolwork at all. I honestly have no idea if there's a teacher here now because I've never seen one during my most recent stay. During my other stays I can count the times I visited the facility classroom on one hand. I have never had regular classes

like with a teacher teaching a lesson at the front of the class, and I do not have face-to-face instruction with any teachers at FCJDC.

24.    The schoolwork I have done in past visits was just worksheets that I did by myself. The worksheets are easy and pointless. I even see them use the same worksheets more than once. They are never graded, and I do not get any feedback on my work except the staff thanks me for doing them. I don't get worksheets graded or marked up, although I'm sure I did everything right because the worksheets are not at my grade-level. When I've done schoolwork it was basically always in my pod.

25.    There is not enough staff here. There's about three staff on duty, and one is in the control room not doing much, and sometimes sleeping. That leaves two "on the floor" to deal with all six pods. All the staff complain about not having enough people to watch us and they tell us that is why we never get out of our cells. Sometimes they have to bring in police to help control kids when they refuse to do something because there's just not enough staff to deal with it when a kid doesn't comply with their orders.

26.    My time at FCJDC has affected my mind and my personality in a bad way. I feel frustrated, restless, lonely due to the amount of time I am confined to my cell alone, and the lack of human interaction. I can't believe I have to deal with this for a while longer, it honestly makes me really sad.

27.    I do not have access to mental health care while at the facility. I have asked for counselors and they're not available. One time I buzzed the staff and was really honest with them that I was really down and had to talk to somebody and they just said "we don't have mental health workers here, we can't help you." There are no counselors that come around to visit us and there is no mental health worker on the staff to go see if you need someone to talk to.

28.     The one time I talked to a counselor was a pretty extreme situation—I was on suicide watch. Even then, they just put me on the phone with a hotline and it was only for like five minutes.

29.     Suicide watch is just a worse version of Restriction. I was locked in the "suicide watch" cell for two weeks straight when I was on suicide watch. The cell is the same as any other except it has a camera and a big window that's supposed to be for observation, but it just means everybody can look in on you all day which is embarrassing. When I was on suicide watch they took my clothes, my books, and my stuff and put me in the turtle suit, which is just like a big barrel they strap on your body that doesn't really keep you warm. I had to stay like that for the whole time and only allowed to shower twice a week. That is no way to treat somebody who's already feeling so bad. It made my mental health even worse. How can you punish somebody for wanting to commit suicide by just putting them in Restriction?

30.     I've seen four or five other kids get put on suicide watch and they all get treated basically the same way. It's terrible.

31.     Another really bad thing I experienced here was what they do to you when you get taken for intake. They process you, give you a physical exam, take your clothes, put lice killing stuff in your hair, and ask you a bunch of basic questions like do you do drugs and have you ever tried suicide. Beyond that, though, they don't do any kind of detailed mental health screening and the person asking the questions is just a security staff person or the nurse, not a mental health professional. They don't do any educational screening. Then when all this is done you get to quarantine, which for me meant staying alone in a cell for 5 days only coming out for showers (and I only came out for showers twice). So right off the bat you are put in solitary here and it starts you on a bad foot.

32.     During my arrest I got attacked by a police dog who chewed up my arm really bad and injured me. When I got processed this past May they let me talk to a nurse who gave me bandages, and I told her I think I have nerve damage because I can't close my right hand all the way. I'm right-handed and now that hand is way weaker than my left. She said she'd order an X-ray right away. That was about three weeks ago and I haven't seen her since. I have never seen a doctor for it even though I've asked for one. They changed my bandages every couple days, but that's it. I'm worried my arm is going to have nerve damage and I'm not going to get treated for it.

33.     Outside of legal calls we only get two personal calls a week here for ten minutes each—on Monday and Friday. They time your calls. If you call people and nobody answers you're out of luck.

34.     I've complained about the problems here many times and never got any response.

35.     From everything I have seen, and from talking to the few other kids I get to contact here, everybody here has it about as bad as me. I've seen lots of kids get put on Restriction. As far as I know nobody gets to go to school full-time. I have never seen any kid that gets to go outside on Rec more than I do. The pods that I have visited are all set up the same with the same small cells and dayrooms.

36.     My lawyers have explained the class action process to me and I understand we are trying to bring a case as a class action. I understand that I am going to be the class representative and I understand the responsibilities of serving as a class representative in this action against Defendants. I understand I represent not just me but the other kids in Franklin County and kids who will be here in the future. I want to make life better here for kids that come after me because it's really bad here. No kid should have to live like this. I am willing to serve as a class representative.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 6th day of June 2023.

Respectfully submitted,

**L.S.**

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| L.S., on behalf of himself and all others similarly situated, by his next friend JASON MAURER, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| FRANKLIN COUNTY, CHIEF JUDGE MELISSA MORGAN of the Second Judicial Circuit Court, DARLA FITZJERRELLS, Director of Court Services of the Second Judicial Circuit Court, and LAVONDA PORTER, Acting Superintendent of the Franklin County Juvenile Detention Center, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

Case No. _____

Hon. _____

## DECLARATION OF T██████ T██

I, T███ T██, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I have been detained at Franklin County Juvenile Detention Center ("FCJDC" or "the Center") since January 23, 2023.

2.      This is my fourth time being detained at FCJDC.  The first time I was detained I was fourteen years old.  I'm now sixteen.  The first time I came to FCJDC was in May, 2021 and I stayed for about a month.  I came back in July 2021 and stayed about three weeks.  Then I came back again in September 2021 and stayed another six weeks or so.  I was in IYC Harrisburg during 2022 and came back to FCJDC in January after I was arrested in Mt. Vernon.

3.      FCJDC has six separate housing pods, which are labeled A, B, C, D, E, and F. I currently live in D pod, which has 8 cells that hold one kid each. I have been in this pod since January of this year. There have been between 1 and 6 other kids in D pod, and there is only one

other kid in there with me right now.  I have been moved to other pods from time to time.  I started in E pod and was in a cell that had a sink that didn't work so I had no water at all.  Eventually I complained enough that they transferred me to B pod.  I moved from B pod to D pod in March.

4.        My cell is very small, about the size of a parking space. There is a hard cement slab with a thin mattress against the back wall. I usually put my mattress on the floor because it's a little better to sleep that way. I also did that back when I lived in B pod because the window above the slab would leak water down onto the slab making the mattress wet.  On the other side, close to the cell door, there is a combined toilet and sink. It's controlled from the outside, so I can't flush my own toilet, I have to ask jail staff to do it and it takes them way too long to do it, usually like an hour or more which makes the cells stink.  They can also turn the water on and off in my sink. Sometimes they turn the water off in my sink for no reason.  They have done this a lot to kids in my pod.  Like I mentioned my first cell didn't even have a working sink at all.

5.        My cell door has a heavy lock that can only be opened from the outside. My former cell wall had black mold on it and the other rooms I have stayed in have black mold too.  I asked to be moved out of this room because the black mold made me cough and made me very congested. They agreed to move me to a new room that has less mold but they just put another kid right into the moldy cell I left.

6.        There is a small window in my cell, it doesn't let in much light. There are fluorescent lights on the ceiling that stays on all the time, night and day, including when I am trying to sleep.  The lights never go out here.  The constant light makes it hard for me to sleep and gives me a headache.

7.      I have never had a pillow even though I've asked for one.  I only have two thin blankets and cannot get more, even though I have asked many times because it gets too cold to sleep at night, especially during the winter.

8.      All the rooms in Franklin County that I have seen and stayed in are set up in basically the same way.  They are all dirty and bright and most of them have black mold in them. The toilets are not flushed enough so they smell, and the sinks only work part of the time.  One of my friends in D pod had his toilet overflow recently and the water and urine flowed under his door into the hallway and made the staff mad.  They pushed the urine back into his room with a broom and didn't clean it for him.  It smelled very bad and they made him live like that for a couple of days.

9.      In D pod, like the other pods, there is a small dayroom between that has two metal tables, some chairs, a broken sink, and a TV mounted on the wall. On some days we get "free time" which is just an hour or two in the day room.  During free time we aren't allowed to walk around and there's no socializing. We have to stay seated and can't move around freely, or else the jail staff will put us back in my cell.

10.      I spend most of my time in my cell at FCJDC. From when I wake up until I fall asleep, I am usually in my cell. This is how it has been for me during all my stays at this facility. On average I would say I spend about 20-22 hours a day in my cell.  Some weeks are worse than others. The last time I met with my lawyers for this case at the end of May I spent about four total hours outside my cell the whole week, most of which was to meet with my criminal lawyer and my lawyer for this case.  Without legal calls it would have been worse. The last week it has been a little better than that, but I still only had about three hours a day outside my cell, and all of that time has been spent in the dayroom right next to my cell sitting on the metal chair.

11.     My pod only gets to go outside for recreation once every few weeks, and when we do it is only for an hour or less to just walk around the grounds. There are no activities or sports when we are outside. I have only been outside about 5-10 times since January. We occasionally go to the basketball court inside for 30 minutes to an hour but that's also only every couple of weeks. We just go when they say they have enough staff to let us do it, which is rare. I haven't been outside, or to indoor Rec, since April or early May.

12.     I have eaten most of my meals at FCJDC alone in my cell, just a few steps away from my toilet. For a little while we were allowed to eat dinner in the D pod day room, but jail staff told us that is not happening anymore for security reasons and that we went back to eating all our meals in our cells again. Last week I had more meals out of my cell but I was only able to eat in the dayroom just a few feet away. It changed back to eating in our cells before so I guess it will change back again.

13.     I get to shower once a day for about 10 minutes.  Then it's right back to my cell.

14.     I do not get to talk to anybody when I am in my cell, except sometimes talking to other kids in their cells through the doors when there is a kid put in a cell close to me. Just last week, though, the staff reminded us that their rule is that kids can't communicate between cells at all. They can enforce that rule or not depending on their mood, you never know. Jail staff conduct "watch tours," where they walk around the cells to monitor the area, but these only last a few minutes and the staff does not talk to us much.

15.     It is very boring to never really be able to talk to anybody for a real conversation and to have nothing to do but stare at a wall in a cell. To pass the time, I usually sleep as much as I can during the day. Sometimes I read a book that I request from the library or do push-ups, which is the only exercise I can do in my cell.

16.     I have been put in Restriction many times as punishment while at FCJDC. Restriction means spending 24 hours in my cell, with no possibility of coming out to the day room or for Recreation. Restriction is terrible and even though it's only an extra hour or two locked in your cell, never coming out of your cell at all for a whole day really messes with your mind.

17.     Since I came to FCJDC in January, I have been put on Restriction about ten times. Sometimes they also put everybody on Restriction at once, they call it "lockdown" but it means everyone in their cell until staff lets them come out. Just about a week ago the whole facility got put on lockdown for a day because of building maintenance. We had to stay in our cells the whole time.

18.     It is never clear to me what kinds of things will get me put on Restriction. I have not been given any kind of rules or handbook that explains this and staff do not explain it either. Staff puts kids on Restriction for things like fighting, but sometimes kids get put on Restriction for really little things. I was once put on Restriction for arguing with another kid in the pod through our doors. It wasn't even a real big argument and we weren't even in the same room. Another time the whole pod got put on Restriction because one kid was banging on the door, but we all got punished. I got put on Restriction a few weeks ago for something another kid in the pod did, I guess they thought it was me but even when I explained it they locked me up. It's crazy to me that I could get locked down for things like that but it's just up to the staff member who's there. They can basically do whatever they want.

19.     I do not go to school full-time while at FCJDC and I never have.

20.     I do not have regular classes, and I do not attend school with a teacher at FCJDC. There are two rooms called classrooms here, but I have only been there a few times and have not

seen been there at all in more than two months.  School is over now for the year so I guess that's it.

21.     My schoolwork is just worksheets that I have to complete by myself. The worksheets are never graded, and I do not get any feedback on my work. I do not think that the worksheets are at my grade-level (I'm supposed to be a sophomore).  Even the few times I visited the classroom I just sat and did the same worksheets I do in my pod.

22.     I am often denied the opportunity to go to school even in my pod. Sometimes the staff forgets to wake me up to do my worksheets, or they do not bring me the worksheets for the day at all.  In the past month or more I have done zero schoolwork at all.

23.     Recently, my entire cell pod was denied access to any schoolwork all at once.  The staff said it was because we were not behaving well.  They just put us all on "Admin" status (meaning none of us could leave the pod) and didn't explain the reason at all.  It seems pointless to even try to behave when you don't understand the rules and the punishments are so random.

24.     I never know when I will go to school, or what I will learn on any given day.

25.     There is not enough staff here.  All the staff complain about not having enough people to watch us and they tell us that is why we never get out of our cells.  Sometimes they have to bring in police and it's not just to break up fights, either. It's just because they don't have enough staff to run the facility. A few months back police came in and broke my friend's arm and he had to go to the hospital. This was all just because he didn't want to go back to his cell during Rec when they tried to shorten his Rec for no reason. His arm was in a splint for a while because of this.  I have seen police in the facility multiple times.

26.     I feel upset, restless, and lonely because I spend so much time alone in my cell and don't get to talk to many people. This facility has had a very negative impact on my life.

27.     I do not have access to mental health care while at the facility.  There are no counselors that come around to visit us and there is no mental health worker on the staff to go see if you need someone to talk to.

28.     I have submitted multiple written grievances about the conditions at FCJDC, but no one from the detention center has ever answered my grievances.

29.     From everything I have seen, and from talking to the few other kids I get to contact here, everybody here has it as bad as me.  I've seen lots of kids get put on Restriction.  As far as I know nobody gets to go to school full-time.  I have never seen any kid that gets to go outside on Rec more than I do.  The pods that I have visited are all set up the same with the same small cells and day rooms.

30.     My lawyers have explained to me about this lawsuit and explained the class action process to me and I understand we are trying to bring a case as a class action.  I want to make life better here for kids that come after me because it's really bad here. No kid should have to live like this.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 16th day of June 2023.

Respectfully submitted,

T.T.

# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| L.S., on behalf of himself and all others<br>similarly situated, by his next friend<br>JASON MAURER,<br><br>    Plaintiffs,<br><br>    v.<br><br>FRANKLIN COUNTY, CHIEF JUDGE<br>MELISSA MORGAN of the Second<br>Judicial Circuit Court, DARLA<br>FITZJERRELLS, Director of Court<br>Services of the Second Judicial Circuit<br>Court, and LAVONDA PORTER,<br>Acting Superintendent of the Franklin<br>County Juvenile Detention Center,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. _____<br>)<br>)    Hon. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF T████ W███████

I, T███ W███████, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am 15 years old.  I was born ███████████ 2008. I am from Mt. Vernon, Illinois.

2.      I have been detained at FCJDC four times.

3.      I was most recently detained at Franklin County Juvenile Detention Center ("FCJDC" or "the Center") between April 10, 2023 and May 17, 2023.

4.      The first time I was detained I was 14 years old.  The first time I came to FCJDC was in October 2022 and I stayed for about a month. I came back in January and stayed about 3 days.  Then I came back again in February 2023 and stayed another six weeks or so.

5.      A few days after I met with my lawyers in FCJDC the facility transferred me to IYC Harrisburg.  That is where I live now.

6.      When I was at FCJDC I lived in D pod.  I also lived in A pod and F pod.

1

7.      All the cells I stayed in when I was at FCJDC were basically the same.  They were all very small concrete boxes. They were all moldy and disgusting.  There is a cement slab on the back wall with a thin mattress, and a combined toilet-sink on the opposite wall near the cell door. I put my mattress on the wall because the slab hurt my back, but anyway the water would leak in from the window up on the ledge and once I woke up with my chest soaking wet with water so I never slept up there again. I never had a pillow while I was there even though I asked for one. They just don't give kids pillows for whatever reason.  I never had enough blankets to keep warm and it was really cold in the cells in the winter.

8.      One of the worst things about the cells was the little toilet sink that was across the cell from the bed. Kids don't have control over it so you have to ask staff to flush your toilet.  It usually takes them a long time to do it.

9.      I was almost always in my cell when I was at FCJDC. I would say I spent about 20-22 hours a day in my cell on average.  It got worse and worse the longer I was there and the last few weeks I almost never left my cell except to shower each day for about 25-30 minutes.  I ate all my meals in my cell by myself. I know there is a cafeteria in the facility but I have never eaten there and I never saw any other kids eat there either. When I did leave my cell it was just to go to the dayroom right outside my door where all we could do was sit at a table. Staff will put you back in your cell if you walk around the dayroom.

10.     All but one of my cells at the Center were filthy and moldy. I was in a D pod cell with a lot of black mold on the walls. It made it hard to breathe and I felt congested all the time and my ears were plugged up and hurt. I begged the jail staff to relocate me to a different cell. I wanted to move cells so badly that I tossed my shoe at the sprinkler system in my cell one day. All this black water poured out of the sprinklers and flooded my cell. At that point, jail staff finally

relocated me to a new cell, but the next day, after trying to clear up the black water from the sprinkler system, they returned me to the moldy cell.

11.     The staff put me on Restriction all the time.  When you're on Restriction you are locked up in your cell for 24 hours.  Sometimes they make you do two or three Restrictions in a row so you're in your cell for a few days. Usually it's for something like arguing with staff but sometimes I didn't even know why I was on Restriction exactly.  It makes you go crazy when you spend all that time alone.  The staff put me on Restriction about 30 times.  Most of the time I was not on Restriction I was on Admin status which means just staying in your cell or the dayroom for a few hours, you never leave your pod. Being alone that long really messed with me emotionally and made me sad. I cried sometimes. I was really mad that when I was in Restriction I couldn't talk to my mom and it's important to me that I get to talk to her.

12.     Sometimes the staff would extend Restriction for multiple days. I had multiple day Restriction several times, sometimes for three or even four days.

13.     My last time in Restriction was really bad. I got into it verbally with the staff and called them names and then they really were mad at me and had it out for me. So they started messing with me bad and messing with my mind. First they refused to flush my toilet so it overflowed. The water and urine from the toilet overflowed out on the floor and it went under my door into the hallway.  This made the staff even more mad and they took a broom and pushed the urine back into my room and put a little foam mat under the door to keep it in there. I asked them to clean it for me but they wouldn't do it and I had to sit in there with all that on the floor for about four days (I was on a really long Restriction at the time so I was locked up in there with it 24 hours a day).  It smelled very bad and made me feel sick.

14.     During my last four-day Restriction I was also stripped down to my boxers. The staff took my clothes and made me stay in my underwear. It was super cold and I just stayed on my mattress pretty much all day. I was also put on shower restriction for two days during this Restriction which is when you can't take your daily shower. When the other kids got to eat cheeseburgers on cheeseburger night the staff gave me cold cuts instead saying I didn't deserve cheeseburgers.  They called me stupid and called me names with swear words that I don't want to write in this paper for the Court.

15.     I do not get to talk to anybody when I am in my cell, except sometimes talking to other kids in their cells through the doors when there is a kid put in a cell close to me. Jail staff conduct "watch tours," where they walk around the cells to monitor the area, but these only last a few minutes and the staff does not talk to us.

16.     I have mental health issues that I used to get treatment and medication for on the outside, and that I get treatment and medication for now that I'm at IYC Harrisburg.  I got nothing at FCJDC for my mental health issues. There wasn't even anyone to talk to. There are no mental health counselors at the facility or other people to talk to about these issues. They were always running out of my medication so I sometimes went a day or more without the medication that I really need.

17.     I was in pretty bad mental health crisis during my most recent time at FCJDC. On April 11, 2023 I was cutting my arm with a broken colored pencil while confined in my cell. The staff saw that I was bleeding all over. Instead of getting me any mental health treatment, they just gave me a paper towel to clean up the blood. I asked to see a nurse they said she wasn't there that day.  No doctor or nurse ever looked at my arm.

18. After the cutting incident, the staff kept me confined to my cell and placed me on suicide watch in my cell for two days. They stripped me to my boxers and tried to put me in what we call the turtle suit, which is supposed to fit over your head and restrain you so you can't hurt yourself. But they couldn't get it on me because the straps didn't work so I just sat in my underwear instead. My mom later found out and called in a person from a suicide hotline to come visit me and talk to me, but the facility never had anyone talk to me or help me when I was on my suicide watch.

19. While I was at FCJDC I got placed on suicide watch 2 times. There's a special suicide watch cell with a big window so the staff can watch the kid on suicide watch, but they don't always use it and both of my suicide watches were in my cell. Suicide watch is just Restriction, though. They don't give you any help or let you talk to anybody to calm you down.

20. My mom was able to set up some counselors to come visit me while I was at FCJDC since the jail didn't have anybody to help me. She had to do it all on her own, though.

21. I got lice while at the Center and got locked up in intake for multiple days and put on shower restriction.

22. When I was at FCJDC we only went for Recreation time when there were enough staff members to take us. That was probably about once a week. Usually Recreation just meant spending about an hour at the indoor basketball court. We only went outside for Recreation about 3-4 times when I was at FCJDC. There are no activities out there. We just walk around the buildings. During my final month at FCJDC, I didn't go out for Rec at all.

23. When I'm in my room by myself it drives me crazy. It makes my mind go to bad places. I don't have anything to pass the time. I can't really sleep well because the lights are so bright and they never turn off.

24.     I never went to school full-time while I was at FCJDC. For my last few weeks I never went to the classroom at all. I sometimes did work on worksheets in my dayroom, but toward the end of my time the staff told my whole pod that we were not going to school anymore at all because there was too much stuff going on at the facility so they didn't have time to take us. I only visited the one classroom 5-6 times and when I did it was just to do the same worksheets I did in the dayroom. I never had regular classes, and I didn't ever have real face-to-face instruction with a teacher at FCJDC.

25.     I also have an Individualized Education Plan, but I didn't get any special education services at FCJDC.

26.     There is not enough staff at FCJDC. There is hardly anyone ever around. All the staff complained about not having enough people to watch us and they tell us that is why we never get out of our cells.  Sometimes they had to bring in police to help them do things because there weren't enough staff to actually deal with things that went wrong.

27.     Earlier this year police came in and broke my friend's arm and he had to go to the hospital after he refused to leave Rec to go back to his cell.  I saw police in the facility multiple times.  Two times they came for me just for small stuff like kicking my door open or not wanting to go back in my room. When the police come in there's like 8-10 of them at a time.

28.     There are always long delays in seeing the nurse. The nurse wouldn't help me with my cut arm. I've heard there is a doctor that is supposed to be available to come to the facility but I've never seen this doctor.

29.     My time at FCJDC has affected my mind and my personality. It affects the way I think, the way I act, and how I think about myself. It made me really angry but also made me feel like I was worthless. Everybody in there is a human being, the guards are just people like us kids,

they're no different. But the staff treat us like we're something different from them. They treat us like a creature or like an animal. So I always felt like an animal when I was at FCJDC. People are all the same, so they should be treated like people.

30.     They should shut down FCJDC. I heard some kids who went to other JDCs didn't have it so bad. It's too bad here to be fixed. They should shut it down and rebuild.

31.     From everything I have seen, and from talking to the few other kids I get to contact here, everybody here has it bad. I've seen lots of kids get put on Restriction. As far as I know nobody gets to go to school full-time. I have never seen any kid that gets to go outside on Recreation every few weeks. The cells that I have visited are all set up the same way with the same day rooms.

32.     I've complained numerous times about the conditions at FCJDC, but no one on staff has ever responded.

33.     My lawyers have explained to me about this lawsuit and explained the class action process to me and I understand we are trying to bring a case as a class action.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ___ day of June 2023.

Respectfully submitted,



T.W.

# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| L.S., on behalf of himself and all others similarly situated, by his next friend JASON MAURER, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| FRANKLIN COUNTY, CHIEF JUDGE MELISSA MORGAN of the Second Judicial Circuit Court, DARLA FITZJERRELLS, Director of Court Services of the Second Judicial Circuit Court, and LAVONDA PORTER, Acting Superintendent of the Franklin County Juvenile Detention Center, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Case No. _____

Hon. _____

## <u>DECLARATION OF A.B.</u>

I, A⬛ B⬛, also known as K⬛ K⬛, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I was detained at Franklin County Juvenile Detention Center ("FCJDC" or "the Center") from October 12, 2023 to June 1, 2023. I live at IYC Harrisburg now.

2.     This is my first time being detained at FCJDC, though I have stayed at two other facilities (Madison County JDC and intake at a JDC facility in Arkansas) that were both much better than FCJDC.

3.     I have been in D pod since March of this year, but I have spent time in most of the other pods.

4. My cell is very small—I have been very bored and so I measured it with my feet (I have big feet and I believe it is about 11.5 by 7.5 feet. There is a hard cement slab with a thin mattress against the back wall but I can't sleep there because the small window above the bed leaks constantly. If I leave the mattress there I get wet, so I moved the mattress to the floor.

5. Next to the cell door, there is a combined toilet and sink. It's controlled from the outside, so I can't flush my own toilet. When I ask jail staff to flush the toilet it typically takes hours for them to do it. Lately they have tried to use a schedule where they flush the toilet every few hours, but it has not been working. They can also turn the water in my sink on and off. I need the water to be on because I get very thirsty, especially when I do push-ups (I try to do a few hundred a day). My water has been turned off many times for multiple days at a time. Right now my water has been off for four or five days because another kid in a different cell let his sink overflow. So, I'm being punished for something another kid did (I think his water has been turned off too). I ask for the staff to bring me water and they say no.

6. The lights on the ceiling of my room never go out, even at nighttime. It makes it almost impossible to sleep for a long time, you always get woken up by the light.

7. My current cell wall has black mold on it and the other rooms I have stayed in have black mold too. There is a small window that leaks water, especially when it rains. That makes the mold worse. I think the mold is affecting my breathing—I get stuffed up and congested when I stay in the rooms with black mold. Most of the rooms I have stayed in at FCJDC have at least some of the black mold that you can see on walls or the ceiling.

8. I have never had a pillow at FCJDC—nobody does. Everybody gets one sheet and a thin blanket. I always ask for extra blankets and some staff members will give you an extra

blanket or two, some will not. Either way you never have enough blankets to stay warm at night, in the winter especially when the cells get so cold you can see your breath.

9.      All the cells I have been in have been set up in basically the same way except that there are a few two-person cells in one of the pods.

10.      There are not enough staff here. There are only a few of them in the facility each day so you do not see many staff. There are not enough staff to control things when kids get in fights or disobey the staff so they bring in the police regularly. The police station in Benton is directly across the street from FCJDC, it's just a few feet away, so they can get the police here quickly and they're here all the time.

11.      One day in December 2022 I had my arm broken by police. We were given a short time to go to the indoor recreation facility for the first time in a long time. I had just gotten off three days of lockdown with almost no time outside my cell, so I was very happy to be out. I got into a verbal argument with another kid but we were not fighting. A staff member told me I had to go back to my cell, but not the other kid. I was so frustrated that I was going to miss this recreation period and get locked back up, and because it was unfair that only I was being punished. So, I said I would not go back to the room, I wanted to stay at recreation until the end. A few minutes later a group of officers rushed in. They were much larger than me and they threw me around in a way that was way too rough. When they were throwing me to the ground they twisted my arm and there was a snap that everybody could hear. They still twisted my broken arm behind my back and it was extremely painful. The officer asked me about my arm and I said "you know it's broken, you heard it snap." They still kept me handcuffed an put me in my room that way. My arm was really painful because it was broken and handcuffed behind my back. I asked to go to the hospital. The staff cooked dinner and took another group of kids for recreation first and then took me to the

emergency room after making me sit in my room for two hours. The ER told me I broke my humerus and put a splint on my arm, and sent me to an orthopedic hospital for more observation. My arm took a few months to heal.

12.     I have seen police at the facility many times since I arrived. I have seen them get too rough with other kids. They tazed another kid. The crazy thing is the police don't even just come in for fights or big things, they come in just when a kid doesn't want to move and they do things that the staff should be doing. There's just almost nobody here, so the police are like the staff.

13.     I spend most of my time in my cell at FCJDC. From when I wake up until I fall asleep, I am usually in my cell. On average I would say I spend about 23 hours a day in my cell.

14.     I have been put on Restriction many times as punishment while at FCJDC. Restriction means spending 24 hours in my cell, with no possibility of coming out to the day room or for Recreation. I am constantly on Restriction, I can't count the number of times I have been on Restriction since I got to FCJDC. There have been times Restriction lasts longer than 24 hours. A couple of times it has lasted as long as three days in a row. Restriction is really bad and makes my loneliness and restlessness a lot worse. Even the day before I was transferred out of FCJDC, I was on Restriction.

15.     One of the worst things about Restriction is there is no way to tell when it is coming. Just this week I woke up in the morning to a staff member telling me I was put on Restriction without giving me a reason. I still have no idea why it happened. Kids get put on Restriction for things like swearing or just "disrespecting" a staff member but it's just up to the staff member to do it and they are not always fair. Sometimes they put kids on Restriction in groups for things only one kid did. It is not clear to me what kinds of things will get me put on Restriction.

16.     In my last JDC the first thing that happened was we got a piece of paper that explained all the things we were allowed to have, what we couldn't do, and what the rules were. There is nothing like that here. I have not been given any kind of rules or handbook that explains this and staff do not explain it either. It's like there are no rules here, it's just whatever the staff makes up every day.

17.     The other kind of punishment you can get is "Admin" status. That's when you can't leave your pod at all, you're just stuck in your cell and then whatever free time they give you in your dayroom. I have been on Admin status pretty much permanently, especially lately, and so have several other kids in my pod. This is only slightly better than Restriction—it just means you're in your cell for like 22 or 23 hours a day instead of 24. Just like Restriction I don't have any real idea why we get put on Admin status. Admin status is probably even less clear and gets handed out as punishment for the whole pod a lot of the time.

18.     In D pod, like the other pods, there is a small dayroom between the cells that has two metal tables with chairs connected to it. The D pod dayroom also has a TV on the wall. Some days the kids who are not on Restriction are given "free time" which just means spending an hour or even less in the dayroom in the evening. The staff only allow one kid to have "free time" at a time, so there's no one to talk to or hang out with when it's your turn to have "free time" in the dayroom. During that time we are usually not allowed to walk around, we just have to sit in the metal seats. I am a very active person and being forced to sit like this is not good for me, but the staff will not let me stretch my legs and pace around like I want to. For the last couple of weeks there has not been any free time anyway, though.

19.     I mostly eat all my meals alone in my cell, just a few steps away from my toilet. The only times I eat a meal outside my cell were the times they let us eat dinner in the D pod

dayroom, but jail staff told us that is not happening anymore so we are back to eating all meals in our cells.

20.     I get to shower once a day for about 10-15 minutes. We usually try to stretch out our showers as long as we can to avoid going back to the room but if you do that too long you can get in trouble and be prevented from taking a shower in the future.

21.     I do not get to talk to anybody when I am in my cell, except talking through the doors to kids in cells next to me. Jail staff conduct "watch tours," where they walk around the cells to monitor the area, but these only last a few minutes and the staff does not talk to us much.

22.     Being alone all the time and not talking to people messes with my head. I am really bored and restless. I used to read books I would ask the staff to bring me from the library but now I can't really concentrate on them. I just pace around my cell to try to stay active and do a few hundred push-ups a day because I am very restless and have so much energy that I can't get out.

23.     Kids who are not on Restriction get to recreation but it only happens once every few weeks. There is indoor recreation which is when we go to an indoor gym with one basketball hoop. We go outside for recreation even less often, really only when the staff say there are enough of them and they decide they want to do it. When we do go outside it is just to just walk around the grounds. They won't let us move freely. I like to go to the fence to look out and see the town but the staff won't let me stand there, I have to stay near the building which doesn't make any sense to me because there's huge fences with razor wire that I could not possibly climb. There are no activities or sports when we are outside.

24.     I do not go to school full-time while at FCJDC. I hardly go to school at all.

25.     I do not have regular classes, and I do not have face-to-face instruction with a teacher at FCJDC. There is one classroom here, but I have only been there a few times and have

not been there in weeks. Even the few times I visited the classroom I just sat and did the same worksheets I do in my pod.

26.     My schoolwork is just worksheets that I have to complete by myself. The worksheets are never graded, and I do not get any feedback on my work. I do not think that the worksheets are at my grade-level since I should be a senior in high school. The reading assignments are like something a third grader could do.  I have asked for more challenging work but I haven't gotten it. You just do a couple worksheets then take a test but nothing is graded and given back to me. I'm sure I did well on it because it is so easy but there is no real point to any of it.

27.     Right now I can only do my worksheets in my cell, or occasionally, in my pod's dayroom.

28.     I am often denied the opportunity to go to school even in my pod. Sometimes the staff forgets to wake me up to do my worksheets, or they do not bring me the worksheets for the day. This would happen pretty often.

29.     In the past two weeks, I have not done any schoolwork at all. This is true for at least two other kids in my pod, too. Now school is over for the summer so I guess I will never do schoolwork again.

30.     Recently, my entire cell pod was denied access to any schoolwork all at once. The staff said it was because we were not behaving well but you can never tell why anything is happening.

31.     I would like to graduate from high school, but I don't have any clear idea of what I need to do to get the credits I need to graduate.

32.     I know that school can be OK in these facilities because in Madison County I had real school. We had teachers who taught age-appropriate lessons and did things in the classroom.

I was actually learning something and I got grades on the work I completed.  We had games and movies and a thing called "Fun Fridays" where we would do activities together in the classroom.

33.    I have PTSD and other mental health problems because I have been exposed to a lot of bad things and trauma over the last few years. I have been shot and have been the victim of a lot of abuse and violence. I really need someone to talk to and I need medication to handle my mood. I do not have access to mental health care while at the facility. There are no counselors on staff and nobody that comes around to visit us and I really need one. I even have a court order requiring that the facility give me a counselor and I still don't have one. I have night terrors when I get to sleep and am having a hard time.

34.    I did get medication ordered for me at my prior JDC and that transferred over here, so the nurse who comes through gives me my medication but other kids who didn't get another facility to order them medication can never get anything because there is nobody here to diagnose them or prescribe the medication.

35.    There is a "suicide watch" cell that I see all the time, because it's in my pod—it's D-9. It's like any other cell except it has a big window and a camera so the kid who gets put in there can be seen all the time. Kids who get put on suicide watch get stripped to their boxers or shorts, and sometimes put in the "turtle suit" which is like a padded suit that looks like a turtle body that I guess is supposed to keep you from hurting yourself. Sometimes they have to sit in there in just their boxers or shorts. Other than that it's just like Restriction because they're on lockdown.  I don't see any counselors or anything go in there to help the kid, they are just locked down for like 24 hours without clothes and that's it.

36.    The nurse who comes through the facility cannot do much because there is nobody to really diagnose anyone with anything. I have been asking for Tylenol and Ibuprofen and been

denied by staff, who seem to be the ones who decide if you need medical care or not and they are not doctors. I get a lot of headaches from previous concussions, and one day I had a really horrible headache, and the staff told me they couldn't give me Tylenol or anything like that anymore. They did not explain why. A friend of mine had a serious cut on his finger that almost cut his finger in half. He couldn't get the pain medication he needed or the treatment he needed for days. He begged and begged and finally after many days got some ointment and a bandage, but he never even saw a doctor.

37.     From everything I have seen, and from talking to other kids through the cell walls and in the dayroom, everybody here has it bad. I've heard lots of kids get put on Restriction. As far as I know nobody gets to go to school full-time. Nobody gets to go outside but once every week or two. The cells are all bad and the conditions in them are horrible.

38.     I have complained dozens of times about the conditions at FCJDC, but no one from the detention center has ever fixed the problems. In my last facility they had a weekly meeting on Mondays where they addressed all the complaints and grievances for the week. Here if you complain about something it just disappears and you never hear about it again.

39.     My time at FCJDC has been horrible. I have been on my own since I was 15 and lived in some bad places and feel like I can put up with a lot but this place is treacherous. Being locked up by yourself all the time messes with your head and makes you go crazy for real. This place brings out the worst in everyone. They make you go crazy and then it's like they punish you for acting like that.

40.     I am really sad for the younger kids because it seems like it messes with them the most. Some kids here are like 11 and they are still learning how to live because they're just kids. They get really sad with having to put up with the conditions here.

41.     I always say you can live here but it's not really living.  Being here is not living.

42.     The lawyers in this case have explained to me about this lawsuit and explained the class action process to me and I understand we/they are trying to bring a case as a class action. I want to help other kids who go to Franklin County, especially the younger kids.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 25th day of May 2023.                    Respectfully submitted,



# Exhibit 5

# 2022 Franklin County Juvenile Detention Center Inspection Report

JOHN ALBRIGHT, CHIEF OF PERFORMANCE AND INNOVATION

ILLINOIS DEPARTMENT OF JUVENILE JUSTICE

**Executive Summary**

The Illinois Department of Juvenile Justice (the "Department") conducted an annual inspection of the Franklin County Juvenile Detention Center on August 2, 2022, pursuant to 730 ILCS 5/3-15-2(b). The Department observed several areas on non-compliance during this review, many of which warrant immediate attention.

The Franklin County Juvenile Detention Center is a facility in crisis. The staffing levels at the facility are extremely low and directly impact conditions of confinement for youth that are well-below minimum standards. On the date of the inspection, the facility only employed eight full-time staff and four part-time staff. It is not possible to adequately manage a 24-hour facility with staffing numbers that low.

The sections and specific requirements of the 20 Ill. Adm. Code 2602 County Juvenile Detention Standards ("County Detention Standards") noted as non-compliant are listed in the table below and specific observations are noted in the following sections of this report.

Each section of the report also includes policy and practice recommendations to either gain compliance or move towards best practice. Those recommendations are combined in a second table at the end of the report.

**Areas of Non-Compliance**

| Section | Requirement |
|---|---|
| 2602.100 Clothing, Personal Hygiene, Grooming | Opportunities to shower shall be provided daily except as amended by medical advice in individual cases. |
| 2602.110 Food Services | At least one full-time cook or the food service provider shall have food services sanitation manager certification from the Illinois Department of Public Health. Meals shall be served and conducted in a group setting except when prohibited by security or medical needs. |
| 2602.170 Discipline | All facilities shall have a developmentally appropriate, research informed behavioral management program that supports the development of pro-social skills and provides positive reinforcement for good behavior. The program shall provide opportunities for immediate recognition of pro-social behavior as well as meaningful incentives and rewards for improvement and maintenance of desired behavior. The program shall also include potential sanctions for negative behavior that are developmentally appropriate, research informed, proportionate and fair. Room confinement may be used only as a temporary response to behavior that threatens the safety of the youth and others. Room confinement shall not be used for a fixed period of time, but only until the youth is calm enough to rejoin programming without being a risk to the safety of others. Supervisory staff shall be notified immediately when room confinement is used. At no time should room confinement exceed 4 hours without administrators and/or mental health staff developing an |

| | |
|---|---|
| | individualized plan to address the behavior. Youth shall not be deprived of the following basic rights as part of a disciplinary response: Approved phone calls; Education. |
| 2602.20 Administration | All staff will have a minimum of 40 hours of training annually. . . Employees shall have access to a manual of policies and procedures either in a written or electronic format. Employees shall review policies on a yearly basis and document acknowledgement of their review. Prior to assuming responsibility for supervision of youth, all staff must complete a 40-hour orientation including but not limited to: A) Facility mission and code of ethics; B) Basic rights of incarcerated youth, including legal rights, grievance procedures and right to be free of retaliation for making a complaint; C) Facility policies and procedures, particularly safety, security and fire and other emergency procedures; and D) Confidentiality. In the first year of employment, all staff shall minimally receive an additional 80 hours of training. Employees shall have access to a manual of policies and procedures either in a written or electronic format. Emergency procedures in event of a fire, riot, escape, bomb threat and natural disaster shall be part of the manual. Employees shall review policies on a yearly basis and document acknowledgement of their review. The superintendent shall designate a person to maintain documentation of employee review from year to year. |
| 2602.210 Visiting | A liberal visiting schedule shall be established identifying no fewer than two visiting days each week, one of which must be during the weekday evening hours and one during the weekend. Additionally, visiting shall be allowed on all legal holidays |
| 2602.220 Detention Programs | Programs designed to address the risk and needs of delinquent youth shall be provided to youth in custody either by staff or community providers. Programs may include drug and alcohol treatment, group or individual counseling, social and life skills training and family interventions. Facilities shall have in place an evidence-based positive behavior program that target criminogenic risk and needs of youth in custody |
| 2602.230 Education | A detention facility shall operate a 12-month long schedule of school instruction and programming with appropriately certified teachers that are licensed by the State Board of Education. There shall be a minimum of five hours of instruction per day. |
| 2602.260 Recreation and Leisure Time | Vigorous physical activities, indoor and out, shall be a part of the daily schedule. Passive indoor activities, in addition to television viewing and radio listening, shall be included. At least one hour of physical recreation and one hour of additional leisure activity shall be scheduled each day. |
| 2602.30 Personnel | Each detention facility must have sufficient personnel to provide adequate 24-hour supervision of youth seven days a week. . . An assistant superintendent, qualified by training and experience to supervise staff and youth, shall be designated for a detention facility of 25 or more rated |

| | |
|---|---|
| | capacity. . . Staffing levels must anticipate the need for coverage for staff absence for leave and training. . . An agency shall employ or designate an upper-level, agency-wide Prison Rape Elimination Act ("PREA") coordinator with sufficient time and authority to develop, implement, and oversee agency efforts to comply with the PREA standards in all of its facilities. . .All personnel working in the detention center, including contractual staff and volunteers, must complete a background check prior to employment and at least once every five years throughout employment. |
| 2602.50 Admissions Procedures | Following admission, a strip search may be administered only when there is an individualized, reasonable suspicion. . .Within 72 hours after the youth's arrival at the facility and periodically throughout a youth's confinement, the agency shall obtain and use information about each youth's personal history and behavior to reduce the risk of sexual abuse by or upon a resident. Assessments shall be conducted using an objective screening instrument. . . An initial orientation shall be conducted by a detention staff member at time of admission. The orientation shall include: Information regarding programs (i.e., education, arts and crafts, counseling and all social services. Procedures for making requests or entering complaints to staff members, judiciary or to Department personnel. . . The agency shall also provide at least one way for youth to report abuse or harassment to a public or private entity or office that is not part of the agency and that is able to receive and immediately forward resident reports of sexual abuse and sexual harassment to agency officials, allowing the resident to remain anonymous upon request. |
| 2602.80 Medical and Health Care | Access to psychiatric and/or psychological services shall be provided in individual cases as needed. |
| 2602.90 Mental Health Services | All facilities shall employ or contract with qualified mental health professionals to address the needs of youth identified in the mental health screening, as well as needs that arise during the period of confinement. Services shall meet or exceed the community level of care. . . Youth with significant mental health needs shall be assessed by a qualified mental health professional. A service plan shall be developed for each youth that includes: 1) Counseling or psychotherapy to be provided; 2) Behavioral management strategies and goals; 3) Medication; 4) Protocol for monitoring youth's progress; and 5) Needed adjustments to normal detention programs and procedures. The facility shall provide appropriate services to youth with serious mental illnesses (e.g., bi-polar disorder, psychosis, severe depression) including psychiatric evaluation and care, as well as prescribing and monitoring psychotropic medication. |

**Methodology**

- Interviews Conducted
    - Acting Superintendent
    - 1 Supervisor

- - 2 Correctional Officers
  - 6 youth
  - 1 Educator
  - Program Manager – Redeploy Illinois
  - 1 Nurse

- Documents Reviewed
  - Youth point cards
  - Sample youth files
  - Staff Training Documentation
  - Sample Incident Reports
  - Menus

## Overview

The Franklin County Juvenile Detention Center is a 32-bed facility in Benton, Illinois. The facility houses youth from several counties in southern Illinois.

The on-site portion of the review took place on Tuesday, August 2, 2022. At the time of the audit, the facility had 15 residents, three of which were out at court. The facility has one acting superintendent, and eight full-time staff (inclusive of both Detention Officers and Supervisors). The Acting Superintendent reported the facility has had trouble hiring over the past several years, which she attributed to a combination of a low starting salary and a requirement that applicants have a bachelor's degree. The facility has four additional people that work in a part-time capacity, usually to provide transportation for youth when needed. The facility does not employee a dietary staff. Detention Officers and Supervisors cook food at the facility.

## Admission Policy and Procedures

The Franklin County Juvenile Detention Center offers 24-hour coverage for admissions. Youth property is collected, inventoried, and laundered according to standards.

The facility conducts strip searches of all youth upon intake. County Detention Standards permit strip searches of youth upon admission only when there is an individualized, reasonable suspicion of weapons, contraband, or body pests.

The facility does not have an adequate orientation process for youth. The facility does not have a formal Youth Orientation Manual; instead, they supply youth with a short, 3-page form that largely consists of facility rules and a small summary of telephone privileges. Some youth indicated a lack of clear expectations after the initial orientation.

The County Detention Standards were updated in 2021 to include some elements from PREA standard. PREA requirements include an assessment to determine risk for victimization within 72 hours of each

youth's admission and periodically throughout a youth's confinement. The facility has not undergone a formal PREA audit and does not use any type of assessment for risk of victimization, nor does the facility have anyone acting in a PREA Coordinator role. Of the youth who were interviewed, none of them were familiar with PREA.

Areas of Non-Compliance and Recommendations
- 2602.50 Admissions Procedures states: "Following admission, a strip search may be administered only when there is an individualized, reasonable suspicion. . .Within 72 hours after the youth's arrival at the facility and periodically throughout a youth's confinement, the agency shall obtain and use information about each youth's personal history and behavior to reduce the risk of sexual abuse by or upon a resident. Assessments shall be conducted using an objective screening instrument. . . An initial orientation shall be conducted by a detention staff member at time of admission. The orientation shall include information regarding programs (i.e., education, arts and crafts, counseling, and all social services) and procedures for making requests or entering complaints to staff members, judiciary or to Department personnel. . . The agency shall also provide at least one way for youth to report abuse or harassment to a public or private entity or office that is not part of the agency and that is able to receive and immediately forward resident reports of sexual abuse and sexual harassment to agency officials, allowing the resident to remain anonymous upon request."
  - Recommendation:
    - Eliminate the use of strip searches as a standard process during intake.
    - Implement the PREA Risk for Victimization Assessment for youth within 72 hours of admission and periodically throughout a youth's confinement.
    - Hire a PREA Officer to supervise facility compliance with PREA standards.
    - Develop a formal Youth Orientation Handbook that contains information on things like programming, a youth grievance procedure, and information regarding PREA.
    - Develop a form to capture youth acknowledgment of receipt of the Youth Orientation Manual and PREA orientation.
    - Contract with a third-party entity for youth to access in order to report abuse or harassment in a confidential manner.

**Personnel, Staffing, Supervision, and Administration**
As aforementioned, the facility only has eight fulltime staff (inclusive of supervisors and correctional staff) and four part time workers. On the date of the inspection there were only three employees working the shift (one supervisor and two detention officers). The Acting Superintendent indicated they only have three people working during the day on most shifts. These staffing levels are directly contributing to poor conditions of confinement for youth and a poor work environment for employees. The staffing levels at the facility are critical and unsustainable as it is not possible to safely run a juvenile justice facility 24 hours a day/seven days per week with just eight fulltime employees, especially considering those employees are charged with providing youth transportation and cooking meals in addition to providing supervision to youth. The facility does not employ an Assistant Superintendent, despite a County Detention Standards requirement that facilities with rated capacity of 25 or more

employ an Assistant Superintendent. The Franklin County Juvenile Detention Center has a rated capacity of 32. Attention needs to be given to this staffing shortage urgently.

There is an obvious lack of training at the facility. New employee training was described as job-shadowing without any formal online or classroom-based education. The facility utilizes Crisis Prevention Institute (CPI) as the primary de-escalation and physical restraint technique. The supervisor on duty reported CPI training has not been conducted in several years and acknowledge some newer employees have never received training at all. This poses a high risk for potential liability for the county. Furthermore, the facility was unable to provide an active policy manual when requested. Staff on-site were not able to find the existing policy manual when it was requested and could only find a version that was approximately 15-years old.

<u>Areas of Non-Compliance and Recommendations</u>

- 2602.20 Administration states "All staff will have a minimum of 40 hours of training annually. . . Employees shall have access to a manual of policies and procedures either in a written or electronic format. Employees shall review policies on a yearly basis and document acknowledgement of their review. Prior to assuming responsibility for supervision of youth, all staff must complete a 40-hour orientation including but not limited to: A) Facility mission and code of ethics; B) Basic rights of incarcerated youth, including legal rights, grievance procedures and right to be free of retaliation for making a complaint; C) Facility policies and procedures, particularly safety, security and fire and other emergency procedures; and D) Confidentiality. In the first year of employment, all staff shall minimally receive an additional 80 hours of training. Employees shall have access to a manual of policies and procedures either in a written or electronic format. Emergency procedures in event of a fire, riot, escape, bomb threat and natural disaster shall be part of the manual. Employees shall review policies on a yearly basis and document acknowledgement of their review. The superintendent shall designate a person to maintain documentation of employee review from year to year."
    - o Recommendations:
        - ▪ Ensure all new hires receive pre-service training in the areas required by these standards.
        - ▪ Develop a schedule to ensure all staff receive 40 hours of training annually.
        - ▪ Review and revise all existing policies to reflect recent changes in standards.
        - ▪ Have all employees sign-off on receipt of the policy manual annually.
- 2602.30 Personnel states: "Each detention facility must have sufficient personnel to provide adequate 24-hour supervision of youth seven days a week. . . An assistant superintendent, qualified by training and experience to supervise staff and youth, shall be designated for a detention facility of 25 or more rated capacity. . . Staffing levels must anticipate the need for coverage for staff absence for leave and training. . . An agency shall employ or designate an upper-level, agency-wide PREA coordinator with sufficient time and authority to develop, implement, and oversee agency efforts to comply with the PREA standards in all of its facilities. . .All personnel working in the detention center, including contractual staff and volunteers, must complete a background check prior to employment and at least once every five years throughout employment."
    - o Recommendations:

- Hire an Assistant Superintendent.
- Hire or designate an upper-level employee to act as PREA Coordinator.
- Compete background checks on all employees who have been employed for five years or longer.
- Develop and implement a plan to substantially increase staffing numbers at the facility.

## Detention Programs, Youth Discipline, and Confinement

On paper, the facility uses a traditional token economy system in which youth earn points throughout the day based on their behavior which are converted into a behavior level (A-D). In practice, however, the facility does not have a meaningful behavior management system at all. Youth and staff both acknowledged that there is virtually no incentive distinction between levels. The facility does not have any kind of meaningful incentive system. Youth do not earn things like later bedtimes, more phone calls, access to activities, or commissary depending on their level. Youth interviewed were uncertain of what level they were on and indicated that it did not matter since their day looked exactly the same regardless of their level. Behavioral incentives are nonexistent at the facility.

The primary behavioral consequence at the facility is confinement. Youth are confined up to 24 hours for infractions. If a youth's scheduled phone call happens to be scheduled when they are confined, the youth misses the phone call. If a youth is on behavioral confinement during school, they are not permitted to attend. The facility also has a list of youth who were on a confinement status on previous stays and has a practice of making youth serve those consequences if they are re-admitted. These are listed on a board in the supervisor office, with a list of youth names and the length of confinement they have left to serve if they happened to be re-detained again at some point in the future.

On the date of the inspection, most of the youth were confined in their rooms, with a couple of youth watching television alone in their respective dayrooms. There is no formal schedule at the facility, but both staff and youth shared that youth eat all meals in their rooms. Youth rotate for "recreation" in two-hour blocks throughout the day. During this time youth are usually alone in the dayroom and watch television. The facility has a gym and an outdoor recreation area, but youth have not had access to either area since early 2020. Youth are only permitted to shower every other day. The facility was on a summer break from school at the time of inspection, but both youth and staff stated youth have not attended school in any of the classrooms since 2020; rather the educator floats from youth to youth during school time to assist the youth with work. One youth who was interviewed was directly asked by inspectors how many times he had exited his dayroom since he arrived the facility. The youth, who had been detained for two months, shared the only times he has left his small dayroom were for phone calls twice per week, to get a new book, and for court and one professional visit. He stated he had never been to the gym or outside.

The practices surrounding youth confinement at the Franklin County Juvenile Detentions are in significant violation of County Detention Standards. Clearly, some of these are either caused or exacerbated by the staffing levels at the facility. Regardless, however, the day-to-day lives of youth at the facility are best described as isolated, whether isolated in their room or in a slightly larger dayroom.

Youth have no access to the gym or outdoor recreations areas and are only offered showers every other day.

The facility does not offer in-person visitation for youth, which the Acting Superintendent attributed to low staffing number rather than Covid-19 mitigation.

Areas of Non-Compliance and Recommendations
- 2602.100 Clothing, Personal Hygiene, Grooming states: "Opportunities to shower shall be provided daily except as amended by medical advice in individual cases."
  - Recommendation:
    - Provide youth the opportunity to shower daily.
- 2602.170 Discipline states: "All facilities shall have a developmentally appropriate, research informed behavioral management program that supports the development of pro-social skills and provides positive reinforcement for good behavior. The program shall provide opportunities for immediate recognition of pro-social behavior as well as meaningful incentives and rewards for improvement and maintenance of desired behavior. The program shall also include potential sanctions for negative behavior that are developmentally appropriate, research informed, proportionate and fair. Room confinement may be used only as a temporary response to behavior that threatens the safety of the youth and others. Room confinement shall not be used for a fixed period of time, but only until the youth is calm enough to rejoin programming without being a risk to the safety of others. Supervisory staff shall be notified immediately when room confinement is used. At no time should room confinement exceed 4 hours without administrators and/or mental health staff developing an individualized plan to address the behavior. Youth shall not be deprived of the following basic rights as part of a disciplinary response: Approved phone calls; Education."
  - Recommendations:
    - Identify and implement a clear list of incentives associated with each behavior level.
    - Implement a policy that prohibits the use of confinement longer than 4 hours without administrator approval and development of an individualized plan.
    - Enhance the documentation of youth confinement time to include:
      - Written reports that indicate the reason for confinement.
      - The start and end times of the confinement.
      - Attempts to de-escalate the youth and return them to regular programming.
    - End the practice of withholding phone calls and access to education during confinements.
    - End the practice of continuing consequences across different detention stays.
- 2602.210 Visiting states: "A liberal visiting schedule shall be established identifying no fewer than two visiting days each week, one of which must be during the weekday evening hours and one during the weekend. Additionally, visiting shall be allowed on all legal holidays."
  - Recommendations:
    - Establish a visitation schedule that allows for at least two visitation days each week.

- 2602.220 Detention Programs states: "Programs designed to address the risk and needs of delinquent youth shall be provided to youth in custody either by staff or community providers. Programs may include drug and alcohol treatment, group or individual counseling, social and life skills training, and family interventions. Facilities shall have in place an evidence-based positive behavior program that targets criminogenic risk and needs of youth in custody."
  - Recommendations:
    - Seek programming to be delivered either by employees or via contract with community organizations and integrate them into a daily youth schedule.
- 2602.260 Recreation and Leisure Time states: "Vigorous physical activities, indoor and out, shall be a part of the daily schedule. Passive indoor activities, in addition to television viewing and radio listening, shall be included. At least one hour of physical recreation and one hour of additional leisure activity shall be scheduled each day."
  - Recommendations
    - Implement a daily schedule that includes, at minimum, one hour of large muscle exercise for each resident in the gym or outdoor recreation space.

**Medical and Health Care**

Medical services are provided via a contract with Wellpath that includes 15 hours of nursing coverage per week. The primary nurse at the facility works in the evenings and is responsible for seeing all youth within seven days of admission for a physical assessment. The facility has a sick call process by which a youth can request to be added to the sick call list, which is maintained in the control room to be given to the nurse upon her arrival. Medication is packaged and organized by day and time for distribution by facility staff. There was not, however, documentation available that indicated physical approval for medication distribution by facility staff. The Wellpath contract includes a physician who is on call and is present at the facility once every two weeks, however there are no psychiatric services included.

Areas of Non-Compliance and Recommendations
- 2602.80 Medical and Health Care states: "Access to psychiatric and/or psychological services shall be provided in individual cases as needed."
  - Recommendations:
    - Hire or contract with an entity to provide psychiatric and/or psychological services.
    - Document physician approval for medication distribution by non-medical personnel.

**Mental Health Services**

Youth at the facility have minimal access to mental health services. The Franklin County Juvenile Detention Center does not have any mental health practitioners employed, nor does the county have a contract with any community mental health service providers. The facility utilizes Screening, Assessments and Support Services (SASS) when youth are in crisis.

Staff at the facility cited a community agency called the Stress and Trauma Center as an agency that has provided services to youth. The primary contact for that agency was interviewed. Essentially, the Stress

and Trauma Center is a subcontractor of Redeploy Illinois through the Second Judicial Circuit. Per the program supervisor, youth at the facility only receive services through the Stress and Trauma Center if they are already enrolled in Redeploy. Absent a court-ordered psychological assessment, youth who are not already enrolled do not receive any type of mental health assessment during intake and do not have access to mental health services through Franklin County. Franklin County does not contribute any financial resources towards providing the mental health services to youth at the facility required by the County Detention Standards. As such, the facility is in violation of a large portion of the mental health section of the standards.

Areas of Non-Compliance and Recommendations

- Section 2602.90 Mental Health Services states: "All facilities shall employ or contract with qualified mental health professionals to address the needs of youth identified in the mental health screening, as well as needs that arise during the period of confinement. Services shall meet or exceed the community level of care. . . Youth with significant mental health needs shall be assessed by a qualified mental health professional. A service plan shall be developed for each youth that includes: 1) Counseling or psychotherapy to be provided; 2) Behavioral management strategies and goals; 3) Medication; 4) Protocol for monitoring youth's progress; and 5) Needed adjustments to normal detention programs and procedures. The facility shall provide appropriate services to youth with serious mental illnesses (e.g., bi-polar disorder, psychosis, severe depression) including psychiatric evaluation and care, as well as prescribing and monitoring psychotropic medication."
  - Recommendations:
    - Employ or contract with qualified mental health professionals to provide mental health services to youth at the facility.
      - Provide a mental health assessment for all youth.
      - Develop and implement service plans for all youth with mental health needs.
    - Employ or contract with a psychiatrist to provide psychiatric assessments, services, and medication prescribing and monitoring for youth in need.


## Youth Grievances

The facility does not have a formal procedure for youth grievances. Youth at the facility were not familiar with a youth grievance process and no policy governing the process was provided. Staff at the facility reported they have not received a youth grievance over the past year.

Areas of Non-Compliance and Recommendations
Recommendations:
- Develop a policy to govern the youth grievance process.
- Incorporate information about the youth grievance process into the Youth Orientation Manual that is to be developed.
- Make grievance forms available to youth without having to obtain one from a staff member.
- Place youth grievance boxes in youth living units and common areas.

- Develop and implement a method for tracking all youth grievances, including the date written and date and summary of the response.

**Food Services**

The facility has a kitchen on-site but does not employ or contract with any formal dietary staff. Food preparation and service is managed by facility staff. This is particularly problematic given the staffing crisis that exists at the facility. Since the facility is typically only staffed by three employees during youth waking hours, having to manage food service preparation is directly exacerbating conditions of confinement that are well below minimum standards.

While the facility does a space for youth to eat meals together, youth have been eating all of their meals in their rooms for the past year.

Areas of Non-Compliance and Recommendations
- Section 2602.110 Food Services states, "At least one full-time cook or the food service provider shall have food services sanitation manager certification from the Illinois Department of Public Health. Meals shall be served and conducted in a group setting except when prohibited by security or medical needs."
    - Recommendations:
        - Hire or contract with a sufficient number of staff to provide dietary coverage for all three meals seven days per week.
        - Serve meals in a group setting.

**Education**

There are two primary teachers employed by the Regional Office of Education that provide services at the facility. One of the teachers is a special education teacher. Youth at the facility are formally enrolled with the Benton High School. One of the teachers does reach out to youth home schools to obtain information and communicate any credits earned while at the facility. School was not in session at the time of the inspection, as the youth were on a summer break. The facility does not offer educational services according to a 12-month schedule; rather the facility operates on a schedule that largely follows that of the Benton High School.

The facility has three classrooms, however, they have not been in use for at least two years. Instead, teachers provide packets of work to youth and rotate amongst the youth to provide individual assistance. As previously noted, the facility had youth largely confined in their rooms and are provided time out of their rooms in the dayroom in a rotation. During the last school year, work was only provided to youth when they were out for their dayroom time. It was not provided to youth when they were in their rooms. The educator reported youth typically spent either the morning or afternoon in their rooms, essentially meaning youth were only provided work for half of a typical school day.

Areas of Non-Compliance and Recommendations

- 2602.230 Education states: "A detention facility shall operate a 12-month long schedule of school instruction and programming with appropriately certified teachers that are licensed by the State Board of Education. There shall be a minimum of five hours of instruction per day."
  - Recommendations:
    - Adjust the annual school schedule to include educational service through the summer to operate a 12-month schedule of instruction.
    - Provide 5 hours of education to all youth each day.
    - Utilize the classrooms to provide direct instruction to youth in a traditional classroom setting.

**Recommendations**

| Section | Recommendations |
|---|---|
| Clothing, Personal Hygiene, Grooming | • Provide youth the opportunity to shower daily. |
| Food Services | • Hire or contract with a sufficient number of staff to provide dietary coverage for all three meals seven days per week.<br>• Serve meals in a group setting. |
| Discipline | • Identify and implement a clear list of incentives associated with each behavior level.<br>• Implement policy that prohibits the use of confinement longer than 4 hours without administrator approval and development of an individualized plan.<br>• Enhance the documentation of youth confinement time to include:<br>    ◦ Written reports that indicate the reason for confinement.<br>    ◦ The start and end times of the confinement.<br>    ◦ Attempts to de-escalate the youth and return them to regular programming.<br>• End the practice of withholding phone calls and access to education during confinements.<br>• End the practice of continuing consequences across different detention stays. |
| Administration | • Ensure all new hires receive pre-service training in the areas required by these standards.<br>• Develop a schedule to ensure all staff receive 40 hours of training annually.<br>• Review and revise all existing policies to reflect recent changes in standards.<br>• Have all employees sign-off on receipt of the policy manual annually. |

| | |
|---|---|
| Visiting | • Establish a visitation schedule that allows for at least two visitation days each week. |
| Detention Programs | • Seek programming to be delivered either by employees or via contract with community organizations and integrate them into a daily youth schedule. |
| Education | • Adjust the annual school schedule to include educational service through the summer to operate a 12-month schedule of instruction.<br>• Provide 5 hours of education to all youth each day.<br>• Utilize the classrooms to provide direct instruction to youth in a traditional classroom setting. |
| Recreation and Leisure Time | • Implement a daily schedule that includes, at minimum, one hour of large muscle exercise for each resident in the gym or outdoor recreation space. |
| Personnel | • Hire an Assistant Superintendent.<br>• Hire or designate an upper-level employee to act as PREA Coordinator.<br>• Compete background checks on all employees who have been employed for five years or longer.<br>• Develop and implement a plan to substantially increase staffing numbers at the facility. |
| Admissions Procedures | • Eliminate the use of strip searches as a standard process during intake.<br>• Implement the PREA Risk for Victimization Assessment for youth within 72 hours of admission and periodically throughout a youth's confinement.<br>• Hire a PREA Officer to supervise facility compliance with PREA standards.<br>• Develop a formal Youth Orientation Handbook that contains information on things like programming, a youth grievance procedure, and information regarding PREA.<br>• Develop a form to capture youth acknowledgment of receipt of the Youth Orientation Manual and PREA orientation.<br>• Contract with a third-party entity for youth to access in order to report abuse or harassment in a confidential manner. |
| Medical and Health Care | • Hire or contract with an entity to provide psychiatric and/or psychological services.<br>• Document physician approval for medication distribution by non-medical personnel. |

| | |
|---|---|
| Mental Health Services | <ul><li>Employ or contract with qualified mental health professionals to provide mental health services to youth at the facility.<ul><li>Provide a mental health assessment for all youth.</li><li>Develop and implement service plans for all youth with mental health needs.</li></ul></li><li>Employ or contract with a psychiatrist to provide psychiatric assessments, services, and medication prescribing and monitoring for youth in need.</li></ul> |
| Youth Grievances | <ul><li>Develop a policy to govern the youth grievance process.</li><li>Incorporate information about the youth grievance process into the Youth Orientation Manual that is to be developed.</li><li>Make grievance forms available to youth without having to obtain one from a staff member.</li><li>Place youth grievance boxes in youth living units and common areas.</li><li>Develop and implement a method for tracking all youth grievances, including the date written and date and summary of the response.</li></ul> |

# Exhibit 6

Franklin County Juvenile Detention Center – Interim Inspection Report

## Summary

The Department of Juvenile Justice conducted an annual inspection of the Franklin County Juvenile Detention Center on August 2, 2022, pursuant to 730 ILCS 5/3-15-2(b). The Department observed several areas of non-compliance during this review, many of which warranted immediate attention.

The Department of Juvenile Justice conducted a follow-up inspection to assess facility progress towards the noncompliant areas on January 23, 2023. There were some improvements noted, but several areas of significant noncompliance remain. Furthermore, there was an incident at the facility on 12/28/22 in which a youth suffered a broken arm during a use of physical intervention. The Franklin County JDC sometimes utilizes county sheriff personnel as emergency responders when an incident occurs at the facility. In this case, the facility had called the Franklin County Sheriff's Department to assist with a non-compliant youth. Sheriff department deputies responded and engaged the youth in a physical intervention, during which the youth suffered a broken arm.

There are several areas of concern in the follow-up to that incident as it is not clear that there was any kind of significant, internal review of the incident to assess if anything improper occurred to contribute to the youth's injury. The Acting Superintendent initially reported that an internal review was conducted by the Franklin County Sheriff's Department since the staff involved in the incident were Franklin County Sheriff's Department Staff, not juvenile detention staff. The Probation Director reported the internal review was conducted by juvenile detention center administrators. No document or summary of findings was produced. Furthermore, the camera system at the facility was found to be deficient as the system did not record the incident and only shows live footage. Administrators reported they are taking steps to improve the camera system.

The commitment and ability for facility administrators to conduct internal reviews of the use of physical intervention is essential to ensuring youth and staff safety. While this report is intended to assess progress on the 2022 report, some additional recommendations are listed below in light of this event and some other observations.

The table below summarizes the areas of non-compliance and recommendations from the August 2, 2022, inspection, along with the observations from the January 23, 2023 follow-up visit.

## Audit Team:

John Albright, Chief of Performance and Innovation
Jeremy Burtis, Deputy Director of Operations
Omar Jamil, Senior Policy Advisor

Franklin County Juvenile Detention Center – Interim Inspection Report

| Section | Recommendations from August 2, 2022, Inspection | Status Assessment – January 23, 2023 |
|---|---|---|
| Clothing, Personal Hygiene, Grooming | • Provide youth the opportunity to shower daily. | Met |

The facility has implemented a policy requiring youth be offered a shower daily. Interviews with youth confirmed showers are being offered daily.

| Section | Recommendations from August 2, 2022, Inspection | Status Assessment – January 23, 2023 |
|---|---|---|
| Food Services | • Hire or contract with a sufficient number of staff to provide dietary coverage for all three meals seven days per week.<br>• Serve meals in a group setting. | Not Met |

There has been no progress in this area. While some additional staff have received food handler certificates, Corrections Officers are still making and serving meals and there is no current plan to make changes. All youth meals are still served in the rooms. Though it was noted that the absence of dietary staff was mitigated by security staff helping in preparing meals, it should be noted that these security staff are not trained dietitians. This was observed in the inadequate food that was prepared on the day of the visit. Youth received a double-patty chicken sandwich on a hamburger bun, an iceberg lettuce salad with ranch dressing, peaches in syrup, and a small carton of milk. Using general estimates of calorie and nutritional information for these items, it appears that this meal could not have been more than 780 calories [Chicken patty = 120 calories x 2, 1 hamburger bun = 128 calories, 1 cup of peaches in light syrup = 135 calories, Salad dressing = 145 calories (2 tbsp), and carton of milk = 140 calories]. Assuming the calories in dinner are approximate to that of lunch; youth would receive around 1,600 calories a day, far lower than a 2,000 minimum for sedentary teen youth as recommended by the USDA (https://www.fns.usda.gov/estimated-calorie-needs-day-age-gender-and-physical-activity-level). The facility did provide a menu with caloric values that calculated the total to be slightly over 2,000 calories, however the analysis was done by a previous administrator, not a trained dietitian.

Further, it should be noted that aside from the chicken patties and milk, most of the calories contained in this meal were from simple carbohydrates, which because of a high glycemic index can lead to increased hunger sooner than if more complex carbohydrates (fiber) or proteins were included. Youth reported not having enough food to eat during the day, and that sometimes they would hoard snacks for future use when there was not enough food. Youth reported that in IDJJ facilities, they had the option of receiving double portions if requested. Double-portions or extra helpings were not an option at this facility.

| Section | Recommendations from August 2, 2022, Inspection | Status Assessment – January 23, 2023 |
|---|---|---|
| | <ul><li>Identify and implement a clear list of incentives associated with each behavior level.</li><li>Implement policy that prohibits the use of confinement longer than 4 hours without administrator approval and development of an individualized plan.</li><li>Enhance the documentation of youth confinement time to include:<ul><li>Written reports that indicate the reason for confinement.</li><li>The start and end times of the confinement.</li><li>Attempts to de-escalate the youth and return them to regular programming.</li></ul></li><li>End the practice of withholding phone calls and access to education during confinements.</li></ul> | Not Met |
| Discipline | End the practice of continuing consequences across different detention stays. | |

There has been very little improvement in this area. The facility maintains the same point and level system as the August 2 visit. Despite having a point and level system, there are few incentives available to youth who achieve higher levels due to the prevalence of confinement at the facility. Youth continue to largely be separated from other youth during the day. Some youth have started attending school in small groups during the day and participate in one hour of recreation time in the gym together, however some youth are not included in these groups. Youth largely spend most of the day in their rooms, rotating to be alone in the dayroom for "free time" in 1–2-hour increments. Youth also reported that if they were confined as a result of a behavioral consequence on the day of their scheduled phone call, they were not permitted to make it.

As noted in the introduction of this report, there was an incident at the facility on 12/28/22 in which a youth suffered a broken arm during a use of physical intervention. There are several areas of concern in the follow-up to that incident as it is not clear that there was any significant, internal review of the incident to assess if anything improper occurred to contribute to the youth's injury. The Acting Superintendent initially reported that an internal review was conducted by the Franklin County Sherriff's Department since the staff involved in the incident were Franklin County Sherriff's Department staff, not juvenile detention staff. The Probation Director reported the internal review was conducted by juvenile detention center administrators. No document or summary of findings was produced. Furthermore, the camera system at the facility was found to be deficient during the review, as the system did not record the incident and only shows live footage. Administrators reported they are taking steps to improve the camera system.

The facility has ended the practice of continuing consequences across different detention stays.

The original recommendations from the August 2, 2022 inspection for the discipline section of the County Detention Standards remain. In addition, the following recommendations are made.

Franklin County Juvenile Detention Center – Interim Inspection Report

New Recommendations:
- Develop a policy to manage the review process of incidents involving the use of physical intervention and youth injuries to include video review, identification for the need of staff training or corrective actions, and a process for review documentation.
- Procure fixes or enhancements to the facility video monitoring system to allow for video playback of past events.

| Section | Recommendations from August 2, 2022 Inspection | Status Assessment – January 23, 2023 |
|---|---|---|
| Administration | • Ensure all new hires receive pre-service training in the areas required by these standards.<br>• Develop a schedule to ensure all staff receive 40 hours of training annually.<br>• Review and revise all existing policies to reflect recent changes in standards.<br>• Have all employees sign-off on receipt of the policy manual annually. | Partially Met |

The Administrative Office of Illinois Courts (AOIC) conducted a 40-hour training for all employees in December 2022 to address the training deficiencies cited in the 2022 report. The facility has updated the policy manual.

| Section | Recommendations from August 2, 2022 Inspection | Status Assessment – January 23, 2023 |
|---|---|---|
| Visiting | • Establish a visitation schedule that allows for at least two visitation days each week. | Partially Met |

The facility has implemented a visitation schedule that includes two visitation days per week on Sundays and Wednesdays. This is reflected in an updated policy that was made effective in September 2022. Youth confirmed they have access to family visitation twice per week. These visits are only non-contact, however, so while it is good that the facility has implemented visitation twice per week it is a County Detention Standard requirement that all visits shall be contact visits unless there are specific concerns that preclude contact visits for identified individuals.

New Recommendation:

- Permit all youth visits to be contact visits unless there are specific concerns that preclude contacts visits for identified individuals.

| Section | Recommendations from August 2, 2022 Inspection | Status Assessment – January 23, 2023 |
|---|---|---|
| Detention Programs | • Seek programming to be delivered either by employees or via contract with community organizations and integrate them into a daily youth schedule. | Not Met |
| | There has been very little progress towards this recommendation. There is no substantive programming provided by facility staff. Administrators and youth shared one instance of a community organization providing programming in the facility since the last audit, but there is no evidence of any attempts to increase this otherwise. | |

Franklin County Juvenile Detention Center – Interim Inspection Report

| Section | Recommendations from August 2, 2022 Inspection | Status Assessment – January 23, 2023 |
|---|---|---|
| Education | • Adjust the annual school schedule to include educational service through the summer to operate a 12-month schedule of instruction.<br>• Provide 5 hours of education to all youth each day.<br>• Utilize the classrooms to provide direct instruction to youth in a traditional classroom setting. | Not Met |
| Some youth have started attending school in the classroom; however, youth only attend a half day of school and rotate with youth on the living units. | | |

| Section | Recommendations from August 2, 2022 Inspection | Status Assessment – January 23, 2023 |
|---|---|---|
| Recreation and Leisure Time | • Implement a daily schedule that includes, at minimum, one hour of large muscle exercise for each resident in the gym or outdoor recreation space. | Partially Met |
| The facility has begun to allow youth to participate in recreational activity in the gym in groups, however youth reported some disruption to their attendance at times due to consequences or staffing levels. | | |

Franklin County Juvenile Detention Center – Interim Inspection Report

| Section | Recommendations from August 2, 2022 Inspection | Status Assessment – January 23, 2023 |
|---|---|---|
| | • Hire an Assistant Superintendent.<br>• Hire or designate an upper-level employee to act as PREA Coordinator.<br>• Compete background checks on all employees who have been employed for five years or longer.<br>• Develop and implement a plan to substantially increase staffing numbers at the facility. | Partially Met |
| Personnel | | |
| The Franklin County Juvenile Detention Center has taken some steps to address the needs in this area. At the time of the August 2, 2022 review, the facility only employed eight full-time employees. The County has made some changes to increase recruitment by increasing the starting salary from $28,000/year to $43,000/year. At the time of the January 23, 2023 review, the facility had a total of 12 full-time employees, three of which are supervisory staff. The facility has also promoted one person to the role of Assistant Superintendent, who is functioning as the Acting Superintendent. While the staffing numbers have improved, significantly more staff are needed to sufficiently correct the areas of non-compliance from the 2022 inspection report. There has not been anyone identified as a PREA Coordinator at the facility. | | |

| Section | Recommendations from August 2, 2022 Inspection | Status Assessment – January 23, 2023 |
|---|---|---|
| | • Eliminate the use of strip searches as a standard process during intake.<br>• Implement the PREA Risk for Victimization Assessment for youth within 72 hours of admission and periodically throughout a youth's confinement.<br>• Hire a PREA Officer to supervise facility compliance with PREA standards.<br>• Develop a formal Youth Orientation Handbook that contains information on things like programming, a youth grievance procedure, and information regarding PREA.<br>• Develop a form to capture youth acknowledgment of receipt of the Youth Orientation Manual and PREA orientation.<br>• Contract with a third-party entity for youth to access in order to report abuse or harassment in a confidential manner. | Not Met |
| Admissions Procedures | | |
| There are no improvements in this area. The facility does not have any updated admissions policies, orientation materials, or PREA-related improvements. The facility still conducts strip searches of all youth upon intake. | | |

Franklin County Juvenile Detention Center – Interim Inspection Report

| Section | Recommendations from August 2, 2022 Inspection | Status Assessment – January 23, 2023 |
|---------|-----------------------------------------------|--------------------------------------|
| Medical and Health Care | • Hire or contract with an entity to provide psychiatric and/or psychological services.<br>• Document physician approval for medication distribution by non-medical personnel. | Not Met |

There has been no improvement in this area. No contract was provided that indicated youth access to psychiatric services.

| Section | Recommendations from August 2, 2022 Inspection | Status Assessment – January 23, 2023 |
|---------|-----------------------------------------------|--------------------------------------|
| Mental Health Services | • Employ or contract with qualified mental health professionals to provide mental health services to youth at the facility.<br>    ○ Provide a mental health assessment for all youth.<br>    ○ Develop and implement service plans for all youth with mental health needs.<br>• Employ or contract with a psychiatrist to provide psychiatric assessments, services, and medication prescribing and monitoring for youth in need. | Not Met |

There has not been any improvement in this area. Administrators reported they have a contract in place with Advanced Correctional Healthcare (ACH) to provide mental health services "as needed" based upon the request of the Administration Team. Auditors requested a copy of the contract, but it was not provided. Youth reported having minimal contact with anyone providing mental health services.

Franklin County Juvenile Detention Center – Interim Inspection Report

| Section | Recommendations from August 2, 2022, Inspection | Status Assessment – January 23, 2023 |
|---------|------------------------------------------------|--------------------------------------|
| | • Develop a policy to govern the youth grievance process.<br>• Incorporate information about the youth grievance process into the Youth Orientation Manual that is to be developed.<br>• Make grievance forms available to youth without having to obtain one from a staff member.<br>• Place youth grievance boxes in youth living units and common areas.<br>• Develop and implement a method for tracking all youth grievances, including the date written and date and summary of the response. | Not Met |
| Youth Grievances | | |

The facility has not updated policies governing the youth grievance process in a manner consistent with County Detention Standards. The facility has a form for youth to use, but they have to request them from a staff member to access them. There are no youth grievance boxes available on the living units to assist with confidentiality. Rather, youth have to turn grievances in to staff in order to be addressed. One youth reported he had written two grievances on blank pieces of paper, placed them in envelopes, and given them to staff but did not receive any response. The acting superintendent is tasked with responding to grievances but reported she had not received the grievances the youth claimed to have submitted. All of the findings of non-compliance and recommendations in this area remain.

# Exhibit 7



## MEMORANDUM OF UNDERSTANDING

BETWEEN

### THE CHIEF JUDGE OF THE SECOND JUDICIAL CIRCUIT
AND
### THE FRANKLIN COUNTY BOARD
AND
### OTHER FRANKLIN COUNTY AGENCIES

WHEREAS, it is acknowledged that a major need exists for a secure Youth Detention Center for use by the Juvenile Court System for holding detained juveniles who are awaiting detention hearings, placement into juvenile field services, placements into another correctional facility, or release back to their legal guardians; and

WHEREAS, the Franklin County Board has financed and constructed the Franklin County Juvenile Detention Center in Benton, Franklin County, Illinois, to meet the County's needs, as well as the needs of other counties in southern Illinois for the providing of a safe, secure and modern facility; and

WHEREAS, it is recognized that the Chief Judge of the Second Judicial Circuit has the general administrative and supervisory authority over management of the facility consistent with the Probation and Probation Officers Act, and has delegated the responsibility for supervising and the control of work of any subordinate personnel to the Director of Court Services; and

WHEREAS, other Franklin County Departments/Agencies will also have responsibilities related to the operation and program of the Franklin County Juvenile Detention Center; and

WHEREAS, the parties believe that it is in the best interest of all concerned that a Memorandum of Understanding be executed delineating the duties and responsibilities, in general terms, of each of the bodies, agencies, governments and/or departments in reference to the construction and maintenance of the Franklin County Juvenile Detention Center, and the management of the services and programs of the said Center.

THEREFORE, this Memorandum of Understanding:

### STATE LAW

All the parties to this Memorandum of Understanding acknowledge that the construction, maintenance and operation of the juvenile facility must be in accordance with state law, including, but not limited to the Probation and Probation Officers Act. The

1

Shelter Care Standards Act. and the Jail and Detention Standards Act. All responsibilities and obligations of the parties to this Memorandum of Understanding must be consistent with the laws of the state of Illinois that are germane to the operation of the Juvenile Center.

## THE FRANKLIN COUNTY BOARD SHALL:

1) Be solely responsible for the finances and construction of the Juvenile Detention Center, and such responsibility shall include all debt service.

2) Provide the necessary equipment for the safe, secure and efficient operation of the Center. The following guidelines shall be followed by the Director of Court Services, the Superintendent of the Center, or the designated representatives:

a) Except in an emergency situation, all requests for expenditures of County funds in excess of $1,000 for the purchase of equipment must first be submitted to the Chair of the County Board for approval.

b) Except in an emergency situation, all requests for expenditures of County funds in excess of $1,000 must first be submitted to the County Board for approval.

In the event a dispute arises concerning the necessity for purchasing of equipment, the Director of Court Services and the Chairman of the County Board/or the County Board shall meet to discuss the request. The final decision on the use of County funds to purchase the requested equipment rests with the County.

3) Establish an annual budget for the operation of the Center after first conferring with the Chief Judge and/or the Director of Court Services. The County reserves the right to declare the final figures for the annual budget. The budget should, whenever possible, reflect the actual needs for the operation of the Center.

4) Provide for the purchase of supplies through a line item in the Center's annual budget. Request for expenditures in excess of the sum budgeted shall first be submitted to the Chair of the County Board and/or the County Board.

5) Pay for all utility costs with estimates being provided through the budgeting process. The Center will immediately notify the Chair of the County Board of any major increase of the monthly usage of utilities.

2

6)      With respect to support service staff only, after conferring with the Director of Court Services, hire individuals, and/or contract independently for necessary support services/staff for the efficient operation of the Center. Any support staff and/or contractor must submit to a background check before performance of any services at the Center. The Board shall notify any such support staff or contractor prior to beginning work or employment that drug testing may be required of any personnel working at the center at any time.

7)      Arrange for liability insurance on the facility and on persons employed to provide juvenile detention services. Coverage shall be at a minimum of $1,000,000. The County will not provide coverage in any form for any acts of willful misconduct by the employee. The County will neither add to nor subtract from a person's current protection as now provided by the Illinois statutes.

8)      Provide appropriate salaries and fringe benefits to Detention Center staff. Both the number of persons employed, their salaries and fringe benefits, shall be set only after appropriate meetings between the Chief Judge of the Circuit, the Director of Court Services, and appropriate County Board members. The fringe benefits provided may not exceed those provided to other Franklin County employees. Salaries and wages must be based upon the County's ability to pay, as well as the need to attract and retain qualified staff. In construing the foregoing in this paragraph 8, the Board recognizes that the discretion of the Chief Judge may be limited by pay scale requirements of the Administrative office of the Illinois Courts for like situated employees statewide and respectfully request to be fully informed by Second Circuit when it appears such State requirements may impact County budget.

9)      Provide a representative to participate in the selection of a superintendent for the facility, and may confer with the Chief Judge and/or the Director of Court Services in the event of any dissatisfaction the County may have with the manner in which the Juvenile Detention Center is being operated.

10)     Have the exclusive the right to receive, own and use, any and all reimbursement received from the Administrative Office of the Illinois Courts (A.O.I.C.) for staff salaries, fringe benefits and/or other expenses.

11)     The County shall receive, control and administer all grant funds received as a result of grant applications written for the operation of the Juvenile Detention Center.

12)     Provide for and oversee the issuance of all checks for payment of authorized expenditures incurred from the operation of the Juvenile Detention Center.

13)     Provide the Chief Judge of the Circuit and/or the Director of Court Services with an itemized list of accounts received and accounts paid relating to the Center on a

3

monthly basis. The County will also provide an accounting for all expenditures directly related to the operation of the Juvenile Detention Center as a part of the County's annual audit process.

14)   Have a right to participate in any collecting bargaining process that may occur as a result of the establishment of the Juvenile Detention Center.

15)   Place on the County's roles, the individuals selected by the Director of Court Services and the Superintendent as persons hired to perform the necessary services and duties in the Juvenile Detention Center.

## THE SECOND JUDICIAL SHALL:

1)   Take all reasonable steps, based upon legal authority, to operate the Juvenile Detention Center in accordance with state law, rules and regulations. If at any time the Juvenile Detention Center is not in compliance with all state laws, rules and regulations, the County shall be immediately notified of the non-compliance, and the steps to be taken for correcting the same.

2)   Provide for the overall direction of programs and services at the Juvenile Detention Center, and under the authority of the Circuit's Chief Judge.

3)   Designate the Circuit's Director of Court Services to provide general supervision of the Juvenile Detention Center and the Superintendent. Shall meet and confer with appropriate representatives of the County Board about the number and classification of staff necessary to operate the Juvenile Detention Center in a safe, secure, economic and efficient manner. The Director of Court Services should first confer with the County Board before adding any additional staff.

4)   Recruit, investigate, interview and select appropriate persons to perform services at the Juvenile Detention Center, utilizing, at all times, established guidelines of the A.O.I.C.. In recommending persons for employment, no one shall be discriminated against based upon their race, creed, color, sex, sexual preference, national origin, religion, age, marital status or disability.

5)   Establish a committee (appointed by the Chief Judge) for the purpose of selecting a Superintendent. The committee must include the Chief Judge of the Second Circuit, Director of Court Services, a representative of the Franklin County Board, and any other persons determined by the Chief Judge. The committee shall select an individual who, in operating the facility, is cognizant of the limitations of the annual budget provided by the County.

4

6) Authorize the Director of Court Services to evaluate the performance of the Superintendent, and in doing so, confer with the County in reference to any comments or observations that it may have.

7) Shall meet and confer with the appropriate County representatives for the establishment of an annual budget for the operation of the Juvenile Detention Center. No commitment for the expenditure of funds beyond the annual budget will occur without approval of the County Board.

8) Select the appropriate subordinate employees for the Detention Center with the approval of the Chief Judge, and to submit all necessary employment documentation to the proper County officials.

9) Serve as a liaison with the various agencies, commissions and related authorities in the field of juvenile justice service.

10) Seek to obtain grants and other funding conducive to the improvement of the operation and program services of the Juvenile Detention Center, and to cooperate in transferring said funds to the County for its use and purposes consistent with the grant. In doing so, the Circuit shall keep the County advised of any grants or grant applications and will seek the same in a timely fashion.

11) Coordinate court services and programs such as probation, to assure cooperation between the County Board, Superintendent and Circuit as it relates to the Franklin County Juvenile Detention Center.

12) Notify, in the event the employees of the Detention Center seek union representation, the County Board to allow their participation in the negotiation of any Collective Bargaining Agreement.

13) Direct, administer, manage and supervise the day to day activities of the Juvenile Detention Center in order to assure that it meets the established standards of operations and programs for a Juvenile Detention Center.

14) At all time, consider the Franklin County Board's financial investment and interest in the proper, efficient, economical and profitable operation of the Center.

15) Develop written policies and procedures supportive of meeting the goals and objectives established by the Franklin County Board and the Chief Judge of the Circuit.

16) Develop a realistic staffing plan and job descriptions utilizing only the necessary number of employees.

17)     Provide for complete, adequate and necessary training of all persons employed to perform services at the Juvenile Detention Center.

18)     Assure security procedures are in place to protect the general public and will promote an atmosphere of professionalism which will reflect in a positive manner for both the Second Judicial Circuit and the Franklin County Board. To establish and promote the utilization of the Juvenile Detention Center by all counties within the Second Judicial Circuit, and by other out of county entities in southern Illinois.

19)     In conjunction with the Franklin County Board, establish a fee schedule for services rendered which are to be paid to the Franklin County Treasurer. In the development in an agreed upon fee schedule, there shall be a coordination of a system for billing directly from the Juvenile Detention Center.

20)     Provide the Franklin County Board with an itemized listing of bills issued on a monthly basis.

21)     Submit payroll timesheets to the County Treasurer.

<u>SECOND JUDICIAL CIRCUIT<br>AND<br>THE FRANKLIN COUNTY BOARD AGREE:</u>

1)     To meet on a regular basis to discuss operational needs, performance and finances.

2)     To keep each other informed of any circumstances that might or could effect the legitimate operation of the Juvenile Detention Center.

3)     To encourage open communication between the parties in order to assure that the Juvenile Detention Center is operated in a professional, efficient and economical fashion.

## DURATION

This Memorandum of Understanding shall remain effective until one of the parties gives written notice to the contrary to the other party.


Office of the Chief Judge
Second Judicial Circuit

_____
Honorable George W. Timberlake

9/18/06

Franklin County
Board of Commissioners

By: _____
Harry Stewart, Chairman


Attest: _____
County Clerk


State's Attorney Franklin County

_____
Thomas J. Dinn, III


7

# Exhibit 8

https://thesouthern.com/news/local/franklin-county-junvenile-detention-center-in-jeopardy/article_2835061b-114f-5eef-9c7c-cc7ade45f441.html

# FRANKLIN COUNTY JUNVENILE DETENTION CENTER IN JEOPARDY

**JIM MUIR THE SOUTHERN [Fri May 02 2003]**

May 3, 2003

BENTON - State budget cuts has placed the future of the $4.3 million Franklin County Juvenile Detention Center in jeopardy and the scheduled October opening in question.

Franklin County officials have learned that $860,000 in funding that was earmarked for employee salaries have been omitted from the budget of the Illinois Supreme Court, leaving the detention center in limbo.

Jake Seymour, chief managing officer of the 4th Probation District, said the funds to finish construction were secured long ago and the anticipated state funds were to provide operating expenses.

Seymour said construction costs came through federal, state and local funds; however the funding that has now been pulled leaves the county in a position where it could possibly have a $4.3 million, 22,000-square-feet facility and no funds to open it.

## People are also reading...

1  **Carbondale priest celebrates 50 years of ministry**

2  **SIU's Sunset Concerts begin June 22**

3  **Business Spotlight | Marion's Fox Comics: The business customers asked for**

4  **Prep Football | Spain takes over coaching reins for Du Quoin**

"Construction and staffing are totally two separate issues," Seymour said. "The salary reimbursement issue - every juvenile detention center in the state has its salaries reimbursed through the Supreme Court budget - had been approved. However, when it came to the 2004 budget we were not there. Part of the reason is because of the budget crunch, but part of the reason is that the state doesn't care. They were simply not going to any extra trouble to make sure we were reimbursed like every other detention center."

Seymour said the omission puts the county in a precarious position.

"Here we are, still looking at construction being completed in October and no money for the rest of the fiscal year which would take us to July 1, 2004 with no money to staff it," Seymour said. "And then there's no guarantee that we would get the funding in 2004. The possibility exists that the new building could sit there and never open if the state won't fund it."

Seymour said the next move for county officials is a full-fledged lobbying attempt to try and get the budget amended so the county can receive funding for at least part of the fiscal year.

"We're pleading our case with legislators and hopefully somebody with clout will step up and get approval from somebody in a leadership role," Seymour said. "This is extremely frustrating. Right now we're at the mercy of the Illinois General Assembly."

The push to build the 38-bed facility began more than four years ago. $1.8 million in grant funding has been secured to go toward construction costs. Additional funds were raised through a tax referendum and through federal funds.

The brunt of juveniles housed in the facility would come from Franklin, Jefferson, Jackson, Williamson and Saline counties - however, more than 40 counties in the lower half of the state have showed an interest in using the detention center.

Currently juveniles from Southern Illinois must be transported to detention centers in either St. Clair County or Vincennes, Ind. According to the sheriff's department, Franklin County spends more than $100,000 in transportation costs to move juvenile offenders.

The new facility, along with providing space for the juvenile detention center, will also house the county's juvenile probation offices and the state's attorney's office, a fact that county officials have said in the past would save the county economically.

Another problem that has been created is that the Franklin County Board borrowed money to help complete the construction. Seymour said county officials had hoped to recoup that money through revenue generated by the detention center.

"The bottom line is that this hurts Southern Illinois because all these counties around here were going to use it," Seymour said. "And Franklin County taxpayers are going to bite the bullet and pay the interest on that loan, and that's almost $250,000 per year. That goes on whether we have a cash flow or not. I was totally surprised by this, there was no forewarning."

Seymour said he has tried to secure help through state Rep. Gary Forby and Sen. Larry Woolard.

"This project has been on the drawing board for more than five years and we've had to jump through all kinds of hoops," Seymour said. Franklin County officials stepped out on good faith thinking the state would follow the same formula it has with every other juvenile detention center, and they gave us every indication they would. Of course, they didn't know they were going to have a $5 billion deficit either."

**writeon1@shawneelink.net** 618-625-2006

# Exhibit 9

https://thesouthern.com/news/local/forby-juvenile-center-funding-still-possible/article_4632891c-44bd-5a90-a90d-e4a1eb503943.html

# FORBY: JUVENILE CENTER FUNDING STILL POSSIBLE

**JIM MUIR THE SOUTHERN [Fri May 30 2003]**
May 31, 2003

**B**ENTON - During the final hours of the 93rd General Assembly, with time and money in short supply, state Rep. Gary Forby, D-Benton, remains optimistic funding will be secured for the Franklin County Juvenile Detention Center.

Speaking by telephone Friday afternoon from the House floor, Forby said he has literally "beat the bushes" throughout this week trying to secure $860,000 in funding to operate the $4.3 million detention center that is scheduled to open in October.

Forby said he has even explored partial funding that would allow the facility to open as scheduled this fall.

"In this instance, partial funding is not bad," Forby said. "The people I spoke with said all the positions at the detention center would not be filled immediately anyway. So my plan is to do whatever we can do to get the facility opened on time, even if that means getting only partial funding."

## People are also reading...

1   **Show your pride at these Southern Illinois events this June**

2   **Carbondale Dairy Queen closure prompts wide response from Southern Illinoisans**

3   **The sports world reacts as 'The Voice of SIU' steps away from the mic**

4   **MVC Notebook | SIU men add Stulic through portal**

Construction of the 32-bed, 22,000-square-foot detention center was paid for by federal, state and local funds. Work on the facility has been under way for more than six months. However, county officials learned last month that funding earmarked for employee salaries and operating expenses had been omitted from the budget of the Illinois Supreme Court. That left the opening of the juvenile center in limbo.

Franklin County Board Finance Chairman Ronald House said the county borrowed $3.5 million to help build the detention center, and was counting on revenue generated when the facility opened to help pay off the debt.

House said the county is already paying a quarterly payment of $52,000 on the detention center. So partial funding through the state would be beneficial, he said.

"It will eventually put the county in a hardship to keep making the payments with no revenue coming in. But we remain optimistic that we will be able to open the facility," House said. "If we can get even half the funding, I think we'll be all right."

House said the hiring process for the detention center would be gradual, something that would not require a full year of funding.

"It is not even going to be open until October 1, so one-half year of funding would get us through until the end of the 2004 fiscal year," House said. "So, even if we don't get all the funds we need this year, next year surely to goodness we'll be a part of the budget. Assuming that full funding will kick in July 2004, we're talking about funding for six or seven months."

Despite the fact that the detention center has taken more than four years to build and has been beset with numerous setbacks, House found a silver lining in the latest dark cloud.

"After all the setbacks and delays, who would have dreamed that the state would not put our operational funding in the budget. Of all the things that could have gone wrong, it never entered our minds that the state considered us a new project and

didn't put us in the budget," House said. "Despite all the problems, I still think this project will be a real asset and a plus for the county."

The brunt of juveniles housed in the facility would come from Franklin, Jefferson, Jackson, Williamson and Saline counties. However, more than 40 counties in the lower half of the state have expressed interest in using the detention center.

Currently juveniles from Southern Illinois must be transported to detention centers in either St. Clair County or Vincennes, Ind. According to the sheriff's department, Franklin County spends more than $100,000 in transportation costs to move juvenile offenders.

The new facility, along with providing space for the juvenile detention center, will also house the county's juvenile probation offices and the state's attorney's office, a fact that county officials have said in the past would save the county money. Currently the county rents space for those offices.

**writeon1@shawneelink.net** 618-625-2006

# Exhibit 10

https://thesouthern.com/news/local/franklin-juvenile-detention-centers-fate-uncertain-but-construction-continues/article_3bcde73c-9949-57b3-99a2-38a5fda7e37a.html

# FRANKLIN JUVENILE DETENTION CENTER'S FATE UNCERTAIN, BUT CONSTRUCTION CONTINUES

**JIM MUIR THE SOUTHERN [Thu May 29 2003]**

May 30, 2003

BENTON - While Illinois lawmakers wrestle this week for a way to fill a $5 billion hole in the state budget, Franklin County officials are keeping a watchful and wary eye on the process.

At stake in the state number crunching is $860,000 in funding to operate the $4.3 million Franklin County Juvenile Detention Center.

The center was scheduled to open in October, but county officials learned last month that funding earmarked for employee salaries was omitted from the budget of the Illinois Supreme Court.

That leaves the center's opening in limbo.

Funding to finish construction was secured long ago. Jake Seymour, chief managing officer of the 4th Probation District said construction costs were covered by federal, state and local funds. But the money that was to come from the Illinois Supreme Court's budget was earmarked for operating expenses.

## People are also reading…

1. **MVC Notebook | SIU men add Stulic through portal**

2. **United no more: Some Southern Illinois congregations have left the United Methodist Church**

3. **Carbondale priest celebrates 50 years of ministry**

4. **'American Pickers' Frank Fritz and Mike Wolfe reunite**

Seymour said omitting those funds leaves the county with a $4.3 million, 22,000-square-feet facility with no funds to open it.

"Construction and staffing are totally two separate issues," said Seymour. "The salary reimbursement issue every juvenile detention center in the state has its salaries reimbursed through the Supreme Court budget had been approved. However, when it came to the 2004 budget, we were not there."

State Rep. Gary Forby said Tuesday from Springfield he still believes an 11th-hour deal might be struck to provide the necessary funds to open the detention center.

"I spoke with the governor this morning and explained just how important of an issue this is," Forby said. "I think there is still a possibility that the funding might come through. Nobody has said 'no' yet, so I'm going to keep working, trying to find the funds. It will be my No. 1 priority this week."

The omission by the Illinois Supreme Court puts the future of the detention center in doubt, at least for this fiscal year. With construction slated to be completed in October and no money to pay salaries for the rest of the fiscal year, the opening date of the center has been moved back to July 1, 2004.

"And then there's no guarantee that we would get the funding in 2004," Seymour said. "The possibility exists that the new building could sit there and never open if the state won't fund it. We've sent out a lot of letters asking for help, and we've pleaded our case with legislators. It's a very tough year to try to get funding."

Also in a difficult spot is the Franklin County Board, which borrowed $3 million to help build the detention center. The board was expecting the detention center to generate revenue to help pay off the debt, which has an annual payment of $250,000.

Harry Stewart, Franklin County Board chairman, said the county cannot afford to provide funding to operate the detention center without assistance from the state.

"This has left the county in a very difficult spot," Stewart said. "And we'll still have to pay for the upkeep and for security at the site, plus the annual loan payment that will come due this year."

The brunt of juveniles housed in the facility would come from Franklin, Jefferson, Jackson, Williamson and Saline counties. However, more than 40 counties in the lower half of the state have showed an interest in using the detention center.

Currently juveniles from Southern Illinois must be transported to detention centers in either St. Clair County or Vincennes, Ind. According to the sheriff's department, Franklin County spends more than $100,000 in transportation costs to move juvenile offenders.

The new facility also will house the county's juvenile probation offices and the state's attorney's office, a fact that county officials have said in the past also would save the county money.

Seymour said the probation and state's attorney offices will move to the new site in July regardless of what the state does about the promised funding.

Seymour said he will take a "wait and see approach" this week.

"I think we've done all we can do up to this point to get everybody's attention about how important this is. It's up to those in Springfield now," Seymour said. "I guess if worse comes to worse, we could always turn the facility into a bed and breakfast."

**writeon1@shawneelink.net** 618-625-2006

# Exhibit 11

https://thesouthern.com/news/local/now-serving-southern-illinois-after-numerous-setbacks-franklin-county-juvenile-detention-center-opens-today/article_787565a7-f3fb-56ca-885a-5d89c6ba78fc.html

# NOW SERVING SOUTHERN ILLINOIS: AFTER NUMEROUS SETBACKS, FRANKLIN COUNTY JUVENILE DETENTION CENTER OPENS TODAY

**JIM MUIR THE SOUTHERN [Mon Feb 16 2004]**

Feb 17, 2004

BENTON - After numerous setbacks during the past seven years, officials will open the Franklin County Juvenile Detention Center today.

The 22,000-square-foot detention center will officially open today when the first juvenile detainees will be moved into the building. It is located adjacent to the Franklin County Jail on East Main Street in Benton.

Jake Seymour, director of court services in the Second Judicial Circuit, has been involved throughout the often vexing process of trying to get the detention center open.

"I have to admit that there were a few times when I wasn't sure we were going to make it and there were a few times when I just got burned out with the whole process, just sick of it," Seymour said. "Last year after construction was completed I was wandering around the finished center that was full of construction material and I started visualizing how we could use the facility to help kids and that really refreshed my cause. It took many, many people pulling together to get this project completed."

## People are also reading...

1   **SIU's Sunset Concerts begin June 22**

2   **The sports world reacts as 'The Voice of SIU' steps away from the mic**

3   **Prep Football | Spain takes over coaching reins for Du Quoin**

**4      Business Spotlight | Marion's Fox Comics: The business customers asked for**

Seymour said Franklin County voters in 1997 approved, by a 62 percent majority, a referendum to construct the juvenile detention center. That vote proved to be one of the easiest obstacles Franklin County officials would face.

"We applied for a federal grant after the referendum was passed and it was turned down and then we re-applied and the second time it was approved - that was the fall of 1999," Seymour said. "That grant was for $1.5 million and we also got a $250,000 grant for design and we let the bids to begin construction."

Shortly after the grants were obtained, the Franklin County Board approved a measure to borrow $3.5 million to help finish construction of the detention center. The board was counting on revenue generated when the facility opened to help pay off the debt. However, county officials received another dose of bad news last fall when they learned the state had omitted funding for the juvenile detention center.

Seymour said omitting the funds left the county with the possibility of having a $4.3 million building and no funds to open it and Franklin County officials with a quarterly payment of $52,000 on the detention center - a payment that would have gone on whether funding was obtained or not.

After much lobbying, county officials learned last year that the center would receive $375,000, which will allow for hiring staff and for the use of 20 beds. The partial funding will come through the budget of the Illinois Supreme Court.

Seymour said the partial funding that only earmarked the 2003-04 fiscal year, albeit a blessing, still leaves Franklin County officials with yet another obstacle to face. The funding will run out when the fiscal year ends in June.

"We still have to get the entire building funded during the next fiscal year, so we still have some more work to do," Seymour said. "The partial funding that we received allowed us to open 20 beds and hire staff and then train that staff. This funding will

only pay for reimbursement of the staff. We really need to open this up to all the 38 beds that we have. All the other juvenile detention centers are funded by the state and we think we should be treated just like the rest as far as funding goes."

Ronald House, finance chairman of the Franklin County Board, also served on the construction committee for the juvenile detention center. House said the benefits of the new facility reach well beyond Franklin County.

"We're elated that the juvenile detention center is opening and its going to be an asset to all of Southern Illinois," House said. "We think it will generate revenue for the county, we are pleased with the building and we have a great staff in place that will be able to assist and help the young people that need help."

House shared the same concern as Seymour about future state funding.

"That's the only concern I have about the juvenile detention center," he said. "It's my understanding that we are guaranteed to receive the current funding level that we are at now. With some additional funding we hope to be able to fill all 38 beds. We plan to work hard with our legislators and with the people in Springfield to ensure that the funding is forthcoming in July and we can fill the facility up."

The majority of juveniles housed in the facility would come from Franklin, Jefferson, Jackson, Williamson and Saline counties, though more than 40 counties in the lower half of the state have showed an interest in using the detention center. Seymour said the county entered into an agreement with the Department of Human Services at the beginning of this year to transport juveniles from 24 counties in Southern Illinois to the juvenile center.

"We think we'll be able to quickly utilize these 20 beds quite well," Seymour said. "This facility will keep kids close to home, which is good for the kids and good for the families. It will save money for the counties involved because they are not going to have to transport kids 100 miles or more. It will allow us to focus on the juveniles here in Southern Illinois. Whether it's mental health, education or drug abuse help, we want these kids to leave our facility better than they arrived."

Currently juveniles from Southern Illinois must be transported to detention centers in either St. Clair County or Vincennes, Ind. According to the sheriff's department, Franklin County spends more than $100,000 in transportation costs annually to move juvenile offenders.

The new facility, along with providing space for the juvenile detention center, also will house the county's juvenile probation offices and the state's attorney's office, a fact that county officials have said in the past would save the county money. Previously the county rented space for those offices.

Seymour said a superintendent, an assistant superintendent, four supervisors and 19 officers have been hired to staff the facility.

"There have been a lot of highs and lows with this project and today is certainly a high," Seymour said. "It has been an unbelievably long and tedious process."

**writeon1@shawneelink.net** 618-625-2006

# Exhibit 12

https://thesouthern.com/news/local/franklin-co-will-stop-funding-juvenile-detention-center/article_2c795056-6905-11df-961b-001cc4c002e0.html

# Franklin Co. will stop funding juvenile detention center

**BY BECKY MALKOVICH, The Southern**

May 26, 2010

**B**ENTON - The Franklin County Board has voted to cease funding for the juvenile detention center effective July 1.

The action, taken at a Tuesday meeting, was necessary because of a cash flow problem created by late and/or incomplete state payments, board chairman Randall Crocker said.

The county, which owns the building that houses the center, pays all costs associated with its operations. Income sources includes costs paid by counties that send juveniles to the facility for detention and funding from the Administrative Office of the Illinois Courts, which provides reimbursement of detention center salaries.

The county was promised 100 percent reimbursement for the salaries but is averaging only about 65 percent from the state. Add in the lateness of state payments - the last one received was in August - and a cash flow problem is the result, Crocker said.

## People are also reading…

1   **Show your pride at these Southern Illinois events this June**

2   **Carbondale Dairy Queen closure prompts wide response from Southern Illinoisans**

3   **Prep Softball | Goreville places fourth in state after 4-3 loss to LeRoy**

4   **Prep Basketball | Local teams hit the court at Vienna summer tournament**

If the state lived up to its bargain, he said, the detention center would break even or make money, but "Who knows when that is going to happen? We can't endanger our ability to pay our other employees and we've borrowed all we can borrow. We have to stop the bleeding."

# Exhibit 13

Date December 5,2022

**FINANCE,**
**(Salaries, Policy and Purchasing, Insurance, Tourism,**
**Supervisor of Assessments/Mapping, Economic Development)**
**DECEMBER 2021 THRU NOVEMBER 2022**
**FIRST AND THIRD MONDAYS OF THE MONTH**

Franklin County Board Committee meetings and Franklin County Board meetings are held at the Franklin County Board
Room, Franklin County Courthouse, 100 Public Square, Benton, Illinois.

COMMITTEEMEN:
(x) Ray Minor - Chairman
(X) Angela Evans
(x) John Gossett - Labor Negotiations (Sheriff's Office)
(x) Neil Hargis – Labor Negotiations (Clerical)
(x) Larry Miller – County Board Chairman, Economic Development
(x) Curtis Overton
(x) Jack Warren – Labor Negotiations (Animal Control)
(x) Kevin Weston – Labor Negotiations (County Highway)
(x) Brad Wilson – Labor Negotiations (Juvenile Detention Center)

County Offices
( ) Amos Abbott, Director 911
(x) Kyle Bacon, Sheriff
( ) Ryan Buckingham, Director EMA
(x) Abigail Dinn
( ) Darla Fitzgerrell, Court Services
(x) Marty Leffler, Coroner
( ) Lorie LeQuatte, ROE
( ) Cynthia Miklos, Supervisor of Assessments
(x) Jim Muir, Circuit Clerk
( ) Bobbie Overturf, Animal Control Supervisor
( ) JDC Superintendent
(x) Gayla Prather, County Board Adm. Assist.
(x) Mike Rolla, County Engineer
(x) Judge Melissa Morgan
( ) Monica Urban, Probation
(x) Steve Vercellino, Treasurer
(x) Kevin Wilson, County Clerk


Guests… Dwayne Williams, Louis Oldoni, Don Miklos, and other interested parties.  No public comments were
expressed.

The meeting was called to order at 5:10 PM by Chairman Ray Minor. See above list of those attending, and
also, those stating public comments and the topics of their comments.

Chairman Minor submitted the county claims which were approved and signed by all members present.

Treasurer Steve Vercellino gave his report...

- Beginning balance as of 12/05/2022 is $8,411,329, ARPA balance is $5,306,681.81, cashflow without ARPA is $2,587,756.20
- The complete report can be seen on www.franklincountyil.gov as 12-5-2022 Finance Committee Meeting Attachment 1.
- Audit is completed and will be presented at the next meeting.
- ARPA report has paid for the Animal Control's truck and the Coroner's Van.
- Money in the General Fund is a little higher than last month due to the distribution from taxes.

Judge Melissa Morgan was at the meeting and was asked to speak about the Juvenile Detention Center...
- Several steps have been made to help the building.
- Building is needing work done on the sewer system, locking system, cameras, control room (is not able to update control system), and other area.
- Needs more staffing.
- Has hired a new Superintendent.
- Population is receiving recreation, education, and leisure time.

Discussion followed on these items.

The meeting adjourned at 5:33 PM
Minutes submitted 12/15/2022
Ray Minor - Finance Committee

# Exhibit 14

417 F.Supp.3d 1125
United States District Court, S.D. Illinois.

Mary MCKINNEY, as Administrator for
the Estate of R.E., Deceased, Plaintiff,
v.
FRANKLIN COUNTY, ILLINOIS, et al., Defendants.

Case No. 15-CV-1044-SMY-RJD
|
Signed 09/30/2019

**Synopsis**
**Background:** Administrator of estate of juvenile detainee who committed suicide brought action against county, county juvenile detention center employees, and others, asserting claims under § 1983 for deliberate indifference and for wrongful death under Illinois state law. Center employees moved for summary judgment.

**Holdings:** The District Court, Staci M. Yandle, J., held that:

detention center employees were not entitled to Eleventh Amendment immunity from liability;

employees lacked actual knowledge of facts to put them on notice of a substantial risk that juvenile detainee would attempt suicide, and therefore not liable for deliberate indifference;

employees were immune from liability on claims of wrongful death under Illinois law;

county was not subject to *Monell* liability; and

county was not liable under Illinois Wrongful Death Act, under theory of respondeat superior.

Motion granted.

**Procedural Posture(s):** Motion for Summary Judgment.

**Attorneys and Law Firms**

**\*1128** Linda C. Powers, Steven L. Groves, Groves Powers, LLC, St. Louis, MO, for Plaintiff.

Joseph A. Bleyer, Bleyer & Bleyer, Marion, IL, Lisa A. Cook, Office of the Attorney General, Terence Corrigan, Illinois Attorney General's Office, Springfield, IL, R. Douglas Rees, Christopher John Kim, Office of the Attorney General, Elizabeth A.F. Morris, Illinois Attorney General's Office, Chicago, IL, Douglas R. Heise, Heyl, Royster, et al., St. Louis, MO, Keith B. Hill, Heyl, Royster, et al., Edwardsville, IL, for Defendants.

**MEMORANDUM AND ORDER**

YANDLE, District Judge:

**\*1129** Tragically, on September 23, 2014, 12 year old R.E. attempted suicide while he was being detained at the Franklin County Juvenile Detention Center. He died the same day. Plaintiff Mary McKinney, Administrator of R.E.'s Estate filed this action against Franklin County, Illinois and various individuals, asserting violations of 42 U.S.C. § 1983 and state law claims for wrongful death, *respondeat superior*, and indemnification.

This matter is now before the Court for consideration of the motions for summary judgment filed by Defendants Michael Abell, Anthony Bechelli, Shawn Freeman, Daniel Lynch, Alicia Mendoza, Diane Sanders, Alan Stewart, Samantha Thomas, and Stephanie Upchurch (the "Center Defendants") (Doc. 145) and Defendants Franklin County and Randall Crocker (Doc. 151). Plaintiff filed Responses (Docs. 182 and 185).

Plaintiff states the following causes of action in the Second Amended Complaint:

Count I: Fourteenth Amendment deliberate indifference claim under 42 U.S.C. § 1983 against Defendants Franklin County, Crocker, Abell (official and individual capacities), Freeman (official and individual capacities), Sanders (official and individual capacities), Thomas (official and individual capacities), Lynch, Mendoza, Bechelli, Upchurch and Stewart;

Count II: Fourteenth Amendment deliberate indifference claim under 42 U.S.C. § 1983 against Defendant CHC and/or Correct Care;

Count III: Fourteenth Amendment deliberate indifference claim under 42 U.S.C. § 1983 against Defendant Little;

Count IV: Fourteenth Amendment deliberate indifference claim under 42 U.S.C. § 1983 against Defendant Vipin Shah, M.D [1] .; and

Count V: claim under the Illinois Wrongful Death Act, 740 ILCS 180/1.

Defendants seek summary judgment on Counts I and V. For the following reasons, Defendants' motions are **GRANTED**.

### Factual Background

Construed in the light most favorable to the plaintiff, the evidence and reasonable inferences establish the following facts relevant to the pending summary judgment motions:

### *Management of the Franklin County Juvenile Detention Center*

In 2006, Franklin County, Illinois and the Chief Judge of the Second Judicial Circuit executed a "Memorandum of Understanding Between the Chief Judge of the Second Judicial Circuit and the Franklin County Board and Other Franklin County Agencies" (the "Memorandum") for the management of the Franklin County Juvenile Detention Center (the "Center"). (Doc. 146-1). The Franklin County Board approved the Memorandum on May 26, 2006 (Doc. 182-2, at pp. 33-35; Doc. 182-7, at pp. 3-4), and the Memorandum was executed by the Franklin County Board Chairman, the State's Attorney for Franklin County, and the Office of the Chief **\*1130** Judge of the Second Judicial Circuit (Doc. 146-1, p. 7).

The Memorandum sets forth the respective responsibilities of Franklin County and the Second Judicial Circuit with respect to the ownership, maintenance and operation of the Center (Doc. 182-2, at pp. 41-42). The Second Judicial Circuit's responsibilities include:

- Taking all responsible steps, based upon legal authority, to operate the Juvenile Detention Center in accordance with state law, rules and regulations. If at any time the Center was not in compliance, the County shall be immediately notified of the non-compliance;

- Providing for the overall direction of programs and services at the Juvenile Detention Center and under the authority of the Circuit's Chief Judge;

- Designating the Director of Court Services to provide general supervision of the Center and the Superintendent. Shall meet and confer with appropriate representatives of the County Board about the number and classification of staff necessary to operate the Center;

- Developing written policies and procedures supportive of meeting the goals and objective established by the Franklin County Board and the Chief Judge of the Circuit;

- Directing, administering, managing and supervising the day to day activities of the Juvenile Detention Center in order to assure that it meets the established standards of operations and programs for a juvenile detention center;

- Providing for complete, adequate and necessary training of all persons employed to perform services at the Center.

Franklin County's responsibilities include:

- Establishing an annual budget for the operation of the Center after first conferring with the Chief Judge and/ or Director of Court Services. The County reserved the right to declare final figures for the annual budget;

- With respect to support service staff only, after conferring with the Director of Court Services, hiring individuals and/or contract independently for necessary support services/staff for the efficient operation of the Center;

- Arranging for liability insurance for the Center and on persons employed to provide juvenile detention services;

- Providing appropriate salaries and fringe benefits to Detention Center staff. The number of persons employed, their salaries and fringe benefits, shall be set only after appropriate meetings between the Chief Judge of the Circuit, Director of Court Services, and appropriate County Board members.

- Placing on the County's roles, the individuals selected by the Director of Court Services and the Superintendent as persons hired to perform the necessary services and duties in the Juvenile Detention Center.

(Doc. 146-1).

More specifically, Franklin County is reimbursed for the salaries paid to Center employees (Doc. 146-3, at p. 35). The Administrative Office of the Illinois Courts ("AOIC") processes the reimbursements, which are then paid for by the Probation Services Division with funds from the Illinois Supreme Court. *Id.* at pp. 37-38. **\*1131** Franklin County maintains liability insurance covering its employees and agents (Doc. 182-4, at pp. 240-241).

At all relevant times, Michael Abell was the Director of Court Services for the Second Judicial Circuit (Doc. 146-3, at p. 8). The Chief Judge delegated to Abell the overall responsibility for the management of the Center and control of the work of subordinate personnel there. *Id.* at pp. 20, 169-170; Doc. 146-1. Abell was directly accountable to the Chief Judge (Doc. 146-3, at pp. 8, 20, 169-170). Abell's duties and responsibilities included: general supervision of the Center and its Superintendent; meeting and conferring with appropriate representatives of the County Board about the number and classification of staff necessary to operate the Center; evaluating the performance of the Superintendent; conferring with Franklin County on numerous issues; and developing written policies and procedures to support the goals and objectives established by Franklin County and the Chief Judge of the Circuit (Doc. 146-1).

Freeman was hired as the Superintendent of the Center and accepted employment with Franklin County (Doc. 146-5, at p. 12; Doc. 182-2, at pp. 93-94; Doc. 182-12). As Superintendent, Freeman represented the Second Judicial Circuit and Franklin County in matters related to the Center (Doc. 182-2, at pp. 93-94; Doc. 182-12). His duties and responsibilities included maintaining and implementing the Center's Policy and Procedure Manual (Doc. 146-3, at p. 53) and the policies and procedures contained in the Security Manual (Doc. 146-5, at pp. 145-146).

Diane Sanders was hired as Assistant Superintendent of the Center and accepted employment with Franklin County (Doc. 182-25; Doc. 182-25, at p. 39; Doc. 182-26). Sanders' job duties included serving as an assistant to the Superintendent and acting as Superintendent during Freeman's extended absences (Doc. 182-26).

### *Jail Policies, Procedures, and Practices*

The Center's Policy Manual provides that "all policies and procedures shall, when appropriate, be compatible with the policies of the Second Judicial Circuit and the Franklin County Board" (Doc. 182-3, at pp. 5344-5345). Franklin County's Personnel Manual policies apply to Center staff (Doc. 182-4, at pp. 305-306; 310-314).

Franklin County is responsible for administering, managing and supervising the health care delivery system of the Center (Doc. 182-27, at p. 1). Consistent with this obligation, in December 2008, Randall Crocker (Chairman of the Franklin County Board) and Superintendent Shawn Freeman, as representatives of Franklin County, entered into a contract with Health Professionals, Ltd., for the provision of healthcare services at the Center (Doc. 182-4, at pp. 294-295; Doc. 182-15).

### *Staff Training*

Franklin County is responsible for the cost of training Center staff (Doc. 182-4, at pp. 180-181). Training is funded from revenue Franklin County receives from other counties who pay the County to house juvenile detainees. *Id.* at pp. 181-182. Franklin County is not reimbursed for training costs. *Id.* at p. 180.

The Illinois Department of Juvenile Justice ("IDJJ") requires detention staff who have direct contact with detainees to receive a minimum of 40 scheduled hours of training each year (Doc. 182-7, at pp. 72-73). Although all Center staff received CPR and First Aid training, between 2007 and 2013, not all staff members received the mandated annual 40 hours of training required by the IDJJ except for one year. *Id.* at pp. 24-25, 32-33, 45-46, 55-56, 63-64, 72-73, 82-84. Each year, the Franklin County Board held a meeting to review the **\*1132** IDJJ report; it accepted the findings through a formal vote but did nothing more to comply with the training requirements. *Id.* at pp. 77, 66-70, 58-61, 49-53, 36-40, 26-30, 15-22.

Defendant Alicia Mendoza underwent training as a newly hired detention officer in July 2014. The only suicide prevention training she recalls receiving was "PowerPoints" (Doc. 182-33, at p. 19). Defendant Daniel Lynch, who had been working as a Center officer for two years prior to R.E.'s death, had not received basic training as of the date of R.E.'s death (Doc. 182-34, at pp. 55-56). Defendant Anthony Bechelli cannot recall exact training in

suicide prevention, but testified that "it could have been mixed in with other trainings that I have received" (Doc. 182-35, at p. 74). Defendant Samantha Thomas does not recall if she received suicide prevention training at the Center (Doc. 182-36, at pp. 14-20). She recalls only that "there was a section on suicide" at her basic training. *Id.* at pp. 18-19.

### R.E.'s Detention History

Plaintiff's Decedent, R.E., had a documented history of Depression and Attention Deficit/Hyperactivity Disorder ("ADHD"). In March 2011, the Southeastern Illinois Counseling Center, Screening, Assessment, Support Services ("SASS") referred R.E. to counseling after he told a school counselor that he had thoughts of not being in the world (Doc. 185-1 at pp. 6792, 6808, 6824). His DSM symptoms at that time included the death of his mother by suicide in November 2009, inattention, feelings of sadness, reported anger toward self, and vague suicide attempts at school. *Id.* at p. 6792. R.E. was diagnosed with Depressive Disorder and ADHD by history. *Id.* at p. 6819.

R.E.'s first admission to the Center occurred in August 2012 (Doc. 185-2, at p. 6947). Sanders recalls having minor interaction with R.E. during this admission but does not recall any specific conversations (Doc. 146-8, at pp. 123-125). There is no evidence that R.E. made any statement to detention staff or did anything indicating he was suicidal during his nine-day detention (Docs. 146-25, 146-26).

R.E. was again admitted to the Center in March 2014 to undergo psychiatric, psychological and substance abuse evaluations (Doc. 146-27, pp. 143-44). Shift Supervisor Samantha Thomas and detention officer Alan Stewart completed the Center's intake and screening process for the admission (Doc. 146-28, at pp. 6936-38). Thomas administered the Massachusetts Youth Screening Instrument Version 2 ("MAYSI-2"), a screening instrument designed to identify and score behavioral risks. *Id.* R.E. responded "no" to each question pertaining to suicidal ideation and scored a zero in the MAYSI-2 category for Suicide Ideation. *Id.* Thomas also administered the MH-JJ Referral Screening, Medical Screening questionnaire, and screening for Methamphetamine Treatment Program Referral. *Id.* In the Medical Screening questionnaire, R.E. responded "no" to each question about the risk of suicide. Thomas noted that R.E. was sad but calm and not angry, restless, or unemotional. *Id.*

Brandy Shirley performed a substance abuse evaluation on R.E. on March 31, 2014 (Doc. 146-30, at pp. 6897–98). Shirley reported that R.E. "denie[d] suicidal/homicidal ideations as well as previous attempts; denie[d] self-mutilation and the need to see a counselor for support at time of consultation; denie[d] medical problems." *Id.* at p. 6897.

Dr. Jeremy Jewell performed a psychological evaluation on R.E. on April 8, 2014 (Doc. 146-31, at pp. 6885-93). As a result of the evaluation, Dr. Jewell recommended: that a psychiatrist evaluate R.E. for the **\*1133** appropriateness of his current medication; the teaching of relaxation skills and/or cognitive behavioral therapy to help R.E. decrease his frustrations; and grief counseling to assist R.E. in coping with the suicide death of his mother (Doc. 146-31, at pp. 6891-6892).

R.E. was readmitted to the Center on May 20, 2014 and underwent a psychiatric evaluation by Dr. L. Spalt (Doc. 146-33, at pp. 6880-84). Dr. Spalt noted R.E.'s mood as depression. *Id.* According to the report, R.E. indicated that he sometimes had difficulty with feeling "depressed" and "kind of moody," but denied all other symptoms of Major Depressive Disorder. *Id.* Dr. Spalt noted that R.E. had difficulty with inattention and that his father indicated that R.E.'s difficulty with low moods had been present since his mother's death when he was six years old. *Id.* Dr. Spalt found that R.E.'s history did not satisfy diagnostic criteria for or suggest the presence of an endogenous psychiatric disorder such as a mood, thought or anxiety state disorder. *Id.* He recommended continued treatment with anti-ADHD medications and noted that if R.E. developed more classic symptoms of an endogenous affective/mood disorder, treatment with appropriate antidepressant medications might be reconsidered at that time. *Id.* Shift supervisor Stephanie Upchurch completed the Center's intake and screening process. *Id.* at p. 6906.

### R.E.'s September 2014 Detention

R.E.'s final admission began on September 17, 2014 when he was transferred to the Center after being arrested and charged with burglary (Doc. 146-34, at pp. 70, 75-76). Upchurch and detention officer Stewart completed the Center's intake and screening process for the admission (Doc. 146-36, at p. 6964). Upchurch administered the MAYSI-2, MH-JJ Referral Screening and Medical Screening questionnaire. *Id.* Although

Upchurch testified during her deposition that R.E. "was a little upset" during his admission (Doc. 185-10, at p. 63), she documented in the Medical Screening Questionnaire that he was calm, not angry, sad, or restless. *Id.* R.E. tested positive for marijuana/THC. The MAYSI screening document reflects that R.E. had never gotten in trouble when he had been high or had been drinking, had never used alcohol or drugs to help him feel better, and had never had something very bad or terrifying happen to him (Doc. 185-2, at pp. 6969-70). Upchurch recorded R.E.'s MAYSI-2 scores as zero for "alcohol/drug use," "angry/irritable," "depressed-anxious," "suicide ideation," "thought disturbance," and "traumatic experiences." *Id.*

Upchurch noted that R.E. was taking Adderall and had received "some type of court ordered mental health treatment" (Doc. 185-2, at pp. 6978-80). Although she knew R.E. had been admitted to the Center for a psychiatric evaluation, she did not know why R.E. required the assessment (Doc. 146-11, pp. 55-56). Center policy required that any detainee who had been diagnosed with depression, was sad at intake, or who was currently taking psychotropic medications be referred for an evaluation by a mental health professional of (Doc. 185-2, at p. 6976). Upchurch did not complete the screening instrument requiring that a juvenile currently on any psychotropic medications be referred to a mental health professional, but instead left the form blank and signed it. *Id.*

Admitting detention staff were required by Center policy to notify the parent or legal guardian during the admission process, or as soon as possible, and to obtain information, including mental/emotional health information (Doc. 185-8, at pp. 5527-5528). Upchurch did not complete the parent notification (Doc. 185-12, at p. 5994). Written policies also required detention **\*1134** center staff to retrieve prior files from the intake area if the juvenile had previous admissions. *Id.* at p. 5525.

Center supervisors complete Shift Exchange Reports ("SERs") to pass information to the next shift supervisor (Doc. 185-12, at p. 5994). The SER for the end of the first shift on September 17, 2014 noted that R.E. was "upset." *Id.* There were no other notations in the Shift Exchange Reports about R.E.'s behavior. R.E. made two intercom calls on September 17, 2014 requesting to speak to Upchurch (Doc. 185-13). R.E. was told that Upchurch was busy. *Id.* There is no documentation that Upchurch responded to R.E.'s intercom request.

There is conflicting evidence regarding R.E.'s behavior between September 17, 2014 and September 23, 2014. Detention officer Alicia Mendoza recalls having contact with R.E. during meal times, and testified that "he didn't show any signs of distress," "did what was expected of him," "wasn't a troublemaker," "didn't talk back," and "listened to everything we told him" (Doc. 146-7, pp. 87-88). Detention officer Daniel Lynch remembers that on September 22, 2014, R.E. was "a little rowdy," "mouthy with some of the other kids," and "loud" in his room (Doc. 146-6, at pp. 84-85), but that he saw no behavioral problems from him. According to Lynch, R.E. was happy and played cards with other detainees on September 22, 2014. *Id.* at pp. 49-51. Detention officer Anthony Bechelli testified that R.E. "was always polite and respectful," "social," and that he "never had or saw any problems with [R.E.] behaviorally, emotionally, mentally" (Doc. 146-4, at p. 72). Juvenile S.B., who was housed in the same cell with R.E., recalls that R.E. was crying and upset; once when he was first detained and again after he returned from court and had not been released. (Doc. 185-14, at p. 160). R.E. talked to Z.P., a juvenile housed in A1, about being afraid that he might be sent to the department of corrections. He recalled that R.E. was also concerned about his behavioral level. *Id.* at p. 163. The Behavioral Sheets for September 17, 2014 through September 22, 2014 indicate that R.E. lost points for behavioral issues (Doc. 185-15).

Shift supervisor Thomas and detention officers Bechelli, Lynch, and Mendoza worked the second shift on September 23, 2014 (3:00 p.m. – 11:00 p.m.) (Doc. 146-10, pp. 141-142). As the control room officer, Bechelli was responsible for calling watch tours. (Doc. 146-4, pp. 116-117, 143). Lynch and Mendoza were responsible for performing watch tours and counts (Doc. 146-10, p. 144). Although the state standard set by the Illinois Department of Juvenile Justice calls for visual checks of each detainee at 30–minute intervals (Doc. 146-15, p. 143), the Center's Policy and Procedure Manual and Security Manual require detention officers to visually check each detainee every 15 minutes and to record the observation on the Center's watch tour system ((Doc. 185-16, pp. 5680-81). During watch checks, officers are required to see a living, breathing human body before verifying the juvenile's presence. *Id.*

There were 6 juvenile detainees in the A Pod when Mendoza conducted a watch tour at approximately 2:41 p.m. (Doc. 185-20). Video surveillance shows that Mendoza reached the first cell at 14:41:18 and finished her watch tour at 14:41:38.

*Id.* Mendoza saw R.E. standing at the door in his room (Doc. 146-7, pp. 46-47). Mendoza helped supervise detainees during a recreation period outside after she completed her watch tour. *Id.* at pp. 66, 73.

At 3:11 p.m., Lynch entered A Pod to gather detainees for a recreation period (Doc. 185-20). Lynch allowed 3 detainees to leave their cells. *Id.* R.E. remained in **\*1135** room confinement due to behavioral demerits. Lynch entered the A Pod again at 3:31 p.m. to conduct a watch tour. He pushed the button outside of R.E.'s room, walked down to the end of the A Pod, and when walking back toward R.E.'s room, looked in the window and discovered that R.E. had hanged himself with a bed sheet tied to the handicap rail attached to his lavatory (Doc. 185-20; Doc. 146-6, at p. 118). Lynch entered R.E.'s room and loosened the sheet from around his neck. *Id.* at pp. 119-120.

Emergency medical services (EMS) arrived at 3:50 p.m. in response to a 911 call and took over CPR efforts (Doc. 146-3, at p. 113). R.E. was transported to Franklin County Hospital where he was pronounced dead at 4:11 p.m. (Doc. 146-42 at pp. 7938–39, 11061).

Detectives Richard Minton and Amy Tipton of the Franklin County Sheriff's Office conducted an investigation into R.E.'s death (Doc. 146-19, at pp. 24-26; Doc. 146-43, at pp. 100-191). During the course of their investigation, Minton and Tipton interviewed witnesses, including detention staff and detainees, asked for and received various requested materials from the Center, and authored Incident/Offense reports of witness interviews and findings (Doc. 146-19, at pp. 19-26). According to Minton, no one they interviewed indicated that R.E. had made any statement or acted in any manner that indicated he was a suicide risk (Doc. 146-19, at p. 188, p. 202). Minton had no reason to believe anyone had been dishonest. *Id.* at p. 189. When asked whether it was true that "based on his investigation none of these state defendants ... knew that R.E.'s mother had committed suicide, he testified that he could not say who but "someone knew because apparently the records came–from the detention center saying that" (Doc. 185-14, at pp. 203-204).

There were 37 suicide attempts at the Center in 2011 (Doc. 146-47, at pp. 9199–201; Doc. 146-5, at pp. 231-232), 43 suicide attempts in 2012 (Doc. 146-47, at pp. 9199-200, 9202; Doc. 146-5, at pp. 25-33), and 28 suicide attempts in 2013. *Id.* There were 21 suicide attempts at the Center in the eight months before R.E.'s death. *Id.* R.E. is the only detainee to

have committed suicide since the Center opened in 2004 (Doc. 146-3 at pp. 15, 94-95).

## Discussion

Summary judgment is proper only if the moving party can demonstrate that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party is entitled to summary judgment where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Any doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Lawrence v. Kenosha County*, 391 F.3d 837, 841 (7th Cir. 2004).

### The Center Defendants' Motion (Doc. 145)

#### *Eleventh Amendment Immunity*

As an initial matter, the Court must address the Center Defendants' contention that Abell, Freeman and Sanders are non-judicial employees of the Second Judicial Circuit, an arm of the State of Illinois, and that they are therefore state employees entitled to Eleventh Amendment **\*1136** immunity.[2] Under the Eleventh Amendment, a state, its agencies, and its officials acting in their official capacities are immune from federal lawsuits unless the state consents to the suit or Congress abrogates the state's immunity. *Tucker v. Williams*, 682 F.3d 654, 658 (7th Cir. 2012) (citing *Seminole Tribe v. Florida*, 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)). Eleventh Amendment immunity does not extend to counties or municipal corporations. *DeGenova v. Sheriff of DuPage* Cty., 209 F.3d 973, 975 (7th Cir. 2000). Plaintiff argues that Abell, Freeman, and Sanders (who she has sued in their individual and official capacities) were agents of Franklin County – not the State of Illinois – with respect to training, supervising, disciplining, creating and enforcing policy, and overseeing the provision of healthcare at the Center.

The Supreme Court's decision in *McMillian v. Monroe County, Alabama*, 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997) guides this Court's analysis of the issue. In that case, the parties agreed that the sheriff was in a policymaking position, but disagreed whether he was an officer of the state or an officer of the county when acting in a law enforcement capacity. *Id.* at 786, 117 S.Ct. 1734. In concluding the sheriff was a state officer, the Court emphasized that the determination was fact-specific:

> First, the question is not whether [the sheriff] acts for [the State or County] in some categorical, "all or nothing" manner... our cases on the liability of local governments under § 1983 instruct us to ask whether governmental officials are final policymakers for the local government in a particular area or on a particular issue... Second... whether a particular official has final policymaking authority is a question of state law. This is not to say that state law can answer the question for us by, for example, simply labeling as a state official an official who clearly makes county policy. But our understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law.

*Id.* at 785-86, 117 S.Ct. 1734.

It is undisputed that Abell, Freeman, and Sanders had final policymaking authority. *See* Doc. 169, ¶¶ 20, 32-33, 138. The dispute centers on whether under Illinois law, these defendants were final policymakers for the State of Illinois or Franklin County when they managed the Center. *See McMillian*, 520 U.S. at 786, 117 S.Ct. 1734. While these defendants may be labeled as employees of the Second Judicial Circuit, under *McMillian* and its progeny, the label itself is inconsequential. For example, in *DeGenova v. Sheriff of DuPage County*, 209 F.3d 973 (7th Cir. 2000), the Seventh Circuit was confronted with the question

whether a sheriff in Illinois is an agent of the county or state when administering the county jail. While the Illinois Constitution defines sheriffs as county officials, consistent with *McMillian*, the Court looked beyond the label, examined the sheriff's particular functions at issue, and concluded that the sheriff acted as a county officer when managing the jail:

> [T]he county maintains and furnishes the jail and bears all of the costs to maintain prisoners. The county board builds the jail and provides for the Sheriff's reasonable and necessary expenses. And the Sheriff, as warden of the jail, **\*1137** must notify the county board if he decides that the jail is insufficient to secure prisoners.

*DeGenova*, 209 F.3d at 976.

The Illinois Constitution does not define juvenile detention employees as either state or county officials, nor does it authorize the Second Judicial Circuit to administer a juvenile detention center.[3] Instead, Franklin County and the Second Judicial Circuit operate the Center pursuant to the County Shelter Care and Detention Home Act (the "Detention Home Act") 55 ILCS § 75/1 *et seq.* and, to a certain extent, the Probation and Probation Officers Act (the "Probation Act"), 730 ILCS 110/0.01, *et seq.* Under the Detention Home Act, a county may establish, support and maintain a detention home for the care and custody of delinquent minors, and may levy and collect taxes to pay for the operation of its juvenile detention center. 55 ILCS 75/1. The statute mandates that counties regulate detention centers and requires detention centers to comply with minimum standards established by the Illinois Department of Juvenile Justice, with administrators and necessary personnel to be appointed by the Chief Judge of the Circuit Court. 55 ILCS 75/1, 75/3. The County Board determines and provides the funding for the detention center and can demand any type of report it needs from the Center's administrator. 55 ILCS 75/3, 75/4. The statute gives a county the exclusive right to eliminate its juvenile detention center. 55 ILCS 75/7. Relatedly, the Probation Act grants the Chief Judge of a judicial circuit general administrative and supervisory authority over administrators and necessary personnel, such as the Director of the Court Services Department. The County Board is responsible for

providing support and maintenance to the Court Services Department. 730 ILCS 110/13.

Consistent with the Detention Home and Probation Acts, Franklin County and the Second Judicial Circuit memorialized their responsibilities in a Memorandum of Understanding. Under the Memorandum, the Second Judicial Circuit's responsibilities include the general administrative and supervisory management of the Center, including the day-to-day operation of programs and services of the Center, the development of Center policies and procedures, and the provision of training to Center employees. Franklin County determines and establishes the annual budget for the operation of the Center. The majority of the Center's funding comes from revenue Franklin County receives from other counties that pay it to house their juveniles and from taxes levied and collected to pay for Center operations. The County provides salaries and fringe benefits to Center employees and maintains liability and workers compensation insurance covering the Center and Center employees. The only expense reimbursed by the State is for Center employee salaries, as mandated in the Detention Home Act.

Franklin County is also responsible for hiring and contracting for necessary support staff. In keeping with this obligation, Crocker and Freeman, as representatives of Franklin County, entered into a contract with Health Professionals, Ltd., for **\*1138** the provision of healthcare services at the Center and Freeman signed amendments to the Agreement on behalf of Franklin County. When Freeman and Sanders were hired, they accepted employment with Franklin County as well as the Second Judicial Circuit.

Franklin County built the Center and is solely responsible for its budget and finances. The County maintains and furnishes the Center and bears most of the costs to maintain detainees at the Center. Abell, Freeman and Sanders are required to notify and confer with the County Board regarding the operation of the Center and any issues arising at the Center. These collective factors demonstrate that Abell, Freeman, and Sanders functioned as county employees relative to the Center.

Defendants cite *Drury v. Cty. of McLean*, 89 Ill. 2d 417, 424, 60 Ill.Dec. 624, 433 N.E.2d 666 (1982) and *People v. Kavinsky*, 91 Ill. App. 3d 784, 787, 793, 47 Ill.Dec. 90, 414 N.E.2d 1206 (1st Dist. 1980) for the proposition that, under the Probation Act, employees who perform services for county courts in non-judicial roles are

employees of the appointing court and are therefore state employees. Defendants' reliance on these cases is misplaced. In determining that certain non-judicial employees were court employees, the *Drury* and *Kavinsky* Courts looked to the employees' role in effectuating the Court's *judicial powers* (emphasis added). *See, e.g., Kavinsky*, 91 Ill. App. 3d at 793, 47 Ill.Dec. 90, 414 N.E.2d 1206 (holding that probation officer's testimony concerning statements made by a juvenile were barred because officer was acting as an assistant to the court in its performance of its judicial functions when statement was made); *Drury*, 89 Ill. 2d at 424, 60 Ill.Dec. 624, 433 N.E.2d 666 (court clerks are state officials because to hold otherwise would interfere with the circuit court's exercise of Article VI's judicial power and the administration of justice). By contrast, Abell, Freeman and Sanders' authority to administer the Center does not stem from the exercise of Article VI judicial power. Rather, their authority is purely statutory and derives from the Detention Home Act. Thus, the Eleventh Amendment does not bar Plaintiff's official capacity claims against these defendants.

### Count I - Deliberate Indifference of Individual Defendants

In Count I, Plaintiff claims the individual defendants were deliberately indifferent to R.E.'s risk of self-harm and suicide. Because R.E. was a pretrial detainee and not an inmate, Plaintiff's claim arises under the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment's Cruel and Unusual Punishment Clause. *See, Kingsley v. Hendrickson*, 576 U.S. 389, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015); *Miranda v. County of Lake*, 900 F.3d 335, 350-351 (7th Cir. 2018).

Under *Kingsley* and *Miranda*, a pretrial detainee need only establish that the defendant's conduct was objectively unreasonable – not that the defendant was subjectively aware that it was unreasonable. *Miranda*, 900 F.3d at 352-53. In other words, a plaintiff must show that a defendant acted intentionally or recklessly as he "knew, or should have known, that the condition posed an excessive risk to health or safety" and "failed to act with reasonable care to mitigate the risk." *Id.* This is a more exacting standard than that required to prove negligence, or even gross negligence and is "akin to reckless disregard." *Id.*

Obviously, suicide poses an excessive risk to health and safety. The question presented then, is whether based on the evidence contained in the record, a jury could reasonably

conclude that the defendants **\*1139** knew or should have known that R.E. was at a substantial risk for suicide and failed to exercise reasonable care to protect him from that risk. Defendants argue there is no evidence they were aware of facts that should have caused them to objectively conclude R.E. was on the verge of suicide, or to support an inference that they were objectively reckless or indifferent to any such risk. The Court agrees. Even taken in the light most favorable to Plaintiff, the evidence is insufficient to establish the individual defendants had actual knowledge of facts to put them on notice of a substantial risk that R.E. would attempt suicide.

Upon admission to the Center, R.E. reported that he was not suicidal and denied suicidal ideation. During their depositions, Defendants generally testified that R.E. was a likable child who did not exhibit significant behavioral problems. Additionally, Mendoza testified that R.E. did not show any signs of distress, did what was expected of him, was not a troublemaker and listened to everything that was told of him. Lynch testified that he did not notice any behavioral problems from R.E. and recalled that he was happy. Thomas testified that she did not have any issues with R.E. Bechelli described R.E. as "always polite and respectful" and testified that he never had or saw any issues with him behaviorally, emotionally or mentally." Defendants Mendoza, Bechelli, Thomas, and Lynch all testified that R.E. showed no signs of distress or mental illness.

Plaintiff points to testimony indicating that R.E. was upset during intake, cried on several occasions, expressed concerns about his behavioral level, and was in a minor altercation with another detainee. But these facts were not enough to put the defendants on notice that R.E. was a suicide risk. Plaintiff also notes that Upchurch conducted the Center's intake and screening process for R.E.'s admission and knew that R.E. was taking psychotropic medications. Although Upchurch knew that R.E. was taking psychotropic medications for ADHD and had a previous mental health evaluation four months prior to his death, she testified that she did not know why R.E. required the evaluation. Regardless, knowledge that a detainee has had a psychological or mental health evaluation does not constitute notice that he is at a substantial risk of self-harm. *See Estate of Novack ex rel. Turbin v. County of Wood,* 226 F.3d 525, 530 (7th Cir. 2000) (jail officials who were informed that decedent had recently been at a mental health facility, was a potential risk for suicide, and exhibited strange behavior while at the jail was not enough to put officials on

notice that there was a significant likelihood that he would attempt to harm himself).

Plaintiff also argues that each defendant acted with deliberate indifference to R.E.'s risk of suicide because they were "exposed to and knew of a longstanding, pervasive" and substantial risk of self-harm and suicide to Center detainees. Defendants' general knowledge of the risk of suicide, however, is insufficient to support a finding that they knew or should have known there was a significant risk R.E. would attempt suicide.

Finally, Plaintiff contends that Defendants Abell, Freeman, and Sanders are liable in their individual capacities as supervisors for condoning and facilitating the conduct of their subordinates. But the doctrine of *respondeat superior* cannot be used to hold a supervisor liable for conduct of a subordinate that violates a plaintiff's constitutional rights. *Chavez v. Illinois State Police,* 251 F.3d 612, 651 (7th Cir. 2001). Supervisory liability can be found only if the supervisor, with knowledge of the subordinate's conduct, approves of the **\*1140** conduct and the basis for it. *Id.* Because this Court has concluded that the conduct of the individual defendants does not amount to a constitutional violation, Defendants Abell, Freeman, and Sanders cannot be held liable as supervisors. Therefore, the individual defendants are entitled to summary judgment on Count I.

### *Count V - Wrongful Death*

The Center Defendants argue if the Court finds that any of the individual defendants are county employees, then Plaintiff's wrongful death claim is barred by the Local Governmental and Governmental Employees Tort Immunity Act (the "Tort Immunity Act"). 745 ILCS 10/2-204, 10/2-202, and 10/4-103. The statute protects public officials from liability for conduct within the scope of their employment "unless such act or omission constitutes willful or wanton conduct." 745 ILCS 10/2-204 and 10-2-202. Conduct is "willful and wanton" under the Act if it shows a "conscious disregard for the safety of others." 745 ILCS 10/1-210. The Seventh Circuit has likened this standard to the deliberate indifference standard. *Williams v. Rodriguez,* 509 F.3d 392, 404–05 (7th Cir. 2007). Thus, because Plaintiff cannot establish that any of the individual defendants were deliberately indifferent to R.E.'s risk of self-harm or suicide, she cannot meet the willful and wanton standard. The Center Defendants are also entitled to summary judgment on Plaintiff's wrongful death claim.

### Franklin County and Randall Crocker's Motion (Doc. 151)

#### *Count I - Monell Liability*

Plaintiff alleges that Franklin County and Defendant Crocker in his official capacity [4] were deliberately indifferent to the risk that R.E. would commit suicide in the following respects: (1) the policymaking defendants failed to train detention staff in suicide prevention, identification and monitoring of at-risk detainees; (2) detainees were housed in unsafe cells and unsafe conditions without monitoring; and (3) the policymaking defendants failed to remedy known and ongoing failures of the staff to follow admission, watch tour, and other policies necessary for the safety of detainees. A local governmental body, such as a county or other municipal corporation, can be held liable under § 1983 if (1) it had an express policy calling for constitutional violations, (2) it had a widespread practice of constitutional violations that was so permanent and well settled as to constitute a custom or usage with the force of law or (3) if a person with final policymaking authority for the body caused the constitutional violation. *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *McCormick v. City of Chi.*, 230 F.3d 319, 324 (7th Cir. 2000).

A municipality is liable only when its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," is the moving force behind the constitutional violation. *Monell*, 436 U.S. at 694, 98 S.Ct. 2018. Plaintiff must provide competent evidence tending to show that the alleged practices were, indeed, widespread. *Davis v. Carter*, 452 F.3d 686, 695 (7th Cir. 2006). A municipality can also be liable for its own failure to act in the face of "actual or constructive notice" that such failure is likely to result **\*1141** in Constitutional deprivations. *See Ross v. Town of Austin, Ind.* 343 F.3d 915, 918 (7th Cir. 2003) (citing *Robles v. City of Fort Wayne*, 113 F.3d 732, 735 (7th Cir. 1997)). Liability is possible even if no individual official is found deliberately indifferent. *Miranda v. Cty. of Lake*, 900 F.3d 335, 344 (7th Cir. 2018); *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (*en banc*).

Defendants argue no Center policy or custom was established by a final policymaker of Franklin County because the policymakers for the Center were actually non-judicial employees of the Second Judicial Circuit who are not county employees under Illinois law. As previously noted, Franklin County built the Center and is solely responsible for the budget and finances. The County maintains and furnishes the Center and bears most of the costs to maintain detainees at the Center. Center administrators are required to notify and confer with the County Board regarding Center operations and other issues arising at the Center. Based on these undisputed facts, this Court finds that Franklin County had final policymaking authority over the Center.

Plaintiff claims the defendants had a widespread custom and practice of failing to adequately train, supervise and discipline Center staff with respect to suicide prevention in the following ways:

> (a) failing to train detention center staff and contract healthcare providers in suicide prevention, identification and monitoring of at-risk detainees; (b) failing to remedy known and ongoing failures of the staff to follow admission, watch tour, and other policies necessary for the safety of detainees; and (c) failing to discipline staff for known violations of policies, thereby condoning the unconstitutional behavior of their subordinates.

(Doc. 157, ¶¶ 143-144).

She argues that there was a longstanding and persistent epidemic of suicide attempts at the Center such that the failure to provide suicide prevention training to Center staff constitutes deliberate indifference. In *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Supreme Court recognized that under certain circumstances, the inadequacy of police training may serve as the basis for § 1983 liability. *Id.* at 388, 109 S.Ct. 1197. Liability attaches only where "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* Deliberate indifference in this context can be shown one of two ways: the failure to train employees on how to "handle

a recurring situation that presents an obvious potential for a constitutional violation" or the failure to provide further training "after learning of a pattern of constitutional violations by the police." *Dunn v. City of Elgin*, 347 F.3d 641, 646 (7th Cir. 2003) (internal citations omitted). This standard cannot be met by merely "showing that the police training was grossly negligent or reckless." *Smith v. City of Joliet*, 965 F.2d 235, 237 (7th Cir. 1992). Additionally, "the identified deficiency in a city's training program must be closely related to the ultimate injury." *Harris*, 489 U.S. at 391, 109 S.Ct. 1197. These standards also apply to municipal corporations and jail officers.

Under the Detention Home Act, the Center was obligated to comply with minimum standards established by the Illinois Department of Juvenile Justice ("IDJJ"). *See* 55 ILCS 75/2. These minimum standards required that Center staff having direct contact with detainees receive a **\*1142** minimum of forty scheduled hours of training each year. Between 2007 and 2013, the Center failed to meet the 40-hour requirement every year except one. Each year, the Franklin County Board held a meeting for the purpose of reviewing the IDJJ report, accepted the findings through a formal vote, but did nothing to comply with the training requirements.

Plaintiff also points to the testimony of the detention center officers as evidence that no suicide prevention training was provided. Particularly, Mendoza underwent training as a newly hired detention officer in July 2014; the only suicide prevention she recalls receiving was "PowerPoints." Lynch, who had been working as a Center officer for two years prior to R.E.'s death, had not even received basic training as of the date of R.E.'s death. Bechelli could not recall exact training in suicide prevention, but testified "it could have been mixed in with other trainings that I have received." Thomas could not recall if she received suicide prevention training at the Center. This evidence is sufficient to support a finding the training was deficient.

Assuming the training was inadequate, the issue is whether the failure to train Center staff can be said to represent a municipal policy of deliberate indifference. As the Supreme Court explained in *Harris*:

> It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees.

But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. 489 U.S. at 389, 109 S.Ct. 1197 (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 483–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)).

Abstractly, Franklin County's failure to provide adequate suicide prevention training could create a risk that is sufficiently obvious as to constitute deliberate indifference to the needs of juvenile detainees at the Center. But as *Harris* instructs, a causal link is necessary for liability to attach. In other words, the alleged deficiencies in Franklin County's training program must be closely related to R.E.'s suicide. The record does not support the requisite causal link.

There was nothing to trigger a heightened response or to put the defendants on notice of a potential suicide. R.E. never displayed or voiced self-harm ideation and the individual defendants testified that they had no knowledge that he was suicidal. On these facts, it is unclear how additional or better training would have prevented R.E.'s death. Speculation that better trained officers would have responded differently or that a different outcome was possible with better training is insufficient to establish causation. *See Lapre v. City of Chicago*, 911 F.3d 424, 437 (7th Cir. 2018). Moreover, while there were previous suicide attempts at the Center, "statistics without any evidence that the failure to maintain a policy contributed to the suicides [attempts] are insufficient to support a *Monell* claim." *Id.*; *Strauss v. City of Chicago*, 760 F.2d 765, 769 (7th Cir. 1985). The record is simply devoid of evidence linking a lack of training to the attempted suicides.

Next, Plaintiff contends there was a custom and practice of housing juvenile detainees under conditions that Defendants knew or should have known posed a substantial risk of harm. Specifically, Plaintiff alleges that R.E.'s cell was **\*1143** equipped with a sink-toilet combination with a handrail that was not an ADA compliant suicide resistant handrail, and that this posed an obvious danger. The sink/toilet combination had a space between the sink and handrail bar which, according

to Plaintiff, could easily be used to tie a sheet around it in a suicide attempt. Plaintiff argues the cell and handrail posed a particular risk of harm to detainees given multiple suicide attempts by hanging at the Center.

Sink/toilet combinations themselves are not inherently dangerous. The general use of an otherwise benign object has not been found to violate constitutional rights based solely on the possibility that a potentially suicidal detainee or inmate would use the object for self-harm. *See Miller v. Kozel,* 2011 WL 5024554, at *16 (N.D. Ill. Oct. 19, 2011), *aff'd sub nom. Miller v. Harbaugh,* 698 F.3d 956 (7th Cir. 2012); *Frake v. City of Chicago,* 210 F.3d 779 (7th Cir. 2000). As such, Plaintiff's theory does not trigger *Monell* liability.

Finally, Plaintiff argues the policymaking defendants were deliberately indifferent in that they failed to remedy known and ongoing failures of the staff to follow admission, watch tour, and other policies necessary for the safety of detainees. However, Plaintiff has failed to produce evidence of unconstitutional acts from which it may be inferred that Franklin County knew Center staff were violating the constitutional rights of detainees and did nothing. *See Estate of Novack,* 226 F.3d at 531. Plaintiff points to evidence showing that Upchurch failed to follow established policies during R.E.'s intake, including failing to properly complete the screening instruments, failing to complete the parental notification, and failing to ask R.E. follow-up questions, and failing to properly classify R.E. under the written policies. But Upchurch's conduct cannot impose *Monell* liability on the policymaking defendants. *See Holmes v. Sheahan,* 930 F.2d 1196, 1201–02 (7th Cir. 1991) ("[W]ithout more evidence pointing to deficiencies in these procedures, [the plaintiff's] story suggests a problem with personnel and the implementation of policy, ... but not a problem with County policy itself."); *Hahn v. Walsh,* 762 F.3d 617, 638 (7th Cir. 2014).

For the foregoing reasons, Defendants Franklin County and Randall Crocker are entitled to summary judgment on Plaintiff's *Monell* claims.

### *Count V - Wrongful Death*

In Count V, Plaintiff seeks to hold Franklin County and Crocker liable under the Wrongful Death Act based on a *respondeat superior* theory. 740 Ill. Comp. Stat. Ann. 180/1; *See, e.g., McHale v. W.D. Trucking, Inc.,* 396 Ill.Dec. 46, 39 N.E.3d 595 (Ill. App. Ct. 2015). An essential element of a wrongful death claim is the defendant's breach of a duty to the decedent to protect him from a foreseeable harm that was the proximate cause of his death. *Bovan v. American Family Life Ins. Co.,* 386 Ill.App.3d 933, 325 Ill.Dec. 40, 897 N.E.2d 288, 292 (2008). Here, as previously noted, there is insufficient evidence that the individual defendants failed to protect R.E. from a foreseeable harm. Given there was no breach of a duty to R.E. by the individual defendants, Franklin County and Crocker cannot be held liable under a *respondeat superior* theory. Additionally, the Local Governmental and Governmental Employees Tort Immunity Act (the "Tort Immunity Act") provides immunity to the extent that Plaintiff seeks to hold Defendants liable for failure to train Center staff or failing to provide sufficient supervision to R.E. *See Payne for Hicks v. Churchich,* 161 F.3d 1030, 1044-45 (7th Cir. 1998) (holding that defendants were immune under the Illinois Tort Immunity **\*1144** Act on plaintiff's claim for failure to protect inmates from self-harm). As such, summary judgment is granted on Plaintiff's wrongful death claim against these defendants.

### Conclusion

The record is insufficient to raise material issues of fact for a jury's determination as to whether R.E.'s suicide was the result of deliberate indifference on the part of the individual defendants or of any Franklin County policy, procedure or custom. Accordingly, Defendants' motions for summary judgment (Docs. 145, 151) are **GRANTED** in their entirety.

**IT IS SO ORDERED.**

### All Citations

417 F.Supp.3d 1125

## Footnotes

1    Plaintiff settled her claims in Counts II, III and IV with Defendants Shah, Little, and CHC/Correct Care.

2    Plaintiff has sued only Defendants Abell, Freeman, and Sanders in their official capacities.

3    Article VI, § 7(c) of the Illinois Constitution provides that the State shall be divided into judicial districts. The chief judge of each judicial district shall have general administrative authority over his court, including authority to provide for divisions, general or specialized, and for appropriate times and places of holding court. Article VI, § 7(c) is a grant of limited administrative authority over the workings of the circuit court. *See People ex rel. Brazen v. Finley*, 146 Ill.App.3d 750, 100 Ill.Dec. 744, 497 N.E.2d 1013, 1015 (1986), *aff'd*, 119 Ill.2d 485, 116 Ill.Dec. 683, 519 N.E.2d 898 (1988).

4    Plaintiff has also sued Crocker in his individual capacity. The Court will grant summary judgment in favor of Crocker in his individual capacity for the same reasons that Defendants Abell, Freeman and Sanders were entitled to summary judgment.

**End of Document**                                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 15

DEPARTMENT OF JUVENILE JUSTICE

NOTICE OF ADOPTED REPEALER

1) Heading of the Part: County Juvenile Detention Standards

2) Code Citation: 20 Ill. Adm. Code 2602

3)
| Section Numbers: | Adopted Actions: |
|---|---|
| 2602.5 | Repealed |
| 2602.10 | Repealed |
| 2602.20 | Repealed |
| 2602.30 | Repealed |
| 2602.40 | Repealed |
| 2602.50 | Repealed |
| 2602.60 | Repealed |
| 2602.70 | Repealed |
| 2602.80 | Repealed |
| 2602.90 | Repealed |
| 2602.100 | Repealed |
| 2602.110 | Repealed |
| 2602.120 | Repealed |
| 2602.130 | Repealed |
| 2602.140 | Repealed |
| 2602.150 | Repealed |
| 2602.160 | Repealed |
| 2602.170 | Repealed |
| 2602.180 | Repealed |
| 2602.190 | Repealed |
| 2602.200 | Repealed |
| 2602.210 | Repealed |
| 2602.220 | Repealed |
| 2602.230 | Repealed |
| 2602.240 | Repealed |
| 2602.250 | Repealed |
| 2602.260 | Repealed |

4) Statutory Authority: 730 ILCS 5/3-15-2

5) Effective Date of Repealer: June 29, 2021

6) Does this rulemaking contain an automatic repeal date? No

DEPARTMENT OF JUVENILE JUSTICE

NOTICE OF ADOPTED REPEALER

7)  Does this rule contain incorporations by reference?  No

8)  A copy of the adopted rules, including any material incorporated by reference, is on file in the Agency's principal office and is available for public inspection.

9)  Notice of Proposal published in *Illinois Register*:  45 Ill. Reg 3091; February 19, 2021

10)  Has JCAR issued a Statement of Objection to this rulemaking?  No

11)  Differences between Proposal and Final Version:  None

12)  Have all the changes agreed upon by the Agency and JCAR been made as indicated in the agreements issued by JCAR?  No changes were requested.

13)  Will this rulemaking replace an emergency rule currently in effect?  No

14)  Are there any rulemakings pending on this Part?  No

15)  Summary and Purpose of Rulemaking:  The Department is required to establish the minimum standards for physical conditions of the juvenile detention centers across the State. These standards have not been updated since 1988. During that time, there have been significant changes to the way youth are provided detention services. Because the amendments are extensive, this current Part 2602 has been repealed and a new Part replaced it.

16)  Information and questions regarding these adopted rules shall be directed to:

Lindsay M. Bentivegna
Policy Staff Attorney
Department of Juvenile Justice
2715 W. Monroe St.
Springfield IL  62704

217/557-1030
DJJ.Rules@illinois.gov

DEPARTMENT OF JUVENILE JUSTICE

NOTICE OF ADOPTED RULES

1) Heading of the Part: County Juvenile Detention Standards

2) Code Citation: 20 Ill. Adm. Code 2602

3) Section Numbers:        Adopted Actions:
   2602.5                  New Section
   2602.10                 New Section
   2602.20                 New Section
   2602.30                 New Section
   2602.40                 New Section
   2602.50                 New Section
   2602.60                 New Section
   2602.70                 New Section
   2602.80                 New Section
   2602.90                 New Section
   2602.100                New Section
   2602.110                New Section
   2602.120                New Section
   2602.130                New Section
   2602.140                New Section
   2602.150                New Section
   2602.160                New Section
   2602.170                New Section
   2602.180                New Section
   2602.190                New Section
   2602.200                New Section
   2602.210                New Section
   2602.220                New Section
   2602.230                New Section
   2602.240                New Section
   2602.250                New Section
   2602.260                New Section
   2602.270                New Section

4) Statutory Authority: 730 ILCS 5/3-15-2

5) Effective Date of Rules: June 29, 2021

6) Does this rulemaking contain an automatic repeal date? No

DEPARTMENT OF JUVENILE JUSTICE

NOTICE OF ADOPTED RULES

7) Does this rulemaking contain incorporations by reference? No

8) A copy of the adopted rules, including any material incorporated by reference, is on file in the Agency's principal office and is available for public inspection.

9) Notice of Proposal published in the *Illinois Register*: 45 Ill. Reg 3157; February 19, 2021

10) Has JCAR issued a Statement of Objection to this rulemaking? No

11) Differences between Proposal and Final Version: Subsection 2602.30(a)(5) was amended to state supervision by juvenile temporary detention center (JTDC) staff shall be conducted by a person of the same gender. Transgender youth shall be allowed to choose the gender of the staff. Subsection 2602.50(r)(6) was amended to clarify that JDTCs shall be exempt from the reporting of sexual abuse under the Prison Rape Elimination Act if it does not have administrative procedures as the youth reporting may proceed directly to federal court. If, the JDTC does have an administrative procedure, it shall meet the requires in that subsection. Subsection 2602.50(r)(6)(G) was amended to clarify youth who report instances of sexual abuse and who are detained in a JDTC solely on a judicial immigration warrant, shall have access to immigration services agencies in addition to outside victim's advocates. Numerous other technical changes were made to align this Part with current Administrative Code style.

12) Have all the changes agreed upon by the Agency and JCAR been made as indicated in the agreements issued by JCAR? Yes.

13) Will this rulemaking replace an emergency rule currently in effect? No

14) Are there any rulemakings pending on this Part? No

15) Summary and Purpose of Rulemaking: The Department is required to establish the minimum standards for physical conditions of the juvenile detention centers across the State. These standards have not been updated since 1988. During that time, there have been significant changes to the way youth are provided detention services. Because the amendments are extensive, the current Part 2602 has been repealed and this new Part replaced it.

To that end, this proposed new Part provides minimum standards that reflect current practices. Numerous definitions have been added. Specifically, definitions for

DEPARTMENT OF JUVENILE JUSTICE

NOTICE OF ADOPTED RULES

delinquent minor, direct staff supervision, full compliance, gender nonconforming, intersex, medical practitioner, mental health practitioner, pat-down search sexual abuse, sexual harassment, and transgender are among the new definitions. Additionally, relevant Sections of the Prison Rape Elimination Act's (PREA) (33 USC 303) federal rules (29 CFR 125) have been added. These provisions detail the guidelines the juvenile detention centers shall follow with respect to personnel matters including hiring, promotion and training; youth record keeping; medical assessment; placement of youth; grievances regarding sexual abuse and sexual harassment; searches of youth; and rules of conduct for youth while in the facility. Also, a Section for mental health services has been added allowing the juvenile detention centers to hire or contract with mental health providers. If needed once assessed, youth with significant mental health needs will have a service plan developed that will include counseling or psychotherapy, behavioral management strategies and goals, medication, protocol for monitoring progress and needed adjustments to normal detention programs and procedures. Juvenile detention centers shall also have a policy regarding suicide prevention and intervention. A Section for all grievances, other than those covered by PREA, has been added to allow youth the opportunity to file a grievance on matters such as damaged or lost personal property, staff conduct, handling of mail, dietary issues, medical or mental health treatment issues, requests for Americans with Disabilities Act accommodations, and disciplinary issues.

Other updates include clarifying that calls with attorneys are private and shall not be monitored. Juvenile detention centers, can, on a case-by-case basis, allow visits outside the normal visiting hours. Juvenile detention centers shall also prioritize family engagement when setting visitation regulations. Visitation has been increased to one hour from 30 minutes. Juvenile detention centers shall also provide an option for video conferencing. Another change clarifies at various times (following admission, after leaving the facility grounds, and after visits) youth may be strip searched only when there is individualized reasonable suspicion. Further, juvenile detention centers shall designate a qualified educational authority to provide educational services to youth. All programs shall meet all State and federal education standards. Teacher ratios shall be at least 1 teacher per every 12 general education students and 1 teacher for every 8 special education students. Juvenile detention centers shall file an annual plan no later than August 1 with the Department which shall include the number of anticipated school days, how the curriculum complies with State and federal standards, how class size will be limited and how credits will be calculated and awarded. No later than July 1 of each year, juvenile detention centers shall file with the Department an annual report that includes the number of students served, total number of days and teacher to student ratios served, total number of days and teacher to student ratios.

DEPARTMENT OF JUVENILE JUSTICE

NOTICE OF ADOPTED RULES

16)     Information and questions regarding these adopted rules shall be directed to:

Lindsay M. Bentivegna
Policy Staff Attorney
Department of Juvenile Justice
2715 W. Monroe St.
Springfield IL  62704

217/557-1030
DJJ.Rules@illinois.gov

The full text of the Adopted Rules begins on the next page:

# Exhibit 16

82°

Cape Girardeau, MO

☰ **Watch Live** **Latest Video** **First Alert Weather** **News** **Heartland Sports**    🔍

ADVERTISEMENT

# Heartland juvenile detention center called 'a facility in crisis' in 15-page inspection report



A Heartland Juvenile Detention center is a "A Facility in Crisis."

By Colin Baillie

*Published: Oct. 3, 2022 at 5:31 PM CDT*

BENTON, Ill. (KFVS) - A southern Illinois juvenile detention center is a "a facility in crisis."

That's the words used by the Illinois Department of Juvenile Justice following an inspection in Franklin County.

The full, 15-page report can be found here.

During an August 2 inspection at the Franklin County Detention Center, the Illinois Department of Juvenile Justice found what it calls "extremely low" staffing levels at the facility.

 ASK ABOUT OUR **POWERTRAIN PROMISE**  CHEVROLET  Martindale  Learn More ››

The report shows just eight full-time works and four part-time employees were working at the detention center at the time of the inspection.

Inspectors say they also found the facility to be non-compliant in several areas, including personal hygiene, food services and education.

"While the facility is still open and accepting juveniles, Jackson County's policy as of now is to locate our juveniles in other places," Joe Cervantez, Jackson County State's Attorney, said.

Cervantez often sends juvenile offenders to Franklin County, but because of this inspection that has changed.

"So we have to go to places like Madison County, St Clair County, Vigo County in Indiana," he explained.

According to the report, the acting superintendent of the Franklin County Detention Center told inspectors they've had a hard time hiring staff due to low starting wages and a requirement that employees have a bachelor's degree.

Cervantez said it is disheartening to hear the facility is in crisis.

"How can we get them back on the right path if we're forcing them to be institutionalized in places that we wouldn't want to stay ourselves," he said about the juvenile offenders. "We owe them a responsibility to get them the best facilities that we can get them while they're going through this painful moment in their life. We just absolutely have that responsibility."

"The recent report highlighting some very troubling and serious findings within the Franklin County Juvenile Detention Center is disappointing and unacceptable," said Senator Dale Fowler (R-Harrisburg).

Fowler went on to add, "For years, this vital facility has provided incarcerated and troubled youth with important resources and tools that help them become productive and lawful members of society. It cannot be neglected. Unfortunately, the Franklin County Juvenile Detention Center is just the latest example of failings within our correctional facilities across the state. Illinois must start taking these issues seriously and providing these centers with the resources they need to succeed."

This past spring session, Senator Fowler sponsored legislation, House Bill 5041, which would have assisted the Franklin County Juvenile Detention Center with recruitment, hiring and retention of correctional officers.

*Copyright 2022 KFVS. All rights reserved.*

**Locate Almost Anyone By Entering Their Name (This Is Addicting!)**

**TruthFinder** | Sponsored

**Parents Of Children With ADHD, If You Took Tylenol While Pregnant -Sign Up For A Claim**

Parents of children with autism may be entitled to significant compensation.

**Autism & ADHD Claims** | Sponsored

**Chrissy Metz, 42, Shows Off Massive Weight Loss In Fierce New Photo**

**Daily Finance Stories** | Sponsored

**Janet Jackson's Son Is All Grown Up & Might Look Familiar To You**

**Sizzlfy** | Sponsored

**"One Drop makes me so productive, I get a days work done in 3 hours"**

Try now without prescription...

**Health Headlines** | Sponsored

# Exhibit 17



# JMIS Monthly Data Report.

Calendar Year 2021 and December 2021

The Illinois Juvenile Justice Commission (IJJC) is an advisory group responsible for administering federal juvenile justice grants, ensuring compliance with the Juvenile Justice and Delinquency Prevention Act, and advising the Governor and General Assembly on matters of juvenile justice. More information about IJJC is available at http://ijjc.illinois.gov.

The Center for Prevention Research and Development (CPRD) within the School of Social Work at the University of Illinois, Urbana-Champaign, created this report. CPRD seeks to support public policy in three ways: improving state and community capacity for prevention; improving prevention and educational practices through research and evaluation; and improving policies and decision making. More information about CPRD is available at http://www.cprd.illinois.edu





# Introduction to JMIS Monthly Data Report

This report provides a summary of juvenile detention admissions for December 2021, comparison data between December 2020 and December 2021, Length of Stay for calendar year 2021, Admissions by Age for calendar year 2021 and summaries on Presenting Offense.

## Data Source

Juvenile detention data derived from the Juvenile Monitoring Information System (JMIS). JMIS is a web-based data platform, which gathers and disseminates data on the detention of youth in all juvenile detention facilities in Illinois. JMIS is a collaborative data system funded by the Illinois Juvenile Justice Commission with support from the Illinois Department of Human Services. JMIS is maintained by the Center for Prevention Research and Development, in the School of Social Work at the University of Illinois, Urbana-Champaign.

The Administrative Office of the Illinois Courts requires counties to report data on every admission of a youth to detention. Each detention center utilizes its own data collection system to process, track and monitor youth in their facility. Each detention center is responsible for getting their data into the JMIS system, either by uploading or hand entry, to populate JMIS with de-identified data for state and local analysis and planning. It is the responsibility of the detention centers to ensure that their data are accurate and complete in JMIS.

*JMIS is a dynamic database constantly updated by the 16 juvenile detention centers in Illinois. Therefore, the data submission frequency of any given detention center may affect the data contained within this report.* ***The data for this report was pulled from the JMIS database on February 2, 2022****. When detention centers experience technical difficulties with either uploading or manually entering data into JMIS, a notation has been added to the resulting summaries that have been affected.*

# State of Illinois Summary

This section provides a brief analysis of juvenile detention admissions for the state of Illinois. For the reporting period of December 2021, there were 422 admissions reported. A further breakdown of the admissions for this month can be found in the following tables and figures.

**Juvenile Detention Admissions in Illinois by December 2021 by Gender, Ethnicity and Race, # and %**

| Table 1 Report Month Gender | | Table 2 Report Month Ethnicity | | Table 3 Report Month Race | |
|---|---|---|---|---|---|
| Female | 60 | Hispanic | 57 | Black/African American | 241 |
| Male | 362 | Non-Hispanic | 365 | White | 149 |
| | | | | Other | 21 |
| | | | | Multi-Racial | 11 |



Figure 1 Gender by %     Figure 2 Ethnicity by %     Figure 3 Race by %

# Illinois Juvenile Detention Center Summary

## Detention Center by Average Daily Population

This summary provides a summary of Average Daily Population (ADP) and Admissions by juvenile detention center.

Table 4
Detention Center Average Daily Population (ADP) and Admissions.

| Detention Center | November 2021 ADP | December 2021 ADP | December 2020 ADP | November 2021 Admissions | December 2021 Admissions | December 2020 Admissions |
|---|---|---|---|---|---|---|
| Adams County Youth Home | 9.3 | 13.0 | 10.1 | 10 | 6 | 4 |
| Champaign County Youth Home | 14.7 | 15.5 | 14.8 | 12 | 17 | 15 |
| Cook County Juvenile Detention Center | 171.4 | 157.7 | 168.5 | 121 | 117 | 125 |
| Franklin County Juvenile Detention | 15.3 | 14.2 | 16.5 | 14 | 18 | 9 |
| Kane County Detention Center | 27.5 | 28.9 | 31.0 | 38 | 61 | 32 |
| Knox County Mary Davis Detention | 11.4 | 18.3 | 13.7 | 17 | 34 | 15 |
| Lake County Detention Center | 15.9 | 17.4 | 13.6 | 17 | 16 | 11 |
| LaSalle County Detention Center | 5.1 | 3.8 | 5.6 | 3 | 3 | 5 |
| Madison County Detention Center | 11.6 | 15.9 | 22.4 | 21 | 18 | 10 |
| McLean County Juvenile Detention Center | 9.7 | 9.9 | 12.9 | 19 | 14 | 19 |
| Peoria County Detention Center | 23.1 | 23.0 | 21.7 | 36 | 47 | 27 |
| Sangamon County Detention Center | 10.3 | 13.3 | 7.3 | 20 | 13 | 9 |
| St. Clair County Detention Center | 16.9 | 11.0 | 24.0 | 22 | 13 | 0 |
| Vermilion Juvenile Detention Center | 13.7 | 12.6 | 13.4 | 12 | 6 | 10 |
| Will County Juvenile Detention Center | 19.0 | 14.5 | 21.5 | 28 | 15 | 21 |
| Winnebago County Detention Center | 23.4 | 23.4 | 19.3 | 27 | 24 | 19 |
| **State of Illinois Total** | **398.2** | **392.4** | **416.3** | **417.0** | **422.0** | **331.0** |

# Detention Center Admissions by Age

This summary provides a breakdown of juvenile detention admissions by age for the calendar year 2021 by juvenile detention center.

Table 5
2021 Detention Center Admissions by Age by Calendar Year 2021 (January 1, 2021 through December 31, 2021)

| Detention Center | Age 10 | Age 11 | Age 12 | Age 13 | Age 14 | Age 15 | Age 16 | Age 17 | Age >17 | Total Admissions |
|---|---|---|---|---|---|---|---|---|---|---|
| Adams County Youth Home | | | 1 | 4 | 19 | 24 | 34 | 26 | | **108** |
| Champaign County Youth Home | | | | 9 | 26 | 37 | 42 | 37 | 2 | **153** |
| Cook County Juvenile Detention Center | | 3 | 8 | 41 | 127 | 262 | 425 | 626 | 85 | **1577** |
| Franklin County Juvenile Detention | | 1 | 2 | 17 | 34 | 37 | 63 | 71 | 10 | **235** |
| Kane County Detention Center | | | 9 | 22 | 50 | 91 | 118 | 151 | 52 | **493** |
| Knox County Mary Davis Detention | 1 | 1 | 4 | 23 | 47 | 55 | 55 | 83 | 5 | **274** |
| Lake County Detention Center | | | 1 | 11 | 19 | 38 | 34 | 46 | 8 | **157** |
| LaSalle County Detention Center | | | | 2 | 13 | 15 | 12 | 15 | | **57** |
| Madison County Detention Center | | | 1 | 11 | 21 | 44 | 45 | 51 | 15 | **188** |
| McLean County Juvenile Detention Center | | | 1 | 10 | 11 | 19 | 45 | 43 | 7 | **136** |
| Peoria County Detention Center | | 3 | 6 | 41 | 75 | 111 | 102 | 108 | 28 | **474** |
| Sangamon County Detention Center | | 2 | 3 | 14 | 16 | 26 | 37 | 54 | 1 | **153** |
| St. Clair County Detention Center | 1 | 1 | 1 | 9 | 28 | 41 | 61 | 71 | | **213** |
| Vermilion Juvenile Detention Center | | 2 | 2 | 8 | 16 | 26 | 38 | 33 | 1 | **126** |
| Will County Juvenile Detention Center | | | 1 | 16 | 20 | 39 | 65 | 79 | 1 | **221** |
| Winnebago County Detention Center | | | 10 | 13 | 14 | 33 | 79 | 78 | 23 | **250** |
| **State of Illinois Total** | **2** | **13** | **50** | **251** | **536** | **898** | **1255** | **1572** | **238** | **4815** |

## Detention Center by Length of Stay

This summary provides an analysis of a youth's Length of Stay (LOS) for calendar year 2021 by Detention Center. This is the complete time the youth is housed in a detention facility from admission. LOS is calculated based upon the admission and release dates and times for each admission. It is possible that the admission date occurred in calendar year 2020, prior to this reporting period, and the release date occurred in this reporting period.

Table 6
2021 Detention Center Length of Stay Category by Days. (January 1, 2021 through December 31, 2021)

| Detention Center | <1-3 Days | 4-8 Days | 9-30 Days | > 30 Days | Total Admissions |
|---|---|---|---|---|---|
| Adams County Youth Home | 40 | 20 | 23 | 25 | **108** |
| Champaign County Youth Home | 68 | 25 | 37 | 23 | **153** |
| Cook County Juvenile Detention Center | 751 | 174 | 307 | 345 | **1577** |
| Franklin County Juvenile Detention | 87 | 41 | 64 | 44 | **236** |
| Kane County Detention Center | 211 | 102 | 101 | 79 | **493** |
| Knox County Mary Davis Detention | 77 | 44 | 115 | 38 | **274** |
| Lake County Detention Center | 64 | 21 | 32 | 40 | **157** |
| LaSalle County Detention Center | 9 | | 26 | 22 | **57** |
| Madison County Detention Center | 78 | 45 | 37 | 28 | **188** |
| McLean County Juvenile Detention Center | 55 | 16 | 43 | 22 | **136** |
| Peoria County Detention Center | 217 | 117 | 81 | 59 | **474** |
| Sangamon County Detention Center | 77 | 24 | 37 | 15 | **153** |
| St. Clair County Detention Center | 108 | 30 | 50 | 25 | **213** |
| Vermilion Juvenile Detention Center | 56 | 15 | 29 | 26 | **126** |
| Will County Juvenile Detention Center | 114 | 11 | 63 | 33 | **221** |
| Winnebago County Detention Center | 88 | 43 | 67 | 52 | **250** |
| **State of Illinois Total** | **2100** | **728** | **1112** | **876** | **4816** |



Figure 4 2021 Detention Center Admissions by Length of Stay Category, %

# Illinois Authorizing County Detention Summary

This section of the report summaries detention admissions by Authorizing County. Authoring County represents the county which authorizes the youth to be admitted and held in a juvenile detention facility. Illinois has a total of 102 Authoring Counties. For the purposes of this report, only the 25 Authoring Counties with the highest number of admissions for calendar year 2021 are summarized within this report.

## Authorizing County by Average Daily Population

The following table summarizes the top 25 Authorizing Counties by ADP and Admissions.

Table 7
Top 25 Authorizing County Average Daily Population and Admissions

| Authorizing County | November 2021 ADP | December 2021 ADP | December 2020 ADP | November 2021 Admissions | December 2021 Admissions | December 2020 Admissions |
|---|---|---|---|---|---|---|
| Cook County | 171.4 | 157.7 | 168.5 | 121 | 117 | 125 |
| Peoria County | 18.6 | 16.3 | 15.8 | 33 | 42 | 19 |
| Winnebago County | 16.8 | 17.4 | 19.2 | 19 | 18 | 19 |
| DuPage County | 9.3 | 7.3 | 3.5 | 20 | 16 | 10 |
| Madison County | 11.0 | 14.0 | 22.1 | 19 | 15 | 10 |
| St. Clair County | 13.8 | 10.6 | 23.0 | 19 | 12 | 0 |
| Kane County | 8.1 | 10.5 | 17.2 | 7 | 22 | 16 |
| Lake County | 15.9 | 17.4 | 13.6 | 17 | 16 | 11 |
| Will County | 11.4 | 9.1 | 14.4 | 21 | 12 | 16 |
| Sangamon County | 9.5 | 14.3 | 7.1 | 19 | 14 | 8 |
| Champaign County | 15.0 | 16.6 | 14.7 | 13 | 18 | 14 |
| Rock Island County | 4.6 | 6.6 | 6.5 | 11 | 14 | 8 |
| Vermilion County | 10.0 | 9.2 | 11.5 | 10 | 2 | 8 |
| Kankakee County | 7.6 | 5.5 | 7.1 | 7 | 3 | 5 |
| LaSalle County | 5.1 | 3.3 | 7.7 | 3 | 2 | 5 |
| Macon County | 2.1 | 2.6 | 2.7 | 2 | 3 | 1 |
| McLean County | 4.7 | 2.8 | 6.9 | 8 | 4 | 10 |
| Jefferson County | 2.6 | 1.0 | 0.9 | 3 | 1 | 1 |
| Kendall County | 3.4 | 3.7 | 1.1 | 2 | 9 | 1 |
| Knox County | 0.5 | 3.4 | 0.9 | 0 | 8 | 1 |
| Adams County | 5.8 | 8.1 | 6.1 | 4 | 3 | 1 |
| Marion County | 1.2 | 1.2 | 0.5 | 2 | 3 | 0 |
| Boone County | 6.6 | 6.7 | 0.1 | 8 | 9 | 0 |
| Out-of-State | 3.1 | 3.4 | 1.0 | 3 | 3 | 2 |
| Tazewell County | 2.3 | 2.2 | 2.2 | 0 | 1 | 6 |

# Authorizing County by Admissions by Age

This table provides a summary of the top 25 Authorizing Counties admissions by age for calendar year 2021.

Table 8
Top 25 Authorizing County Admissions by Age (January 1, 2021 through December 31, 2021)

| Authorizing County | Age 10 | Age 11 | Age 12 | Age 13 | Age 14 | Age 15 | Age 16 | Age 17 | Age >17 | Total Admissions |
|---|---|---|---|---|---|---|---|---|---|---|
| Cook County | | 3 | 8 | 41 | 127 | 262 | 426 | 627 | 85 | **1579** |
| Peoria County | | 3 | 5 | 36 | 67 | 89 | 76 | 84 | 20 | **380** |
| Winnebago County | | | 10 | 13 | 13 | 25 | 59 | 71 | 23 | **214** |
| DuPage County | | | 3 | 8 | 19 | 39 | 32 | 53 | 39 | **193** |
| Madison County | | | 1 | 10 | 21 | 44 | 42 | 48 | 15 | **181** |
| St. Clair County | | 1 | 1 | 7 | 20 | 30 | 54 | 58 | | **171** |
| Kane County | | | 1 | 8 | 19 | 24 | 48 | 44 | 13 | **157** |
| Lake County | | | 1 | 11 | 19 | 38 | 34 | 46 | 8 | **157** |
| Will County | | | 1 | 10 | 15 | 27 | 44 | 56 | 1 | **154** |
| Sangamon County | | 2 | 3 | 14 | 16 | 27 | 37 | 51 | 1 | **151** |
| Champaign County | | | | 9 | 26 | 34 | 44 | 37 | 1 | **151** |
| Rock Island County | 1 | 1 | 1 | 12 | 29 | 33 | 22 | 45 | 1 | **145** |
| Vermilion County | | 2 | | 6 | 11 | 22 | 27 | 19 | | **87** |
| Kankakee County | | | | 6 | 5 | 12 | 21 | 22 | | **66** |
| LaSalle County | | | | 2 | 13 | 15 | 12 | 13 | | **55** |
| Macon County | | | | 2 | 5 | 13 | 15 | 18 | 1 | **54** |
| McLean County | | | | | 3 | 3 | 19 | 20 | 6 | **51** |
| Jefferson County | | | | 7 | 10 | 6 | 16 | 9 | 2 | **50** |
| Kendall County | | | | | 5 | 14 | 14 | 15 | 1 | **49** |
| Knox County | | | | 2 | 11 | 7 | 10 | 14 | 1 | **45** |
| Adams County | | | | | 6 | 10 | 15 | 12 | | **43** |
| Marion County | | | | 1 | 6 | 5 | 12 | 16 | 1 | **41** |
| Boone County | | | | | 1 | 8 | 20 | 11 | | **40** |
| Out-of-State | | | 2 | 3 | 7 | 5 | 12 | 7 | | **36** |
| Tazewell County | | | | 3 | 4 | 6 | 8 | 8 | 7 | **36** |

## Authorizing County by Length of Stay

The table below provides an analysis of the LOS by Authorizing County for the calendar year 2021.

Table 9
Top 25 Authorizing County by Length of Stay Category, Days (January 1, 2021 through December 31, 2021)

| Authorizing County | <1-3 Days | 4-8 Days | 9-30 Days | > 30 Days | Total Admissions |
|---|---|---|---|---|---|
| Cook County | 752 | 175 | 307 | 345 | 1579 |
| Peoria County | 186 | 85 | 62 | 47 | 380 |
| Winnebago County | 81 | 37 | 54 | 42 | 214 |
| DuPage County | 89 | 47 | 34 | 23 | 193 |
| Madison County | 78 | 45 | 30 | 28 | 181 |
| St. Clair County | 89 | 22 | 42 | 18 | 171 |
| Kane County | 63 | 26 | 40 | 28 | 157 |
| Lake County | 64 | 21 | 32 | 40 | 157 |
| Will County | 73 | 6 | 50 | 25 | 154 |
| Sangamon County | 77 | 23 | 36 | 15 | 151 |
| Champaign County | 68 | 25 | 35 | 23 | 151 |
| Rock Island County | 44 | 22 | 63 | 16 | 145 |
| Vermilion County | 47 | 6 | 13 | 21 | 87 |
| Kankakee County | 40 | 5 | 13 | 8 | 66 |
| LaSalle County | 8 | | 25 | 22 | 55 |
| Macon County | 17 | 22 | 7 | 8 | 54 |
| McLean County | 27 | 5 | 12 | 7 | 51 |
| Jefferson County | 21 | 3 | 17 | 9 | 50 |
| Kendall County | 26 | 5 | 7 | 11 | 49 |
| Knox County | 12 | 11 | 18 | 4 | 45 |
| Adams County | 18 | 9 | 5 | 11 | 43 |
| Marion County | 16 | 3 | 18 | 4 | 41 |
| Boone County | 9 | 7 | 14 | 10 | 40 |
| Out-of-State | 9 | 12 | 9 | 6 | 36 |
| Tazewell County | 9 | 10 | 16 | 1 | 36 |

Presenting Offense Summary

**Uniform Crime Reporting Categories**

The following provides a summary of presenting offense by uniform crime reporting category.

Table 10
Report Month by Admissions by UCR Offense
Category

| UCR Category | # Admissions | % Admissions |
|---|---|---|
| Status Offense | 0 | 0% |
| Contempt | 2 | 0% |
| Sex | 4 | 1% |
| Drug | 4 | 1% |
| Violations | 19 | 5% |
| Property | 76 | 18% |
| Warrant | 88 | 21% |
| Violent | 111 | 26% |
| Other | 118 | 28% |
| **Total** | **422** | **100%** |



**Figure 5 Report Month Admissions by UCR Category**

## Other Category

This sub-section provides a closer review of the UCR Category of Other.  The following table provides a summary of Other Category Presenting Offenses with greater than five admissions.

Table 11
Report Month by Other Category Admissions >5

| Presenting Offense | Admissions |
|---|---|
| Unlawful Use of a Weapon | 67 |
| Disorderly Conduct | 21 |
| All Other Criminal Offenses | 7 |
| Unlawful Use or Possession of a Weapon by a Felon | 7 |

## Violent Category

This sub-section provides a closer review of the UCR Category of Violent.  The following table provides a summary of Violent Category Presenting Offenses with greater than four admissions.

Table 12
Report Month by Violent Category Admissions > 5

| Presenting Offense | Admissions |
|---|---|
| Aggravated Battery | 40 |
| Domestic Battery | 31 |
| Armed Robbery | 7 |
| Battery | 6 |

## Presenting Offense

This summary provides a summary of the top ten presenting offenses.

Table 13
Report Month by Admissions by Top Ten Presenting Offenses

| Presenting Offense | Admissions |
|---|---|
| Warrant -- Delinquent | 85 |
| Unlawful Use of a Weapon | 67 |
| Aggravated Battery | 40 |
| Domestic Battery | 31 |
| Disorderly Conduct | 21 |
| Probation Violation | 19 |
| Vehicular Hijacking | 18 |
| Motor Vehicle Theft | 12 |
| Residential Burglary -- Forcible Entry | 10 |
| Burglary | 8 |

## Presenting Offense by Authorizing County

This summary provides a review of Authorizing County by Presenting Offense.

**Table 14**
**Report Month 2021 Admissions by Authorizing County by Presenting Offense**

| Authorizing County | Presenting Offense | |
|---|---|---|
| **Adams County** | **Total** | **3** |
| | Child Pornography | 1 |
| | Warrant -- Delinquent | 1 |
| | Residential Burglary -- Forcible Entry | 1 |
| **Bond County** | **Total** | **1** |
| | Warrant -- Delinquent | 1 |
| **Boone County** | **Total** | **9** |
| | Probation Violation | 4 |
| | Warrant -- Delinquent | 2 |
| | Unlawful Use of a Weapon | 2 |
| | Disorderly Conduct | 1 |
| **Bureau County** | **Total** | **1** |
| | Burglary from Motor Vehicle | 1 |
| **Calhoun County** | **Total** | **1** |
| | Criminal Sexual Assault | 1 |
| **Carroll County** | **Total** | **1** |
| | Residential Burglary -- Forcible Entry | 1 |
| **Champaign County** | **Total** | **18** |

| | | |
|---|---|---:|
| | Aggravated Battery | 5 |
| | Warrant -- Delinquent | 4 |
| | Motor Vehicle Theft | 3 |
| | Unlawful Possession of Firearms and Firearm Ammunition | 2 |
| | Armed Robbery | 1 |
| | Burglary from Motor Vehicle | 1 |
| | Residential Burglary -- Forcible Entry | 1 |
| | Retail Theft | 1 |
| **Cook County** | **Total** | **117** |
| | Unlawful Use of a Weapon | 40 |
| | Warrant -- Delinquent | 22 |
| | Vehicular Hijacking | 17 |
| | Aggravated Battery | 6 |
| | Battery | 5 |
| | Unlawful Use or Possession of a Weapon by a Felon | 4 |
| | Armed Robbery | 3 |
| | Aggravated Discharge of a Firearm | 3 |
| | Murder -- First Degree | 2 |
| | Stolen Property -- Receiving, Possession | 2 |
| | Domestic Battery | 2 |
| | Disorderly Conduct | 2 |
| | Criminal Trespass to Vehicle | 2 |
| | Aggravated Vehicular Hijacking | 1 |
| | Arson | 1 |
| | Armed Violence | 1 |
| | Possession of Controlled Substance | 1 |
| | Domestic Dispute | 1 |
| | Burglary | 1 |
| | Aggravated Assault | 1 |
| **DeKalb County** | **Total** | **3** |
| | Motor Vehicle Theft | 1 |
| | Warrant -- Delinquent | 1 |
| | Unlawful Use of a Weapon | 1 |
| **DeWitt County** | **Total** | **2** |
| | Probation Violation | 1 |
| | Criminal Sexual Assault | 1 |
| **Douglas County** | **Total** | **1** |
| | All Other Criminal Offenses | 1 |
| **DuPage County** | **Total** | **16** |
| | Domestic Battery | 4 |
| | Warrant -- Delinquent | 4 |
| | Disorderly Conduct | 2 |
| | All Other Criminal Offenses | 1 |
| | Aggravated Discharge of a Firearm | 1 |
| | Motor Vehicle Theft | 1 |
| | Aggravated Battery | 1 |
| | Burglary | 1 |
| | Criminal Damage to Government Supported Property | 1 |
| **Edgar County** | **Total** | **1** |
| | Aggravated Battery | 1 |
| **Effingham County** | **Total** | **3** |
| | Aggravated Battery | 1 |
| | Possession of Controlled Substance | 1 |
| | Armed Robbery | 1 |
| **Franklin County** | **Total** | **1** |

| County | Offense | Count |
|---|---|---|
| | Aggravated Battery | 1 |
| **Hancock County** | **Total** | **1** |
| | Aggravated Battery | 1 |
| **Henderson County** | **Total** | **2** |
| | Warrant -- Delinquent | 1 |
| | Intimidation | 1 |
| **Henry County** | **Total** | **1** |
| | Unlawful Use of a Weapon | 1 |
| **Iroquois County** | **Total** | **2** |
| | Mob Action | 1 |
| | Aggravated Battery | 1 |
| **Jackson County** | **Total** | **4** |
| | Warrant -- Delinquent | 1 |
| | Robbery | 1 |
| | Aggravated Battery | 1 |
| | Aggravated Kidnapping | 1 |
| **Jefferson County** | **Total** | **1** |
| | Aggravated Battery | 1 |
| **Jersey County** | **Total** | **1** |
| | Probation Violation | 1 |
| **Kane County** | **Total** | **22** |
| | Aggravated Battery | 8 |
| | Warrant -- Delinquent | 3 |
| | Disorderly Conduct | 3 |
| | Domestic Battery | 3 |
| | Possession of Controlled Substance | 1 |
| | All Other Criminal Offenses | 1 |
| | Aggravated Domestic Battery | 1 |
| | Motor Vehicle Theft | 1 |
| | Possession of Burglary Tools | 1 |
| **Kankakee County** | **Total** | **3** |
| | Aggravated Assault | 1 |
| | Criminal Damage to Property | 1 |
| | Arson | 1 |
| **Kendall County** | **Total** | **9** |
| | Disorderly Conduct | 3 |
| | Unlawful Use of a Weapon | 2 |
| | Warrant -- Delinquent | 2 |
| | Domestic Battery | 2 |
| **Knox County** | **Total** | **8** |
| | Warrant -- Delinquent | 2 |
| | Aggravated Battery | 2 |
| | Assault | 2 |
| | Unlawful Use or Possession of a Weapon by a Felon | 1 |
| | Residential Burglary -- Forcible Entry | 1 |
| **Lake County** | **Total** | **16** |
| | Warrant -- Delinquent | 5 |
| | Unlawful Use of a Weapon | 4 |
| | Resist, Obstruct, or Disarm a Peace Officer | 1 |
| | Criminal Damage to Property | 1 |
| | Unlawful Possession of Firearms and Firearm Ammunition | 1 |
| | Burglary | 1 |
| | Battery | 1 |
| | Disorderly Conduct | 1 |
| | Domestic Battery | 1 |

| County | Offense | Count |
|--------|---------|------:|
| **LaSalle County** | **Total** | **2** |
| | Warrant -- Delinquent | 2 |
| **Lee County** | **Total** | **1** |
| | Burglary | 1 |
| **Macon County** | **Total** | **3** |
| | Armed Violence | 1 |
| | Unlawful Use of a Weapon | 1 |
| | Stolen Property -- Receiving, Possession | 1 |
| **Madison County** | **Total** | **15** |
| | Domestic Battery | 5 |
| | Warrant -- Delinquent | 4 |
| | Armed Robbery | 2 |
| | Assault | 1 |
| | Unlawful Use or Possession of a Weapon by a Felon | 1 |
| | Making a Terrorist Threat | 1 |
| | Aggravated Battery | 1 |
| **Marion County** | **Total** | **3** |
| | Aggravated Battery | 1 |
| | Making a Terrorist Threat | 1 |
| | Criminal Damage to Property | 1 |
| **Mason County** | **Total** | **1** |
| | Warrant -- Delinquent | 1 |
| **McDonough County** | **Total** | **3** |
| | Residential Burglary -- Forcible Entry | 2 |
| | Disorderly Conduct | 1 |
| **McHenry County** | **Total** | **6** |
| | Warrant -- Delinquent | 3 |
| | Domestic Battery | 1 |
| | Aggravated Battery | 1 |
| | Disorderly Conduct | 1 |
| **McLean County** | **Total** | **4** |
| | Warrant -- Delinquent | 2 |
| | Aggravated Battery | 1 |
| | Contempt of Court -- Del. | 1 |
| **Morgan County** | **Total** | **1** |
| | Aggravated Battery | 1 |
| **Moultrie County** | **Total** | **3** |
| | All Other Criminal Offenses | 1 |
| | Warrant -- Delinquent | 1 |
| | Burglary | 1 |
| | Out-of-State | 3 |
| | Probation Violation | 2 |
| | Arson | 1 |
| **Peoria County** | **Total** | **42** |
| | Probation Violation | 6 |
| | Motor Vehicle Theft | 5 |
| | Unlawful Use of a Weapon | 5 |
| | Warrant -- Delinquent | 5 |
| | Criminal Damage to Airport | 4 |
| | Domestic Battery | 3 |
| | Disorderly Conduct | 3 |
| | Theft of Labor, Services, Use of Property | 1 |
| | Criminal Trespass to Vehicle | 1 |
| | Vehicular Hijacking | 1 |
| | Aggravated Assault | 1 |

| | | |
|---|---|---:|
| | Theft from Motor Vehicle | 1 |
| | Aggravated Robbery | 1 |
| | Burglary | 1 |
| | Assault | 1 |
| | Aggravated Criminal Sexual Abuse | 1 |
| | Bomb Threat | 1 |
| | Residential Burglary -- Forcible Entry | 1 |
| **Pulaski County** | **Total** | **1** |
| | Unlawful Use of a Weapon | 1 |
| **Richland County** | **Total** | **1** |
| | Warrant -- Delinquent | 1 |
| **Rock Island County** | **Total** | **14** |
| | Warrant -- Delinquent | 5 |
| | Criminal Damage to Property | 2 |
| | Domestic Battery | 2 |
| | Unlawful Use or Possession of a Weapon by a Felon | 1 |
| | Residential Burglary -- Forcible Entry | 1 |
| | Probation Violation | 1 |
| | Aggravated Battery | 1 |
| | Possession of Controlled Substance | 1 |
| **Saline County** | **Total** | **3** |
| | Bomb Threat | 2 |
| | Warrant -- Delinquent | 1 |
| **Sangamon County** | **Total** | **14** |
| | All Other Criminal Offenses | 3 |
| | Warrant -- Delinquent | 3 |
| | Stolen Property -- Receiving, Possession | 2 |
| | Residential Burglary -- Forcible Entry | 2 |
| | Aggravated Battery | 2 |
| | Defacing Identification Mark of Firearm | 1 |
| | Murder -- First Degree | 1 |
| **Scott County** | **Total** | **3** |
| | $300 and Under | 1 |
| | Involuntary Manslaughter -- Non-Vehicle | 1 |
| | Burglary | 1 |
| **St. Clair County** | **Total** | **12** |
| | Unlawful Use of a Weapon | 6 |
| | Probation Violation | 2 |
| | Domestic Battery | 2 |
| | Aggravated Assault | 1 |
| | Aggravated Battery | 1 |
| **Stephenson County** | **Total** | **1** |
| | Aggravated Domestic Battery | 1 |
| **Tazewell County** | **Total** | **1** |
| | Burglary | 1 |
| **Vermilion County** | **Total** | **2** |
| | Warrant -- Delinquent | 1 |
| | Unlawful Use of a Weapon | 1 |
| **Warren County** | **Total** | **1** |
| | Disorderly Conduct | 1 |
| **Will County** | **Total** | **12** |
| | Domestic Battery | 4 |
| | Warrant -- Other (Name It) | 2 |
| | Robbery | 2 |
| | Contempt of Court -- Other (Name It) | 1 |

| | | |
|---|---|---:|
| | Warrant -- Delinquent | 1 |
| | All Other Disorderly Conduct | 1 |
| | Unlawful Use of a Weapon | 1 |
| **Williamson County** | **Total** | **1** |
| | Resist, Obstruct, or Disarm a Peace Officer | 1 |
| **Winnebago County** | **Total** | **18** |
| | Warrant -- Delinquent | 6 |
| | Disorderly Conduct | 3 |
| | Probation Violation | 2 |
| | Unlawful Use of a Weapon | 2 |
| | Aggravated Battery | 1 |
| | Burglary from Motor Vehicle | 1 |
| | Murder -- First Degree | 1 |
| | Domestic Battery | 1 |
| | Motor Vehicle Theft | 1 |
| **Woodford County** | **Total** | **3** |
| | Aggravated Battery | 1 |
| | Violation of HDET | 1 |
| | Domestic Battery | 1 |
| | **Grand Total** | **422** |

# Exhibit 18

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| L.S., on behalf of himself and all others similarly situated, by his next friend JASON MAURER, | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| FRANKLIN COUNTY, CHIEF JUDGE MELISSA MORGAN of the Second Judicial Circuit Court, DARLA FITZJERRELLS, Director of Court Services of the Second Judicial Circuit Court, and LAVONDA PORTER, Acting Superintendent of the Franklin County Juvenile Detention Center, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Case No. _____

Hon. _____

## DECLARATION OF LOUIS KRAUS, M.D.

I, Louis Kraus, pursuant to 28 U.S.C. § 1746, declare as follows:

### Expert Qualifications

1.      I am currently Professor and Division Director of Child and Adolescent Psychiatry at Rush University Medical Center in Chicago, Illinois. In that capacity, I supervise and train child and adolescent psychiatry fellows in various placements, including in-patient, residential treatment, and outpatient programs for children, adolescents, and young adults. I am also currently the Psychiatric Director at the Sonia Shankman Orthogenic School, a day treatment program for children and adolescents in need of support for profound emotional issues; the Founding Director of the Autism Assessment, Research, Treatment and Services Center ("AARTS") at Rush University Medical Center; and the Medical Director of the Chicago Metropolitan Easter Seals

Therapeutic School, a school providing a continuum of services for children with autism. I also have a private practice where I assess and treat children and adolescents and provide therapy and psychopharmacological services.

2.     I have worked with juveniles in correctional settings for the past 33 years, including for nine years from 1990 to 1999 as the treating psychiatrist at the Illinois Maximum Security Youth Center in Joliet, Illinois. From 2003 to 2004, I was a consultant to the Civil Rights Division of the United States Department of Justice on a Civil Rights of Institutionalized Person Act (CRIPA) investigation in Maryland. I also consulted with the American Civil Liberties Union of Illinois in a case challenging conditions in the Cook County Juvenile Temporary Detention Center which resulted in system-wide restructuring of mental health services for juveniles held in pretrial detention. I have served as a consultant on various other correctional and juvenile justice matters. I more recently worked as an expert in Palm Beach County, New York, and in several cases in Seattle, Washington.

3.     I have been appointed to serve as monitor in consent decrees involving reform in juvenile justice systems in Arizona and Illinois, both of which included reform to the use of solitary confinement against juveniles in those systems. In my monitor role in Illinois, which is currently ongoing, I am assessing and restructuring the mental health programming of the Illinois Department of Juvenile Justice. *See R.J. v. Mueller*, No. 1:12-cv-07289 (N.D. Ill. Sept. 2012). In the Arizona case, I assisted the Department of Justice from 2005 to 2008 in restructuring the mental health, medical services, and dental services in two state facilities. *See United States v. Arizona*, No. 2:04-cv-01926-EHC (D. Ariz. Sept. 2004).

4.     I have also been involved in special education consulting and development of Individualized Education Programs and Plans ("IEPs") for the past twenty-six years. I am currently

a consultant on special education issues to over fifteen school districts in Illinois. I typically complete one educational evaluation every week, assist with developing IEPs, and attend IEP meetings. I have testified regarding special education issues in due process hearings under the Individuals with Disabilities Education Act as well as in other civil cases.

5.      I have authored a number of publications on treatment of juveniles in correctional settings. I am the primary author of the American Academy of Child and Adolescent Psychiatry's ("AACAP") Policy Statement on Solitary Confinement. I assisted in the completion of the American Psychological Association policy statement on Solitary Confinement of Juveniles. I co-edited two monographs on juvenile justice reform for the AACAP, I co-edited a book through Cambridge University Press entitled *The Mental Health Needs of Young Offenders*, and also edited a book through the Child and Adolescent Psychiatric Clinics of North America entitled *Adjudicated Youth*, published in January of 2016. I wrote the Practice Parameter for Child and Adolescent Forensic Evaluations for child and adolescent psychiatry, which was published in the Journal of Child and Adolescent Psychiatry.

6.      I have served in a number of professional appointments in my field. From June 2014 to 2015, I served as the chair-elect of the American Medical Association's Council on Science and Public Health, and from 2015 to 2016, I served as chair. From May 2012 to May 2015, I was the chair of the American Psychiatric Association's Council on Children, Adolescents and Their Families, which I had served in as a member for 18 years. From October 2000 to October 2015, I was the chair of the AACAP's Juvenile Justice Reform Committee, and from 2011 to 2013, I was chair of the AACAP Assembly.

7.      I was on the Board of Directors of the National Commission of Correctional Health Care ("NCCHC") from 1997 to 2003. I was appointed chairman of the NCCHC Committee on

Juvenile Health Care from 1999 to 2003 and served as vice-chairman of the same committee in 1998.

8.      I obtained my Doctor of Medicine degree, M.D., from the Chicago Medical School in 1987 and my Bachelor of Science degree, B.S., from Syracuse University in 1983.

9.      I include a copy of my Curriculum Vitae to this report which includes all publications that I have authored in the previous ten years. *See* Exhibit A. I also include a list of the cases that I have testified in as an expert at trial or deposition during the past four years. *See* Exhibit B.

**Professional Opinions Regarding Practice of Solitary Confinement**

10.     In this present case, I was asked by the ACLU of Illinois to evaluate the effects of solitary confinement on children in connection with this action challenging the conditions of confinement at the Franklin County Juvenile Detention Center ("FCJDC") in Benton, Illinois.

11.     For the purpose of preparing this declaration, I reviewed the Illinois Department of Juvenile Justice's August 2022 audit of FCJDC, which described the facility's use of solitary confinement, among other things. I also reviewed the complaint in this case and the declarations of the young people that were submitted with the complaint in this case. I understand that FCJDC's policy and practice is to isolate children in solitary confinement for more than 20 hours a day and sometimes for days at a time, in locked cells alone, depriving them of meaningful social interaction, environmental stimulation, outdoor recreation, educational instruction, access to personal property, and adequate sanitation.

12.     I also understand that there are no mental health professionals or counselors employed at FCJDC.

13.     It is my professional view, based on over three decades of academic and

professional experience, that children detained in extended solitary confinement as described above and by IDJJ's report—whether for administrative or disciplinary reasons—are at risk of serious harm.

14.     The AACAP defines solitary confinement as the placement of an incarcerated individual "in a locked room or cell with minimal or no contact with people other than staff of the correctional facility." The NCCHC defines solitary confinement or "isolation" as "the housing of an adult or juvenile with minimal to rare meaningful contact with other individuals" who "often experience sensory deprivation and are offered few or no educational, vocational, or rehabilitative programs."

15.     Solitary confinement can be dangerous for anyone, but juveniles are especially susceptible to the severe and devastating psychological impacts of solitary confinement because of their ongoing physical, social, psychological, and neurological development.

16.     The risk of harm from solitary confinement exists for all children, even for short periods of time, and increases with the length of confinement.

17.     Medical research on adolescent brains explains why juveniles are more vulnerable to the negative effects of solitary confinement. In the adolescent and young adult brain, the connections between the frontal lobe and the mid-brain have not fully developed. The mid-brain, which is the part of the brain responsible for the flight-or-fight response, is firing away. If an adolescent is traumatized in certain ways, it can cause permanent changes in brain development and create a higher risk of developing permanent psychiatric symptoms like paranoia and anxiety. This trauma in the developing brain can likely lead to changes in brain structure for these juveniles. Trauma, such as what is induced by solitary confinement, has a high likelihood of causing these permanent changes.

18.     Based on knowledge of the brain development and the impact of adverse childhood experiences on the physical, mental, and behavioral health of children and adolescents, experts agree that children subject to solitary confinement in the criminal justice system are at increased risk for adverse reactions.

19.     These risks are even more pronounced for children who have mental illnesses or developmental disabilities. Children with mental illness constitute a high proportion, at least 60%, of the population in the juvenile justice system.

20.     Solitary confinement negatively impacts juveniles by perpetuating, worsening, or precipitating mental health concerns, including but not limited to post-traumatic stress disorders, psychosis, anxiety disorders, major depression, suicidal ideation, suicidal intent, self-mutilation, and suicidal behavior. Solitary confinement has a high likelihood of bringing on acute symptomatology, even if the symptomatology is not already present in the individual. For the estimated 60% of youth in correctional settings who already have this symptomatology, the incidence of presenting it again after solitary confinement is much higher.

21.     There is a clear medical consensus that for those juveniles with mental illnesses, the risk of serious harm from solitary confinement is especially great. People with mental illnesses already have deficits in their brain structure or biochemistry. They have weakened defensive mechanisms, making them less resilient than the general population. They are at a higher risk for mental health symptoms and are more susceptible to the significant trauma of social isolation. The trauma of social isolation that can occur for those with mental illnesses will be even more significant and long-lasting than for those without a mental illness.

22.     There is a high correlation between juvenile suicide and the use of solitary confinement in detention, including when solitary confinement is used for short periods of time.

A national study by the U.S. Department of Justice's Office of Juvenile Justice and Delinquency Prevention found that half of youth who committed suicide in juvenile facilities were in isolation at the time of their death and more than 60% percent of young people who committed suicide in detention had a history of being held in isolation. Of the children held in detention centers, suicides occurred within the first 4 months of confinement, with 40% of those suicides occurring within the first 72 hours. This evidence demonstrates a substantial risk of serious harm that can be fatal for children exposed to solitary confinement for even short periods of time.

23.     The absence of mental health treatment and intervention for children placed in solitary confinement exacerbates these harms and dangers.

24.     Solitary confinement can cause long-term harm, including chronic conditions like depression which, in teenagers, can manifest as anger or as self-harm. Children who experience depression and anxiety are at a higher risk of presenting with these diagnoses again after their release from solitary confinement. In addition, the damage from solitary confinement associated with low self-esteem, vegetative features, and hopelessness associated with depression can be similarly long-standing. Depression in the general population is generally associated with a standard 10-15% mortality rate for suicide, and solitary confinement increases the risk of depression and suicide substantially compared to the general population.

25.     Solitary confinement of juveniles can also lead to long-term trust issues with adults, including paranoia, anger, and hatred directed at others. This makes it difficult to create a trusting, therapeutic relationship. It can also lead to noncompliance with treatment in the future, making it hard for people to get the help that they need to address the mental health concerns resulting from solitary confinement.

26.     In my experience, juveniles placed in solitary confinement also exhibit fear,

dissociative episodes, and anxiety, which may lead to increased levels of hopelessness, paranoia, and lack of trust in others resulting from the arbitrary nature of the use of solitary confinement as a punishment in detention. This creates an anxious and fearful environment for the children even when they are not in solitary confinement, as they cannot predict which behaviors will result in their placement in solitary confinement again. Furthermore, when children are subjected to open-ended, and repeated, solitary confinement it exacerbates mental health conditions as they perceive that they are subjected to seemingly interminable periods of time in isolation. Children experience time differently—a day to a child feels longer than a day to an adult—and have a greater need for social stimulation. Juveniles should be managed in a correctional setting using defined structures for behavioral management and imposition of discipline, as well as mental health interventions.

27.     Children that I have interviewed in various detention facilities, including those that documented as having a pre-existing mental illness or suicide risk, have reported they had the following symptoms (or that symptoms became worse) while they were in solitary confinement: depression, distrust, fear, anxiety, thoughts of self-harm, sadness, and engaging in self-harm. These harms are consistent with the literature about the damaging impacts of solitary confinement.

28.     For these reasons, several health, medical, corrections, and professional organizations have condemned solitary confinement of children recognizing that they are particularly vulnerable to the adverse psychiatric consequences of such confinement. The American Academy of Child and Adolescent Psychiatry opposes the use of solitary confinement for juveniles in correctional facilities, recognizing the damaging impacts from solitary confinement relevant to adolescents' developmental vulnerabilities and that the majority of suicides in juvenile correctional facilities occur when the individual is isolated or in solitary confinement. The National Commission on Correctional Health Care, a major accrediting agency, takes the position that

juveniles should be excluded from solitary confinement completely. The American Medical Association has called for correctional facilities to halt the isolation of juveniles in solitary confinement for disciplinary purposes. The American Psychiatric Association has supported this position statement. The United Nations Rules for the Protection of Juveniles Deprived of their Liberty specifically prohibit the solitary confinement of juvenile offenders. The World Health Organization has recognized that solitary confinement is particularly harmful to children, noting the particular vulnerabilities of children, who are developing physically, mentally and socially, and the high rates of mental illness and suicide among young people. The United Nations Standard Minimum Rules for the Treatment of Prisoners, revised in 2015 as the Nelson Mandela Rules, completely prohibit solitary confinement for children. The Council of Juvenile Correctional Administrators opposes the use of solitary confinement for juveniles based on research that shows that placing detained youth in isolation has "negative public safety consequences" and "does not reduce violence and likely increases recidivism" and can cause "permanent psychological damage" and is highly correlated with suicide. In 2016, the United States Department of Justice ended the practice of using solitary confinement for juveniles in all federal prisons because of the growing consensus of the risk of harm for children.

29.     Research studies and professional guidelines on the potentially damaging effects of solitary confinement are evolving, namely, that mental health professionals, institutions, and government agencies have formed a consensus that solitary confinement is deeply problematic, and correctional systems must find better ways to manage incarcerated individuals—particularly when they are juveniles.

30.     The harm that children suffer as a result of solitary confinement becomes more severe when there is no programming or environmental stimulation, as well as when the cells and

facility are in poor physical condition. Denying children educational opportunities further exacerbates an already harmful environment.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 20th day of June 2023.                    Respectfully submitted,


                                                            /s/ Louis Kraus, MD  _____

**<u>REFERENCES</u>**

American Academy of Child & Adolescent Psychiatry, *Solitary Confinement of Juvenile Offenders* (April 2012), https://www.aacap.org/aacap/Policy_Statements/2012/Solitary_Confinement_of_Juvenile_Offenders.aspx.

American Medical Association, *Solitary Confinement of Juveniles in Legal Custody H-60.922*, https://policysearch.ama-assn.org/policyfinder/detail/youth%20solitary%20confinement?uri=%2FAMADoc%2FHOD.xml-0-5016.xml.

American Psychiatric Association, *Position Statement on Solitary Confinement of Juveniles* (May 2018), https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Solitary-Confinement-Restricted-Housing-of-Juveniles.pdf.

American Psychological Association, *Brain research advances help elucidate teen behavior* (2004), https://www.apa.org/monitor/julaug04/brain.

Karen M. Abram, Linda A. Teplin, et al., *Posttraumatic Stress Disorder and Trauma in Youth in Juvenile Detention*, 61 Archives Gen. Psychiatry 403, 403-10 (2004).

Elizabeth Bennion, *Banning the Bing: Why Extreme Solitary Confinement Is Cruel and Far Too Usual Punishment*, 90 Ind. L.J. 741, 753 (2015).

Samantha Buckingham, *Trauma Informed Juvenile Justice*, 53 Am. Crim. L. Rev. 641, 654 (2016).

Andrew B. Clark, *Juvenile Solitary Confinement as a Form of Child Abuse*, 45 J. Am. Acad. Psychiatry and the Law, 350 (2017).

Child Welfare Information Gateway, *Child Maltreatment and Brain Development: A Primer for Child Welfare Professionals* (March 2023), https://www.childwelfare.gov/pubPDFs/brain_development.pdf.

Council of Juvenile Correctional Administrators, *CJCA Toolkit: Reducing the Use of Isolation* (March 2015), https://stopsolitaryforkids.org/wp-content/uploads/2016/04/CJCA-Toolkit-Reducing-the-use-of-Isolation.pdf.

*Department of Justice Review of Solitary Confinement*, The White House Office of the Press Secretary (January 2016), https://obamawhitehouse.archives.gov/the-press-office/2016/01/25/fact-sheet-department-justice-review-solitary-confinement.

Stefan Enggist, Lars Møller, Gauden Galea, and Caroline Udesen, *Prisons and Health*, World Health Organization (2014), file:///C:/Users/apicard/Downloads/9789289050593-eng.pdf.

Jay N. Giedd, et al., *Quantitative magnetic resonance imaging of human brain development: ages 4-18*, 6 Cerebral Cortex 551, 551-59, (1996).

Jay N. Giedd, et al., *Brain development during childhood and adolescence: a longitudinal MRI study*, 2 Nature Neuroscience 861, 861-63 (1999).

Stuart Grassian, *Psychopathological Effects of Solitary Confinement*, 140 Am. J. of Psychiatry 1450, 1452 (1983).

Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U.J.L. & Pol'y 325 (2006).

Stuart Grassian & Nancy Friedman, *Effects of Sensory Deprivation in Psychiatric Seclusion and Solitary Confinement*, 8 Int'l J.L. & Psychiatry 49 (1986).

Lindsay Hayes, *Juvenile Suicide in Confinement: A National Survey*, U.S. Department of Justice Office of Justice Programs (February 2009), https://www.ojp.gov/pdffiles1/ojjdp/213691.pdf.

*Intersection Between Mental Health and the Juvenile Justice System*, U.S. Department of Justice Office of Juvenile Justice and Delinquency Prevention (July 2017), https://ojjdp.ojp.gov/model-programs-guide/literature-reviews/intsection_between_mental_health_and_the_juvenile_justice_system.pdf.

Sara B. Johnson, et al., *Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy*, Journal of Adolescent Health (2009), https://www.jahonline.org/article/S1054-139X(09)00251-1/fulltext;

National Commission on Correctional Health Care, *Solitary Confinement (Isolation)* (April 2016), https://www.ncchc.org/position-statements/solitary-confinement-isolation-2016/.

Sandra Simkins, Marty Beyer, and Lisa Geis, *The Harmful Use of Isolation in Juvenile Facilities: The Need for Post-Disposition Representation*, 38 Wash. U.J.L. & Pol'y 241, 253-61 (2012).

Kathleen Skowyra and Joseph Cocozza, *A Blueprint for Change: Improving the System Response to Youth with Mental Health Needs Involved with the Juvenile Justice System*, The National Center for Mental Health and Juvenile Justice Policy Research Associates, Inc. (January 2007).

Linda A. Teplin, et al., *Psychiatric Disorders in Youth in Juvenile Detention*, 59 Archives Gen. Psychiatry 1133, 1133-43 (2002).

United Nations General Assembly, *U.N. Rules for the Protection of Juveniles Deprived of their Liberty* (1990), https://www.ohchr.org/en/instruments-mechanisms/instruments/united-nations-rules-protection-juveniles-deprived-their-liberty#:~:text=Juveniles%20deprived%20of%20their%20liberty%20shall%20not%20for%20any%20reason,with%20the%20deprivation%20of%20liberty.

United Nations General Assembly, *Resolution adopted by the General Assembly on 17 December 2015* (January 2016), https://documents-dds-ny.un.org/doc/UNDOC/GEN/N15/443/41/PDF/N1544341.pdf?OpenElement.

# Appendix A

**LOUIS JAMES KRAUS, M.D., DFAPA, FAACAP**
Woman's Board Professor of Child and Adolescent Psychiatry
Chief, Section of Child and Adolescent Psychiatry
Rush University Medical Center

910 Skokie Boulevard, Suite 230
Northbrook, IL 60062
Office Telephone: (847) 559-0560
Cell: (847) 217-7755
Email: rkraus9@mac.com

**PERSONAL DATA:**                              Louis James Kraus, MD
                                                DOB:  12-3-1960 USA

**EDUCATION:**

| | |
|---|---|
| 1987 | M.D., University of Health Sciences, The Chicago Medical School |
| 1983 | B.S., Syracuse University |


**POSTGRADUATE TRAINING:**

| | |
|---|---|
| 7/1/92-6/30/94 | Child and Adolescent Psychiatry Fellow, The University of Chicago, Chicago, Illinois |
| 10/1/88-6/30/92 | Psychiatry Resident, Northwestern University, Chicago, Illinois |
| 7/1/91-12/31/91 | Chief Resident, Psychiatry, Northwestern University, Chicago, Illinois |
| 7/1/87-6/30/88 | Surgical Intern, Boston University, Boston, Massachusetts |


**ACADEMIC APPOINTMENTS:**

| | |
|---|---|
| July 2016 – Present | Professor of Clinical Psychiatry, Rush University Medical Center |
| July 2003 – June 2016 | Associate Professor of Clinical Psychiatry, Rush University Medical Center |
| March 2001 – 2002 | Visiting Associate Professor of Psychiatry, University of Illinois at Chicago |
| July 2001 – 2002 | Assistant Professor of Psychiatry, Northwestern University |
| November 1997 – July 2001 | Clinical Instructor, Dept. of Psychiatry, Northwestern University |

| July 1994 – August 1997 | Assistant Professor, Department of Psychiatry, University of Chicago |
|---|---|
| July 1994 – August 1997 | Director of Child and Adolescent Forensic Psychiatry, University of Chicago |

**BOARD CERTIFICATION:**

| May, 2015 (Current) | Maintenance of Certification in **Child and Adolescent Psychiatry**, by The American Board of Psychiatry and Neurology, Certification No. 3956 |
|---|---|
| June, 2019 (Current) | Board Certified in **Forensic Psychiatry**, by the American Board of **Psychiatry and Neurology**, Certification No. 1079 |
| October, 1995 (Current) | Board certified in **Child and Adolescent Psychiatry**, by The American Board of Psychiatry and Neurology, Certification No. 3956 |
| December, 1993 (Lifetime) | Board certified in **General Psychiatry**, by The American Board of Psychiatry and Neurology, Certification No. 38252 |

**LICENSE:**

| State of Illinois | No. 036-079584 | Expires: 07/31/2023 |
|---|---|---|
| State of Florida | No. ME 83084 | Expires: 01/31/2023 |
| State of Arizona | No. 33456 | Expires: 04/03/2023 |

**HONORS AND AWARDS:**

- 2020 Agnes Purcell McGavin Award for Distinguished Career Achievement in Child and Adolescent Psychiatry from the American Psychiatric Association (APA) and APA Foundation.
- Child and Adolescent Psychiatry, Award: "Scholarship and Perseverance in the Creation of our Practice Parameter for Child and Adolescent Forensic Evaluations", 58th Annual Meeting, Toronto, Canada, October 2011.
- Fellow, American Academy of Child and Adolescent Psychiatry (2006)
- Distinguished Fellow, American Psychiatric Association (2004)
- Woman's Board Professor of Child and Adolescent Psychiatry, Rush University Medical Center (2004)
- AMA Glaxo Welcome Emerging Leaders Development Program (1998)
- Top Doctor – 1997 - 2001
- Resident Fellowship of The American Psychoanalytic Association (1992)
- Laughlin Fellow, Northwestern University (1991)
- Magna Cum Laude, Syracuse University
- Phi Beta Kappa Honor Society
- Honors Program in Biology, Syracuse University

**PROFESSIONAL SOCIETY MEMBERSHIPS**

American Medical Association
American Academy of Child and Adolescent Psychiatry
American Academy of Psychiatry and the Law
American Psychiatric Association
Illinois State Medical Society
Illinois Council of Child and Adolescent Psychiatry
Illinois Psychiatric Association
Chicago Medical Society
American College of Psychiatrists

## TEACHING EXPERIENCE:

| | |
|---|---|
| Sept 2021-Present | Supervise Rush child and adolescent psychiatry fellows of the Orthogenic Day School. |
| May 2008 – Present | American Psychiatric Association Mentor for psychiatric residents through the Council on Children, Adolescents and Their Families |
| July 2006 – June 2021 | Supervise Rush child and adolescent psychiatry fellows at the Sonia Shankman Orthogenic School (a residential school) |
| July 2002 – Present | Supervise general residents and child and adolescent fellows at Rush University Medical Center |
| July 2002 – Present | Developed forensic rotation at Rush University Medical Center for child and adolescent fellows allowing them to observe forensic evaluations in court, and the Cook County Juvenile Pre-Detention Facility |
| July 2002 – Present | Develop school consult didactics as well as didactics dealing with Autism at Rush University Medical Center; Supervise Rush University Medical Center's child and adolescent fellows in their school Autism rotation at the Chicago Metropolitan Easter Seals Therapeutic Day Schools |
| July 2002 - Present | Develop and teach the child and adolescent forensic psychiatry course for child and adolescent psychiatry fellows at University of Illinois at Chicago and Rush University Medical Center |
| July 2002 - Present | Teach and supervise medical students in clinical rotations through child and adolescent psychiatry at Rush University Medical Center |
| March 2001 – July 2002 | Supervise and lecture residents at University of Illinois |

| August 1997 – March 2001 | Teaching and lecturing to general psychiatry residents at Northwestern University |
| August 1997 – March 2001 | Supervise child and adolescent psychiatry residents and general psychiatry residents at Northwestern University |
| August 1994 – 1997 | Provide child and adolescent forensic psychiatry course offered to residents and fellows at the University of Chicago |
| August 1993 – 1997 | Supervise child and adolescent psychiatry fellows, psychiatry residents and psychology trainees at the University of Chicago |
| July 1991- July 1992 | Supervise psychiatry residents at Northwestern University |

## ELECTED POSITIONS:

| June 2008 – Oct 2021 | Chair, AACAP Delegation to AMA House of Delegates |
| July 2015 – June 2016 | Chair, AMA Council on Science and Public Health |
| July 2014 – June 2015 | Chair Elect, AMA Council on Science and Public Health |
| 2011 – 2013 | Chair, AACAP Assembly |
| 2011 – 2013 | AACAP Executive Committee |
| July 2008 – June 2016 | AMA Council on Science and Public Health |
| 2009 – 2011 | Vice-Chair, AACAP Assembly |
| 2007 – 2009 | AACAP Assembly Treasurer |
| 2007 – 2013 | AACAP Council |
| 2002 – 2004 | AACAP Assembly Representative to the Executive Committee |

## REVIEWER:

Guest Reviewer – Journal of The American Academy of Child and Adolescent Psychiatry
Panelists –AMA Organized Medical Staff on Science and Public Health June 6, 2018
Guest

## TRAINEES AND MENTOREES:

| 2005 – Present | Ongoing Mentoring for AACAP and APA Mentor Programs |
| 2005 – 2007 (Jada Johnson, MD) | Chair, Psychiatry, Illinois Masonic Hospital |
| 2002 – 2004 (Shiraz Butt, MD) | Prior Medical Director, Maryville Academy |
| 1998 – 2000 (Lucyna Puszkarska, MD) | Medical Director, River Edge Hospital |
| 2021-Present (Adrienne Adams) | Medical Director, for Rosecrance Residential Treatment Program |

## PROFESSIONAL SOCIETY APPOINTMENTS

| 2017 – 2021 | APA Budget & Finance Committee |
| May 2015 – 2021 | American Psychiatric Foundation (APF BOD), Board of Directors |
| 2014 – 2021 | CMS District 1, Delegate to 2014 Illinois House of Delegates |

| | |
|---|---|
| May 2012 – 2016 | Chair – Council on Children, Adolescents and Their Families, American Psychiatric Association |
| May 2012 – May 2014 | Chicago Medical Society, District 1 Councilor |
| May 2012 – May 2013 | Chicago Medical Society District 1, Alternate Delegate to Illinois 2013 House of Delegates |
| November 2010 – June 2011 | APA Task Force on Prevention of Bullying. |
| 2009 – Present | APA Political Action Committee (PAC) Board |
| October 2009 – Present | AACAP Committee on Juvenile Justice Reform |
| April 2008 – 2009 | Member APA Council on Children, Adolescents and Their Families. |
| 2008 – Present | AACAP Delegate to AMA House of Delegates |
| May 2007 – Present | Member – Council on Children, Adolescents and Their Families, American Psychiatric Association |
| September 2001 – Present | Co-chairman of the AACAP committee on Juvenile Justice Reform. |
| May 2001 – 2010 | Chairman of the American Psychiatric Association Committee on Juvenile Justice Issues |
| December 2000 – 2007 | AACAP Alternate Delegate to the AMA House of Delegates 2007 |
| June 2000 – June 2002 | President, Illinois Council of Child & Adolescent Psychiatry |
| December 1999 – December 2000 | AACAP Delegate for Young Physicians to the AMA |
| November 1999 – 2001 | Evanston Northwestern Healthcare Child Protection Committee |
| September 1999 – March 2001 | Member, Evanston Mental Health Board, Substance Abuse Task Force |
| June 1999 – 2001 | Member, AMA Advisory Board on Alcohol Intervention Project for Youth |
| January 1999 – January 2003 | Chairman, National Commission on Correctional Health Care, Committee on Juvenile Health Care |
| 1998 - 2010 | Member of the American Psychiatric Association Committee on Juvenile Justice Issues |
| October 1998 – Present | Delegate, for The Illinois Council of Child and Adolescent Psychiatry to American Academy of Child and Adolescent Psychiatry (AACAP) |

| September 1998 – 2000 | Clinical Advisor, Chicago Metropolitan Child and Adolescent Comprehensive Community Services Systems Network Advisory Council |
|---|---|
| April 1998 – December 1998 | Vice Chairman, National Commission on Correctional Health Care, Committee on Juvenile Health Care |
| April 1998 – December 1998 | Vice Chairman, National Commission on Correctional Health Care, Task Force for Revision of the NCCHC Standards for Health Services in Juvenile Detention and Confinement Facilities |
| June 1997 – January 1999 | Chairperson of AACAP Committee for New Physicians |
| June 1997 – January 2003 | Board of Directors, National Commission on Correctional Health Care |
| January 1997 – July 2000 | Program Chairman, Illinois Council for Child and Adolescent Psychiatry |
| July 1995 – July 1996 | Program Chairman for Chicago Society for Adolescent Psychiatry |
| September 1994 – October 1999 | AACAP Committee on Foster and Adoptive Families |
| March 1994 – December 1996 | AACAP Alternate Delegate for Young Physicians to the AMA |

**CONSULTING POSITIONS**

| January 2013-Present | Federal Consent Decree appointment, Assessment and restructuring of the mental health programming for the Illinois Department of Juvenile Justice (IDJJ) under a Consent Decree filed with the Attorney General's Office by the American Civil Liberties Union (ACLU) of Illinois in December 2012 (RJ v. Bishop) |
|---|---|
| February 2006 – Present | Consultant to the ACLU |
| May 2003 – 2008 | Consultant, United States Department of Juvenile Justice, Civil Rights Division |
| March 2001 – June 2002 | Director, Child and Adolescent Forensic Psychiatry, University of Illinois at Chicago |
| 1993 – Present | Forensic testimony in Juvenile Court (abuse/neglect & delinquency), Family Court focusing on custody and expert testimony in other state and federal cases. Previously worked as an Expert for the Cook County Public Guardian's Office and DCFS. |
| September 1992-1993 | Psychiatrist Chairperson of the Physician Review Board for the City of Chicago, Department of Mental Health – 1992 |

| 1992 – Present | Expert testimony in juvenile and domestic relations courts in a variety of cases ranging from transfer hearings, abuse including Munchausen by Proxy, Child Advocacy Focusing on Custody and "Best Interest" of the Child |
| April 1990 – June 1999 | Psychiatric Consultant to Illinois Youth Center, Joliet, Illinois; General Population and the Intensive Reintegration Unit |
| January 1990 – 1992 | City of Chicago, South East Community Mental Health Center |

## ADMINISTRATIVE SERVICES:

| 2021-Present | Division Director of Child and Adolescent Psychiatry Rush University Medical Center. |
| 2011 - Present | Development of the Autism Assessment, Research, Treatment and Services (AARTS) Center at Rush University Medical Center |
| 2006 – Present | Director of the Sonia Shankman Orthogenic School and Rush University Medical Center's clinical rotation for child and adolescent psychiatry fellows at Rush |
| 2006 – Present | Director of Psychiatric Services, Sonia Shankman Orthogenic School |
| 2002 – Present | Chief of Child and Adolescent Psychiatry, Rush University Medical Center |
| 1999 – Present | Medical Director of the Chicago Metropolitan Easter Seals Therapeutic Schools |

## CLINICAL SERVICE:

| June 2019-Present | Medical Director, Josselyn Community Mental Health Center |
| 2012 - Present | Director, Autism Assessment, Research, Treatment and Services Center at Rush University Medical Center |
| July 2005 – Present | Psychiatric Director Sonia Shankman Orthogenic School at Chicago |
| June 2005 – Present | Psychiatric Consultant to New Trier, Niles North and Niles West High Schools |
| February 2000 – June 2001 | Director, Child and Adolescent and Forensic Psychiatry, University of Illinois at Chicago |

| January 1999 – present | Medical Director, Chicago Metropolitan Easter Seals Therapeutic School |
|---|---|
| September 1998 – Present | Psychiatric Consultant to Evanston Township High School |
| August 1997 – February 2000 | Division Head of Child/Adolescent Psychiatry, Evanston Northwestern Healthcare |
| May 1997 – June 1999 | Psychiatric Consultant to Youth Campus (A DCFS contracting agency) |
| September 1992 – May 1993 | Psychiatrist Chairperson of the Physician Review Board for the City of Chicago, Department of Mental Health – 1992 |
| July 1994 – August 1997 | Assistant Director of Child and Adolescent Inpatient Services, University of Chicago |

**MEDIA**

1. October 26, 1994, Chicago Sun Times, TV-Violence Line Elusive.
2. November 6, 1994, Chicago Tribune, "Mental health tests for kids spark debate;" Screening: Testing would help parents, supporters say.
3. November 19, 1994, Chicago Tribune, Try Sandifer suspect as kid, experts say. Louis Kraus testified, "Derrick Hardaway suffers from a *conduct disorder* that developed in his early adolescence because of family tensions, physical abuse and other problems."
4. February 25, 1997, Chicago Tribune, Leniency sought for teen convicted of killing Sandifer.
5. March 13, 1997, Chicago Tribune, Return girl slowly to mom, psychiatrist say.
6. March 30, 1997, Chicago Tribune, Student-Teacher contact is becoming a danger zone. Kraus was quoted to say, "The students are drawn into the relationship because they idolize their teacher and often don't see anything wrong until much later. At that point they might feel depressed and used and have trouble forming relationships."
7. March 25, 1998, Chicago Tribune, 4 pupils, teacher die in schoolyard ambush.
8. March 25, 1998, Chicago Sun Times, Kids ambush kids; Shooting stuns school.
9. March 29, 1998, Violence is linked to genetics, early abuses that set patterns
10. April 6, 1998, Chicago Tribune, Teen smokers a pack short of a carton in wisdom department.
11. June 3, 1998, Toronto, Canada, American Psychiatric Association, The Daily Bulletin, Presidential Sessions on "A Time of Violence."
12. June 1998, Chicago Parenting, "Keeping rage from turning into tragedy."
13. August 14, 1998, Chicago Sun Times, Making Sense of kids' case.
14. August 14, 1998, Chicago Tribune, Young suspects sent home. Dr. Kraus testament was paramount in the 7-year-old being allowed to go home with his family.
15. Possley, M. and Puente, T., "Young Suspects Sent Home", Chicago Tribune, August 14, 1998
16. Kotlowitz, A., "The Unprotected", The New Yorker. February 8, 1999
17. March 7, 1999, Chicago Tribune, Aftermath an ordeal for parents, kids.
18. November 11, 1999, Northwest Herald, Boy who shot clerk sentenced.
19. February 23, 2000, Tribune Allied Health, Safety nets for teens.
20. April 9, 2000, Chicago Tribute, School provides unique antidote for depression.
21. January 30, 2001, Chicago Tribune, Files in Ryan Harris case shed new light. Disclosure of the results of the psychiatric interview changed interview process of minors.
22. December 7, 2001, Psychiatric News, AACAP Kraus was quoted "We certainly disagree with the

Supreme Court ruling and believe the death penalty constitutes cruel and unusual punishment."

23. July 9, 2002, Psychiatric News, AMA Vows to Prevent Future Psychologist Prescribing Laws.
24. April 4, 2003, Study Questions Youths' Ability to Understand Trial Process, *Study Implications.*
25. July 18, 2003, Psychiatric News, Psychiatrist Wins AMA Leadership Post: *Psychiatry Scores in HOD.* Kraus argued successfully in favor of an amendment to a resolution asking that the AMA support comprehensive health education for female delinquent, including information on responsible sexual behavior and the prevention of sexually transmitted diseases and HIV/AIDS." Kraus also testified, "Medicaid reaches 44 million Americans, more than Medicare or any other form of health insurance and covers Americans who are among the poorest and most disadvantaged populations in the country."
26. February 13, 2004, Chicago, Metro North Shore, Abuse of cold medicine rising.
27. Tresniowski, A.  Hewitt, B., "Escape from Hell", People Magazine. September 25, 2006
28. Reuters, "Experts say video games not an addiction in AMA Meeting", June 25, 2007
29. Neergaard, L. "Easy nondrug helps ADHD Kids", USA Today. September 3, 2007
30. Tanner, L. "Shock Treatment Sought for Autistic Man", USA Today. September 3, 2007
31. Reuters, "Antidepressant warnings scared parents, doctors", September 9, 2007
32. Fox News, "Study: Brains of ADHD Children Develop More Slowly than Brains of other Youngsters", November 13, 2007
33. Bynum, R., Stobbe, M., "Experts Dubious of Ga. 3rd- Grader Plot", Associated Press. April 2, 2008
34. October 31, 2008, The Wall Street Journal, Therapy, Antidepressants Ease Anxiety in Children.
35. Tanner, L., "Kids with ADHD on meds test better than peers", Associated Press. April 27, 2009
36. Tanner, L., "Jackson kids face hurdles coping with his death, universal trauma of losing a parent may be eased if stability can be offered", Associated Press. July 5, 2009
37. Chicago Tribune by Bonnie Miller Rubin, "Caught in the Web of Addiction", September 9, 2009
38. Fox News, "Psychiatrists say Blagojevich's choice to have daughters join him at court may be stressful", July 7, 2010
39. FOX – Judge Jeanine, "8-year Old Boy's Commitment to a Psychiatric Ward", February 19, 2011
40. CNN, Anderson Cooper 360, "KTH: Mass. School called 'house of horrors', May 24, 2012,
41. Fox News Chicago, "Beauty may no longer be in the eye of the beholder", May 10, 2012
42. CNN, Anderson Cooper 360, "Anderson Cooper Investigates Shocking RTC Treatment", June 4, 2012
43. Moran, M. "More research needed on SSRI's for treating Autism Disorders", Psychiatric News. Volume 47, Number 11. June 11, 2012
44. CNN, Anderson Cooper 360, "Crime and Punishment, The Sandusky Trial", June 12, 2012
45. NBC News Chicago, "How to Talk to Your Kids about Conn. Shooting", December 14, 2012
46. Niedowski, E., Tanner, L. "How to Talk to Your Kids about Conn. Shooting", Associated Press. December 15, 2012
47. CNN, Anderson Cooper 360, "Former Child Hostage Describes Captivity Underground", February 4, 2013
48. Fox News Chicago, "Violence has long term effects on children", August 12, 2013
49. England, C. "Helping young adults make the transition", Chicago Medicine Magazine, September 2013
50. Schmadeke, S., "State's youth prison system violates inmates' rights, experts say", Chicago Tribune. September 25, 2013
51. WGN Radio.com, "Solutions for Gun Violence in Chicago", June 17, 2014
52. NBC News, "Black Box warning on antidepressants raised suicide attempt", July 18, 2014
53. FOX News, "How far should we go to discipline our kids", September 2014
54. Fox News, "Study: Brains of ADHD Children Develop More Slowly than Brains of Other Youngsters", January 13, 2015

55. FOX News, "Could a self-esteem booster turn your child into a narcissist?", March 2015
56. Al Jazeera America, "US Only Nation to Imprison Kids for Life," March 2015
57. NBC Channel 5 News, "Some Suburban Schools Ban Fidget Spinners as Popularity Grows", May 2, 2017
58. Associated Press, "Video Games Focus on a Red Herring", March 8, 2018
59. US Today, "Doctor:  Impact-separating-families tragic June 19, 2018
60. Fox News,  "Medical experts warn that separating children from parents causes psychological damage June 20, 2018
61. March 20, 2019, Chicago Tribune, "Local autism community cheers Amy Schumer's loving disclosure that her husband has a form of autism". Kraus was quoted stating "To have someone like Amy Schumer come out and talk about this is really amazing. I think it will be wonderful for people (with autism) and perhaps generate interest in the dating population about autism"
62. AP News, "Linked by pain: 2 school massacre survivors, dad kill selves", March 25, 2019
63. Channel 9 Chicago Local News "Helping Explain the Tragedy in Highland Park to Kids", July 5, 2022
64. Fox 32 News, "How to Talk to Your Children About the Highland Park Shooting", July 8, 2022
65. Fox 32 News, "Tips for Talking to Your Children About Gun Violence", July 8, 2022
66. Fox 32 News, "Mass Shootings: Breaking the Cycle, a Fox 32 Special Report" July 15, 2022

**SCIENTIFIC ACTIVITIES**

*a)  Grants:*

| | |
|---|---|
| 2011-Present | Effects of memantine vs. placebo on motor planning and memory in children with autism spectrum disorders. $74,176 |
| 2010 | Rush Women's Board, Assessment of prevalence of Bipolar Disorder in adolescent population in a residential placement, $30,000 |
| April, 1999 | Department of Human Service, State of Illinois Grant – Bridges Program for Development of School and Home-based Therapeutic Services for Adolescents, $100,000 per year |
| March, 1998 | Evanston Northwestern Healthcare Auxiliary Grant for Development of a Community-based Adolescent Mental Health and Substance Abuse Program, $1,000,000 |

*b)  Research*

| | |
|---|---|
| 2011 – Present | Development of Research Program at the Rush AARTS Center |
| 1984 - 1986 | Research under direction of Max Harry Weil, Ph.D., Chairman, Department of Medicine, University of Health Sciences, The Chicago Medical School, on the reversal of academia during cardiopulmonary resuscitation |
| 1999 – 2001 | Outcomes research focusing on adolescent dual diagnosis; early diagnosis and intervention in a community based treatment program. |

*c)  Poster Presentations*

Grunewald, S., Kraus, L., Youngkin, S., Wade, K. H., Forburger, N., Owley, T., Loftin, R., Fogg, L. & Soorya, L. (May 2014). *Access to care:*

*Familial and racial variables associated with limited service access for individuals with ASD.* Poster presented at 2014 Annual International Meeting for Autism Research (IMFAR). Atlanta, GA.

Poster Presentation: APA Meeting, Washington, DC "Monitoring Resident Supervision in Times of Change," May 1992.

## SCHOLARSHIP

### a) Books and Chapters

1. Thomas, C.R., Kraus, L.J. "Public Policy Implications of Research on Aggression and Antisocial Behavior", The Origins of Antisocial Behavior. Oxford University Press, 2012.
2. Galatzer-Levy, R., Kraus, L., Galatzer-Levy, J., The Scientific Basis of Child Custody Decisions. **Cambridge Press**, 2009.
3. Kessler, C., Kraus, L, The Mental Health Needs of Young Offenders. **Cambridge Press**, 2007.
4. Geraghty, R., Kraus, L, Fink, P, "Assessing children's competence to stand trial and to waive Miranda rights: new directions for legal and medical decision-making in juvenile courts" in The Mental Health Needs of Young Offenders. **Cambridge Press**, 2007,
5. Kraus L, Sobel, H, "Post-adjudicatory assessment of youth" in The Mental Health Needs of Young Offenders. **Cambridge Press**, 2007.
6. Galatzer-Levy, R., Kraus, L.J., eds, The Scientific Study of Child Custody Decisions, **Wiley Press,** 1999.
7. Kraus, L, "Understanding the Relationship between Children and Caregivers" in The Scientific Basis of Child Custody Decisions, **Wiley Press**, Ed. Galatzer-Levy R. and Kraus, L 1999.
8. Leventhal, B. Kelman, J., Galatzer-Levy, R., Kraus, L., "Divorce, Custody, and Visitation in Mid-Childhood" in The Scientific Basis of Child Custody Decisions, **Wiley Press,** Ed. Galatzer-Levy R. and Kraus, L 1999.
9. Kraus, L.J., Trivedi, H.K. "Adjudicated Youth: Child and Adolescent Psychiatric Clinics of North America" in Clinics Review Articles Volume 25. **Elsevier,** 2016.

### b) Peer Reviewed Publications

1. 1988 Practice Parameter for "Child and Adolescent Forensic Evaluations", Kraus, L, JAACAP, Vol 50, No.12, Dec. 2011 pp1299-1312.
2. Geraghty, T.F., Kraus, L, "Treating the Mentally-Ill Offender: The Challenge of Creating an Effective, Safe and Just System," **The Journal of Criminal Law and Criminology**, Northwestern University School of Law 89 (1) Fall, 1998.
3. von Planta, M., Gluldipati, R., Weil, M.H., Kraus, L.J., Rackow, E., "Bicarbonate and Tromethamine (Tham) Buffers Fail to Improve Resuscitability During Porcine C.P.R.," **Federation Proceedings 46** (4), 1145, 1987
4. von Planta, M, Gudipati, R., Weil, M.H., Kraus, L.J., Rackow, E., "Effects of Tromethamine and Sodium Bicarbonate Buffers During Cardiac Resuscitation," **Journal of Clinical Pharmacology 28,** 594-599, 1987

### c) Other Publications

1. Kraus, L., Arroyo, W. "Recommendations for Juvenile Justice Reform, Second Edition", American

Academy of Child and Adolescent Psychiatry Committee on Juvenile Justice Reform. October 2005.

2. Kraus, L, Arroyo, W. Editors, "Recommendations for Juvenile Justice Reform", **Monograph**, October 2001, American Academy Child and Adolescent Psychiatry.
3. Kraus, L. "Standards for Juvenile Detention and Confinement Facilities", Recommendations for Juvenile Justice Reform, **Monograph**, October 2001.
4. Kraus, L. "Females in the Juvenile Justice System", Recommendations for Juvenile Justice Reform, **Monograph**, October 2001.
5. Kraus, L, Morris R. "Seclusion and Restraint Standards in Juvenile Corrections", Recommendations for Juvenile Justice Reform, **Monograph**, October 2001.
6. Kraus, L, "Tackling Juvenile Justice," **AACAP News**, Volume 31, Issue 2, March/April 2000, pp. 75-76.

## PRESENTATIONS:

Association of Women Attorneys of Lake County September Meeting, "Coping with Trauma in our Community" with Ruth Kraus, Ph.D. and Louis J. Kraus, MD, September 7, 2022

American Psychiatric Association, "Mentally-Healthy Schools in Times of a Pandemic" Speaker-Wednesday, August 19, 2020

Community SAFETY & The Future o Illinois' Youth Prisons.  Children and Family Justice Center, "Harm Instead of Healing: Imprisoning Youth with Mental Illness", March 2020

American Psychiatric Association, "Children & Adolescents in Juvenile Detention", October 7, 2018

Harvard University Conference, "Behind Bars: Health and Human Rights in U.S. Prisons" November 28, 2017

AACAP 64th Annual Meeting, Washington, DC, October 23-28, 2017

Keynote Speaker, Eugene J-M.A. Thonar, PhD, Award Presentation, Rush University Medical Center, October 14, 2014

Grand Rounds, Rush University Medical Center, "Psychiatric Malpractice: Dos and Don'ts." May 21, 2014

**Chair**, AACAP Douglas B. Hansen, MD 39th Annual Review Course in Child and Adolescent Psychiatry, *Child and Adolescent Forensic Psychiatry*, Westin Chicago River North, Chicago, IL, March 22-23, 2014.

Autism, Behavioral Challenges and Complex Medical Needs (ABC) Conference, "Making Systems Work Across the Lifespan for Children with Special Needs," *Treatment and Advocacy for the Autistic Teen as they Transition into Adulthood*, Kraus, LJ, Palos Hills, IL November 22, 2013.

Illinois State Board of Education, Kraus, LJ, **Keynote Speaker**, "The Complexity of Diagnosis and Behavior of Students Placed Residentially."  November 7, 2013.

Illinois State Board of Education, Kraus, LJ, "Juvenile Justice, Social Maladjustment and Associated Mental Health Disorder: How do we educate this difficult population and what do we do when they get out?" November 7, 2013.

7th Congress of Asian Society for Child and Adolescent Psychiatry & Allied Professions and 12th Biennial Conference of Indian Association for Child and Adolescent Mental Health; Kraus, LJ., **Chair,** "Cyberage and Child Mental Health." September 26, 2013, New Delhi, India.

12th Biennial Conference of Indian Association for Child and Adolescent Mental Health; Kraus, LJ., **Chair**, "Role in the Changing Landscape of Child and Adolescent Psychiatry and Mental Health," September 25, 2013, New Delhi, India.

12th Biennial Conference of Indian Association for Child and Adolescent Mental Health, Kraus, LJ., "DSM-V: Implications for Child and Adolescent Psychiatry," September 25, 2013, New Delhi, India.

Illinois Institute for Continuing Legal Education, IIT Chicago-Kent College of Law, "Cutting Edge Child Custody Symposium", *Professional Training and Requirements*, June 21, 2013.

Illinois Institute for Continuing Legal Education, IIT Chicago-Kent College of Law, "Cutting Edge Child Custody Symposium," *Point and Counterpoint: Adoption of Custody Evaluation Standards*, June 21, 2013.

American Psychiatric Association (APA) Annual Meeting Workshop; "A Career in Child and Adolescent Psychiatry: From a Developmental Perspective." San Francisco, CA May 22, 2013.

Office of Juvenile Justice and Delinquency Prevention in Collaboration with the National Center for Youth in Custody "The Impact of Isolation Practices in Confinement Facilities," National Webinar, April 3, 2013.

19th Judicial Circuit Child Representative/Guardian ad Litem Training, "Psychology of Child Development and Age Appropriate Visitation." College of Lake County, Grayslake, Illinois, September 12, 2012.

Abraxas Education Forums; "The Role of Child and Adolescent Psychiatry in Public and Private Special Education." Woodridge, IL March 30, 2012.

Learning Disabilities Association of America, 49th International Conference, "Dissecting a Bully: Interventions for the Bullied." February 22-25, 2012, Chicago, IL.

APA Annual Meeting, "Wayward Youth Revisited", May 17, 2011, Honolulu, Hawaii.

APA Annual Meeting, "Teen Bullying", May 17, 2011, Honolulu, Hawaii.

ISBA Chicago Regional Meeting (Effective Advocacy for Juveniles with Mental Health Needs) "Diagnosis and Treatment of Mental Health in the Juvenile Justice System", May 11, 2011.

American Academy of Child and Adolescent Psychiatry (AACAP) 57th Annual Meeting, "Variations in State Decisions on Custody" October 29, 2010, NY, NY.

AACAP 57th Annual Meeting, "Role of the Expert in Child & Adolescent Psychiatry Malpractice" October 29, 2010, NY, NY.

AACAP 57th Annual Meeting, "Advocacy for Children with Autism: How to Find the Right Services" October 29, 2010, NY, NY.

ISBA Family Law Section, Springfield, IL. "Custody Evaluations When Children Have Major Psychiatric Disorders", October15, 2010.

ISBA Family Law Section, Chicago, IL. "Custody Evaluations When Children Have Major Psychiatric Disorders", September 23, 2010.

DePaul University College of Law, "Juvenile Competency to Stand Trial and Understand Miranda", April 11, 2009.

Illinois State Bar Association (ISBA) and the Committee on Continuing Legal Education, Attorney Education in Child Custody and Visitation Matters, "Factoring a Child's Development into Custody and Visitation" November 21, 2008.

AACAP Members Forum, Practice Parameter for Child and Adolescent Forensic Evaluations, October 31, 2008.

55th Annual AACAP Meeting Chicago, "The Role of the Child Psychiatrist in Juvenile Competency" October 30, 2008.

Rush University Medical Center, Department of Pediatrics Grand Rounds, "Perspectives on Delinquency, Past and Present", August 12, 2008.

American Medical Association (AMA), "How has science impacted juvenile justice regarding competency, waiver hearings, adjudications, dispositions, and treatment (psychopharmacology)". Annual Meeting, Washington DC, July 2008.

Spring Midwest American Academy of Psychiatry and the Law (AAPL) Meeting, Chicago, IL, "Juvenile Competency to Stand Trial and Understand Miranda," Louis J. Kraus, MD, April 21, 2007.

National APA Meeting in San Diego, "Workshop on Juvenile Justice Presentation on Child Competency to Stand Trial and Understand Miranda. May 2007.

53rd Annual American Academy of Child & Adolescent Psychiatry, San Diego, CA, "The Psychiatrist's Role in Child Custody: A Mock Hearing," Louis J. Kraus, MD, October 28, 2006.

Rush University Medical Center, Department of Psychiatry Grand Rounds, "Capital Punishment for Teenagers – The Recent Supreme Court Decision Roper v Simmons: Discussion and Forensic Application of Current Neuroimaging Research on Teenagers ", April 20, 2005.

Cambridge Hospital, Department of Psychiatry Grand Rounds, "Juvenile Delinquency", September 2004

AACAP National Meeting, San Francisco – Symposium – "Addressing the Needs of Behavior Disordered Children Within the School System", San Francisco, CA, October 25, 2002.

University of Chicago – Workshop "Early Onset Bipolar Disorder", December 14, 2001.

Juvenile Justice Reform – Media Workshop, National AACAP meeting, Honolulu, Hawaii, October 2001.

Hephzibah Children's Association – Workshop "Child and Adolescent Psychiatric Diagnoses and Medications" September 28, 2001

A&E Television Broadcast on "Shattered Innocence - Fells Acres Abuse Case", August 8, 2001

15th Annual Statewide Forensic Conference, October 16-17, 2000 Loyola University Chicago, Illinois Department of Human Services

Speaking engagements at parent groups, managed care meetings, University of Chicago, the Department of Corrections and Probation

Media interviews on television, radio and in newspapers and various publications.

American Psychiatric Association – "Littleton – One Year Later, The Assessment of the Potentially Violent Child Within The School System," May 15, 2000.

Institute of Psychoanalysis, Conference on Youth and Violence, "Diagnosis and Treatment of Delinquents in a Maximum Security Youth Center," May 12, 2000

Evanston Northwestern Healthcare – Pediatric Grand Rounds, "Connections Program – Development of a Community-Based Adolescent Alcohol and Drug Treatment Program," May 2, 2000.

Evanston Northwestern Healthcare – Pediatric Grand Rounds, "ADHD, Differential Diagnosis and Treatment" April 4, 2000.

New Trier High School – Peer Helping, "Adolescent Youth Violence," March 2, 2000.

Response Center, Skokie, IL, "Adolescent School Violence," February 16, 2000.

Chicago Bar Association Matrimonial Law Committee, "Physical, Mental and Emotional Abuse in Custody Cases," February 14, 2000.

Cook County Public Guardian's Office, "Domestic Violence and How It Affects Children," January 31, 2000.

Illinois Psychological Association, "Assessment of Violence in Children and Adolescents, November 11, 1999.

New Trier Township, "School Violence - Treatment and Community Intervention," May 12, 1999.
Shand Morahan Worksite Lunch Program, "Signs of ADD/ADHD and Possible Treatment," April 21, 1999.

Evanston Northwestern Healthcare Health Watch Program, "Childhood Attention Deficit Disorder: Treatment Options," April 7, 1999.

Evanston Northwestern Healthcare, Department of Psychiatry, Professional Conferences, "School Violence," April 6, 1999.

The Warren Wright Adolescent Center, Stone Institute of Psychiatry, Northwestern Memorial Hospital, "Violence in Schools," November 6, 1998.

Institute for Women's Health, Evanston Northwestern Healthcare "Helping Kids Cope with Divorce," October 1998.

Illinois Society of Child and Adolescent Psychiatry, "Juvenile Transfer Hearings – The Psychiatric Evaluation," October 1998.

APA Meeting, Toronto, Ontario, Canada, "Treatment of Severe Delinquents in a Maximum Security Youth Center," June 1998.

Evanston Northwestern Healthcare Pediatric Lecture Series, "The Continuum of Behavior Disorders," April 1998.

Evanston Northwestern Healthcare Department of Psychiatry, Professional Conferences, "Transfer Hearings in Juvenile Court: Evaluation of Behavior Disordered Youth," January 1998.

Evanston Northwestern Healthcare Department of Psychiatry, Professional Conferences, "The Use of Attachment Theory in Custody Evaluations," January 1998.

Juvenile Justice Division of the Circuit Court of Cook County, "Psychiatric Assessments in Juvenile Justice Cases," June 1997.

Chicago Bar Association-Juvenile Law Committee, "Utilizing Psychiatric Evaluations In Juvenile Justice Cases: Transfer And Dispositional Hearings," February 1997.

Genesis Schools/Illinois Association of Counsel for Children, "Helping Incarcerated Youth Overcome Delinquency and Mental Illness," December 1996.

University of Chicago, Laboratory School Lower School Parents Association Lecture Series, "Is My Child's Behavior Normal?" November 1995.

CAUSES - Illinois Masonic Hospital, "Attachment Theory In The Use Of Bonding Evaluations," September 1995.

Illinois Probation and Court Services 1995 Annual Spring Conference, "Kids Killing Kids," March 1995.

Grand Rounds: Columbus Hospital Department of Pediatrics.  "Delinquency, Etiology and Intervention," July 1994.

Cook County Juvenile Court, Office of the Public Guardian.  "Munchausen By Proxy," July 1994.

Columbus Hospital, Department of Pediatrics Grand Rounds, "Delinquency, Risk Factors, and Interventions," July 1994.

International Correctional Education Association Conference, Chicago " Attention Deficit Hyperactivity Disorder," May 1993.

The American Psychoanalytic Association National Conference, New York, "Attachment Theory - Forensic Implications for Best Interest of the Child," December 1993.

Poster Presentation:  APA Meeting, Washington, DC "Monitoring Resident Supervision in Times of Change," May 1992.

The University of Health Sciences, The Chicago Medical School, "Effects of Tham and NaHCO3 on Acid Base Balance During CPR," 1984.

Presentation: Lake County Bar Association Seminar, "Preparing a Client for a 604.10 Evaluation and/or Mediation," April 23, 2021.

# Appendix B

**Louis J. Kraus, MD**
**910 Skokie Boulevard**
**Suite 230**
**Northbrook, IL  60062**

**Deposition and Testimony Cases**

*Telephone: 847-559-560*
*Facsimile: 847-559-0612*

| | | | | |
|---|---|---|---|---|
| **06/30/2022**<br>**18 D 005945** | Schiller, DuCanto & Fleck | Kenney V Strang | Trial Testimony | Circuit Court of Cook County |

| | | | | |
|---|---|---|---|---|
| **03/18/2022**<br>**4:19-cv-00431-RLF-MJF** | Florida Legal Services, Inc. | GH., et al v. Dept of Juvenile Justice and Secretary of the Dept of Juvenile Justice | Deposition | United States District Court of Northern District of Florida Tallahassee Division |

| | | | | |
|---|---|---|---|---|
| **03/09/2022**<br>**14D8661** | Katz & Stefani | Skidelsky v Skidelsky | Deposition | Circuit Court of Cook County |

| | | | | |
|---|---|---|---|---|
| **02/15/2022**<br>**14D8661** | Davis Friedman | Skidelsky v Skidelsky | Deposition | Circuit Court of Cook County |

| | | | | |
|---|---|---|---|---|
| **01/20/2022**<br>**18D005945** | Schiller, DuCanto & Fleck, LLP | Kenney v Strang | Deposition | Circuit Court of Cook County |

| | | | | |
|---|---|---|---|---|
| **09/29/2021**<br>**4:19-cv-002-**<br>**AW-MAF** | Florida Legal Services, Inc. | Harvard v Inch | Deposition | United States District Court Northern District of Florida Tallahassee Division |
| **9/22/2021**<br>**12 L 58** | Patrick Flaherty of Kinnally, Flaherty, Krentz, Loran, Hodge & Masur | Carolyn Overstreet, Special Administrator of the estate of Cynthia Overstreet, Deceased v Rhomas Rossi, MD et al | Trial | Circuit Court of the 17th Judicial Circuit Winnebago County, Illinois |
| **9/21/2021**<br>**2014 D 11482** | Brigham Law | Buterman v Buterman | Trial | Circuit Court of Cook County |
| **07/06/2021**<br>**2015 D 3224** | Beermann Law And Veon Law | Ball v Olson | Deposition | Circuit Court of Cook County, Illinois |
| **05/21/2021**<br>**1:18-CV-05560** | City of Chicago | City of Chicago v. Mendez | Deposition | United States District Court for the Northern District of Illinois |

| 03/29/2021<br>16 L 008702 | Karlin Fleisher &<br>Falkenber LLC<br>And Clausen Miller,<br>PC | TR v Rockford | Deposition | Circuit Court of<br>Cook County,<br>Illinois |
|---|---|---|---|---|

| 02/03/21<br>2019 D 6124 | Berger Schatz | Zach Trial | Deposition | Circuit Court of<br>Cook County,<br>Illinois |
|---|---|---|---|---|

| 2021<br>2016 L 008702 | Clausen Miller, PC | T.R. vs. Rockford<br>Acquisition Sub, Inc | Deposition | Circuit Court of<br>Cook County,<br>Illinois |
|---|---|---|---|---|

| 2020<br>18 D 1380 | Bradford & Gordon,<br>LLC/Burcu Ozadali | Sean Noonan v<br>Brook Noonan | Deposition | Circuit Court of<br>Cook County,<br>Illinois |
|---|---|---|---|---|

| 2019<br>2016 L 011004<br>Consolidated<br>with 2016 L<br>011007 | Kathleen Kunkle of<br>Ancel, Glink,<br>Diamond, Bush,<br>DeCianni<br>Krafthefer, P.C. | Jane Doe 1 v Cicero<br>School District 99 | Trial | Circuit Court of<br>Cook County,<br>Illinois, County<br>Department, Law<br>Division |
|---|---|---|---|---|

| 2019<br>12 L 58 | Patrick Flaherty of<br>Kinnally, Flaherty,<br>Krentz, Loran,<br>Hodge & Masur | Carolyn Overstreet,<br>Special<br>Administrator of<br>the estate of<br>Cynthia Overstreet,<br>Deceased v Rhomas<br>Rossi, MD et al | Deposition | Circuit Court of the<br>Seventeenth Judical<br>Circuit Winnebago<br>County, Illinois |
|---|---|---|---|---|

| 2019<br>18 D 1071 | Jordan Rosenberg<br>of Beermann, LLP | Dr. Jennifer Casey v<br>Jason Sachman | Deposition | Circuit Court for<br>the Nineteenth<br>Judicial Circuit<br>Lake County,<br>Illinois |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| **2019**<br>**16 D 6144** | Joan Comiskey of Law Office of Joan Comiskey and Leon Finkel of Berger & Schatz | Anthony Geroulis v Mirofora Geroulis | Deposition | Circuit Court of Cook County Illinois |
| **2019**<br>**11 D 002 451** | Enrico Mirabelli of Beermann, Pritikin, Mirabelli, Swerdlove, LLP | Roiban Ryan v Suzanne Ryan | Trial | Circuit Court of Cook County, Illinois |
| **2019**<br>9:19-CV-0061 | Mario Williams, Dalls LePierre of Nexus Derechos Humanos Attorneys, Inc. | Natalya Paykina, on behalf of minor child, E.L. v Donna Lewin, Anthony Annucci, John Doe 1, John Doe 2, et al | Evidentiary Hearing | United States District Court for the Northern District of New York |
| **2019**<br>1:16-CV-08303 | Steven Weil Weil and Chardon LLC | T.S., et at v Twentieth Centry Fox Television, et al. | Deposition | United States District Court for the Northern District of Illinois Eastern Division |
| **2019**<br>2017 D 0301 | Ruggio & Associates | Yasser Refaat Farid/ Hassan V Rehab Esmat Baldrerin | Deposition | Circuit Court of Cook County Illinois |
| **2019**<br>2017 D 1173 | Richard Boonstra Boonstra, Hoogendoorn & Talbot LLP | Charles Pratt v Lisa Anne Settli | Trial | Circuit Court of Cook County Illinois |
| **2019**<br>12 – L 132 | Ann DeVries, Hinshaw & Culbertson Law, LLP | Chynna Brown v Rockford Memorial Hospital | Deposition | Circuit Court of the 17th Judicial Circuit Winnebago County, IL |

| | | | | |
|---|---|---|---|---|
| **2018**<br>17 D 662 | Miller, Shakman & Beem, LLP and Berger Schatz | Kemper Ryan v Kristen Ryan | Deposition | Circuit Court of the Nineteenth Judicial Circuit, Lake County, Il |
| **2018**<br>3:18-CV-05056 | Law, Lyman, Daniel, Kamerrer & Bogdanovich, P.S. | Samuel Tarabochia v Thurson County; Peter Feliciano, Christopher Marx, Anjelita Fornara, Vic Herbert, John Cody White, Mike Fenton, Ted Bryan, Dana Hanson, in their individual capacities | Deposition | U.S. District Court Seattle, Washington |
| **2018**<br>12CV02595 | Alan Mandel, Alan J Mandel Law Office | Nagrin Kormi v Antoinette Choate, and David L. Lee | Deposition | US District Court Northern District of Illinois Eastern Division |
| **2018**<br>17 – D 662 | Miller,Shakman and Beem LLC | Kemper Ryan v Kristen Ryan | Deposition | Circuit Court of the Nineteenth Judicial Circuit, Lake County, Il |
| **2018**<br>16-CV-01356-NJR-RLD | Roderick and Solange MacArthur Justice Center, Northwestern Pritzker School of Law | Delarren Mason v Superintendent Donald Schaefer, Cheryl Prost, et al. | Deposition | US District Court Southern District of Illinois |
| **2017**<br>16-CV-00039 | Buckley Sandler | Latson V Clarke | Deposition | Western District of VA |

| | | | | |
|---|---|---|---|---|
| **2017**<br><br>16-cv-02848-LHK | Daniel Berger of Grant & Eisenhofer | Charles Des Roche et el v California Physicians Service | Deposition | US District Court for the Northern District of California (San Jose Division) |

| | | | | |
|---|---|---|---|---|
| **2017**<br><br>2012 F 000032 | Michael Ochoa Law Office of Jeffery Leving, Ltd. | Whitlock/Kochevor | Deposition | 1st Municipal District – Cook County, Chicago |

| | | | | |
|---|---|---|---|---|
| **2016**<br><br>2014 D 001488 | Schiller DuCanto & Fleck | DePalo v. DePalo | Deposition<br>Testimony | 1st Municipal District – Cook County, Chicago |

| | | | | |
|---|---|---|---|---|
| **2016**<br><br>2014 D 009277 | James Hagler, Esq. Law Office of Jeffery Leving, Ltd | Rea v. Rea | Deposition<br>Testimony | 1st Municipal District – Cook County, Chicago |

| | | | | |
|---|---|---|---|---|
| **2016**<br><br>2014 D 009277 | James Hagler, Esq. Law Office of Jeffery Leving, Ltd | Rea v. Rea | Deposition<br>Testimony | 1st Municipal District – Cook County, Chicago |

| | | | | |
|---|---|---|---|---|
| **2015**<br><br>2010 L005691 | B. Whalen | McKinley v Doe | Deposition | 1st Municipal District-Cook County, Chicago |

| | | | | |
|---|---|---|---|---|
| **2015**<br><br>2013 D 000182 | A Berman Grund & Leavitt | Radassnau 215(a) | Deposition | 1st Municipal District-Cook County, Chicago |

| | | | | |
|---|---|---|---|---|
| **2014**<br><br>2008 D 10469 | Michael Bender | Dowd v Strauss | Deposition<br>Trial | 1st Municipal District-Cook County, Chicago |

| | | | | |
|---|---|---|---|---|
| **2014**<br>008800 | O'Connor v Hurst | Weinhouse | Trial | 1st Municipal District-Cook County, Chicago |
| **2014**<br>ON L143 | Livingston/Berger | Miller v Morgan | Deposition | 1st Municipal District-Cook County, Chicago |
| **2014**<br>2013 D 005580 | Schiller, DuCanto Fleck | Ring 215a | Deposition | 1st Municipal District-Cook County, Chicago |
| **2014**<br>2009 L 003496 | Stephen Veltman Pretzel, Strougger | Angel v Segal | Deposition Trial | 1st Municipal District-Cook County, Chicago |
| **2014**<br>2012-CV-000648 | Minh C. Wai | LaCrosse v Veolia, et al | Deposition | 1st Municipal District-Cook County, Chicago |
| **2013**<br>2010 D 007929 | Brian Hurst | Burrows v Burrows 604.5 | Trial | 1st Municipal District-Cook County, Chicago |
| **2013**<br>2010 D 009879 | Levin & Conde | Blakeslee/Slade 604.5 | Deposition Trial | 1st Municipal District-Cook County, Chicago |
| **2013**<br>2010 EV 11187C | Insley/Race | Dukes v Acadia et al | Deposition | 1st Municipal District-Cook County, Chicago |

| | | | | |
|---|---|---|---|---|
| **2013**<br><br>2009 L 003496 | Pretzel & Stouffer | Angel v Segal et al | Deposition | 1st Municipal District-Cook County, Chicago |
| **2013**<br><br>2012 D 011835 | Clancy Law | Sproston v Gallee DO | Deposition | 1st Municipal District-Cook County, Chicago |
| **2013**<br><br>2009 L 000083 | Holfert Hickey, Melia & Assoc | Bjork v Beltran | Deposition | 1st Municipal District-Cook County, Chicago |
| **2013**<br><br>2007 L 009154 | Richard Griffin | Molina v Morgan | Deposition | 1st Municipal District-Cook County, Chicago |
| **2013**<br><br>2012 D 011835 | J. Dahlan | G. Rotter (215a) | Testimony | 1st Municipal District-Cook County, Chicago |
| **2012**<br><br>09 CV 7290 | Wms. Montgomery & John | Green v Kabota | Opinion Deposition | 1st Municipal District-Cook County, Chicago |
| **2012** | Samuel Lockner Carlson, Caspers, Vandenburg | Elan v Teva | 2nd Opinion | |
| **2012** | Capital WRITS | How Brain Development Effect Both Intent & Culpability | Opinion | |

| | | | | |
|---|---|---|---|---|
| **2011** | Baizer Kolar & Lewis | Estate of K. Brock | Deposition | |

| | | | | |
|---|---|---|---|---|
| **2011** | Cunningham Meyer & Vedrine | First Choice v Professional, Ltd. Et al | Deposition | |

| | | | | |
|---|---|---|---|---|
| **2011** | Kevin Costello Zukowski, Flood, Rogers, McArdie | Jeremy March | Deposition Trial | 1st Municipal District |

| | | | | |
|---|---|---|---|---|
| **2010**<br><br>00 D 06326 | Grund & Leavitt | Gleicher v Garland | Testimony | 1st Municipal District |

| | | | | |
|---|---|---|---|---|
| **2010**<br><br>4:09-CV-00033 | York Legal Group | USA v Arkansas | Deposition | |

| | | | | |
|---|---|---|---|---|
| | | | | |

# Exhibit 19



Home    News    Login

Search

Chief Judge | Local Court Rules | Online Forms | Circuit Courts | Guardians Ad Litem | Community Directory | Service Providers

# Franklin County Detention Center

The Franklin County Juvenile Detention Center serves law enforcement and the juvenile justice system within 26 rural southern Illinois counties.

The Franklin County Juvenile Detention Center provides a safe, secure and caring environment that guides the youth in our care toward productive, lawful lives and enhances community safety and well being. Caring, competent and compassionate staff provide a wide range of helpful services which support the youth's physical, emotional and social development. These services minimally include: education, recreation, counseling, nutrition, medical and health care services, reading, visitation, communication and continuous supervision.

The building provides 38 beds within a 20,000 square foot facility, including detention and staff secured areas. Each juvenile who is served by this center is provided individualized developmental services, resulting in the youth leaving the center in a better physical, mental, emotional, academic, and social condition, than at arrival. It is not a warehouse, but a resource for the youth who are incarcerated where every effort is made to redirect their lives to become productive, honest, hardworking citizens. At the same time it protects our communities by incarcerating serious offenders.

## Superintendent

Sarah Popham
Email: spopham@il2ndcircuit.org
Office Location
409 East Washington
Benton, IL 62812

## Section Links

Court Probation Services

Court Reporting Services

Franklin County Detention Center

Legal Self-Help Centers

Parenting Education Classes

Redeploy Illinois

Southern 30 Adolescent Center

Traffic Safety School

Phone: 618.438.2222 x1
Fax: 618.435.4650

## Secretary

Rebecca Rick
Office Location
409 East Washington
Benton, IL 62812
Phone: 618.438.2222 x3
Fax: 618.435.4650

Illinois Second Judicial
Circuit Court

© Copyright 2023 Illinois Second Judicial
Circuit Court

Permission required to reuse content in
print or electronic form

# Exhibit 20

## DIANE SANDERS  12/13/2016

Page 1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF ILLINOIS
2
3    MARY MCKINNEY, as            )
     Administrator of the Estate  )
4    of R.E., deceased,           )
                                  )
5         Plaintiff,              )
                                  )
6    vs.              ) No. 15-1044-SMY-PMF
                                  )
7    FRANKLIN COUNTY, ILLINOIS,   )
     et al.,                      )
8                                 )
          Defendants.     )
9
10
11        DEPOSITION OF DIANE SANDERS
12        TAKEN ON BEHALF OF THE PLAINTIFF
13             DECEMBER 13, 2016
14
15
16
17
       (Starting time of the deposition: 9:00 a.m.)
18
19
20
21
22
23
24
25

Page 3

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF ILLINOIS
2
3    MARY MCKINNEY, as            )
     Administrator of the Estate  )
4    of R.E., deceased,      )
                                  )
5         Plaintiff,         )
                                  )
6    vs.              ) No. 15-1044-SMY-PMF
                                  )
7    FRANKLIN COUNTY, ILLINOIS,   )
     et al.,                      )
8                                 )
          Defendants.     )
9
10        Deposition of Diane Sanders, produced,
11   sworn, and examined on December 13, 2016, between
12   the hours of eight o'clock in the forenoon and six o'clock
13   in the afternoon of that day, at the Trial Court
14   Administrator's Building, 411 East Main Street, Benton,
15   Illinois, before Joanna Charlton, RPR, CCR(MO),
16   CSR(IL), in a certain cause now pending in the United
17   States District Court for the Southern District of
18   Illinois, in re:  MARY MCKINNEY vs. FRANKLIN COUNTY,
19   ILLINOIS, et al.; on behalf of the Plaintiff.
20
21
22
23
24
25

Page 2

1         I N D E X
2
     QUESTIONS BY:                    PAGE
3    Ms. Powers                       5
4    Ms. McNaught                     128
     Mr. Heise                        133
5    Ms. Powers                       134
     Ms. McNaught                     138
6
7
8         E X H I B I T S
9
     EXHIBIT          DESCRIPTION
10
11   Plaintiff's Exhibit 1   Policy and procedure manual
     Plaintiff's Exhibit 4   Security manual
12   Plaintiff's Exhibit 21  Face sheet
     Plaintiff's Exhibit 27  Policy 15
13   Plaintiff's Exhibit 31  Control log
     Plaintiff's Exhibit 42  Personnel file
14   Plaintiff's Exhibit 43  Interrogatories
     Plaintiff's Exhibit 46  Transportation log
15   Plaintiff's Exhibit 47  Medicine admin. record
     Plaintiff's Exhibit 48  Outline
16   Plaintiff's Exhibit 49  Watch tour log

     (Original exhibits retained by Ms. Linda Powers.)
17
18
19
20
21
22
23
24
25

Page 4

1    A P P E A R A N C E S
2    FOR THE PLAINTIFF:
3         Linda Powers, Esq.
          GROVES POWERS, LLC
4         1310 Papin
          Suite 108
5         St. Louis, Missouri 63103
          (314) 696-2300
6
     FOR THE DEFENDANTS MICHAEL ABELL, SHAWN
7    FREEMAN, DIANE SANDERS, SAMANTHA THOMAS,
     DANIEL LYNCH, ANTHONY BECHELLI,
8    STEPHANIE UPCHURCH and ALAN STEWART:
9         Karen McNaught, Esq.
          ATTORNEY GENERAL'S OFFICE
10        STATE OF ILLINOIS
          500 South Second Street
11        Springfield, Illinois 62706
          (217) 782-1090
12
     FOR THE DEFENDANTS CHC COMPANIES, INC,
13   LORI LITTLE and VIPIN SHAH, M.D.:
14        Douglas Heise, Esq.
          HEYL, ROYSTER, VOELKER & ALLEN
15        105 West Vandalia Street
          Suite 100
16        Edwardsville, Illinois 62025
          (618) 656-4646
17
     FOR THE DEFENDANTS RANDALL CROCKER and
18   FRANKLIN COUNTY, ILLINOIS:
19        K. Rockne Bleyer, Esq.
          BLEYER and BLEYER
20        601 West Jackson Street
          Marion, Illinois 62959
21        (618) 997-1331
22   Court Reporter:
          Joanna Charlton, RPR, CCR(MO), CSR(IL)
23        Midwest Litigation Services
          711 North 11th Street
24        St. Louis, Missouri 63101
          (314) 644-2191
25        1-800-280-3376

# EXHIBIT 6

1 (Pages 1 to 4)

**DIANE SANDERS  12/13/2016**

Page 5

1	IT IS HEREBY STIPULATED AND AGREED by and
2	between counsel for the Plaintiff and counsel for the
3	Defendants that this deposition may be taken in
4	shorthand by Joanna Charlton, RPR, CCR(MO), CSR(IL) and
5	afterwards transcribed into printing, and signature by
6	the witness expressly waived.
7	* * * * *
8	DIANE SANDERS,
9	of lawful age, produced, sworn, and examined on behalf
10	of Plaintiff, deposes and says:
11	EXAMINATION
12	QUESTIONS BY MS. POWERS:
13	Q. Would you state your name, please.
14	A. Diane Lynn Sanders.
15	Q. Ms. Sanders, my name is Linda Powers. I
16	represent the Plaintiffs in this case. I'm going to be
17	asking you some questions. Okay? Have you ever given
18	a deposition before?
19	A. No, ma'am.
20	Q. Okay. Before you answer this, give your —
21	give your answer just a second. Okay?
22	A. Okay.
23	Q. Can you tell me what your home address is,
24	please.
25	MS. MCNAUGHT: Objection.

Page 6

1	MS. POWERS: Okay.
2	MS. MCNAUGHT: And I direct her not to
3	answer.
4	Q. (BY MS. POWERS) All right. She's directed
5	you not to answer that question. Are you going to
6	follow her direction?
7	A. Yes.
8	Q. Okay. Your current employer?
9	A. Franklin County Juvenile Detention Center.
10	Q. What's your position?
11	A. Supervisor. Second shift specific.
12	Q. Date of birth.
13	MS. MCNAUGHT: Objection. Direct her not to
14	answer.
15	Q. (BY MS. POWERS) You going to follow her
16	advice and not answer that?
17	A. Yes.
18	Q. Have you ever been convicted of a
19	misdemeanor or felony?
20	A. I had a — no. I'm going to say no. Sorry.
21	Q. Okay. Have you ever been convicted of any
22	offense? You sort of hesitated.
23	A. 30 years ago — over 30 years ago I had a
24	DUI, but I believe it would've been a traffic offense.
25	Q. That was 30 years ago?

Page 7

1	A. Over 30. I think it was, like, 1985.
2	Q. What was the jurisdiction?
3	A. Jackson County.
4	Q. What was your sentence?
5	A. It was suspended I believe. It's been a lot
6	of years.
7	Q. Suspended imposition?
8	A. I don't know what that means.
9	Q. Okay. When you say suspended, what does
10	that mean to you? Were you on probation?
11	A. No.
12	Q. I want to ask you about your educational
13	background starting after high school. Did you attend
14	college?
15	A. Yes.
16	Q. Okay. Where did you go?
17	A. I attended Rend Lake College for two years
18	and Southern Illinois University for two years.
19	Q. Okay. Did you get a degree from Rend Lake?
20	A. Yes.
21	Q. What was that degree?
22	A. Associate of Arts.
23	Q. Any particular studies?
24	A. Not that I recall.
25	Q. Okay. What year did you get that degree?

Page 8

1	A. 1983.
2	Q. Okay. Did you get a degree from SIU?
3	A. Yes.
4	Q. All right. And what was your degree?
5	A. Bachelor of Social Work.
6	Q. What year did you get that degree?
7	A. 1985.
8	Q. Okay. Any other college education?
9	A. No.
10	Q. Any other — do you have any certifications
11	like CPR certifications, anything else like that?
12	A. Yes. CPR — you mean currently?
13	Q. Or have you gotten any.
14	A. Oh, my Lord. CPR, first aid, CPI. There
15	may be. A lot of years.
16	Q. Okay. What's CPI?
17	A. I'm not sure that I even know what the names
18	represent at the moment, but it's a — it's a form of
19	deescalation techniques as well as holds, but it's —
20	the primary goal is deescalation.
21	Q. Is it some sort of crisis intervention
22	having to do with probation work?
23	A. Yes. Crisis prevention. I'm not sure off
24	the top of my head what the acronym is.
25	Q. What is your CPR certification?

2 (Pages 5 to 8)

**DIANE SANDERS  12/13/2016**

Page 85

1    A.  Yes.

2    Q.  And I can't read that writing, but does it

3  indicate that that's to be given once a day?

4    A.  It appears, yes.

5    Q.  Okay.  And if we look across, you go across

6  the days, the numbers 1 through 31 are the days of the

7  month; correct?

8    A.  Yes.

9    Q.  All right.  So he came in — ▓ came in

10  on the 17th in the morning; right?

11    A.  Yes.

12    Q.  He did not get his medication that day, did

13  he, according to this form?

14    A.  No.

15    Q.  And according to this form, he did not get

16  his medication on the 18th; correct?

17    A.  Correct.

18    Q.  And according to this form, the first time

19  he got his medication was on the 19th; right?

20    A.  Yes.

21    Q.  When parent notification is done and a child

22  is on medication, is the parent asked to bring the

23  medication to the facility?

24    A.  Yes.  At times, yes.

25    Q.  I'm going to go back to Exhibit 27.

Page 86

1    A.  We're all confused here.

2    Q.  That one's the section 15 policies.

3    A.  Goodness.

4    MS. MCNAUGHT:  Let's keep these together.

5    Q.  (BY MS. POWERS)  As someone that's worked at

6  the detention center for the amount of time you have as

7  a — first as a detention officer then as a supervisor

8  and then your years as assistant superintendent, you're

9  familiar with these policies and procedures; correct?

10    A.  Yes.

11    Q.  You know what the written policies and

12  procedures require; right?

13    A.  I may have to review them.  I don't know

14  them by heart by any means, but that's what they're

15  there for to be able to review when needed.  They're

16  guidelines.

17    Q.  Well, maybe parts of them are guidelines,

18  but some of them set forth mandatory duties and steps

19  that are to be taken by the staff; correct?

20    A.  Yes.

21    Q.  Okay.  In Exhibit 27 if we go to Bates 5535,

22  this is policy 15.16 suicide prevention plan.  The

23  effective date on this policy is also 2/1/04; is that

24  right?

25    A.  Yes.

Page 87

1    Q.  And under the policy the first thing it says

2  is "The Franklin County Juvenile Detention Center shall

3  make every effort to prevent the occurrence of

4  suicide;" is that right?

5    A.  Yes.

6    Q.  "A suicide prevention plan shall be

7  utilized, which includes provision for the training of

8  staff, screening of youth for risk of suicidal

9  behavior, and the supervision of juveniles who are

10  classified as at risk for suicide."  See that?

11    A.  Uh-huh.  Yes.

12    Q.  "The screening shall be used to assist staff

13  in determining the appropriate measures to be taken in

14  the care and placement of a juvenile."  Did I read that

15  correctly?

16    A.  Yes:

17    Q.  High risk periods for suicide."  It tells

18  you about — this policy sets forth what are considered

19  to be high risk periods for suicide; right?

20    A.  Yes.

21    Q.  And one of them is immediately upon

22  admission to the detention center; correct?

23    A.  Yes.

24    Q.  Number two is the first 24 hours in

25  incarceration; is that right?

Page 88

1    A.  Yes.

2    Q.  Number three is when the juvenile is

3  returned to the center?

4    A.  Yes.

5    Q.  Number four following the receipt of adverse

6  news regarding self or family, e.g., serious illness or

7  loss of loved one; correct?

8    A.  Yes.

9    Q.  Another example of that might be when a

10  youth gets adverse news from the court; correct?

11    A.  Yes.

12    Q.  Number five after suffering some type of

13  humiliation or rejection; correct?

14    A.  Yes.

15    Q.  Number six is segregation; correct?

16    A.  Yes.

17    Q.  Segregation means keeping them apart from

18  other youth; correct?

19    A.  Yes.

20    Q.  And number seven prolonged incarceration in

21  a juvenile detention facilities; right?

22    A.  Yes.

23    Q.  If you flip to the next page 5536, at the

24  top of the page it says "In addition, guest speaker,

25  slash, trainers with professional experience and

**MIDWEST LITIGATION SERVICES**

www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334

# Exhibit 21

https://thesouthern.com/news/local/franklin-county-shifts-money-to-break-even/article_6de9cf39-16cc-5b46-aa60-a84213ad083f.html

# Franklin County shifts money to break even

**JIM MUIR, THE SOUTHERN**
Mar 23, 2007

**B**ENTON - Newly appointed Franklin County Board chairman Randall Crocker says finding a way to solve the county's worsening financial situation tops his list of priorities.

Crocker, a Sesser businessman, was appointed to chair the county board in December. He said for the past two years the county has been forced to borrow money from a surplus in the road and bridge fund in order to keep the general fund in the black.

During a recent board meeting the county repaid a $600,000 loan to the fund and then immediately approved a resolution to borrow the same amount again for operating revenue. Crocker said the county has been forced to use this procedure since 2004 just to "break even."

"Our plan is to find a way to annually reduce the amount," Crocker said.

According to Crocker the biggest drain on county finances is the juvenile detention center that was built approximately three years ago. The county owes $3.5 million on the facility.

## People are also reading…

1  **'American Pickers' Frank Fritz and Mike Wolfe reunite**
2  **MVC Notebook | SIU men add Stulic through portal**
3  **Prep Football | Spain takes over coaching reins for Du Quoin**
4  **Rural Illinois communities pushing back against narrative that they're dying**

"Originally, the center was supposed to pay for itself, and it hasn't," Crocker said. "The idea was sold with a lot of false information. The people who presented the information might have really believed it was accurate, but it wasn't. It has turned out to be one of the biggest disappointments I've seen."

When the juvenile detention center was built, county officials were told that the state would reimburse 100 percent of the salaries for employees.

"Their idea of 100 percent is that they will reimburse until they run out of money and then they don't reimburse anything," Crocker said. "We were told the state would reimburse 100 percent but in reality it's more like 70 percent in salaries and nothing in fringe benefits. And the county has made up the difference."

Crocker said on the plus side the detention center has maintained positive numbers at or near maximum.

"From an income standpoint it's just about where we thought it would be," Crocker said. "But the state is just not doing what we thought they would do. I think the course we're on, the county is going to have to make some tough decisions about the juvenile detention center."

On a positive note Crocker said possible construction of multiple coal mines within the county "could prove to be our salvation."

"The proposed mine at Akin is a lot more than just a rumor. I think it will become a reality," he said. "And that would be a big plus for the county."

Longtime board member Jim McPhail of West Frankfort said the shortfall in state reimbursement amounts to between $300,000 and $400,000 annually that the county is paying.

"The reality is that the county has a big shortfall of cash," McPhail said. "From a financial standpoint the situation at the juvenile detention center is a big problem, the biggest problem we've got."

**writeon1@shawneelink.net**

525-4744

## Popular in the Community



AdChoices ▷                    Sponsored

Music Historicity | Gary Gibula:...

🟢 cottondog

What a great series memorializing a...

🔥 Top Comment                    👍

United no more: Some Southern...

🟣 Gee Dog

I thought United Methodists were jus...

🔥 Top Comment                    👍

As conservatives target schools...

🟣 Gee Dog

Is this an opinion piece or is it suppos...

🔥 Top Comment                    👍

## ▌Around The Web



**Three Illinois Banks Paying Record High Interest - See the List**



**There's a "Forbidden Island" in Hawaii That's Forbidden to Tourists**



**20 Kitchen Appliances That Are a Waste of Money, Ranked in Order**



**These Cars Are Great, but Nobody Wants Them**



**These Knee Sleeves Have Surgeons Speechless (Works Fast)**



**What Flight Attendants Notice About You in 3 Secs**



**30 Things Every Restaurant Has to Do for Guy Fieri**



**Next Level Gardening Hacks That Involves Bananas**



**Life in Medieval Castles Was Rough**

# Exhibit 22

https://thesouthern.com/news/local/franklin-county-seeks-to-save-500k/article_513c9000-2d27-11e1-98a6-001871e3ce6c.html

# Franklin County seeks to save $500K

**BY BECKY MALKOVICH, THE SOUTHERN**

Dec 23, 2011

**B**ENTON - The Franklin County Board has taken the first step toward a cost-saving measure that will save the county about $500,000 over the next 16 years.

The board agreed Tuesday to start the process of refinancing a loan for the county's justice center, which includes the juvenile detention center and offices of the state's attorney and probation department.

The board passed an ordinance authorizing the issuance of alternative revenue bonds not to exceed $3 million, board chairman Randall Crocker said.

The money generated from the bonds would go to pay off the justice center loan and would result in a savings of a half-million dollars, Crocker said.

"We are taking advantage of the current interest rates," Franklin County Treasurer John Gulley said. "We'll be refinancing at a lower interest rate, paying off the existing loan and saving quite a bit of money over the life of the loan."

## People are also reading…

1  **Show your pride at these Southern Illinois events this June**

2  **Prep Basketball | Local teams hit the court at Vienna summer tournament**

3  **Carbondale priest celebrates 50 years of ministry**

4  **The sports world reacts as 'The Voice of SIU' steps away from the mic**

The board action is the first step in the process which will also include a public notice and hearing, Gulley said.

The board also accepted the resignation of longtime Franklin County Animal Control Supervisor Jarrett Broy and agreed to advertise for a full-time supervisor-officer position as well as a part-time animal control employee.

**beckymalk@gmail.com**

618-927-5633

On Twitter: @beckymalkovich

## ▎Around The Web



**Three Illinois Banks Paying Record High Interest - See the List**



**Boost cash flow with built-in payment processing**



**20 Kitchen Appliances That Are a Waste of Money, Ranked in Order**



**These Knee Sleeves Have Surgeons Speechless (Works Fast)**



**The Best Cars out There That No One Wants - It's Insane**



**Rare Photos of Life on Hawaii's Forbidden Island**



**Flight Attendants Notice This About You the Moment You Sit Down**



**Next Level Gardening Hacks That Involves Bananas**

**40 Abandoned Disney Attractions You Never
Knew Existed**

# Exhibit 23

Date: <u>March 7, 2022</u>

**FINANCE,**
**(Salaries, Policy and Purchasing, Insurance, Tourism,**
**Supervisor of Assessments/Mapping, Economic Development)**
**DECEMBER 2021 THRU NOVEMBER 2022**
**FIRST AND THIRD MONDAYS OF THE MONTH**

****Beginning Monday, October 4, 2021, and until further notice...the Franklin County Board Committee meetings and Franklin County Board meetings will be held at:**

**FRANKLIN COUNTY CAMPBELL BUILDING,**
**COURTROOM A**
**901 PUBLIC SQUARE**
**BENTON, ILLINOIS**

COMMITTEEMEN:
(x) Ray Minor - Chairman
(x) Randall Crocker – Tourism, Supervisor of Assessments/Mapping
(x) John Gossett - Labor Negotiations (Sheriff's Office)
(x) Neil Hargis – Labor Negotiations (Clerical)
(x) Mark Kash
(x) Larry Miller – County Board Chairman, Economic Development
(x) Jack Warren – Labor Negotiations (Animal Control)
(x) Kevin Weston – Labor Negotiations (County Highway)
(x) Brad Wilson – Labor Negotiations (Juvenile Detention Center)

County Offices
( ) Amos Abbott, Director 911
( ) David Bartoni, Sheriff
( ) Ryan Buckingham, Director EMA
( ) Abigail Dinn
( ) Darla Fitzgerrell, Court Services
( ) Marty Leffler, Coroner
( ) Lorie LeQuatte, ROE
( ) Cynthia Miklos, Supervisor of Assessments
(x) Jim Muir, Circuit Clerk
(x) Bobbie Overturf, Animal Control Supervisor
( ) Sarah Popham, JDC Superintendent
(x) Gayla Prather, County Board Adm. Assist.
(x) Mike Rolla, County Engineer
( ) Judge Tom Tedeschi,
( ) Monica Urban, Probation
(x) Steve Vercellino, Treasurer – Conference Call-In
(x) Greg Woolard, County Clerk

Guests...Rick and Barb Linton (RLATC – Tourism Budget and 1st Quarter Report) and other interested parties.

The meeting was called to order at 5:02 PM by Chairman Ray Minor. See above list for those attending.

Chairman Minor asked for the county claims to be submitted to the board, which were then approved and signed by all members present.

Treasurer Steve Vercellino gave his report (see full report - attachment Finance 1) which included...

- As of March 7, 2022, beginning balance in Cash Flow is $4,453,768. With $643,898 in claims and one payroll, and with income of 3rd tax distribution, income tax (est.) and sales use tax (est.) of $329,828, the estimated ending balance will be $4,139,697.
- Mobile Home Taxes will go out mid-April.
- Questions were asked concerning the negative balance in the Juvenile Detention Center. Certification of the number of beds per officers on duty was discussed. County Board members Brad Wilson and John Gossett agreed to talk to Chief Judge Melissa Morgan concerning the Juvenile Detention Center and possible solutions concerning the ongoing monthly negative balances.

Rick and Barb Linton were on hand to report the RLATC Budget and 1st Quarter Report 2022 to the county board. (see full report – attachment Finance 2). Some of the areas mentioned at the meeting were...

- 2021 Franklin County bed tax collected was $75,135.77 which is 5% of $1,502,715.40.
- Tourism statistics indicate visitors spend more money in the area than they do for their lodging.
- S3DA National Tournament will be held June 16-19, 2022.
- RLATC is currently in need of office space.

Circuit Clerk Jim Muir's annual audit is finished. He does not have a copy of the report to hand to the board, but has been told it looks good again this year.

The meeting adjourned at 5:40 PM
Minutes submitted 3/17/2022
Ray Minor - Finance Committee

# Exhibit 24

DATE: <u>March 21 2022</u>

**PUBLIC SAFETY**
**(Sheriff's Office, Juvenile Detention Center, EMA, Animal Control,**
**Waste Management, Bi-County Health Board, 911/Emergency Services, Animal Control)**
**DECEMBER, 2021 THRU NOVEMBER, 2022**
**FIRST AND THIRD MONDAYS OF THE MONTH**

**\*\*\*\*Beginning Monday, October 4, 2021, and until further notice…the Franklin County Board Committee meetings and Franklin County Board meetings will be held at:**

> **FRANKLIN COUNTY CAMPBELL BUILDING,**
> **COURTROOM A**
> **901 PUBLIC SQUARE**
> **BENTON, ILLINOIS**

COMMITTEEMEN:
(x) John Gossett – Chairman
(x) Randall Crocker
(x) Neil Hargis - EMA
(x) Mark Kash – Waste Management
(x) Larry Miller – County Board Chairman
(x) Ray Minor – 911/Emergency Services
( ) Jack Warren – Animal Control
(x) Kevin Weston
(x) Brad Wilson – Juvenile Detention Center

County Offices
( ) Amos Abbott, Director 911
(x) Amos Abbott, Director 911
(x) David Bartoni, Sheriff
( ) Ryan Buckingham, Director EMA
( ) Abigail Dinn
( ) Darla Fitzgerrell, Court Services
(x) Marty Leffler, Coroner
( ) Lorie LeQuatte, ROE
(x) Cynthia Miklos, Supervisor of Assessments
(x) Jim Muir, Circuit Clerk
(x) Bobbie Overturf, Animal Control Supervisor
( ) Sarah Popham, JDC Superintendent
(x) Gayla Prather, County Board Adm. Assist.
( ) Mike Rolla, County Engineer
( ) Judge Tom Tedeschi,
( ) Monica Urban, Probation
(x) Steve Vercellino, Treasurer – Conference Call-In
(x) Greg Woolard, County Clerk

Guests…Tom Carter (OMA Question & Comments on Mining problems), Rocky Morris (Comments on Mining problems) and other interested parties.

The Public Safety Meeting was called to order at 5:44 PM by Chairman John Gossett. See above list of those attending.

Coroner Mary Leffler gave his February,2022 report (see 3-21-2022 Public Safety Attachment 1).

EMA Director Ryan Buckingham is still working through the renewal of the ambulance service contract.

County Board Member Brad Wilson and Chairman Gossett agreed to talk to the Chief Judge concerning the Juvenile Detention Center finances.

County Board Chairman Larry Miller gave his report...

- Several appointments will be made at the following meeting.
- He mentioned some ideas for allocating space in the Campbell Building once the Courthouse is finished and occupied.
- Would like to have a county board picture made at the May 2nd meeting in the Courthouse.
- Salaries for elected officials will need to be discussed and made at the next regular board meeting.

Discussion followed on several ideas for occupancy in the Campbell Building.

The meeting adjourned at 6:01 PM.
Minutes 3/31/2022
John Gossett - Health and Environment Committee

# Exhibit 25

**FINANCE,**
**(Salaries, Policy and Purchasing, Insurance, Tourism,**
**Supervisor of Assessments/Mapping, Economic Development)**
**DECEMBER 2021 THRU NOVEMBER 2022**
**FIRST AND THIRD MONDAYS OF THE MONTH**

Franklin County Board Committee meetings and Franklin County Board meetings are held at the Franklin County Board Room, Franklin County Courthouse, 100 Public Square, Benton, Illinois.

COMMITTEEMEN:
(x) Ray Minor - Chairman
( ) Randall Crocker – Tourism, Supervisor of Assessments/Mapping
(x) John Gossett - Labor Negotiations (Sheriff's Office)
( ) Neil Hargis – Labor Negotiations (Clerical)
( ) Mark Kash
(x) Larry Miller – County Board Chairman, Economic Development (phone)
(x) Jack Warren – Labor Negotiations (Animal Control)
(x) Kevin Weston – Labor Negotiations (County Highway)
(x) Brad Wilson – Labor Negotiations (Juvenile Detention Center)

County Offices
( ) Amos Abbott, Director 911
( ) David Bartoni, Sheriff
( ) Ryan Buckingham, Director EMA
( ) Abigail Dinn
( ) Darla Fitzgerrell, Court Services
(x) Marty Leffler, Coroner
( ) Lorie LeQuatte, ROE
(x) Cynthia Miklos, Supervisor of Assessments
(x) Jim Muir, Circuit Clerk
( ) Bobbie Overturf, Animal Control Supervisor
( ) Sarah Popham, JDC Superintendent
(x) Gayla Prather, County Board Adm. Assist.
(x) Mike Rolla, County Engineer
( ) Judge Melissa Morgan
( ) Monica Urban, Probation
(x) Steve Vercellino, Treasurer
(x) Greg Woolard, County Clerk

Guests…Rocky Morris (question concerning progress on Forensic audit and also on possible Morgue for Coroner), Kevin Wilson, Curtis Overton, and other interested parties.

The meeting was called to order at 5:04 PM by Chairman Ray Minor. See above list of those attending, and also, those stating public comments and the topics of their comments.

Treasurer Steve Vercellino passed around the county claims to the board members to view and sign by all members present...

- Beginning balance as of 10/3/2022 is $6,426,762, ARPA balance is $5,463,655.03, cashflow without ARPA is $963,107.25
- The complete report can be seen on www.franklincountyil.gov as 10-3-2022 Finance Committee Meeting Attachment 1.
- The first distribution for 2021 pay 2022 taxes should be made the following week.

Discussion on the Juvenile Detention Center followed...
- Several opinions were given concerning the negative balance for the JDC,
- Conversation about the requirement of a reverse referendum to change the usage of the building,
- When it will be paid in full,
- Other uses for the building,
- Maintenance needed on the building.

Finance Chairman Minor reported to the board that he has been working on the 2022-2023 Budget.

The meeting adjourned at 5:21 PM
Minutes submitted 10/13/2022
Ray Minor - Finance Committee

# Exhibit 26

**FINANCE,**
**(Salaries, Policy and Purchasing, Insurance, Tourism,**
**Supervisor of Assessments/Mapping, Economic Development)**
**DECEMBER 2021 THRU NOVEMBER 2022**
**FIRST AND THIRD MONDAYS OF THE MONTH**

Franklin County Board Committee meetings and Franklin County Board meetings are held at the Franklin County Board Room, Franklin County Courthouse, 100 Public Square, Benton, Illinois.

COMMITTEEMEN:
(x) Ray Minor - Chairman
(x) Randall Crocker – Tourism, Supervisor of Assessments/Mapping
(x) John Gossett - Labor Negotiations (Sheriff's Office)
(x) Neil Hargis – Labor Negotiations (Clerical)
(x) Mark Kash
(x) Larry Miller – County Board Chairman, Economic Development (phone)
( ) Jack Warren – Labor Negotiations (Animal Control)
(x) Kevin Weston – Labor Negotiations (County Highway)
(x) Brad Wilson – Labor Negotiations (Juvenile Detention Center)

County Offices
( ) Amos Abbott, Director 911
(x) David Bartoni, Sheriff
( ) Ryan Buckingham, Director EMA
( ) Abigail Dinn
( ) Darla Fitzgerrell, Court Services
(x) Marty Leffler, Coroner
( ) Lorie LeQuatte, ROE
(x) Cynthia Miklos, Supervisor of Assessments
() Jim Muir, Circuit Clerk
( ) Bobbie Overturf, Animal Control Supervisor
( ) Sarah Popham, JDC Superintendent
(x) Gayla Prather, County Board Adm. Assist.
(x) Mike Rolla, County Engineer
( ) Judge Melissa Morgan
( ) Monica Urban, Probation
(x) Steve Vercellino, Treasurer
(x) Greg Woolard, County Clerk

Guests…Tom Carter (Questions concerning the Mariah Boat Building and how much do the forfeitures of back taxes affect the county – Board responded to get information on that) Rocky Morris (question concerning progress on Forensic audit – Board responded that he was detained by a previous audit), Kevin Wilson, and other interested parties.

The meeting was called to order at 5:06 PM by Chairman Ray Minor. See above list of those attending, and also, those stating public comments and the topics of their comments.

Treasurer Steve Vercellino passed around the county claims to the board members to view and sign by all members present...
- Beginning balance as of 10/17/2022 is $5,844,351, ARPA balance is $5,463,655.03, cashflow without ARPA is $380,696.25
- The complete report can be seen on www.franklincountyil.gov as 10-17-2022 Finance Committee Meeting Attachment 1.
- Juvenile Detention Center (JDC) showed a -$475,207.60.

Discussion followed...
- Board Chairman Larry Miller asked why the negative amount in the JDC was carried over for several years.
- Chairman Minor asked why, when other departments went over their budget, the lines were zeroed out for the next budget year.
- Vercellino responded that the JDC balance had been carried that way for years before he took office.
- Minor then responded that past treasurers, for years, had been involved in the budget and levy process, but Vercellino has decided not to be a part of that this year.
- Board Member Neil Hargis mentioned his concern for the taxpayers being saddled with the JDC loss of income for so many years.
- Minor then let the board know that several department heads had different figures in their information than the treasurer had, and the JDC was one of the departments.
- Miller mentioned the problem of the referendum with the beginning of the JDC construction.
- Vice Chairman Brad Wilson will ask Judge Melissa Morgan to speak to the board concerning the JDC.

The meeting adjourned at 5:24 PM
Minutes submitted 11/3/2022
Ray Minor - Finance Committee

Exhibit 27

**FINANCE,**
**(Salaries, Policy and Purchasing, Insurance, Tourism,**
**Supervisor of Assessments/Mapping, Economic Development)**
**DECEMBER 2022 THRU NOVEMBER 2023**
**FIRST AND THIRD MONDAYS OF THE MONTH**

Franklin County Board Committee meetings and Franklin County Board meetings are held at the Franklin County Board Room, Franklin County Courthouse, 100 Public Square, Benton, Illinois.

COMMITTEEMEN:
(x) Ray Minor – Chairman
(x) Angela Evans
(x) John Gossett - Labor Negotiations (Sheriff's Office)
(x) Neil Hargis – Labor Negotiations (Clerical)
(x) Larry Miller – County Board Chairman, Economic Development
(x) Curtis Overton
( ) Jack Warren – Labor Negotiations (Animal Control)
(x) Kevin Weston – Labor Negotiations (County Highway)
(x) Brad Wilson – Labor Negotiations (Juvenile Detention Center)

County Offices
(x) Amos Abbott, Director 911
(x) Kyle Bacon, Sheriff
(x) Ryan Buckingham, Director EMA
( ) Abigail Dinn
(x) Darla Fitzgerrell, Court Services
(x) Marty Leffler, Coroner
( ) Lorie LeQuatte, ROE
(x) Cynthia Miklos, Supervisor of Assessments
(x) Jim Muir, Circuit Clerk
(x) Bobbie Overturf, Animal Control Supervisor
( ) LaVonda Porter, JDC Assistant Superintendent
(x) Gayla Prather, County Board Adm. Assist.
(x) Mike Rolla, County Engineer
( ) Judge Melissa Morgan
( ) Monica Urban, Probation
(x) Steve Vercellino, Treasurer
(x) Kevin Wilson, County Clerk


Guests… Heather Gossett Carroll (Problem with a pit bull chasing her but no help from Animal Control) Mariah Hays (Casa), Heather Morse (EMS), Tom Carter and other interested parties.


The meeting was called to order at 5:05 PM by Chairman Ray Minor. See above list of those attending, and also, those stating public comments and the topics of their comments.

County claims were submitted and were approved and signed by all members present.

Treasurer Steve Vercellino gave his report...

- Beginning balance as of 3/20/2023 is $7,831,227.00. ARPA balance is $5,262,301.66, cashflow without ARPA is $2,568,925.24.
- The complete report can be seen on www.franklincountyil.gov as 3-20-2023 Finance Committee Meeting Attachment 1.

Board Chairman Larry Miller addressed the item on the agenda concerning the ordinance abating the tax levied for the year 2022. This is an annual ordinance passed by the board and it was determined that it is necessary to abate the levy.

Board Member John Gossett asked questions concerning how to pay for repairs and updates needed at the Juvenile Detention Center.

Discussion followed on revenue, Bank accounts with interest rates, the difference between the amount of the loan that has not been used on the Courthouse and the 1% that is being accumulated. Vercellino said he would have more information for them at the next meeting.


The meeting adjourned at 5:15 PM
Minutes submitted 3/30/2023
Ray Minor - Finance Committee

# Exhibit 28

## EXPERIENCE OF PROPOSED CLASS COUNSEL

**Kevin M. Fee**, a 2002 graduate of Harvard Law School, is Senior Special Litigation Counsel at the Roger Baldwin Foundation ("RBF") of the ACLU of Illinois. Mr. Fee was formerly a Partner at Sidley Austin LLP, where his practice included litigating and resolving complex class actions. Since 2012 he has served as counsel on *R.J. v. Jones*, No. 12-cv-07289 (N.D. Ill.), through which he represents a class of juveniles who now are, and/or in the future will be, confined by the Illinois Department of Juvenile Justice facilities. Mr. Fee was also counsel for the certified class in *Ms. J.P. v. Garland, et al.* (C.D. Cal., Case No. 18-cv-6081), which successfully secured mental health treatment for detained victims of family separation.

**Camille E. Bennett**, a 1994 graduate of the University of Chicago Law School, is Director of the Corrections Reform Project at the Roger Baldwin Foundation of ACLU of Illinois. Since joining RBF in 2015, Ms. Bennett has served as counsel in *Lippert v. Jeffreys*, No. 10-cv-4607 (N.D. Ill.), a healthcare class action lawsuit on behalf of prisoners in the custody of the State of Illinois, and is among the lawyers appointed by the Court in 2017 as counsel to that class of "all prisoners in the custody of the Illinois Department of Corrections with serious medical and dental needs." She also serves as counsel on *R.J. v. Jones*, No. 12-cv-07289 (N.D. Ill.), through which she represents a class of juveniles who are or will be confined in Illinois Department of Juvenile Justice facilities. Ms. Bennett has litigated cases concerning jail and prison conditions since 2004, including *Johnson-Ester v. Elyea*, No. 07-cv-4190 (N.D. Ill.), and *Rasho v. Walker*, No. 07-1298-MMM (C.D. Ill.), a class action suit on behalf of the mentally ill prisoners in the Illinois Department of Corrections. She was formerly Counsel at Dentons US LLP, where her practice included litigating and resolving complex class actions, and was the co-

author of "Securities Class Actions," in Class Actions: A Practitioner's Guide (ABA Tort Trial & Insurance Practice Section; 2010 and 2012).

**Allyson M. Bain**, a 2016 graduate of the Northwestern Pritzker School of Law, is a Staff Attorney in the Institutional Reform Project and Corrections Reform Project at the Roger Baldwin Foundation of the ACLU of Illinois. Ms. Bain works on several long-standing consent decree cases, including *R.J. v. Mueller*, No. 12-cv-07289 (N.D. Ill.), through which she helps represent a class of juveniles who are or will be confined in Illinois Department of Juvenile Justice facilities. Ms. Bain also works on *B.H. v. Smith*, No. 88-C-5599 (N.D. Ill.), which is a case involving a class of minors who are currently or will be in the care of the Illinois Department of Children and Family Services. Previously, Ms. Bain also served as counsel in *Price v. Federal Bureau of Prisons*, No. 21-cv-0542 (N.D. Ill.), through which she helped ensure that detainees at the Chicago Metropolitan Correctional Center were protected from exposure to COVID-19. Before joining RBF in 2017 as a Skadden Fellow, Ms. Bain clerked for Judges Alan Kay and Robin Meriweather at the United States District Court for the District of Columbia. She is admitted to the Illinois Bar, as well as to the United States District Court for the Northern District of Illinois and Southern District of Illinois.

**Alexis Picard**, a 2022 graduate of Harvard Law School, is a Legal Fellow at the Roger Baldwin Foundation of the ACLU of Illinois. At the ACLU, she focuses on cases involving prison conditions, including *R.J. v. Jones*, No. 12-cv-07289 (N.D. Ill.) and *Monroe v. Hughes*, No. 3:18-cv-00156 (S.D. Ill.). During law school, Ms. Picard dedicated both summers to litigating class actions addressing discriminatory policing and inhumane prison conditions.